**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **DAVID N. TERHUNE** | : | |
| **Plaintiff** | : | **Civil Action** |
| | : | |
| **v.** | : | |
| | : | |
| **APPLIED EXTRUSION** | : | **No.** |
| **TECHNOLOGIES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JACKSON CRAIG** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TERRY SMITH** | : | |

_____

## COMPLAINT
### Jury Trial Demanded

Plaintiff, David N. Terhune, brings this action for equitable relief and
monetary damages against defendants, Applied Extrusion Technologies, Inc.
("AET"), Jackson Craig ("Craig"), and Terry Smith ("Smith") and states in support
of his claims as follows:

### Introduction

1.      This action for declaratory, injunctive, monetary and other
appropriate relief is brought by Plaintiff, David N. Terhune, against his former
employer, Applied Extrusion Technologies, Inc., the Chairman of the Company's
Board of Directors, Jackson Craig, and its acting Office of the President Terry
Smith for violations of the Employment Retirement Security Act of 1974

("ERISA"), 29 U.S.C. §1001 *et seq.,* breach of contract, breach of implied covenant of good faith and fair dealing, violations of the Delaware Wage Payment and Collection Law, 19 Del. C. §1101, *et seq.* and the common law of Delaware.

## Jurisdiction and Venue

2.      Jurisdiction is conferred upon this Court by 29 U.S.C. § 1132(e) and (f), 28 U.S.C. §§1331 all of which provide for original jurisdiction of plaintiff's claims arising under the laws of the United States and over actions to secure equitable and other relief.

3.      This Court has jurisdiction over Plaintiff's claims under the statutory and common law of the State of Delaware pursuant to its supplemental jurisdiction as codified at 28 U.S.C. §1367 because they arise out of the same occurrences and transaction as the federal; claims so that they form the same case and controversy under Article III of the United States Constitution.

4.      All of the actions complained of took place within the District of Delaware and involve defendants that reside within the jurisdictional limits of this Court.

## Parties

5.      Plaintiff, David N. Terhune, is a citizen of the State of Delaware, with his address at Box 299, Montchanin, DE 19710.  At all times applicable hereto, Plaintiff was a participant or beneficiary of a plan covered by the terms of ERISA.

6.      Plaintiff has been employed as a business executive for over 30 years, directly responsible for all aspects of the businesses in which he engaged, including companies engaged in manufacturing, consulting, real estate and food service.  Since 1994, Plaintiff has served in the capacities of Chief Financial Officer ("CFO")(1994-95), Chief Operating Officer ("COO")(1996-2001), President and COO(2002-2004) and President and CEO(2005-2006) of AET.

7.      Defendant, Applied Extrusion Technologies, Inc. is a manufacturer and supplier of oriented polypropylene films ("OPP") duly organized under the laws of the State of Delaware with its principal place of business located at 15 Reads Way, New Castle, DE 19720.  At all times applicable hereto, AET was the Administrator and a fiduciary under a contractual benefit plan covered by the terms of ERISA.

8.      Formed in 1986, Defendant is North America's leading developer and independent global supplier dedicated solely to the manufacturing of OPP films, with annual sales exceeding $300 million dollars.  The Company maintains production facilities in Covington, Virginia, Terre Haute, Indiana and Varennes, Canada.

9.      The Company's products are used by suppliers of consumer products including labels for bottles and cans, packaging for confectionary and snack foods, pet foods, condiments, holographic films for gift wrap and promotional packages, and specially designed barrier films used to extend the shelf-life of snack foods, cheeses, meats and fresh produce.  The Company's

products serve end-users such as Coca-Cola®, Pepsi-Cola®, Frito-Lay®, Hershey® and Nabisco®.

10.    Individual Defendant Jackson Craig is the Chairman of the Board of the corporate Defendant AET and maintains offices at 15 Reads Way, New Castle, DE 19720 and 141 Linden Street, Wellesley, MA 02482.  At all times applicable hereto, individual Defendant Craig was the Chairman of the Board of the corporate Defendant AET and was authorized to take action, make decisions and enter into contracts on its behalf.

11.    Defendant Craig also serves as a Vice –President of DDJ Capital Management, LLC, the largest shareholder of AET.

12.    Individual Defendant Terry Smith is the Vice President and General Manager of the Commercial Films Business, and subsequent to the termination of the Plaintiff was appointed by the Board of Directors of AET, along with Brian Crescenzo, to the temporary position of Office of the President of the corporate Defendant AET and maintains offices at 15 Reads Way, New Castle, DE 19720. At all times applicable hereto, individual Defendant Smith was an executive employed by the corporate Defendant AET and was authorized to take action, make decisions and make statements on its behalf.

13.    At all time applicable hereto, individual Defendants, and Jackson Craig, Terry Smith, as possibly prompted and/or directed by other officers of the Company or members of the Board of Directors of AET, knowingly permitted the corporation to violate the terms of Plaintiff's Employment Agreement and the applicable provisions of the Delaware Wage Payment and Collection Law.

4

## **Factual Background**

14.    On March 8, 2005, Plaintiff and Defendant AET entered into an
Employment Agreement (the "Agreement") for good and valuable consideration,
the term of which assured Plaintiff that he would be employed as the Company's
Chief Executive Officer and President through December 31, 2006.  A copy of
the Agreement is attached hereto as Exhibit "A."

15.    The Agreement provided for the following compensation and
benefits:

a.    a base salary of Four Hundred Thirty Thousand Dollars
($430,000) subject to annual adjustments based upon the Consumer Price Index;

b.    an incentive bonus targeted at fifty percent (50%) of
Plaintiff's base salary, with a maximum payout of one hundred percent (100%) of
his base salary;

c.    participation in the Company's equity-based incentive plan
for senior management;

d.    participation in the Company's deferred compensation
retirement plan ("EDCRP");

e.    participation in the Company's pension and saving's plans;

f.    health insurance;

g.    long-term disability insurance providing not less than sixty-
five percent (65%) of Plaintiff's base salary;

5

h.     life insurance providing death benefits of not less than $1,875,000;

i.     provision of an automobile and automobile allowance;

j.     payment of membership expenses (including fees and dues) at clubs chosen by the Plaintiff with the consent of the Company (not to be unreasonably withheld); and

k.     payment for a yearly physical medical examination.

16.     The Agreement also provided in pertinent part in Section 4(e) that AET could terminate Plaintiff at any time "without cause" during the term of the Agreement and that upon that occurrence (or if the Plaintiff's employment should terminate at the end of the term pursuant to notice given by AET), Plaintiff would be entitled to receive the following severance benefits:

a.     payment of all unpaid base salary and benefits through the date of termination;

b.     within 60 days after termination, payment in a lump sum equal to the total of 18 months base pay and average bonus he would have received if still employed for that period[1];

c.     payment of any unpaid bonus;

d.     continuation for 18 months from the date of termination of Plaintiff's participation in all benefit plans referred to in Sections 3(d)(i)(disability insurance, health insurance, pension, retirement plans and accident plans),

---

[1] Plaintiff's Employment Agreement that controlled the terms of his employment prior to March 8, 2005 provided for a severance period of 36 months.

3(d)(ii)(EDCRP), 3(d) (iii)(B)(life insurance) or the cash equivalent thereof and 3(e);[2] and

   e.  vesting in all plans as if the Plaintiff were employed through the 18 month severance period.

   17.  The singular eligibility requirement for all severance benefits due to Plaintiff upon termination without cause was the execution of a general release in favor of AET in a form reasonably satisfactory to AET and Plaintiff.

   18.  On February 7, 2006, Plaintiff's employment with AET was terminated without cause.

   19.  On or about April 11, 2006, AET transmitted a proper calculation of the benefits owed under the severance provisions of the Agreement in the amount of $925,426.67, and contrary to the specific terms of the Agreement: proposed payment of its obligations in four installments through January 2007; required the continued Board Membership of Plaintiff; made the benefits and EDCRP payments due to Plaintiff conditional upon extraneous events and circumstances; restated alleged obligations stated under the Employment Agreement and required their novation; required the release of entities and individuals other than AET; and required Plaintiff's continued consultation services after termination.  A copy of the unsigned correspondence of AET is attached as Exhibit "B."  Despite Plaintiff's complete compliance with the terms of the Employment Agreement, including the proffer of an appropriate release of AET, no payments in accordance with the terms of the controlling Employment Agreement have been made to date.

---

[2] See Footnote No. 1 above.

20.    The actions of AET constitute a material breach of Plaintiff's Employment Agreement of March 8, 2006, violations of the employee benefit plan established thereunder and violations of the statutory and common law of the State of Delaware.

21.    As a direct result of improper actions of AET as set forth herein, Plaintiff has and will continue to suffer great economic loss as well as severe financial and emotional distress.

## COUNT I

### Violations of ERISA
### Plaintiff v. AET

22.    Plaintiff repeats and realleges paragraphs 1 through 21 above as though fully set forth herein.

23.    The actions of AET in failing to pay Plaintiff in accordance with the terms of the controlling terms of the Employment Agreement and institute the equity-based incentive plan as required therein are in direct violation of the provisions of ERISA as set forth at Section 1132(1)(B).

## COUNT II

### Breach of Contract
### Plaintiff v. AET

24.    Plaintiff repeats and realleges paragraphs 1 through 23 above as though fully set forth herein.

25.    Plaintiff and Defendant AET entered into a contract of employment for good and valuable consideration that set forth the terms and conditions upon which Plaintiff's employment could be terminated without cause as stated above.

26.     Defendant AET materially violated its contract with Plaintiff by not complying with the conditions set forth in the controlling Employment Agreement of March 8, 2005, including the non-establishment of a qualified executive equity-based incentive plan, which was to be established by April 8, 2006 in accordance with the Solicitation and Disclosure Statement of AET dated November 1, 2004 that was agreed to by Craig on behalf of DDJ Capital Management, LLC and not compensating Plaintiff at the conclusion of his employment in accordance with the severance provisions of the Agreement.

### COUNT III

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Plaintiff v. AET

27.     Plaintiff repeats and realleges paragraphs 1 through 26 above as though fully set forth herein.

28.     The law of Delaware implies a covenant of good faith and fair dealing into the contractual relationship between Plaintiff and Defendant AET.

29.     In acting as described above, Defendant AET wrongfully and unreasonably breached its duty implied in the Employment Agreement of March 8, 2005 to deal fairly and in good faith with Plaintiff pursuant to the terms thereof.

### COUNT IV

### Delaware Wage Payment And Collection Law
### 19 Del.C. § 1101, *et seq.*
### Plaintiff v. Both Defendants

30.     Plaintiff incorporates the allegations in paragraphs 1 through 29, above as if fully set forth herein.

31.     At the termination of his employment and 60 days thereafter, all payments due to Plaintiff under the terms of the Employment Agreement of March 8, 2005 were immediately due and payable.

32.     In direct violation of the terms of the Delaware Wage Payment and Collection Law, Defendant AET failed to pay Plaintiff the balance due and owing to him.

33.     Defendant AET has willfully and without good reason therefore, failed to pay Plaintiff the severance payments mandated by the Agreement to date.

34.     Defendant AET does not have any good faith dispute regarding its duty to pay the sums owed under the terms of Plaintiff's Employment Agreement to Plaintiff.

35.     As the Officers, Directors and fiduciaries and administrators of AET and its benefits plans applicable hereto, the individual Defendants are jointly and severally liable with Defendant AET for all payments due to Plaintiff.

**COUNT V**
**Fraud In the Inducement**
**Plaintiff v. Defendants Craig and AET**

36.     Plaintiff incorporates the allegations in paragraphs 1 through 35, above as if fully set forth herein.

37.     The Defendants Craig and AET induced Plaintiff to enter into the March 8, 2005 Employment Agreement (that provided for a severance benefit of only 18 months as opposed to the 36 month severance benefit in the employment contract that it replaced) by promising that an executive equity-

based incentive plan in which Plaintiff would participate would be put into place. At the time that they were made, these promises were known to be, and were intended to be, false and fraudulently made for the sole purpose of inducing Plaintiff to enter into the Employment Agreement of March 8, 2005, the terms of which were negotiated on behalf of AET by Craig with the intention of shortly thereafter terminating Plaintiff's employment and thereby permitting the payment of a greatly reduced severance benefit.

38.    On reliance of the commitment of AET that he would enjoy the benefits of that participation, plaintiff entered into the Agreement on or about March 8, 2005 and as a result, reduced his entitlement to a significantly higher severance benefit.

39.    As a direct result of Defendants' fraud, Plaintiff has suffered the loss of compensation and benefits as set forth above as well as the painful diminution of his ability to provide for himself and his family.

40.    As a direct result of Defendants' fraud, Plaintiff has suffered emotional distress and humiliation.

41.    Defendants' actions were willful, vindictive, malicious, outrageous, without cause and in reckless disregard of the rights of the Plaintiff.

## COUNT VI

### Libel and Slander
### Plaintiff v. Defendants AET, Craig and Smith

42.    Plaintiff incorporates the allegations in paragraphs 1 through 41, above as if fully set forth herein.

43.     Following Plaintiff's termination from employment with AET, Plaintiff was provided and as requested, agreed to a press release regarding Plaintiff's resignation a copy of the press release is attached as Exhibit "C".  Defendant Smith, upon the direction, and with the full approval, of Defendant Craig, made statements for publication in the Packaging Strategies Newsletter, the most influential publication in the packing industry disseminated to packaging professionals and their customers throughout the world, that would lead a reasonable reader that Plaintiff was not competent to fulfill his duties as a company Chief Executive Officer.

44.     As a direct result of those actions, Packaging Strategies Newsletter published on page 8 of its February 28, 2006 edition an article that heralded AET's growth and accomplishments since Plaintiff became its President in 2002 and stated, quoting Defendant Smith, that Plaintiff's "resignation…came down to a singular event-driven inability to establish a good communication flow," a trait essential to the competency of any company executive, leaving the publication to speculate as to "what went on between Terhune and the board."  A copy of the published defamatory statements are attached as Exhibit "D."

45.     As fully set forth above, the Defendants Craig and Smith, individually and in concert, have, by words and actions, published, or caused to be published, false and defamatory information about the Plaintiff in connection with Plaintiff's termination from employment with Defendant AET without privilege or justification.

46.     The false information published, or caused to be published, by the

Defendants Craig and Smith about the Plaintiff relate to the fitness of plaintiff to be employed in the packing industry or to be employed as a high level executive expected to competently communicate with any company's Board of Directors in a competent manner and therefore, constitute defamation *per se*.

47.    As a direct result of the improper and unlawful publication of defamatory information about Plaintiff by Defendants, the reputation of the Plaintiff has been irreparably damaged in the communities in which he lives and works.

**WHEREFORE**, Plaintiff claims of the Defendants and demands judgment for:

(a)    specific performance by AET and the individual Defendants of all the terms and conditions set forth in the Employment Agreement of March 8, 2005 including the granting and payment of all benefits provided therein;

(b)    the award to Plaintiff in an amount equal to all sums owed under the terms of his contract including wages, bonuses, benefits, severance and other amounts owed, as well as all statutory penalties under the applicable provisions of ERISA and the Delaware Wage Payment and Collection Law;

(c)    pre- and post-judgment interest and attorneys fees as allowed by

law;

(d)    all other applicable compensatory and punitive damages; and

(e)    all other relief that the Court deems just and proper under the

circumstances.


/s/ James S. Green, Sr.
James S. Green, Sr., Esquire (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

                              Attorneys for Plaintiff

Dated:  May 30, 2006

**EXHIBIT A**

EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into as of March 8, 2005 (the "Effective Date"), by and between Applied Extrusion Technologies, Inc., a Delaware corporation (the "Employer"), and David N. Terhune (the "Executive").

RECITALS

1.      The Executive is currently employed by the Employer as its Chief Operating Officer and President pursuant to an Amended and Restated Employment Agreement dated as of August 1, 2002, as in effect on the date hereof (the "Prior Employment Agreement").

2.      The Employer desires to continue to employ the Executive and to make secure for itself the experience, abilities and services of the Executive and to prevent the loss of such experience, services and abilities.

3.      In consideration of the employment to be provided hereby and the amounts to be paid as provided herein, the Executive desires to continue to be employed by the Employer and to agree with the Employer as further provided herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      Employment. The Employer shall continue to employ the Executive, and the Executive shall continue to perform services for and continue in the employment of the Employer, for the period (the "Employment Period") beginning on the Effective Date and ending on December 31, 2006, subject to extension as set forth herein (such final date, as from time to time in effect, being referred to herein as the "Expiration Date"); provided, however, that, unless either the Employer or the Executive shall give notice to the other (which notice may be given in the sole discretion of either party hereto) no later than ninety (90) days prior to the then-current Expiration Date (the "Current Expiration Date") that such party does not wish to have the Employment Period extended for another year past the Current Expiration Date, then, at the close of business on such date which is ninety (90) days prior to the Current Expiration Date, the Expiration Date shall automatically become the date which is exactly one (1) year after the Current Expiration Date; and provided, further, that the employment of the Executive by the Employer may be terminated prior to the Expiration Date in accordance with Section 4 hereof.

2.      Capacity. During the Employment Period:

(a)      Position and Duties. The Executive shall serve on a full-time basis in the capacity of Chief Executive Officer and President, shall report to the Board of Directors of the Employer (the "Board") and shall be accountable to, and shall have such other powers, duties and responsibilities consistent with his position and experience as may from time to time be prescribed by, the Board. The Executive shall perform and discharge, faithfully, diligently and to the best of his ability, such duties and responsibilities. The Executive shall devote substantially all of his working time and efforts to the business and affairs of the Employer.

(b)    Board Membership. The Employer agrees to propose to the shareholders of the Employer at each appropriate meeting of such shareholders the reelection of the Executive as a member of the Board, so long as the Executive is otherwise eligible for such election; provided, however, that if the Executive's employment hereunder terminates for any reason, the Executive shall immediately be deemed to have resigned from the Board and from the board of directors of each subsidiary or affiliate of the Employer on which the Executive is then serving, if the Employer has paid all amounts owed to the Executive by virtue of the termination of his employment and is not otherwise then in default hereunder.

3.    Compensation and Benefits.

(a)    Salary. During each year of the Employment Period, the Executive shall receive an annual base salary (the "Base Salary") of $430,000; provided, however, that effective January 1, 2006, and on each January 1 thereafter, the Base Salary then in effect shall be increased by the greater of (i) such increase as the Board may specify in its sole discretion or (ii) an amount equal to the then-current Salary *multiplied by* the percentage increase (if any) in the Consumer Price Index for All Urban Consumers (CPI-U) - U.S. City Average during the immediately preceding calendar year.

(b)    Incentive Bonus; Equity Incentives .

      (i)    During each year of the Employment Period, the Executive shall be eligible to receive an incentive bonus (the "Bonus") based upon criteria that are defined annually by the Employer and targeted at fifty percent (50%) of Base Salary, with a maximum payout potential of one hundred percent (100%) of Base Salary.

      (ii)    In consultation with the Executive, the Board will establish a plan providing for equity-based incentives for the senior management of the Employer. The Executive shall be entitled to participate in such plan at a level commensurate with his position as the Chief Executive Officer and President of the Employer.

(c)    Expenses. The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him on behalf of the Employer consistent with Employer's past practices with Executive and in accordance with the Employer's business expense reimbursement policies.

(d)    Pension and Welfare Benefits.

      (i)    The Executive shall be entitled, subject to eligibility requirements, to participate in or receive benefits under each disability insurance, health, pension, retirement and accident plan or arrangement generally made available by the Employer to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.

(ii)    In consultation with the Executive, the Board will establish an executive deferred compensation retirement plan (the "EDCRP") that provides benefits substantially the same as the Employer's executive deferred compensation retirement plan established on September 1, 1994 and amended and restated August 10, 2001, pursuant to which the Executive will receive a "Company Credit" (as such term was defined in the Employer's plan) of twenty percent (20%) and pursuant to which the Executive will be fully vested in all benefits provided thereunder.

(iii)    The Employer shall provide to the Executive or, at the Executive's election, reimburse the Executive on an after tax basis for the cost of the following:

(A)    Long-term disability insurance providing not less than sixty-five percent (65%) of Base Salary replacement until age sixty-five (65), and

(B)    Life insurance protection providing total death benefits of not less than $1,875,000, payable to such person as the Executive has designated in a notice filed with the Employer (the "Designee"), or, if no such person has been designated, to his estate (the "Estate"), in each case consistent with the Employer's past practices regarding such insurance for executives.

(e)    Additional Fringe Benefits.  Without limiting the generality of the foregoing, during the Employment Period:

(i)    the Executive shall be furnished with an automobile, of a make and year reasonably satisfactory to the Employer and the Executive and consistent with the past practice of the Employer with the Executive , either owned or leased by the Employer or by way of an automobile allowance sufficient to permit the Executive to obtain the use of such an automobile;

(ii)    the Employer shall either pay the Executive's membership expenses (including fees and dues), or otherwise make available to the Executive at no cost to the Executive, membership at clubs chosen by the Executive with the consent of the Employer (not to be unreasonably withheld) and consistent with the past practice of the Employer with the Executive; and

(iii)    the Executive shall be entitled to a physical examination each calendar year, by a physician selected by the Executive, either pursuant to the Employer's health or other plans or otherwise at the expense of the Employer.

(f)    Change of Control.  If a "Change of Control" (as such term is defined and set forth in Exhibit A hereto) shall occur, then

(i)    all equity-based incentives previously granted to the Executive which, by their terms, have not yet vested, shall immediately vest and (as applicable) become exercisable and shall remain exercisable until the earlier of the Benefits Termination Date or the expiration date of the related grant of such equity-based incentives, regardless of employment status, and

(ii)    the Executive shall be entitled to carry out Executive's duties and responsibilities hereunder primarily from Executive's current office in New Castle, Delaware (or another facility serving such purpose and located within 15 miles of such current office) and will not be required to locate his primary place of business outside such area without his consent (which may be given or withheld in his sole discretion).

4.    Termination and Consequences Thereof.

(a)    Definitions.  As used herein, the following terms shall have the meanings indicated:

(i)    "Average Bonus" shall mean the greater of (A) the average annual Bonus accrued by the Employer as payable to the Executive with respect to the three (3) years immediately preceding the Termination Date or (B) twenty-five percent (25%) of the Base Salary payable in the year in which the Termination Date occurs.

(ii)    "Benefits Termination Date" shall mean the date which is eighteen (18) months after the Termination Date; provided, however, that in the case of a termination by the Company for Cause or by the Executive without Good Reason or if the Executive's employment hereunder shall terminate on the Expiration Date because the Executive has given the notice contemplated by the first proviso to Section 1 hereof, the Benefits Termination Date shall be the Termination Date.

(iii)    "Cause" shall mean (A) other than by reason of Executive's Disability, willful conduct by the Executive demonstrating gross misconduct and gross unfitness to serve and which has caused material harm to the business or interests of the Employer, or (B) the Executive's conviction of, or entry into a consent decree or substantially similar arrangement in connection with, a felony crime involving fraud, dishonesty or other conduct which materially and adversely affects the Employer.  For purposes of this Section 4, no act, or failure to act, on the Executive's part shall be considered "willful" unless done, or omitted to be done, by him knowing that such action or inaction would not be in the best interests of the Employer or otherwise done or omitted to be done in bad faith or with reckless disregard for the best interests of the Employer.

(iv)   "<u>Disability</u>" shall mean a physical or mental incapacity that prevents the Executive from performing the essential functions of his position with the Employer for a period of one hundred eighty (180) or more consecutive days as determined (A) in accordance with any long-term disability plan provided by the Employer, or (B) by the following procedure:  The Executive agrees to submit to medical examinations by a licensed healthcare professional selected by the Employer, in its sole discretion, to determine whether a Disability exists.  In addition, the Executive may submit to the Employer documentation of a Disability, or lack thereof, from a licensed healthcare professional of his choice.  Following a determination of a Disability or lack of Disability by the Employer's or the Executive's licensed healthcare professional, the other party may submit subsequent documentation relating to the existence of a Disability from a licensed healthcare professional selected by such other party.  In the event that the medical opinions of such licensed healthcare professionals conflict, such licensed healthcare professionals shall appoint a third licensed healthcare professional to examine the Executive, and the opinion of such third licensed healthcare professional shall be dispositive.

(v)    "<u>Good Reason</u>" shall mean a termination by the Executive due to the occurrence of one or more of the following:  (A) failure of the Employer to continue the Executive in the position of Chief Executive Officer and President, (B) failure of the Executive to be elected to the Board, (C) material diminution in the nature or scope of the Executive's responsibilities, duties or authority, or (D) a decrease in the Executive's compensation, bonus opportunity and benefits, in the aggregate, including a failure to pay any such amounts when due; <u>provided</u>, <u>however</u>, that no termination by the Executive for Good Reason shall be effective unless and until the Executive has given thirty (30) days  written notice to the Board of the reasons for the termination for Good Reason, and the Employer has failed to remedy such reasons; and <u>provided</u>, <u>further</u>, that no termination for Good Reason shall be effective if the reasons for the termination occurred more than sixty (60) days prior to the date on which the Executive has provided written notice to the Board.

(vi)   "<u>Termination Date</u>" shall mean the earlier of (A) the Expiration Date or (B) if the Executive's employment is terminated (1) by his death, the date of his death, (2) due to a Disability, the date that the Executive commences receiving long-term disability benefits pursuant to a plan provided by the Employer or, if later, is otherwise determined to have suffered a Disability in accordance with the process prescribed herein, or (3) for any other reason, the date on which such termination is to be effective pursuant to the notice of termination given by the party terminating the employment relationship.  The Employment Period shall terminate on the Termination Date, and the Expiration Date shall automatically be changed and shall become the Termination Date.

(b)     Death. The Executive's employment hereunder shall terminate upon his death. In such event, the Employer shall provide the Designee or, if no such person has been designated, the Estate, with the following, in lieu of any other payments or benefits whatsoever:

    (i)     as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

    (ii)     any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date, and

    (iii)     the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

(c)     Disability. The Employer, by action of the Board, may terminate the Executive's employment hereunder due to the Executive's Disability, in which event, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

    (i)     as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

    (ii)     any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date,

    (iii)     during the period beginning on the Termination Date and ending on the Benefits Termination Date, shall continue Executive's the participation in the benefit plans referred to in Sections 3(d)(i), 3(d)(ii), 3(d)(iii)(B) (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to Section 3(e) hereof, and

    (iv)     the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

(d)    Termination by the Employer for Cause.  The Employer may terminate the Executive's employment hereunder for Cause, in which event, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for unpaid Base Salary and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(e)    Termination by the Employer Without Cause.  The Employer may terminate the Executive's employment hereunder, other than pursuant to Section 4(b) (relating to death), Section 4(c) (relating to Disability) or Section 4(d) (for to Cause), at any time.  In the event of such termination, or if the Executive's employment hereunder shall terminate on the Expiration Date because the Employer has given the notice contemplated by the first proviso to Section 1 hereof, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

    (i)    as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

    (ii)    a lump sum payment, within 60 days after the Termination Date, equal to the aggregate amount of Salary and Average Bonus that would have been payable to the Executive over the period from the Termination Date to the Benefits Termination Date if the Executive had continued to be employed by the Employer through the Benefits Termination Date and received Salary and Average Bonus for periods after the Termination Date based upon the Salary he would have received under Section 3(a) if this Agreement was extended through the Benefits Termination Date (but excluding any cost of living or discretionary increases that would have occurred after the Termination Date),

    (iii)    any previously awarded but unpaid Bonus,

    (iv)    during the period beginning on the Termination Date and ending on the earlier of the Benefits Termination Date and the date on which the Executive first becomes eligible for substantially equivalent benefits provided by any other entity following the Termination Date, shall continue Executive's the participation in the benefit plans referred to in Sections 3(d)(i), 3(d)(ii), 3(d)(iii)(B) (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to Section 3(e) hereof, and

    (v)    benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans, programs or arrangements in which the Executive is participating on the Termination Date (including without limitation any equity based incentive plans), subject to the following:  (A) with respect to all vesting requirements, the

Executive shall be deemed to have been employed by the Employer until the Benefits Termination Date, (B) any vested stock options shall remain exercisable until the earlier of the Benefits Termination Date and the date such options would expire according to the terms of the grant, provided they do not otherwise expire.

(f)    <u>Termination by the Executive for Good Reason</u>. The Executive may terminate his employment hereunder for Good Reason in accordance with <u>Section 4(a)(v)</u>. In event of termination pursuant to this <u>Section 4(f)</u>, the Employer shall provide the Executive with the payments and benefits set forth in <u>Section 4(e)</u>, above, in lieu of any other payments or benefits whatsoever.

(g)    <u>Termination by the Executive Other Than for Good Reason</u>. The Executive may terminate his employment hereunder other than for Good Reason. In the event of termination of the Executive's employment pursuant to this <u>Section 4(g)</u>, or if the Executive's employment hereunder terminates on the Expiration Date because the Executive has given the notice contemplated by the first proviso to <u>Section 1</u> hereof, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for payment of any unpaid Base Salary earned and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(h)    <u>Effect of Termination</u>. This <u>Section 4</u> sets forth all obligations of the Employer to the Executive upon termination of his employment hereunder, including any payments or benefits due under any severance plans or policies administered by the Employer. The provisions of this <u>Section 4</u> and of <u>Sections 5</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u> hereof shall survive the Termination Date.

(i)    <u>Consulting Services</u>. Following termination of his employment hereunder pursuant to the provisions of <u>Section 4(e)</u> or <u>Section 4(f)</u> hereof, and in partial consideration for the payments provided pursuant thereto, during the period from the Termination Date until the Benefits Termination Date, the Executive shall provide to the Employer no less than eight (8) hours per month of consulting services as reasonably requested by Employer. Such consulting services shall be provided from locations and at times reasonably acceptable to both parties. The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him in connection with the provisions of consulting services to the Employer, subject to the Executive providing appropriate documentation of the same.

(j)    <u>Non-Duplication of Benefits</u>. Notwithstanding the foregoing, nothing in this Agreement shall result in a duplication of payments or benefits provided under this <u>Section 4</u>, nor shall anything in this Agreement require the Employer to make any payment or to provide any benefit to the Executive that the Employer is otherwise required to provide under any other contract, agreement or arrangement except to the extent that this Agreement specifically provides that Executive shall be entitled to the benefits under a policy or program maintained by Employer.

(k)    General Release.  No payments or benefits payable to the Executive upon the Termination of his employment pursuant to this Section 4 shall be made to the Executive unless and until the Executive executes a general release in favor of the Employer in a form reasonably satisfactory to the Employer and the Executive and such general release becomes effective pursuant to its terms.

(l)    No interest shall accrue on or be paid with respect to any portion of any payments hereunder, except as required by law.

5.    Duty of Loyalty.

(a)    General.  The Employer is engaged in a continuous program of research, design, development, production, marketing and servicing with respect to its businesses and the clients and customers it services, and the Executive's employment with the Employer creates a relationship of confidence and trust between the Executive and the Employer with respect to the business of the Employer and its Affiliates (as hereinafter defined) and to the business of any client or customer of the Employer or its Affiliates.

(b)    Definitions.  For the purposes of this Agreement, the following terms shall have the following meanings:

    (i)    "Affiliate" shall mean any person, corporation or other entity directly or indirectly under the common control of the Employer.  For the purposes of this definition, "control" when used with respect to any person, corporation or other entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.  The terms "controlling" and "controlled" have meanings correlative to the foregoing.

    (ii)    "Competitor" shall mean a person or entity (including, without limitation, the Executive) that in any way:

        (A)    conducts, operates, carries out or engages in the business of manufacturing oriented polypropylene films, or

        (B)    conducts, operates, carries out, engages in or is involved in any other business which the Employer or any Affiliate may in the future conduct, in any geographic area in which such business is conducted by the Employer or any Affiliate.

    The terms "competition," "competitive" and "compete" have meanings correlative to the foregoing.

    (iii)    "Confidential Information" means all confidential, proprietary or other non-public information relating to the Employer and its Affiliates and their businesses, and includes without limitation all such information relating to: (A) the development, research, testing, manufacturing and marketing activities of the Employer, (B) the products manufactured, sold or

distributed by the Employer, (C) the costs, sources of supply and strategic plans of the Employer, (D) the identity and special needs of the customers of the Employer, (E) the financial arrangements and capital structure of the Employer, (F) the management and operation of the Employer, and (G) people and organizations with whom the Employer has business relationships and those relationships, regardless in any instance of whether such information has been reduced to documentary form. Confidential Information also includes comparable information that the Employer may receive or has received belonging to customers or others who do business with the Employer. Confidential Information shall not include information which is publicly known, or becomes publicly known, through no fault of the Executive or is generally known or readily obtainable by the public.

(iv)    "Restricted Period" shall mean the twenty-four (24) month period following the Benefits Termination Date.

(c)    Restricted Activities. As a condition of the Executive's having access to Confidential Information, and in consideration of the payments and benefits provided hereunder, the Executive agrees that the Executive will not, directly or indirectly, either for himself or for any other person or entity, whether as an owner, partner, agent, consultant, employee, officer, director, investor, shareholder, proprietor or in any other individual or representative capacity (excluding the holding for investment of less that five percent (5%) of the outstanding securities of any corporation which are regularly traded on a recognized stock exchange), do any of the following:

(i)    Nondisclosure and Nonuse of Confidential Information. The Executive shall not disclose to any other person (except as required by applicable law or in connection with the performance of his duties and responsibilities hereunder), or use for his own benefit or gain, any Confidential Information. The Executive understands that this restriction shall continue to apply after the Executive's employment terminates, regardless of the reason for such termination.

(ii)    Non-Interference with Business Relationships. During the Restricted Period, the Executive shall not:

(A)    Engage in Competition with the Employer without the Employer's prior express written approval;

(B)    Divert or take away (or attempt to divert or take away) any of the Employer's present, former or prospective customers, including, but not limited to, those upon whom he called, met with or became acquainted with while engaged as an employee of the Employer;

(C)    Interfere with the contractual or business relationships of the Employer;

     (D)    Solicit or attempt to solicit any clients of the Employer; or

     (E)    Slander or disparage the Employer, or undertake any activity which adversely impacts, or is reasonably likely to impact, the goodwill of the Corporation and its business opportunities.

  (iii)   <u>Non-Solicitation</u>.  During the Restricted Period, the Executive shall not:

     (A)    Knowingly, nor shall the Executive knowingly attempt to or assist any other person in attempting to, employ or engage or solicit for employment any person who is then, or at any time during the one hundred eighty (180) day-period prior thereto was, (x) an officer; (y) an employee; or (z) a consultant, agent or independent contractor (in each case, if exclusively dedicated to service to the Employer) of the Employer or otherwise provided services to the Employer in a similar, full-time capacity; or encourage any such person to terminate such relationship with the Employer, without the express written consent of the Board; or

     (B)    Solicit, pursue, call upon or take away, either for himself or for the benefit of any other person or entity, any of the customers of the Employer upon whom he called or with whom he became acquainted during his employment with the Employer as it relates to the business of the Employer.

   (d)    <u>Documents, Materials and Property</u>.  Upon termination of the Executive's employment with the Employer or at any other time upon the Employer's request, the Executive will promptly deliver to the Employer i) without retaining any copies, all documents and other materials furnished to the Executive by the Employer, prepared by the Executive for the Employer or otherwise relating to the Employer's business, if and to the extent that the information therein constitutes Confidential Information, and (ii) any other property of the Employer in the Executive's possession, custody or control.

   (e)    <u>Duty to Disclose</u>.  The Executive will inform the Employer in writing of any offer of employment or engagement that he receives during his employment with the Employer or during the Restricted Period from a Competitor, or any person or entity who might reasonably be viewed to be a Competitor, prior to accepting such offer.  Without limiting the foregoing, if the Executive seeks employment with a company that has several divisions, only certain of which are Competitive with the Employer, and the Executive seeks employment with such non-competitive division, the Executive may accept such employment, provided that the Employer is informed in writing of the offer in accordance with the preceding sentence, and the new employer is informed of the restrictions and obligations set forth herein.

(f)     <u>Reasonableness of Restrictions</u>.  The Executive represents that his experience, capabilities and circumstances are such that the provisions of this <u>Section 5</u> will not prevent him from earning a livelihood.  The Executive further agrees that the limitations set forth in this <u>Section 5</u> are reasonable in duration, geographic area and scope and are properly required for the adequate protection of the business interests of the Employer.  It is understood and agreed that the covenants made by the Executive in this <u>Section 5</u> shall survive any termination of the Executive's employment with the Employer.

(g)     <u>Relief; Interpretation</u>.  The Executive agrees that the Employer shall, in addition to any other remedies available to it, be entitled to preliminary and permanent injunctive relief against any breach by him of the covenants and agreements contained in this <u>Section 5</u> without having to post bond.  In the event that any provision of this <u>Section 5</u> hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, it shall be interpreted to extend only over the maximum period of time, geographic area or range of activities as to which it may be enforceable.  Each of the covenants of this <u>Section 5</u> shall be construed as separate covenant covering the subject matter in each of the separate counties and states in the United States and governmental subdivisions outside of the United States (collectively, the "<u>Governmental Units</u>").  To the extent that any covenant is determined by a court of competent jurisdiction to be unenforceable in any one or more of said Governmental Units, said covenant shall not be affected with respect to any other Governmental Unit, each covenant with respect to each Governmental Unit being construed as severable and independent.  For purposes of this <u>Section 5</u> the term "<u>Employer</u>" shall mean the Employer and any of its Affiliates to the extent that such enterprises are, during the term of the Executive's employment by the Employer, engaged in the same line of business as the Employer.

6.     <u>Conflicting Agreements</u>.  The Executive hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which he is a party or is bound, and that he is not now subject to any covenants against competition or similar covenants which would affect the performance of his obligations hereunder.  The Executive will not disclose to or use on behalf of the Employer any proprietary information of a third party without such party's consent.  The Executive will not enter into any agreement, whether written or oral, conflicting with the provisions of this Agreement.

7.     <u>Taxes</u>.

(a)     All payments made by the Employer under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Employer under applicable law.

(b)     Notwithstanding the immediately preceding sentence, in the event that it is determined that any payments or benefits provided by the Employer to or for the benefit of the Executive will be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code or any successor provision ("***Section 4999***"), the Employer will, immediately prior to the date on which any amount of the excise tax must be paid or withheld, make an additional lump-sum payment (the "***gross-up payment***") to the Executive.  The gross-up payment will be sufficient, after giving effect to all federal, state and other taxes (including any excise tax under

Section 4999) and charges (including interest and penalties, if any) with respect to the gross-up payment, to make the Executive whole for all taxes (including withholding taxes) and any associated interest and penalties imposed under or as a result of Section 4999 with respect to all payments and benefits provided by the Employer to or for the benefit of the Executive. Determinations under this Section 7 will be made by the Employer's independent auditors unless the Executive has reasonable objections thereto, in which case the determinations will be made by a comparable auditor chosen by the Executive after consultation with the Employer (the firm making the determinations to be referred to as the "*Firm*"). The determinations of the Firm will be binding upon the Employer and the Executive except as the determinations are established in resolution (including by settlement) of a controversy with the Internal Revenue Service to have been incorrect. All fees and expenses of the Firm will be paid by the Employer. If the Internal Revenue Service asserts a claim that, if successful, would require the Employer to make a gross-up payment or an additional gross-up payment, the Employer and the Executive will cooperate fully in resolving the controversy with the Internal Revenue Service. The Employer will make or advance such gross-up payments as are necessary to prevent the Executive from having to bear the cost of payments made to the Internal Revenue Service in the course of, or as a result of, the controversy. The Firm will determine the amount of such gross-up payments or advances and will determine after resolution of the controversy whether any advances must be returned by the Executive to the Employer. The Employer will bear all expenses of the controversy and will gross the Executive up for any additional taxes that may be imposed upon the Executive as a result of its payment of such expenses.

8.     <u>Indemnification</u>. To the maximum extent permitted under the Employer's by-laws, the Employer hereby agrees to indemnify the Executive and hold him harmless from, against and in respect of any and all damages, deficiencies, actions, suits, proceedings, demands, assessments, judgments, claims, losses, costs, expenses, obligations and liabilities arising from or related to the performance of this Agreement or the Prior Employment Agreement by the Executive, other than for gross negligence, willful misconduct or willful violation of this Agreement, provided that the Executive gives the Employer prompt notice of any matter to which he is claiming indemnification, including any threats thereof, and subject to such procedural requirements that the Employer may impose.

9.     <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or three (3) days after being mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

        (i)     If to Employer, to it at:

                Applied Extrusion Technologies, Inc.
                15 Read's Way
                New Castle, Delaware  19720
                Attention:  Chief Financial Officer

and to:

Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
Attention: Winthrop G. Minot

(ii)    If to the Executive, to him at:

Applied Extrusion Technologies, Inc.
15 Read's Way
New Castle, Delaware 19720

with a copy to him at:

Box 299
Montchanin, Delaware 19710

10.    Assignment. Neither the Employer nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; provided, however, that the Employer may assign its rights and obligations under this Agreement without the consent of the Executive in the event that the Employer shall hereafter effect a reorganization, consolidate with, or merge into any other person or transfer all or substantially all of its properties or assets to any other person. This Agreement shall inure to the benefit of and be binding upon the Employer and the Executive, their respective successors, executors, administrators, heirs and permitted assigns

11.    Cooperation. As of the Effective Date and at all times thereafter, the Executive hereby agrees to cooperate in all reasonable respects (after taking into account any employment obligations the Executive may have during periods after the Termination Date) with the Employer and its subsidiaries, affiliates, directors, officers, attorneys and experts in connection with the conduct of any action, proceeding, investigation or litigation involving the Employer, either directly or indirectly, including any such action, proceeding, investigation or litigation in which the Executive is called to testify. In connection with the Executive's compliance with this Section 11, the Employer will provide the Executive with reimbursement for any reasonable out-of-pocket expenses incurred by the Executive.

12.    Legal Fees.

(a)    In the event of litigation concerning the interpretation or application of any provision of this Agreement or concerning any other issue arising out the Executive's employment, the court or other tribunal deciding the dispute shall have the authority to direct the party that does not prevail to pay the reasonable attorneys fees of the prevailing party.

(b)    Notwithstanding the provisions of section 12(a), the Employer shall pay or reimburse Executive on an after-tax basis for all costs and expenses (including, without limitation, court costs and reasonable legal fees and expenses incurred by Executive) as a result of any claim, action or proceeding arising solely out of any claim by Executive that Employer

wrongfully failed to make termination payments due under Sections 4(e) or (f) of this Agreement when due. Such payments or reimbursements shall be made promptly following, receipt by the Employer of request by Executive for such payment or reimbursement, including an invoice detailing any such legal fees and expenses. Requests for payment or reimbursement hereunder may be delivered no more frequently than monthly. Notwithstanding the foregoing, the Executive shall reimburse the Employer for any fees or expenses previously paid or reimbursed by Employer in connection with a dispute if the relevant trier-of-fact determines that Executive's claim for termination payments under Sections 4(e) or (f) was not brought or asserted in good faith.

13.    Miscellaneous.

(a)    Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous communications, agreements, representations, understandings and negotiations, whether oral or written, with respect to the subject matter hereof.  As of the Effective Date, the Prior Employment Agreement is hereby terminated with respect to the employment of the Executive by the Employer, and shall be of no further force or effect with respect to such employment.

(b)    Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by each party hereto.  No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

(c)    Waiver.  The waiver by either party of a breach of any provision of this Agreement by the other party will not operate or be construed as a waiver of any other subsequent breach by the other party.

(d)    Severability.  The invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of any other term or provision hereof.

(e)    Headings.  The headings in this Agreement are for convenience of reference only and shall not alter or otherwise affect the meaning hereof.

(f)    Counterparts.  This Agreement may be executed in any number of counterparts which together shall constitute one instrument.

(g)    Governing Law.  This Agreement shall be governed and construed in accordance with the domestic substantive laws of the State of Delaware without regard to any choice or conflict of laws rules or principles that would cause the application of the domestic substantive laws of any jurisdiction other than the State of Delaware.

(h)    Acknowledgement.  By signing this Agreement, the Executive hereby acknowledges and confirms that:

(i)    he has consulted with legal counsel of his choice regarding the terms of this Agreement;

(ii)    he has read the Agreement carefully and completely and understands each of the terms hereof; and

(iii)   he is entering into this Agreement of his own free will and has not been subject to any coercion or duress in this regard.


IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

APPLIED EXTRUSION TECHNOLOGIES, INC.

By: _____

Brian Crescenzo
Chief Financial Officer


EXECUTIVE

_____

David N. Terhune

EXHIBIT A

Definition of Change of Control

A Change of Control will occur for purposes of this Agreement if:

(a)    any individual, corporation, partnership, company or other entity (including a "group" of the type referred to in Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "Act"), (a "Person") becomes the "beneficial owner" (as defined in Rule 13d-3 under the Act) of securities of the Employer representing more than thirty percent (30%) of the combined voting power of the Employer's then-outstanding securities (other than as a result of acquisitions of such securities from the Employer),

(b)    there is a change of control of the Employer of a kind which would be required to be reported under Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Act (or a similar item in a similar schedule or form), whether or not the company is then subject to such reporting requirement,

(c)    the Employer is a party to, or the stockholders approve, a merger, consolidation, or other reorganization (other than a merger, consolidation or other reorganization which would result in the voting securities of the Employer outstanding immediately prior thereto continuing to represent, either by remaining outstanding or by being converted into voting securities of the surviving entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Employer or such surviving entity outstanding immediately after such merger, consolidation, or other reorganization), a sale of all or substantially all assets, or a plan of liquidation, or

(d)    individuals who, at the date hereof, constitute the Board cease for any reason to constitute a majority thereof; provided, however, that any director who is not in office at the date hereof but whose election by the Board or whose nomination for election by the Employer's shareholders was approved by a vote of at least a majority of the directors then still in office who either were directors at the date hereof or whose election or nomination for election was previously so approved (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Employer, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Act) shall be deemed to have been in office at the date hereof for purposes of this definition.

Notwithstanding the foregoing provisions of this Exhibit A, a "Change of Control" will not be deemed to have occurred solely because of the acquisition of securities of the Employer (or any reporting requirements under the Act relating thereto) by an employment benefit plan maintained by the Employer for its employees.

NY2:#4602799v15

**EXHIBIT B**

**APPLIED EXTRUSION TECHNOLOGIES, INC.**
**15 Read's Way**
**New Castle, Delaware  19720**

April 11, 2006

**By email delivery**

Mr. David N. Terhune
Six Montchanin Court
Box 299
Montchanin, DE  19710

Dear David:

As we have discussed, your employment with Applied Extrusion Technologies, Inc. (the "Company") has terminated, effective as of February 7, 2006 (the "Separation Date").  The purpose of this letter is to confirm the agreement between you and the Company concerning your severance arrangements, as follows:

1.    **Final Salary and Vacation Pay; Expense Reimbursement.**

(a)    You acknowledge that you have received pay for all work you have performed for the Company through the Separation Date, to the extent not previously paid, as well as pay, at your final base rate of pay, for the 11 vacation days you had earned, but not used, as of the Separation Date determined in accordance with Company policy and as reflected on the books of the Company.

(b)    The Company will, consistent with its past practices with you and in accordance with its business expense reimbursement policies, reimburse you promptly for all reasonable business expenses incurred by you on behalf of the Company which have not yet been reimbursed. You will use your reasonable efforts to submit all requests for reimbursement within 30 days of the date hereof.

2.    **Severance Benefits.**  In consideration of your acceptance of this Agreement and subject to your meeting in full your obligations under it and under Sections 5, 6, 7, 8 and 11 of the agreement between you and the Company captioned Employment Agreement which you signed as of March 8, 2005 (the "Employment Agreement"), the Company will provide you the following severance pay and benefits:

(a)    After the Effective Date (as defined below), and in accordance with the installment schedule below, the Company will pay you an amount equal to $925,426.67.

| Installment | Date | Amount |
|---|---|---|
| First | April 28, 2006 | $231,356.67 |
| Second | July 31, 2006 | 231,356.67 |
| Third | October 31, 2006 | 231,356.67 |
| Fourth | January 31, 2007 | 231,356.67 |
| Total | | $925,426.67 |

(b)    You acknowledge that, of the total amount referred to in Section 2(a) above, (i) $42,031.39 represents life insurance premiums payable by the Company pursuant to Section 3(d)(iii)(B) of the Employment Agreement, (ii) $29,250.00 represents your car allowance payable by the Company pursuant to Section 3(e)(i) of the Employment Agreement, (iii) $12,328.54 represents your membership expenses payable by the Company pursuant to Section 3(e)(ii) of the Employment Agreement and (iv) $3,750.00 represents the expense of annual physicals payable by the Company pursuant to Section 3(e)(iii) of the Employment Agreement, in each case for the period (the "Benefits Period") from the Separation Date to August 6, 2007 (the "Benefits Termination Date"). If, during the Benefits Period, you shall become eligible for benefits substantially equivalent to any of the above provided by any other entity, you shall so notify the Company and shall return to the Company a portion of the applicable amount previously paid to you based on the number of days remaining in the Benefits Period divided by the total number of days in the Benefits Period, less any taxes paid by you on such amount with are not, using reasonable efforts, recoverable from the recipient thereof.

(c)    The Company will pay to you all amounts required to be paid to you under its 2005 Executive Retirement and Deferred Compensation Plan as in effect on the date hereof and as from time to time hereafter amended with your consent (the "EDCRP"), in accordance with the terms of the EDCRP, including without limitation Section 6.2 thereof. On each of June 30, 2006, June 30, 2007, and June 30, 2008 the Company will pay to you the amount which otherwise would have been a Company Credit to your Account (each as defined in the EDCRP) in accordance with the terms of the EDCRP in respect of the immediately preceding calendar year. For the avoidance of doubt, such Company Credit in respect of the calendar year ending December 31, 2006 shall take into account the payment pursuant to Section 2(a) hereof to the extent it

constitutes "Compensation", as defined in the EDCRP.

(d)    The Company shall use its commercially reasonable efforts to transfer the ownership of all life insurance covering you to you so that you may continue such protection, at your expense.

(e)    Until the earlier of Benefits Termination Date or the date you shall first become eligible for substantially equivalent benefits provided by any other entity, you shall be entitled to continue to participate in or receive benefits under each disability insurance, health, pension, retirement and accident plan or arrangement generally made available by the Company to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements; *provided, however,* that, if the Company is unable to continue your participation in any such plan or arrangement, the Company will pay to you such amount as is necessary to permit you to obtain benefits equivalent in all material respects from another source at the same after-tax cost to you as if the benefits were being obtained from the Company; and *provided, further,* that your participation in the EDCRP shall be governed by Section 2(c) hereof.

3.    **Board of Directors.**  Notwithstanding the provisions of Section 2(b) of the Employment Agreement, you agree to continue as a member of the Board until you are requested to resign such position by the Board or you wish to resign from the Board. You understand that you will receive no compensation for such service, although the Company will reimburse your expenses incurred to attend meetings of the Board on the same terms and conditions as such expenses are generally reimbursed to other non-employee directors.

4.    **Consulting.**  You agree from time to time, from locations and at times reasonably acceptable to both you and the Board, to render to the Board consulting services relating to the Company, for such compensation payable to you as you and the Board may from time to time agree upon. In addition, you will be entitled to receive prompt reimbursement for all reasonable business expenses incurred by you in connection with the provision of such services (subject to the Company's approval, not to be unreasonably withheld or delayed), subject to your providing reasonable documentation thereof.

5.    **Withholding.**  All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law and all other deductions authorized by you.

6.    **Acknowledgement of Full Payment.**  You acknowledge and agree that the payments provided under paragraph 1 of this Agreement are in complete satisfaction of any and all compensation due to you from the Company, whether for services provided to the Company or otherwise, through the Separation Date and that, except as expressly provided under this Agreement, no further compensation is owed to you.

7.     **Status of Employee Benefits and Paid Time Off.**  Except as otherwise expressly provided in Sections 2(c) and 2(e) of this Agreement, your participation in all employee benefit plans of the Company has ended as of the Separation Date, in accordance with the terms of those plans.  You will not continue to earn vacation or other paid time off after the Separation Date.

8.     **Termination of Employment Agreement.** Notwithstanding Section 4(h) of the Employment Agreement, except for Sections 5, 6, 7, 8, 9, 10, 11 and 12 of the Employment Agreement, which shall survive the execution, delivery and effectiveness of this Agreement and shall remain in full force and effect, the Employment Agreement is hereby terminated and shall be of no further force or effect.

9.     **Release of Claims.**

(a)     In exchange for the special severance pay and benefits provided you under this Agreement, to which you would not otherwise be entitled, on your own behalf and that of your heirs, executors, administrators, beneficiaries, personal representatives and assigns, you agree that this Agreement shall be in complete and final settlement of any and all causes of action, rights or claims, whether known or unknown, that you have had in the past, now have, or might now have, in any way related to, connected with or arising out of your employment or its termination or pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the fair employment practices statutes of the state or states in which you have provided services to the Company or any other federal, state or local law, regulation or other requirement and you hereby release and forever discharge the Company and its subsidiaries and other affiliates and all of their respective past, present and future directors, shareholders, officers, members, managers, general and limited partners, employees, agents, representatives, successors and assigns, and all others connected with any of them, both individually and in their official capacities, from any and all such causes of action, rights or claims; *provided, however,* that the foregoing shall not apply to any causes of actions, rights or claims that you may have under this Agreement or Sections 7 or 8 of the Employment Agreement.

(b)     This Agreement, including the release of claims set forth the paragraph immediately above, creates legally binding obligations and the Company therefore advises you to consult an attorney before signing this Agreement.  In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms; that you have had sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney, if you wished to do so, or to consult with any other of your advisors; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

10.    **Miscellaneous**.

(a)    This Agreement constitutes the entire agreement between you and the Company and supersedes all prior and contemporaneous communications, agreements and understandings, whether written or oral, with respect to your employment, its termination and all related matters, except Sections 5, 6, 7, 8, 9, 10, 11 and 12 of the Employment Agreement, which shall remain in full force and effect as provided herein.

(b)    This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and the Chairman of the Board of Directors of the Company or his expressly authorized designee. The captions and headings in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

(c)    The obligation of the Company to make payments and provide benefits to you or on your behalf under this Agreement is expressly conditioned upon your continued full performance of your obligations under this Agreement and Sections 5, 6, 7, 8 and 11 of the Employment Agreement.

(d)    The Company will pay or reimburse you for all expenses of your counsel in connection with the negotiation, execution and delivery of this Agreement in an amount not exceeding $15,000.

If the terms of this Agreement are acceptable to you, please sign, date and return it to me within twenty-one days of the date you receive it.  You may revoke this Agreement at any time during the seven-day period immediately following the date of your signing.  If you do not revoke it, then, at the expiration of that seven-day period (the date such period expires being referred to herein as the "Effective Date"), this letter will take effect as a legally-binding agreement between you and the Company on the basis set forth above.  The enclosed copy of this letter, which you should also sign and date, is for your records.

Sincerely,

APPLIED EXTRUSION TECHNOLOGIES, INC.

By: _____
       *Title:*

Accepted and agreed:

Signature: _____

Date: _____

**EXHIBIT C**

Contact:    Brian P. Crescenzo
            (302) 326-5648


<u>FOR IMMEDIATE RELEASE</u>

## APPLIED EXTRUSION TECHNOLOGIES, INC.
## ANNOUNCES CEO RESIGNATION

NEW CASTLE, DE, February 8, 2006 – Applied Extrusion Technologies, Inc. today announced that, on Tuesday, February 7, the AET Board of Directors accepted the resignation of David Terhune as President and Chief Executive Officer of the Company.

Jackson Craig, Chairman of AET, commented, "David Terhune has been with AET since 1994, serving as its President, since October 2002, and CEO since March 2005. He presided over a doubling of the company's sales base and associated broadening of its market reach and scope. The Board of Directors has expressed its sincere gratitude to David, who will continue as a member of the Board and to serve AET, as needed, in an advisory role."

"The Board has formed an Office of the President to carry out operational leadership responsibilities until a new CEO is appointed. This collaborative position will be held by Terry Smith, Vice President and General Manager Commercial Films, and Brian Crescenzo, Vice President, Secretary, and CFO. Together, they will report directly to me."

Mr. Craig further commented: "The Board of Directors remains committed to the Company's fundamental strategy of increasing profitability through productivity and product mix enhancements, and appreciates the operating team's continued dedication in its execution."

Applied Extrusion Technologies, Inc. is a leading North American developer and manufacturer of specialized oriented polypropylene (OPP) films used primarily in consumer products labeling and flexible packaging applications.

**EXHIBIT D**

PACKAGING STRATEGIES

February 28, 2006

## STREET TALK    *INTELLIGENCE FOR THE INFORMED PACKAGING EXECUTIVE*

### O-I Could Tie Its Ship to a Re-emerging Anchor Glass

**Owens-Illinois** has dropped hints that it would consider purchasing **Anchor Glass Container** once that troubled company again re-emerges from bankruptcy protection.

When asked about the possibility, O-I ceo Steven McCracken said O-I's strategies revolve around consolidation in established markets and asset growth in developing markets. "We have a major competitor in our established market (in Anchor)," McCracken said. "As a market share leader, we have to take a strategic interest in the competition."

Tampa-based Anchor, the third-largest U.S. glass container maker, expects to emerge from Chapter 11 in March as a privately held company. A reorganization plan includes a debt-for-equity swap with creditors that would reduce the company's staggering long-term debt totals from about $500mn to $125mn.

If O-I decides to take on Anchor, it literally will still be saddled with the anchor of high debt, albeit lower than it once was, and facilities that are not considered the gold standard.

On the plus side, Toledo, OH-based O-I would add sales of more than $700mn in segments it knows well, bring in a few new customers, and shrink the pie to only two main U.S. players (**St. Gobain Container** being the other). The possibility is enticing, if also a little scary for one of the few packaging segments that can't be called cluttered.

*continued from p. 1*

**Replacing the venerable No.10 metal can has become a priority for the U.S. military**, McCassie said. Weight savings, reduced waste disposal, quick preparation times, and the lack of can-opening injuries far outweigh the cost differences per meal module, he explained.

While the pouches cost $6.46 more per 50 modules than that of metal cans, the military's cost-benefit analysis demonstrates $9.51 per module is saved by using a pouch.

Another factor in the decision to forego cans for pouches is security. Cans can be used by enemy combatants to make improvised explosive devices (IEDs), while pouches cannot be easily tampered with or reused, McCassie added.

DoD is currently writing specifications for the new pouches and hopes to have them ready for bid by vendors in a few months, according to McCassie. Several food distributors, including Cincinnati-based **Wornick Foods**, already has worked on the five-year project with the Rutgers center. [PS]

### 'Failure To Communicate' Leaves AET's Terhune Disconnected

Sometimes, it pays to be a good listener, especially when talking with a board of directors. Although his problems might have run deeper than his listening ability, the resignation of president/ceo David Terhune from New Castle, DE-based **AET Films** came down to "a singular event-driven inability to establish a good communication flow," said Terry Smith, vp/general manager of AET's commercial films. "It was communication pure and simple."

Smith wanted it made clear that the maker of oriented polypropylene films is healthy and sold more product in 2005 than ever before in the company's history. The year also included adding nearly 10mn lbs worth of new product, including a new embossed holographic overlay film, Smith said. "We and the board are very much steadfast in support of the ongoing strategy of AET."

But the company's recent success also begs the question of what went on between Terhune and the board. Terhune, after all, presided over a major growth period that took AET from $125mn to $260mn in sales since becoming president in October 2002.

Smith and cfo Brian Crescenzo will lead company operations until a new president is named.

### 'Insulting' Headline Fuels Aluminum vs. Glass Debate

*Packaging Strategies* unintentionally threw more fuel on an already heated debate about the thermal properties of extruded aluminum vs. glass beer cans. A Page 8 story in the Feb. 15 issue on the insulating properties of new aluminum cans had an unfortunate headline; we meant to say 'Aluminum Displays Surprising *Insulating* Properties,' not 'Insulating Properties.'

*The Editors*

*Unauthorized reproduction in whole or in part prohibited without permission of publisher*

🖉 JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

**DEFENDANTS**

(b) County of Residence of First Listed Plaintiff  **New Castle**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  **New Castle**
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)  **James S. Green**
**Seitz, Van Ogtrop & Green, 222 Delaware**
**Ave., Suite 1500, Wilmington, DE (302) 888-0600**

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1  U.S. Government Plaintiff | ☒ 3  Federal Question (U.S. Government Not a Party) |
| ☐ 2  U.S. Government Defendant | ☐ 4  Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☒ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

| | |
|---|---|
| ☒ 1  Original Proceeding | ☐ 2  Removed from State Court |
| ☐ 3  Remanded from Appellate Court | ☐ 4  Reinstated or Reopened |
| ☐ 5  Transferred from another district (specify) | ☐ 6  Multidistrict Litigation |
| ☐ 7  Appeal to District Judge from Magistrate Judgment | |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
**29 U.S.C. Section 1001**

Brief description of cause:
**Violation of ERISA (29 U.S.C. Section 1001) and Breach of/**     Employment Agreement

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____

DOCKET NUMBER _____

DATE _____

SIGNATURE OF ATTORNEY OF RECORD _____

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

2006 MAY 30  PH 4: 37

0 6 - 3 6 0

Civil Action No. _____

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ____5____ COPIES OF AO FORM 85.

____5-30-06____
(Date forms issued)

_____
(Signature of Party or their Representative)

____FRANK JOYCE / PACCAR, INC.____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action