IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID N. TERHUNE | : | |
| Plaintiff | : | Civil Action |
| | : | |
| v. | : | |
| | : | |
| APPLIED EXTRUSION | : | No. 06-360-KAJ |
| TECHNOLOGIES, INC. | : | |
| | : | |
| and | : | |
| | : | |
| JACKSON CRAIG | : | |
| | : | |
| and | : | |
| | : | |
| TERRY SMITH | : | |

## APPENDIX

James Green, Esquire (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

And

Alan B. Epstein, Esquire
[Admitted *Pro Hace Vice*]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103


Attorneys for Plaintiff
David N. Terhune

Dated: August 3, 2006

# APPENDIX TABLE OF CONTENTS

**EXHIBIT 1 – COMPLAINT (with attachments)**                 **A-1**

**EXHIBIT 2 – UNREPORTED CASES**

    1.    *American Medical International, Inc. v. Valliant,*
        No. 94-16573 1996 WL 14227 (C.A.9(Cal.)
        January 16, 1996)                                **A-45**

    2.    *Balock v. Mars Electronics International, Inc.,*
        No. 89-1290 1990 WL 511
        (E.D. Pa. January 2, 1990)                      **A-49**

    3.    *In re: Crown American Realty Trust (Pasquerilla v. Johnson),*
        No. 95-202J 1999 WL 529581
        (W.D. Pa. July 21, 1999)                        **A-52**

    4.    *Kockman and DiTondo v. Safeguard Business Systems,*
        No. 88-5127 1989 WL 71492
        (E.D. Pa. June 28, 1989)                        **A-58**

    5.    *In re: Linerboard Antitrust Litigation,*
        No. MDL 1261 2000 WL 1475559
        (E.D. Pa. October 4, 2000)                      **A-61**

    6.    *National Rural Electric Cooperative Association v. Breen
        Capital Services Corp.,*
        No. 00-722 (WGB) 2001 WL 294086
        (D.N.J. March 28, 2001)                         **A-70**

    7.    *Roddy v. Nac Re Corporation,*
        No. 3:99-1977 2000 WL 1336477
        (D. Conn. August 11, 2000)                      **A-77**

    8.    *Welch v. Maritrans Inc.,*
        No. 00-2606 2001 WL 73112
        (E.D. Pa. January 25, 2001)                     **A-81**

282873-1

# EXHIBIT "1"

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| **DAVID N. TERHUNE** | : | |
| **Plaintiff** | : | **Civil Action** |
| | : | |
| **v.** | : | |
| | : | |
| **APPLIED EXTRUSION** | : | **No.** |
| **TECHNOLOGIES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JACKSON CRAIG** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TERRY SMITH** | : | |

## COMPLAINT
### Jury Trial Demanded

Plaintiff, David N. Terhune, brings this action for equitable relief and monetary damages against defendants, Applied Extrusion Technologies, Inc. ("AET"), Jackson Craig ("Craig"), and Terry Smith ("Smith") and states in support of his claims as follows:

### Introduction

1.    This action for declaratory, injunctive, monetary and other appropriate relief is brought by Plaintiff, David N. Terhune, against his former employer, Applied Extrusion Technologies, Inc., the Chairman of the Company's Board of Directors, Jackson Craig, and its acting Office of the President Terry Smith for violations of the Employment Retirement Security Act of 1974

("ERISA"), 29 U.S.C. §1001 *et seq.,* breach of contract, breach of implied

covenant of good faith and fair dealing, violations of the Delaware Wage

Payment and Collection Law, 19 Del. C. §1101, *et seq.* and the common law of

Delaware.

## Jurisdiction and Venue

2.     Jurisdiction is conferred upon this Court by 29 U.S.C. § 1132(e)

and (f), 28 U.S.C. §§1331 all of which provide for original jurisdiction of plaintiff's

claims arising under the laws of the United States and over actions to secure

equitable and other relief.

3.     This Court has jurisdiction over Plaintiff's claims under the statutory

and common law of the State of Delaware pursuant to its supplemental

jurisdiction as codified at 28 U.S.C. §1367 because they arise out of the same

occurrences and transaction as the federal; claims so that they form the same

case and controversy under Article III of the United States Constitution.

4.     All of the actions complained of took place within the

District of Delaware and involve defendants that reside within the jurisdictional

limits of this Court.

## Parties

5.     Plaintiff, David N. Terhune, is a citizen of the State of Delaware,

with his address at Box 299, Montchanin, DE 19710.  At all times applicable

hereto, Plaintiff was a participant or beneficiary of a plan covered by the terms of

ERISA.

A-2

6.    Plaintiff has been employed as a business executive for over 30 years, directly responsible for all aspects of the businesses in which he engaged, including companies engaged in manufacturing, consulting, real estate and food service. Since 1994, Plaintiff has served in the capacities of Chief Financial Officer ("CFO")(1994-95), Chief Operating Officer ("COO")(1996-2001), President and COO(2002-2004) and President and CEO(2005-2006) of AET.

7.    Defendant, Applied Extrusion Technologies, Inc. is a manufacturer and supplier of oriented polypropylene films ("OPP") duly organized under the laws of the State of Delaware with its principal place of business located at 15 Reads Way, New Castle, DE 19720. At all times applicable hereto, AET was the Administrator and a fiduciary under a contractual benefit plan covered by the terms of ERISA.

8.    Formed in 1986, Defendant is North America's leading developer and independent global supplier dedicated solely to the manufacturing of OPP films, with annual sales exceeding $300 million dollars. The Company maintains production facilities in Covington, Virginia, Terre Haute, Indiana and Varennes, Canada.

9.    The Company's products are used by suppliers of consumer products including labels for bottles and cans, packaging for confectionary and snack foods, pet foods, condiments, holographic films for gift wrap and promotional packages, and specially designed barrier films used to extend the shelf-life of snack foods, cheeses, meats and fresh produce. The Company's

A-3

products serve end-users such as Coca-Cola®, Pepsi-Cola®, Frito-Lay®, Hershey® and Nabisco®.

10.    Individual Defendant Jackson Craig is the Chairman of the Board of the corporate Defendant AET and maintains offices at 15 Reads Way, New Castle, DE 19720 and 141 Linden Street, Wellesley, MA 02482. At all times applicable hereto, individual Defendant Craig was the Chairman of the Board of the corporate Defendant AET and was authorized to take action, make decisions and enter into contracts on its behalf.

11.    Defendant Craig also serves as a Vice –President of DDJ Capital Management, LLC, the largest shareholder of AET.

12.    Individual Defendant Terry Smith is the Vice President and General Manager of the Commercial Films Business, and subsequent to the termination of the Plaintiff was appointed by the Board of Directors of AET, along with Brian Crescenzo, to the temporary position of Office of the President of the corporate Defendant AET and maintains offices at 15 Reads Way, New Castle, DE 19720. At all times applicable hereto, individual Defendant Smith was an executive employed by the corporate Defendant AET and was authorized to take action, make decisions and make statements on its behalf.

13.    At all time applicable hereto, individual Defendants, and Jackson Craig, Terry Smith, as possibly prompted and/or directed by other officers of the Company or members of the Board of Directors of AET, knowingly permitted the corporation to violate the terms of Plaintiff's Employment Agreement and the applicable provisions of the Delaware Wage Payment and Collection Law.

A-4

**Factual Background**

14.    On March 8, 2005, Plaintiff and Defendant AET entered into an

Employment Agreement (the "Agreement") for good and valuable consideration,

the term of which assured Plaintiff that he would be employed as the Company's

Chief Executive Officer and President through December 31, 2006.  A copy of

the Agreement is attached hereto as Exhibit "A."

15.    The Agreement provided for the following compensation and

benefits:

      a.    a base salary of Four Hundred Thirty Thousand Dollars

($430,000) subject to annual adjustments based upon the Consumer Price Index;

      b.    an incentive bonus targeted at fifty percent (50%) of

Plaintiff's base salary, with a maximum payout of one hundred percent (100%) of

his base salary;

      c.    participation in the Company's equity-based incentive plan

for senior management;

      d.    participation in the Company's deferred compensation

retirement plan ("EDCRP");

      e.    participation in the Company's pension and saving's plans;

      f.    health insurance;

      g.    long-term disability insurance providing not less than sixty-

five percent (65%) of Plaintiff's base salary;

A-5

h.    life insurance providing death benefits of not less than $1,875,000;

i.    provision of an automobile and automobile allowance;

j.    payment of membership expenses (including fees and dues) at clubs chosen by the Plaintiff with the consent of the Company (not to be unreasonably withheld); and

k.    payment for a yearly physical medical examination.

16.    The Agreement also provided in pertinent part in Section 4(e) that AET could terminate Plaintiff at any time "without cause" during the term of the Agreement and that upon that occurrence (or if the Plaintiff's employment should terminate at the end of the term pursuant to notice given by AET), Plaintiff would be entitled to receive the following severance benefits:

a.    payment of all unpaid base salary and benefits through the date of termination;

b.    within 60 days after termination, payment in a lump sum equal to the total of 18 months base pay and average bonus he would have received if still employed for that period[1];

c.    payment of any unpaid bonus;

d.    continuation for 18 months from the date of termination of Plaintiff's participation in all benefit plans referred to in Sections 3(d)(i)(disability insurance, health insurance, pension, retirement plans and accident plans),

---

[1] Plaintiff's Employment Agreement that controlled the terms of his employment prior to March 8, 2005 provided for a severance period of 36 months.

A-6

3(d)(ii)(EDCRP), 3(d) (iii)(B)(life insurance) or the cash equivalent thereof and 3(e);[2] and

        e.      vesting in all plans as if the Plaintiff were employed through the 18 month severance period.

      17.     The singular eligibility requirement for all severance benefits due to Plaintiff upon termination without cause was the execution of a general release in favor of AET in a form reasonably satisfactory to AET and Plaintiff.

      18.     On February 7, 2006, Plaintiff's employment with AET was terminated without cause.

      19.     On or about April 11, 2006, AET transmitted a proper calculation of the benefits owed under the severance provisions of the Agreement in the amount of $925,426.67, and contrary to the specific terms of the Agreement: proposed payment of its obligations in four installments through January 2007; required the continued Board Membership of Plaintiff; made the benefits and EDCRP payments due to Plaintiff conditional upon extraneous events and circumstances; restated alleged obligations stated under the Employment Agreement and required their novation; required the release of entities and individuals other than AET; and required Plaintiff's continued consultation services after termination.  A copy of the unsigned correspondence of AET is attached as Exhibit "B."  Despite Plaintiff's complete compliance with the terms of the Employment Agreement, including the proffer of an appropriate release of AET, no payments in accordance with the terms of the controlling Employment Agreement have been made to date.

---

[2] See Footnote No. 1 above.

A-7

20.    The actions of AET constitute a material breach of Plaintiff's Employment Agreement of March 8, 2006, violations of the employee benefit plan established thereunder and violations of the statutory and common law of the State of Delaware.

21.    As a direct result of improper actions of AET as set forth herein, Plaintiff has and will continue to suffer great economic loss as well as severe financial and emotional distress.

## COUNT I

### Violations of ERISA
### Plaintiff v. AET

22.    Plaintiff repeats and realleges paragraphs 1 through 21 above as though fully set forth herein.

23.    The actions of AET in failing to pay Plaintiff in accordance with the terms of the controlling terms of the Employment Agreement and institute the equity-based incentive plan as required therein are in direct violation of the provisions of ERISA as set forth at Section 1132(1)(B).

## COUNT II

### Breach of Contract
### Plaintiff v. AET

24.    Plaintiff repeats and realleges paragraphs 1 through 23 above as though fully set forth herein.

25.    Plaintiff and Defendant AET entered into a contract of employment for good and valuable consideration that set forth the terms and conditions upon which Plaintiff's employment could be terminated without cause as stated above.

8

A-8

26.    Defendant AET materially violated its contract with Plaintiff by not complying with the conditions set forth in the controlling Employment Agreement of March 8, 2005, including the non-establishment of a qualified executive equity-based incentive plan, which was to be established by April 8, 2006 in accordance with the Solicitation and Disclosure Statement of AET dated November 1, 2004 that was agreed to by Craig on behalf of DDJ Capital Management, LLC and not compensating Plaintiff at the conclusion of his employment in accordance with the severance provisions of the Agreement.

## COUNT III

### Breach of the Implied Covenant of Good Faith and Fair Dealing
### Plaintiff v. AET

27.    Plaintiff repeats and realleges paragraphs 1 through 26 above as though fully set forth herein.

28.    The law of Delaware implies a covenant of good faith and fair dealing into the contractual relationship between Plaintiff and Defendant AET.

29.    In acting as described above, Defendant AET wrongfully and unreasonably breached its duty implied in the Employment Agreement of March 8, 2005 to deal fairly and in good faith with Plaintiff pursuant to the terms thereof.

## COUNT IV

### Delaware Wage Payment And Collection Law
### 19 Del.C. § 1101, *et seq.*
### Plaintiff v. Both Defendants

30.    Plaintiff incorporates the allegations in paragraphs 1 through 29, above as if fully set forth herein.

9

A-9

31. At the termination of his employment and 60 days thereafter, all payments due to Plaintiff under the terms of the Employment Agreement of March 8, 2005 were immediately due and payable.

32. In direct violation of the terms of the Delaware Wage Payment and Collection Law, Defendant AET failed to pay Plaintiff the balance due and owing to him.

33. Defendant AET has willfully and without good reason therefore, failed to pay Plaintiff the severance payments mandated by the Agreement to date.

34. Defendant AET does not have any good faith dispute regarding its duty to pay the sums owed under the terms of Plaintiff's Employment Agreement to Plaintiff.

35. As the Officers, Directors and fiduciaries and administrators of AET and its benefits plans applicable hereto, the individual Defendants are jointly and severally liable with Defendant AET for all payments due to Plaintiff.

## COUNT V
### Fraud in the Inducement
### Plaintiff v. Defendants Craig and AET

36. Plaintiff incorporates the allegations in paragraphs 1 through 35, above as if fully set forth herein.

37. The Defendants Craig and AET induced Plaintiff to enter into the March 8, 2005 Employment Agreement (that provided for a severance benefit of only 18 months as opposed to the 36 month severance benefit in the employment contract that it replaced) by promising that an executive equity-

10

A-10

based incentive plan in which Plaintiff would participate would be put into place. At the time that they were made, these promises were known to be, and were intended to be, false and fraudulently made for the sole purpose of inducing Plaintiff to enter into the Employment Agreement of March 8, 2005, the terms of which were negotiated on behalf of AET by Craig with the intention of shortly thereafter terminating Plaintiff's employment and thereby permitting the payment of a greatly reduced severance benefit.

38.    On reliance of the commitment of AET that he would enjoy the benefits of that participation, plaintiff entered into the Agreement on or about March 8, 2005 and as a result, reduced his entitlement to a significantly higher severance benefit.

39.    As a direct result of Defendants' fraud, Plaintiff has suffered the loss of compensation and benefits as set forth above as well as the painful diminution of his ability to provide for himself and his family.

40.    As a direct result of Defendants' fraud, Plaintiff has suffered emotional distress and humiliation.

41.    Defendants' actions were willful, vindictive, malicious, outrageous, without cause and in reckless disregard of the rights of the Plaintiff.

### COUNT VI

### Libel and Slander
### Plaintiff v. Defendants AET, Craig and Smith

42.    Plaintiff incorporates the allegations in paragraphs 1 through 41, above as if fully set forth herein.

11

A-11

43.   Following Plaintiff's termination from employment with AET, Plaintiff was provided and as requested, agreed to a press release regarding Plaintiff's resignation a copy of the press release is attached as Exhibit "C". Defendant Smith, upon the direction, and with the full approval, of Defendant Craig, made statements for publication in the Packaging Strategies Newsletter, the most influential publication in the packing industry disseminated to packaging professionals and their customers throughout the world, that would lead a reasonable reader that Plaintiff was not competent to fulfill his duties as a company Chief Executive Officer.

44.   As a direct result of those actions, Packaging Strategies Newsletter published on page 8 of its February 28, 2006 edition an article that heralded AET's growth and accomplishments since Plaintiff became its President in 2002 and stated, quoting Defendant Smith, that Plaintiff's "resignation...came down to a singular event-driven inability to establish a good communication flow," a trait essential to the competency of any company executive, leaving the publication to speculate as to "what went on between Terhune and the board." A copy of the published defamatory statements are attached as Exhibit "D."

45.   As fully set forth above, the Defendants Craig and Smith, individually and in concert, have, by words and actions, published, or caused to be published, false and defamatory information about the Plaintiff in connection with Plaintiff's termination from employment with Defendant AET without privilege or justification.

46.   The false information published, or caused to be published, by the

12

A-12

Defendants Craig and Smith about the Plaintiff relate to the fitness of plaintiff to be employed in the packing industry or to be employed as a high level executive expected to competently communicate with any company's Board of Directors in a competent manner and therefore, constitute defamation *per se.*

47.    As a direct result of the improper and unlawful publication of defamatory information about Plaintiff by Defendants, the reputation of the Plaintiff has been irreparably damaged in the communities in which he lives and works.

**WHEREFORE**, Plaintiff claims of the Defendants and demands judgment for:

(a)    specific performance by AET and the individual Defendants of all the terms and conditions set forth in the Employment Agreement of March 8, 2005 including the granting and payment of all benefits provided therein;

(b)    the award to Plaintiff in an amount equal to all sums owed under the terms of his contract including wages, bonuses, benefits, severance and other amounts owed, as well as all statutory penalties under the applicable provisions of ERISA and the Delaware Wage Payment and Collection Law;

13

A - 13

(c)    pre- and post-judgment interest and attorneys fees as allowed by law;

(d)    all other applicable compensatory and punitive damages; and

(e)    all other relief that the Court deems just and proper under the circumstances.


/s/ James S. Green, Sr.
James S. Green, Sr., Esquire (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

                                        Attorneys for Plaintiff

Dated:  May 30, 2006

268950-1

A-14

EXHIBIT A

## EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into as of March 8, 2005 (the "Effective Date"), by and between Applied Extrusion Technologies, Inc., a Delaware corporation (the "Employer"), and David N. Terhune (the "Executive").

### RECITALS

1.      The Executive is currently employed by the Employer as its Chief Operating Officer and President pursuant to an Amended and Restated Employment Agreement dated as of August 1, 2002, as in effect on the date hereof (the "Prior Employment Agreement").

2.      The Employer desires to continue to employ the Executive and to make secure for itself the experience, abilities and services of the Executive and to prevent the loss of such experience, services and abilities.

3.      In consideration of the employment to be provided hereby and the amounts to be paid as provided herein, the Executive desires to continue to be employed by the Employer and to agree with the Employer as further provided herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.      Employment.  The Employer shall continue to employ the Executive, and the Executive shall continue to perform services for and continue in the employment of the Employer, for the period (the "Employment Period") beginning on the Effective Date and ending on December 31, 2006, subject to extension as set forth herein (such final date, as from time to time in effect, being referred to herein as the "Expiration Date"); provided, however, that, unless either the Employer or the Executive shall give notice to the other (which notice may be given in the sole discretion of either party hereto) no later than ninety (90) days prior to the then-current Expiration Date (the "Current Expiration Date") that such party does not wish to have the Employment Period extended for another year past the Current Expiration Date, then, at the close of business on such date which is ninety (90) days prior to the Current Expiration Date, the Expiration Date shall automatically become the date which is exactly one (1) year after the Current Expiration Date; and provided, further, that the employment of the Executive by the Employer may be terminated prior to the Expiration Date in accordance with Section 4 hereof.

2.      Capacity.  During the Employment Period:

(a)      Position and Duties.  The Executive shall serve on a full-time basis in the capacity of Chief Executive Officer and President, shall report to the Board of Directors of the Employer (the "Board") and shall be accountable to, and shall have such other powers, duties and responsibilities consistent with his position and experience as may from time to time be prescribed by, the Board.  The Executive shall perform and discharge, faithfully, diligently and to the best of his ability, such duties and responsibilities.  The Executive shall devote substantially all of his working time and efforts to the business and affairs of the Employer.

A-16

(b)    Board Membership.  The Employer agrees to propose to the shareholders of the Employer at each appropriate meeting of such shareholders the reelection of the Executive as a member of the Board, so long as the Executive is otherwise eligible for such election; provided, however, that if the Executive's employment hereunder terminates for any reason, the Executive shall immediately be deemed to have resigned from the Board and from the board of directors of each subsidiary or affiliate of the Employer on which the Executive is then serving, if the Employer has paid all amounts owed to the Executive by virtue of the termination of his employment and is not otherwise then in default hereunder.

3.    Compensation and Benefits.

(a)    Salary.  During each year of the Employment Period, the Executive shall receive an annual base salary (the "Base Salary") of $430,000; provided, however, that effective January 1, 2006, and on each January 1 thereafter, the Base Salary then in effect shall be increased by the greater of (i) such increase as the Board may specify in its sole discretion or (ii) an amount equal to the then-current Salary *multiplied by* the percentage increase (if any) in the Consumer Price Index for All Urban Consumers (CPI-U) - U.S. City Average during the immediately preceding calendar year.

(b)    Incentive Bonus; Equity Incentives .

(i)    During each year of the Employment Period, the Executive shall be eligible to receive an incentive bonus (the "Bonus") based upon criteria that are defined annually by the Employer and targeted at fifty percent (50%) of Base Salary, with a maximum payout potential of one hundred percent (100%) of Base Salary.

(ii)    In consultation with the Executive, the Board will establish a plan providing for equity-based incentives for the senior management of the Employer. The Executive shall be entitled to participate in such plan at a level commensurate with his position as the Chief Executive Officer and President of the Employer.

(c)    Expenses.  The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him on behalf of the Employer consistent with Employer's past practices with Executive and in accordance with the Employer's business expense reimbursement policies.

(d)    Pension and Welfare Benefits.

(i)    The Executive shall be entitled, subject to eligibility requirements, to participate in or receive benefits under each disability insurance, health, pension, retirement and accident plan or arrangement generally made available by the Employer to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.

A-17

(ii)    In consultation with the Executive, the Board will establish an executive deferred compensation retirement plan (the "EDCRP") that provides benefits substantially the same as the Employer's executive deferred compensation retirement plan established on September 1, 1994 and amended and restated August 10, 2001, pursuant to which the Executive will receive a "Company Credit" (as such term was defined in the Employer's plan) of twenty percent (20%) and pursuant to which the Executive will be fully vested in all benefits provided thereunder.

(iii)   The Employer shall provide to the Executive or, at the Executive's election, reimburse the Executive on an after tax basis for the cost of the following:

(A)     Long-term disability insurance providing not less than sixty-five percent (65%) of Base Salary replacement until age sixty-five (65), and

(B)     Life insurance protection providing total death benefits of not less than $1,875,000, payable to such person as the Executive has designated in a notice filed with the Employer (the "Designee"), or, if no such person has been designated, to his estate (the "Estate"), in each case consistent with the Employer's past practices regarding such insurance for executives.

(e)     Additional Fringe Benefits.  Without limiting the generality of the foregoing, during the Employment Period:

(i)     the Executive shall be furnished with an automobile, of a make and year reasonably satisfactory to the Employer and the Executive and consistent with the past practice of the Employer with the Executive , either owned or leased by the Employer or by way of an automobile allowance sufficient to permit the Executive to obtain the use of such an automobile;

(ii)    the Employer shall either pay the Executive's membership expenses (including fees and dues), or otherwise make available to the Executive at no cost to the Executive, membership at clubs chosen by the Executive with the consent of the Employer (not to be unreasonably withheld) and consistent with the past practice of the Employer with the Executive; and

(iii)   the Executive shall be entitled to a physical examination each calendar year, by a physician selected by the Executive, either pursuant to the Employer's health or other plans or otherwise at the expense of the Employer.

A-18

(f)    Change of Control.  If a "Change of Control" (as such term is defined and set forth in Exhibit A hereto) shall occur, then

(i)    all equity-based incentives previously granted to the Executive which, by their terms, have not yet vested, shall immediately vest and (as applicable) become exercisable and shall remain exercisable until the earlier of the Benefits Termination Date or the expiration date of the related grant of such equity-based incentives, regardless of employment status, and

(ii)    the Executive shall be entitled to carry out Executive's duties and responsibilities hereunder primarily from Executive's current office in New Castle, Delaware (or another facility serving such purpose and located within 15 miles of such current office) and will not be required to locate his primary place of business outside such area without his consent (which may be given or withheld in his sole discretion).

4.    Termination and Consequences Thereof.

(a)    Definitions.  As used herein, the following terms shall have the meanings indicated:

(i)    "Average Bonus" shall mean the greater of (A) the average annual Bonus accrued by the Employer as payable to the Executive with respect to the three (3) years immediately preceding the Termination Date or (B) twenty-five percent (25%) of the Base Salary payable in the year in which the Termination Date occurs.

(ii)    "Benefits Termination Date" shall mean the date which is eighteen (18) months after the Termination Date; provided, however, that in the case of a termination by the Company for Cause or by the Executive without Good Reason or if the Executive's employment hereunder shall terminate on the Expiration Date because the Executive has given the notice contemplated by the first proviso to Section 1 hereof, the Benefits Termination Date shall be the Termination Date.

(iii)    "Cause" shall mean (A) other than by reason of Executive's Disability, willful conduct by the Executive demonstrating gross misconduct and gross unfitness to serve and which has caused material harm to the business or interests of the Employer, or (B) the Executive's conviction of, or entry into a consent decree or substantially similar arrangement in connection with, a felony crime involving fraud, dishonesty or other conduct which materially and adversely affects the Employer.  For purposes of this Section 4, no act, or failure to act, on the Executive's part shall be considered "willful" unless done, or omitted to be done, by him knowing that such action or inaction would not be in the best interests of the Employer or otherwise done or omitted to be done in bad faith or with reckless disregard for the best interests of Employer.

A-19

(iv)    "Disability" shall mean a physical or mental incapacity that prevents the Executive from performing the essential functions of his position with the Employer for a period of one hundred eighty (180) or more consecutive days as determined (A) in accordance with any long-term disability plan provided by the Employer, or (B) by the following procedure:  The Executive agrees to submit to medical examinations by a licensed healthcare professional selected by the Employer, in its sole discretion, to determine whether a Disability exists.  In addition, the Executive may submit to the Employer documentation of a Disability, or lack thereof, from a licensed healthcare professional of his choice.  Following a determination of a Disability or lack of Disability by the Employer's or the Executive's licensed healthcare professional, the other party may submit subsequent documentation relating to the existence of a Disability from a licensed healthcare professional selected by such other party.  In the event that the medical opinions of such licensed healthcare professionals conflict, such licensed healthcare professionals shall appoint a third licensed healthcare professional to examine the Executive, and the opinion of such third licensed healthcare professional shall be dispositive.

(v)    "Good Reason" shall mean a termination by the Executive due to the occurrence of one or more of the following:  (A) failure of the Employer to continue the Executive in the position of Chief Executive Officer and President, (B) failure of the Executive to be elected to the Board, (C) material diminution in the nature or scope of the Executive's responsibilities, duties or authority, or (D) a decrease in the Executive's compensation, bonus opportunity and benefits, in the aggregate, including a failure to pay any such amounts when due; provided, however, that no termination by the Executive for Good Reason shall be effective unless and until the Executive has given thirty (30) days  written notice to the Board of the reasons for the termination for Good Reason, and the Employer has failed to remedy such reasons; and provided, further, that no termination for Good Reason shall be effective if the reasons for the termination occurred more than sixty (60) days prior to the date on which the Executive has provided written notice to the Board.

(vi)    "Termination Date" shall mean the earlier of (A) the Expiration Date or (B) if the Executive's employment is terminated (1) by his death, the date of his death, (2) due to a Disability, the date that the Executive commences receiving long-term disability benefits pursuant to a plan provided by the Employer or, if later, is otherwise determined to have suffered a Disability in accordance with the process prescribed herein, or (3) for any other reason, the date on which such termination is to be effective pursuant to the notice of termination given by the party terminating the employment relationship.  The Employment Period shall terminate on the Termination Date, and the Expiration Date shall automatically be changed and shall become the Termination Date.

A-20

(b)   <u>Death</u>.  The Executive's employment hereunder shall terminate upon his death.  In such event, the Employer shall provide the Designee or, if no such person has been designated, the Estate, with the following, in lieu of any other payments or benefits whatsoever:

    (i)   as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

    (ii)   any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date, and

    (iii)   the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

(c)   <u>Disability</u>.  The Employer, by action of the Board, may terminate the Executive's employment hereunder due to the Executive's Disability, in which event, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

    (i)   as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

    (ii)   any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date,

    (iii)   during the period beginning on the Termination Date and ending on the Benefits Termination Date, shall continue Executive's the participation in the benefit plans referred to in <u>Sections 3(d)(i)</u>, <u>3(d)(ii)</u>, <u>3(d)(iii)(B)</u> (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to <u>Section 3(e)</u> hereof, and

    (iv)   the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

A-21

(d)    <u>Termination by the Employer for Cause</u>.  The Employer may terminate the Executive's employment hereunder for Cause, in which event, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for unpaid Base Salary and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(e)    <u>Termination by the Employer Without Cause</u>.  The Employer may terminate the Executive's employment hereunder, other than pursuant to Section 4(b) (relating to death), Section 4(c) (relating to Disability) or Section 4(d) (for to Cause), at any time.  In the event of such termination, or if the Executive's employment hereunder shall terminate on the Expiration Date because the Employer has given the notice contemplated by the first proviso to Section 1 hereof, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

(i)    as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

(ii)    a lump sum payment, within 60 days after the Termination Date, equal to the aggregate amount of Salary and Average Bonus that would have been payable to the Executive over the period from the Termination Date to the Benefits Termination Date if the Executive had continued to be employed by the Employer through the Benefits Termination Date and received Salary and Average Bonus for periods after the Termination Date based upon the Salary he would have received under Section 3(a) if this Agreement was extended through the Benefits Termination Date (but excluding any cost of living or discretionary increases that would have occurred after the Termination Date),

(iii)    any previously awarded but unpaid Bonus,

(iv)    during the period beginning on the Termination Date and ending on the earlier of the Benefits Termination Date and the date on which the Executive first becomes eligible for substantially equivalent benefits provided by any other entity following the Termination Date, shall continue Executive's participation in the benefit plans referred to in Sections 3(d)(i), 3(d)(ii), 3(d)(iii)(B) (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to Section 3(e) hereof, and

(v)    benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans, programs or arrangements in which the Executive is participating on the Termination Date (including without limitation any equity based incentive plans), subject to the following:  (A) with respect to all vesting requirements, the

A-22

Executive shall be deemed to have been employed by the Employer until the Benefits Termination Date, (B) any vested stock options shall remain exercisable until the earlier of the Benefits Termination Date and the date such options would expire according to the terms of the grant, provided they do not otherwise expire.

(f)    <u>Termination by the Executive for Good Reason</u>.  The Executive may terminate his employment hereunder for Good Reason in accordance with <u>Section 4(a)(v)</u>.  In event of termination pursuant to this <u>Section 4(f)</u>, the Employer shall provide the Executive with the payments and benefits set forth in <u>Section 4(e)</u>, above, in lieu of any other payments or benefits whatsoever.

(g)    <u>Termination by the Executive Other Than for Good Reason</u>.  The Executive may terminate his employment hereunder other than for Good Reason.  In the event of termination of the Executive's employment pursuant to this <u>Section 4(g)</u>, or if the Executive's employment hereunder terminates on the Expiration Date because the Executive has given the notice contemplated by the first proviso to <u>Section 1</u> hereof, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for payment of any unpaid Base Salary earned and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(h)    <u>Effect of Termination</u>.  This <u>Section 4</u> sets forth all obligations of the Employer to the Executive upon termination of his employment hereunder, including any payments or benefits due under any severance plans or policies administered by the Employer.  The provisions of this <u>Section 4</u> and of <u>Sections 5</u>, <u>6</u>, <u>7</u>, <u>8</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u> hereof shall survive the Termination Date.

(i)    <u>Consulting Services</u>.  Following termination of his employment hereunder pursuant to the provisions of <u>Section 4(e)</u> or <u>Section 4(f)</u> hereof, and in partial consideration for the payments provided pursuant thereto, during the period from the Termination Date until the Benefits Termination Date, the Executive shall provide to the Employer no less than eight (8) hours per month of consulting services as reasonably requested by Employer.  Such consulting services shall be provided from locations and at times reasonably acceptable to both parties.  The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him in connection with the provisions of consulting services to the Employer, subject to the Executive providing appropriate documentation of the same.

(j)    <u>Non-Duplication of Benefits</u>.  Notwithstanding the foregoing, nothing in this Agreement shall result in a duplication of payments or benefits provided under this <u>Section 4</u>, nor shall anything in this Agreement require the Employer to make any payment or to provide any benefit to the Executive that the Employer is otherwise required to provide under any other contract, agreement or arrangement except to the extent that this Agreement specifically provides that Executive shall be entitled to the benefits under a policy or program maintained by Employer.

A-23

(k)    General Release.  No payments or benefits payable to the Executive upon the Termination of his employment pursuant to this Section 4 shall be made to the Executive unless and until the Executive executes a general release in favor of the Employer in a form reasonably satisfactory to the Employer and the Executive and such general release becomes effective pursuant to its terms.

(l)    No interest shall accrue on or be paid with respect to any portion of any payments hereunder, except as required by law.

5.    Duty of Loyalty.

(a)    General.  The Employer is engaged in a continuous program of research, design, development, production, marketing and servicing with respect to its businesses and the clients and customers it services, and the Executive's employment with the Employer creates a relationship of confidence and trust between the Executive and the Employer with respect to the business of the Employer and its Affiliates (as hereinafter defined) and to the business of any client or customer of the Employer or its Affiliates.

(b)    Definitions.  For the purposes of this Agreement, the following terms shall have the following meanings:

(i)    "Affiliate" shall mean any person, corporation or other entity directly or indirectly under the common control of the Employer.  For the purposes of this definition, "control" when used with respect to any person, corporation or other entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.  The terms "controlling" and "controlled" have meanings correlative to the foregoing.

(ii)    "Competitor" shall mean a person or entity (including, without limitation, the Executive) that in any way:

(A)    conducts, operates, carries out or engages in the business of manufacturing oriented polypropylene films, or

(B)    conducts, operates, carries out, engages in or is involved in any other business which the Employer or any Affiliate may in the future conduct, in any geographic area in which such business is conducted by the Employer or any Affiliate.

The terms "competition," "competitive" and "compete" have meanings correlative to the foregoing.

(iii)    "Confidential Information" means all confidential, proprietary or other non-public information relating to the Employer and its Affiliates and their businesses, and includes without limitation all such information relating to: (A) the development, research, testing, manufacturing and marketing activities of the Employer, (B) the products manufactured, sold or

A-24

distributed by the Employer, (C) the costs, sources of supply and strategic plans of the Employer, (D) the identity and special needs of the customers of the Employer, (E) the financial arrangements and capital structure of the Employer, (F) the management and operation of the Employer, and (G) people and organizations with whom the Employer has business relationships and those relationships, regardless in any instance of whether such information has been reduced to documentary form. Confidential Information also includes comparable information that the Employer may receive or has received belonging to customers or others who do business with the Employer. Confidential Information shall not include information which is publicly known, or becomes publicly known, through no fault of the Executive or is generally known or readily obtainable by the public.

(iv)    "Restricted Period" shall mean the twenty-four (24) month period following the Benefits Termination Date.

(c)    Restricted Activities. As a condition of the Executive's having access to Confidential Information, and in consideration of the payments and benefits provided hereunder, the Executive agrees that the Executive will not, directly or indirectly, either for himself or for any other person or entity, whether as an owner, partner, agent, consultant, employee, officer, director, investor, shareholder, proprietor or in any other individual or representative capacity (excluding the holding for investment of less that five percent (5%) of the outstanding securities of any corporation which are regularly traded on a recognized stock exchange), do any of the following:

(i)    Nondisclosure and Nonuse of Confidential Information. The Executive shall not disclose to any other person (except as required by applicable law or in connection with the performance of his duties and responsibilities hereunder), or use for his own benefit or gain, any Confidential Information. The Executive understands that this restriction shall continue to apply after the Executive's employment terminates, regardless of the reason for such termination.

(ii)    Non-Interference with Business Relationships. During the Restricted Period, the Executive shall not:

(A)    Engage in Competition with the Employer without the Employer's prior express written approval;

(B)    Divert or take away (or attempt to divert or take away) any of the Employer's present, former or prospective customers, including, but not limited to, those upon whom he called, met with or became acquainted with while engaged as an employee of the Employer;

(C)    Interfere with the contractual or business relationships of the Employer;

A-25

(D)     Solicit or attempt to solicit any clients of the Employer; or

(E)     Slander or disparage the Employer, or undertake any activity which adversely impacts, or is reasonably likely to impact, the goodwill of the Corporation and its business opportunities.

(iii)     Non-Solicitation.  During the Restricted Period, the Executive shall not:

(A)     Knowingly, nor shall the Executive knowingly attempt to or assist any other person in attempting to, employ or engage or solicit for employment any person who is then, or at any time during the one hundred eighty (180) day-period prior thereto was, (x) an officer; (y) an employee; or (z) a consultant, agent or independent contractor (in each case, if exclusively dedicated to service to the Employer) of the Employer or otherwise provided services to the Employer in a similar, full-time capacity; or encourage any such person to terminate such relationship with the Employer, without the express written consent of the Board; or

(B)     Solicit, pursue, call upon or take away, either for himself or for the benefit of any other person or entity, any of the customers of the Employer upon whom he called or with whom he became acquainted during his employment with the Employer as it relates to the business of the Employer.

(d)     Documents, Materials and Property.  Upon termination of the Executive's employment with the Employer or at any other time upon the Employer's request, the Executive will promptly deliver to the Employer i) without retaining any copies, all documents and other materials furnished to the Executive by the Employer, prepared by the Executive for the Employer or otherwise relating to the Employer's business, if and to the extent that the information therein constitutes Confidential Information, and (ii) any other property of the Employer in the Executive's possession, custody or control.

(e)     Duty to Disclose.  The Executive will inform the Employer in writing of any offer of employment or engagement that he receives during his employment with the Employer or during the Restricted Period from a Competitor, or any person or entity who might reasonably be viewed to be a Competitor, prior to accepting such offer.  Without limiting the foregoing, if the Executive seeks employment with a company that has several divisions, only certain of which are Competitive with the Employer, and the Executive seeks employment with such non-competitive division, the Executive may accept such employment, provided that the Employer is informed in writing of the offer in accordance with the preceding sentence, and the new employer is informed of the restrictions and obligations set forth herein.

A-26

(f)     <u>Reasonableness of Restrictions</u>. The Executive represents that his experience, capabilities and circumstances are such that the provisions of this <u>Section 5</u> will not prevent him from earning a livelihood. The Executive further agrees that the limitations set forth in this <u>Section 5</u> are reasonable in duration, geographic area and scope and are properly required for the adequate protection of the business interests of the Employer. It is understood and agreed that the covenants made by the Executive in this <u>Section 5</u> shall survive any termination of the Executive's employment with the Employer.

(g)     <u>Relief; Interpretation</u>. The Executive agrees that the Employer shall, in addition to any other remedies available to it, be entitled to preliminary and permanent injunctive relief against any breach by him of the covenants and agreements contained in this <u>Section 5</u> without having to post bond. In the event that any provision of this <u>Section 5</u> hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, it shall be interpreted to extend only over the maximum period of time, geographic area or range of activities as to which it may be enforceable. Each of the covenants of this <u>Section 5</u> shall be construed as separate covenant covering the subject matter in each of the separate counties and states in the United States and governmental subdivisions outside of the United States (collectively, the "<u>Governmental Units</u>"). To the extent that any covenant is determined by a court of competent jurisdiction to be unenforceable in any one or more of said Governmental Units, said covenant shall not be affected with respect to any other Governmental Unit, each covenant with respect to each Governmental Unit being construed as severable and independent. For purposes of this <u>Section 5</u> the term "<u>Employer</u>" shall mean the Employer and any of its Affiliates to the extent that such enterprises are, during the term of the Executive's employment by the Employer, engaged in the same line of business as the Employer.

6.     <u>Conflicting Agreements</u>. The Executive hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which he is a party or is bound, and that he is not now subject to any covenants against competition or similar covenants which would affect the performance of his obligations hereunder. The Executive will not disclose to or use on behalf of the Employer any proprietary information of a third party without such party's consent. The Executive will not enter into any agreement, whether written or oral, conflicting with the provisions of this Agreement.

7.     <u>Taxes</u>.

(a)     All payments made by the Employer under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Employer under applicable law.

(b)     Notwithstanding the immediately preceding sentence, in the event that it is determined that any payments or benefits provided by the Employer to or for the benefit of the Executive will be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code or any successor provision ("*Section 4999*"), the Employer will, immediately prior to the date on which any amount of the excise tax must be paid or withheld, make an additional lump-sum payment (the "*gross-up payment*") to the Executive. The gross-up payment will be sufficient, after giving effect to all federal, state and other taxes (including any excise tax under

A-27

Section 4999) and charges (including interest and penalties, if any) with respect to the gross-up payment, to make the Executive whole for all taxes (including withholding taxes) and any associated interest and penalties imposed under or as a result of Section 4999 with respect to all payments and benefits provided by the Employer to or for the benefit of the Executive. Determinations under this Section 7 will be made by the Employer's independent auditors unless the Executive has reasonable objections thereto, in which case the determinations will be made by a comparable auditor chosen by the Executive after consultation with the Employer (the firm making the determinations to be referred to as the "*Firm*"). The determinations of the Firm will be binding upon the Employer and the Executive except as the determinations are established in resolution (including by settlement) of a controversy with the Internal Revenue Service to have been incorrect. All fees and expenses of the Firm will be paid by the Employer. If the Internal Revenue Service asserts a claim that, if successful, would require the Employer to make a gross-up payment or an additional gross-up payment, the Employer and the Executive will cooperate fully in resolving the controversy with the Internal Revenue Service. The Employer will make or advance such gross-up payments as are necessary to prevent the Executive from having to bear the cost of payments made to the Internal Revenue Service in the course of, or as a result of, the controversy. The Firm will determine the amount of such gross-up payments or advances and will determine after resolution of the controversy whether any advances must be returned by the Executive to the Employer. The Employer will bear all expenses of the controversy and will gross the Executive up for any additional taxes that may be imposed upon the Executive as a result of its payment of such expenses.

8. <u>Indemnification</u>. To the maximum extent permitted under the Employer's by-laws, the Employer hereby agrees to indemnify the Executive and hold him harmless from, against and in respect of any and all damages, deficiencies, actions, suits, proceedings, demands, assessments, judgments, claims, losses, costs, expenses, obligations and liabilities arising from or related to the performance of this Agreement or the Prior Employment Agreement by the Executive, other than for gross negligence, willful misconduct or willful violation of this Agreement, provided that the Executive gives the Employer prompt notice of any matter to which he is claiming indemnification, including any threats thereof, and subject to such procedural requirements that the Employer may impose.

9. <u>Notices</u>. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or three (3) days after being mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(i)     If to Employer, to it at:

Applied Extrusion Technologies, Inc.
15 Read's Way
New Castle, Delaware  19720
Attention:  Chief Financial Officer

A - 28

and to:

Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110
Attention: Winthrop G. Minot

(ii)    If to the Executive, to him at:

Applied Extrusion Technologies, Inc.
15 Read's Way
New Castle, Delaware 19720

with a copy to him at:

Box 299
Montchanin, Delaware 19710

10.    Assignment. Neither the Employer nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; provided, however, that the Employer may assign its rights and obligations under this Agreement without the consent of the Executive in the event that the Employer shall hereafter effect a reorganization, consolidate with, or merge into any other person or transfer all or substantially all of its properties or assets to any other person. This Agreement shall inure to the benefit of and be binding upon the Employer and the Executive, their respective successors, executors, administrators, heirs and permitted assigns

11.    Cooperation. As of the Effective Date and at all times thereafter, the Executive hereby agrees to cooperate in all reasonable respects (after taking into account any employment obligations the Executive may have during periods after the Termination Date) with the Employer and its subsidiaries, affiliates, directors, officers, attorneys and experts in connection with the conduct of any action, proceeding, investigation or litigation involving the Employer, either directly or indirectly, including any such action, proceeding, investigation or litigation in which the Executive is called to testify. In connection with the Executive's compliance with this Section 11, the Employer will provide the Executive with reimbursement for any reasonable out-of-pocket expenses incurred by the Executive.

12.    Legal Fees.

(a)    In the event of litigation concerning the interpretation or application of any provision of this Agreement or concerning any other issue arising out the Executive's employment, the court or other tribunal deciding the dispute shall have the authority to direct the party that does not prevail to pay the reasonable attorneys fees of the prevailing party.

(b)    Notwithstanding the provisions of section 12(a), the Employer shall pay or reimburse Executive on an after-tax basis for all costs and expenses (including, without limitation, court costs and reasonable legal fees and expenses incurred by Executive) as a result of any claim, action or proceeding arising solely out of any claim by Executive that Employer

A-29

wrongfully failed to make termination payments due under Sections 4(e) or (f) of this Agreement when due. Such payments or reimbursements shall be made promptly following, receipt by the Employer of request by Executive for such payment or reimbursement, including an invoice detailing any such legal fees and expenses. Requests for payment or reimbursement hereunder may be delivered no more frequently than monthly. Notwithstanding the foregoing, the Executive shall reimburse the Employer for any fees or expenses previously paid or reimbursed by Employer in connection with a dispute if the relevant trier-of-fact determines that Executive's claim for termination payments under Sections 4(e) or (f) was not brought or asserted in good faith.

13. <u>Miscellaneous</u>.

(a) <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous communications, agreements, representations, understandings and negotiations, whether oral or written, with respect to the subject matter hereof. As of the Effective Date, the Prior Employment Agreement is hereby terminated with respect to the employment of the Executive by the Employer, and shall be of no further force or effect with respect to such employment.

(b) <u>Amendments</u>. No amendment to this Agreement shall be effective unless it shall be in writing and signed by each party hereto. No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

(c) <u>Waiver</u>. The waiver by either party of a breach of any provision of this Agreement by the other party will not operate or be construed as a waiver of any other subsequent breach by the other party.

(d) <u>Severability</u>. The invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of any other term or provision hereof.

(e) <u>Headings</u>. The headings in this Agreement are for convenience of reference only and shall not alter or otherwise affect the meaning hereof.

(f) <u>Counterparts</u>. This Agreement may be executed in any number of counterparts which together shall constitute one instrument.

(g) <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the domestic substantive laws of the State of Delaware without regard to any choice or conflict of laws rules or principles that would cause the application of the domestic substantive laws of any jurisdiction other than the State of Delaware.

(h) <u>Acknowledgement</u>. By signing this Agreement, the Executive hereby acknowledges and confirms that:

(i) he has consulted with legal counsel of his choice regarding the terms of this Agreement;

A-30

(ii)     he has read the Agreement carefully and completely and understands each
         of the terms hereof; and

(iii)    he is entering into this Agreement of his own free will and has not been
         subject to any coercion or duress in this regard.


IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement
as of the date first written above.

APPLIED EXTRUSION TECHNOLOGIES, INC.

By: _____
         Brian Crescenzo
         Chief Financial Officer


EXECUTIVE

_____
         David N. Terhune


Page 16 of 16

A-31

EXHIBIT A

Definition of Change of Control

A Change of Control will occur for purposes of this Agreement if:

(a)     any individual, corporation, partnership, company or other entity (including a "group" of the type referred to in Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "Act"), (a "Person") becomes the "beneficial owner" (as defined in Rule 13d-3 under the Act) of securities of the Employer representing more than thirty percent (30%) of the combined voting power of the Employer's then-outstanding securities (other than as a result of acquisitions of such securities from the Employer),

(b)     there is a change of control of the Employer of a kind which would be required to be reported under Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Act (or a similar item in a similar schedule or form), whether or not the company is then subject to such reporting requirement,

(c)     the Employer is a party to, or the stockholders approve, a merger, consolidation, or other reorganization (other than a merger, consolidation or other reorganization which would result in the voting securities of the Employer outstanding immediately prior thereto continuing to represent, either by remaining outstanding or by being converted into voting securities of the surviving entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Employer or such surviving entity outstanding immediately after such merger, consolidation, or other reorganization), a sale of all or substantially all assets, or a plan of liquidation, or

(d)     individuals who, at the date hereof, constitute the Board cease for any reason to constitute a majority thereof; provided, however, that any director who is not in office at the date hereof but whose election by the Board or whose nomination for election by the Employer's shareholders was approved by a vote of at least a majority of the directors then still in office who either were directors at the date hereof or whose election or nomination for election was previously so approved (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Employer, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Act) shall be deemed to have been in office at the date hereof for purposes of this definition.

Notwithstanding the foregoing provisions of this Exhibit A, a "Change of Control" will not be deemed to have occurred solely because of the acquisition of securities of the Employer (or any reporting requirements under the Act relating thereto) by an employment benefit plan maintained by the Employer for its employees.

NY2:#4602799v15

A-32

**EXHIBIT B**

**APPLIED EXTRUSION TECHNOLOGIES, INC.**
**15 Read's Way**
**New Castle, Delaware  19720**

April 11, 2006

**By email delivery**

Mr. David N. Terhune
Six Montchanin Court
Box 299
Montchanin, DE  19710

Dear David:

As we have discussed, your employment with Applied Extrusion Technologies, Inc. (the "Company") has terminated, effective as of February 7, 2006 (the "Separation Date").  The purpose of this letter is to confirm the agreement between you and the Company concerning your severance arrangements, as follows:

1.     **Final Salary and Vacation Pay; Expense Reimbursement.**

(a)     You acknowledge that you have received pay for all work you have performed for the Company through the Separation Date, to the extent not previously paid, as well as pay, at your final base rate of pay, for the 11 vacation days you had earned, but not used, as of the Separation Date determined in accordance with Company policy and as reflected on the books of the Company.

(b)     The Company will, consistent with its past practices with you and in accordance with its business expense reimbursement policies, reimburse you promptly for all reasonable business expenses incurred by you on behalf of the Company which have not yet been reimbursed. You will use your reasonable efforts to submit all requests for reimbursement within 30 days of the date hereof.

DNT Severance Agreement(Revised)          - 1 -

A-34

2.    **Severance Benefits.**  In consideration of your acceptance of this Agreement and subject to your meeting in full your obligations under it and under Sections 5, 6, 7, 8 and 11 of the agreement between you and the Company captioned Employment Agreement which you signed as of March 8, 2005 (the "Employment Agreement"), the Company will provide you the following severance pay and benefits:

    (a)    After the Effective Date (as defined below), and in accordance with the installment schedule below, the Company will pay you an amount equal to $925,426.67.

| Installment | Date | Amount |
|---|---|---|
| First | April 28, 2006 | $231,356.67 |
| Second | July 31, 2006 | 231,356.67 |
| Third | October 31, 2006 | 231,356.67 |
| Fourth | January 31, 2007 | 231,356.67 |
| Total | | $925,426.67 |

    (b)    You acknowledge that, of the total amount referred to in Section 2(a) above, (i) $42,031.39 represents life insurance premiums payable by the Company pursuant to Section 3(d)(iii)(B) of the Employment Agreement, (ii) $29,250.00 represents your car allowance payable by the Company pursuant to Section 3(e)(i) of the Employment Agreement, (iii) $12,328.54 represents your membership expenses payable by the Company pursuant to Section 3(e)(ii) of the Employment Agreement and (iv) $3,750.00 represents the expense of annual physicals payable by the Company pursuant to Section 3(e)(iii) of the Employment Agreement, in each case for the period (the "Benefits Period") from the Separation Date to August 6, 2007 (the "Benefits Termination Date"). If, during the Benefits Period, you shall become eligible for benefits substantially equivalent to any of the above provided by any other entity, you shall so notify the Company and shall return to the Company a portion of the applicable amount previously paid to you based on the number of days remaining in the Benefits Period divided by the total number of days in the Benefits Period, less any taxes paid by you on such amount with are not, using reasonable efforts, recoverable from the recipient thereof.

    (c)    The Company will pay to you all amounts required to be paid to you under its 2005 Executive Retirement and Deferred Compensation Plan as in effect on the date hereof and as from time to time hereafter amended with your consent (the "EDCRP"), in accordance with the terms of the EDCRP, including without limitation Section 6.2 thereof. On each of June 30, 2006, June 30, 2007, and June 30, 2008 the Company will pay to you the amount which otherwise would have been a Company Credit to your Account (each as defined in the EDCRP) in accordance with the terms of the EDCRP in respect of the immediately preceding calendar year. For the avoidance of doubt, such Company Credit in respect of the calendar year ending December 31, 2006 shall take into account the payment pursuant to Section 2(a) hereof to the extent it

DNT Severance Agreement(Revised)                - 2 -

A-35

constitutes "Compensation", as defined in the EDCRP.

(d)     The Company shall use its commercially reasonable efforts to transfer the ownership of all life insurance covering you to you so that you may continue such protection, at your expense.

(e)     Until the earlier of Benefits Termination Date or the date you shall first become eligible for substantially equivalent benefits provided by any other entity, you shall be entitled to continue to participate in or receive benefits under each disability insurance, health, pension, retirement and accident plan or arrangement generally made available by the Company to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements; *provided, however,* that, if the Company is unable to continue your participation in any such plan or arrangement, the Company will pay to you such amount as is necessary to permit you to obtain benefits equivalent in all material respects from another source at the same after-tax cost to you as if the benefits were being obtained from the Company; and *provided, further,* that your participation in the EDCRP shall be governed by Section 2(c) hereof.

3.     **Board of Directors.**  Notwithstanding the provisions of Section 2(b) of the Employment Agreement, you agree to continue as a member of the Board until you are requested to resign such position by the Board or you wish to resign from the Board. You understand that you will receive no compensation for such service, although the Company will reimburse your expenses incurred to attend meetings of the Board on the same terms and conditions as such expenses are generally reimbursed to other non-employee directors.

4.     **Consulting.**  You agree from time to time, from locations and at times reasonably acceptable to both you and the Board, to render to the Board consulting services relating to the Company, for such compensation payable to you as you and the Board may from time to time agree upon. In addition, you will be entitled to receive prompt reimbursement for all reasonable business expenses incurred by you in connection with the provision of such services (subject to the Company's approval, not to be unreasonably withheld or delayed), subject to your providing reasonable documentation thereof.

5.     **Withholding.**  All payments made by the Company under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Company under applicable law and all other deductions authorized by you.

6.     **Acknowledgement of Full Payment.**  You acknowledge and agree that the payments provided under paragraph 1 of this Agreement are in complete satisfaction of any and all compensation due to you from the Company, whether for services provided to the Company or otherwise, through the Separation Date and that, except as expressly provided under this Agreement, no further compensation is owed to you.

A-36

7.    **Status of Employee Benefits and Paid Time Off.**  Except as otherwise expressly provided in Sections 2(c) and 2(e) of this Agreement, your participation in all employee benefit plans of the Company has ended as of the Separation Date, in accordance with the terms of those plans.  You will not continue to earn vacation or other paid time off after the Separation Date.

8.    **Termination of Employment Agreement.** Notwithstanding Section 4(h) of the Employment Agreement, except for Sections 5, 6, 7, 8, 9, 10, 11 and 12 of the Employment Agreement, which shall survive the execution, delivery and effectiveness of this Agreement and shall remain in full force and effect, the Employment Agreement is hereby terminated and shall be of no further force or effect.

9.    **Release of Claims.**

(a)    In exchange for the special severance pay and benefits provided you under this Agreement, to which you would not otherwise be entitled, on your own behalf and that of your heirs, executors, administrators, beneficiaries, personal representatives and assigns, you agree that this Agreement shall be in complete and final settlement of any and all causes of action, rights or claims, whether known or unknown, that you have had in the past, now have, or might now have, in any way related to, connected with or arising out of your employment or its termination or pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the fair employment practices statutes of the state or states in which you have provided services to the Company or any other federal, state or local law, regulation or other requirement and you hereby release and forever discharge the Company and its subsidiaries and other affiliates and all of their respective past, present and future directors, shareholders, officers, members, managers, general and limited partners, employees, agents, representatives, successors and assigns, and all others connected with any of them, both individually and in their official capacities, from any and all such causes of action, rights or claims; *provided, however,* that the foregoing shall not apply to any causes of actions, rights or claims that you may have under this Agreement or Sections 7 or 8 of the Employment Agreement.

(b)    This Agreement, including the release of claims set forth the paragraph immediately above, creates legally binding obligations and the Company therefore advises you to consult an attorney before signing this Agreement.  In signing this Agreement, you give the Company assurance that you have signed it voluntarily and with a full understanding of its terms; that you have had sufficient opportunity, before signing this Agreement, to consider its terms and to consult with an attorney, if you wished to do so, or to consult with any other of your advisors; and that, in signing this Agreement, you have not relied on any promises or representations, express or implied, that are not set forth expressly in this Agreement.

10.   **Miscellaneous.**

(a)    This Agreement constitutes the entire agreement between you and the Company and supersedes all prior and contemporaneous communications, agreements and understandings, whether written or oral, with respect to your employment, its termination and all related matters, except Sections 5, 6, 7, 8, 9, 10, 11 and 12 of the Employment Agreement, which shall remain in full force and effect as provided herein.

(b)    This Agreement may not be modified or amended, and no breach shall be deemed to be waived, unless agreed to in writing by you and the Chairman of the Board of Directors of the Company or his expressly authorized designee. The captions and headings in this Agreement are for convenience only and in no way define or describe the scope or content of any provision of this Agreement.

(c)    The obligation of the Company to make payments and provide benefits to you or on your behalf under this Agreement is expressly conditioned upon your continued full performance of your obligations under this Agreement and Sections 5, 6, 7, 8 and 11 of the Employment Agreement.

(d)    The Company will pay or reimburse you for all expenses of your counsel in connection with the negotiation, execution and delivery of this Agreement in an amount not exceeding $15,000.

A-38

If the terms of this Agreement are acceptable to you, please sign, date and return it to me within twenty-one days of the date you receive it. You may revoke this Agreement at any time during the seven-day period immediately following the date of your signing. If you do not revoke it, then, at the expiration of that seven-day period (the date such period expires being referred to herein as the "Effective Date"), this letter will take effect as a legally-binding agreement between you and the Company on the basis set forth above. The enclosed copy of this letter, which you should also sign and date, is for your records.

Sincerely,

APPLIED EXTRUSION TECHNOLOGIES, INC.

By: _____
       *Title:*

Accepted and agreed:

Signature: _____

Date: _____

DNT Severance Agreement(Revised)                    - 6 -

A-39

**EXHIBIT C**

Contact:    Brian P. Crescenzo
(302) 326-5648

**FOR IMMEDIATE RELEASE**

### APPLIED EXTRUSION TECHNOLOGIES, INC. ANNOUNCES CEO RESIGNATION

NEW CASTLE, DE, February 8, 2006 – Applied Extrusion Technologies, Inc. today announced that, on Tuesday, February 7, the AET Board of Directors accepted the resignation of David Terhune as President and Chief Executive Officer of the Company.

Jackson Craig, Chairman of AET, commented, "David Terhune has been with AET since 1994, serving as its President, since October 2002, and CEO since March 2005. He presided over a doubling of the company's sales base and associated broadening of its market reach and scope. The Board of Directors has expressed its sincere gratitude to David, who will continue as a member of the Board and to serve AET, as needed, in an advisory role."

"The Board has formed an Office of the President to carry out operational leadership responsibilities until a new CEO is appointed. This collaborative position will be held by Terry Smith, Vice President and General Manager Commercial Films, and Brian Crescenzo, Vice President, Secretary, and CFO. Together, they will report directly to me."

Mr. Craig further commented: "The Board of Directors remains committed to the Company's fundamental strategy of increasing profitability through productivity and product mix enhancements, and appreciates the operating team's continued dedication in its execution."

Applied Extrusion Technologies, Inc. is a leading North American developer and manufacturer of specialized oriented polypropylene (OPP) films used primarily in consumer products labeling and flexible packaging applications.

A-41

**EXHIBIT D**

8    www.packstrat.com    PACKAGING STRATEGIES    February 28, 2006

## STREET TALK    INTELLIGENCE FOR THE INFORMED PACKAGING EXECUTIVE

### O-I Could Tie Its Ship to a Re-emerging Anchor Glass

Owens-Illinois has dropped hints that it would consider purchasing Anchor Glass Container once that troubled company again re-emerges from bankruptcy protection.

When asked about the possibility, O-I ceo Steven McCracken said O-I's strategies revolve around consolidation in established markets and asset growth in developing markets. "We have a major competitor in our established market (in Anchor)," McCracken said. "As a market share leader, we have to take a strategic interest in the competition."

Tampa-based Anchor, the third-largest U.S. glass container maker, expects to emerge from Chapter 11 in March as a privately held company. A reorganization plan includes a debt-for-equity swap with creditors that would reduce the company's staggering long-term debt totals from about $500mn to $125mn.

If O-I decides to take on Anchor, it literally will still be saddled with the anchor of high debt, albeit lower than it once was, and facilities that are not considered the gold standard.

On the plus side, Toledo, OH-based O-I would sale sales of more than $700mn in segments it knows well, bring in a few new customers, and shrink the pie to only two main U.S. players (St. Gobain Container being the other). The possibility is enticing, if also a little scary for one of the few packaging segments that can't be called cluttered.

---

continued from p. 1

Replacing the venerable No.10 metal can has become a priority for the U.S. military, McCassie said. Weight savings, reduced waste disposal, quick preparation times, and the lack of can-opening injuries far outweigh the cost differences per meal module, he explained.

While the pouches cost $6.46 more per 50 modules than that of metal cans, the military's cost-benefit analysis demonstrates $9.51 per module is saved by using a pouch.

Another factor in the decision to forego cans for pouches is security. Cans can be used by enemy combatants to make improvised explosive devices (IEDs), while pouches cannot be easily tampered with or reused, McCassie added.

DoD is currently writing specifications for the new pouches and hopes to have them ready for bid by vendors in a few months, according to McCassie. Several food distributors, including Cincinnati-based **Wornick Foods**, already has worked on the five-year project with the Rutgers center. [PS]

---

### 'Failure To Communicate' Leaves AET's Terhune Disconnected

Sometimes, it pays to be a good listener, especially when talking with a board of directors. Although his problems might have run deeper than his listening ability, the resignation of president/ceo David Terhune from New Castle, DE-based AET Films came down to "a singular event-driven inability to establish a good communication flow," said Terry Smith, vp/general manager of AET's commercial films. "It was communication pure and simple."

Smith wanted it made clear that the maker of oriented polypropylene films is healthy and sold more product in 2005 than ever before in the company's history. The year also included adding nearly 10mn lbs worth of new product, including a new embossed holographic overlay film, Smith said. "We and the board are very much steadfast in support of the ongoing strategy of AET."

But the company's recent success also begs the question of what went on between Terhune and the board. Terhune, after all, presided over a major growth period that took AET from $125mn to $260mn in sales since becoming president in October 2002.

Smith and cfo Brian Crescenzo will lead company operations until a new president is named.



A-43

# EXHIBIT "2"

Westlaw.

74 F.3d 1245                                                                                            Page 1

74 F.3d 1245, 1996 WL 14227 (C.A.9 (Cal.))
**(Cite as: 74 F.3d 1245)**

**H**
Briefs and Other Related Documents
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a "
Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA9
Rule 36-3 for rules regarding the citation of
unpublished opinions.)
    United States Court of Appeals, Ninth Circuit.
AMERICAN MEDICAL INTERNATIONAL,
    INC., and American Medical International, Inc.
Executive Severance Plan, Plaintiffs-Appellees
                          v.
    William E. VALLIANT, Defendant-Appellant
                   No. 94-16573.

         Argued and Submitted Dec. 8, 1995.
                Decided Jan. 16, 1996.

Appeal from the United States District Court, for
the Northern District of California, Civ. No.
94-CV-2107; Samuel Conti, District Judge,
Presiding.
N.D.Cal., 1994 WL 443675.

REVERSED.

Before: BOOCHEVER and REINHARDT, Circuit
Judges, and KING,[FN*] District Judge.

                MEMORANDUM [FN*]

*1 Defendant/Appellant, William Valliant ("Valliant
" or "Appellant") appeals from the district court's
granting of Plaintiffs/Appellees, American Medical
International, Inc. ("AMI") and the American
Medical International, Inc. Executive Severance
Plan's motion for summary judgment. The district
court also dismissed Valliant's counterclaim and
denied his motion for attorney's fees. For the
reasons stated below, we find that summary
judgment was inappropriate and reverse. We also

reverse the order dismissing the counterclaim.

                          I.

Valliant was employed as AMI's corporate vice
president and Director of Taxes, under a two-year
contract ("the Agreement") that commenced on
September 1, 1988. The Agreement provided
benefits under its employee welfare benefit plan.
The Plan falls within the meaning of ERISA § 3(1),
29 U.S.C. § 1002(1).

On July 6, 1989, IMA Acquisition Corporation
signed a merger agreement which culminated in its
acquisition of 100% of AMI's stock. Valliant's
employment was, as a result, terminated on June 15,
1990. Valliant received $343,814 in connection
with the change in control of AMI. The parties are
in disagreement over whether Valliant is entitled to
further severance benefits.

Valliant argues that §§ 7 and 9 of the Agreement
are in conflict. Section 7 of the Agreement
provided that, if within 24 months of a "Change in
Control," Valliant was involuntarily terminated for
any reason other than "misconduct" or if he
voluntarily terminated his employment for "Good
Reason," he would receive a "Change in Control
Payment," as computed under the Agreement.

Section 9 of the Agreement provided, however, that
if any "parachute payment" [FN1] would not be
deductible by AMI under Section 280G of the
Internal Revenue Code, then the "parachute
payments" would be reduced so that the aggregate
present value of the "parachute payments" equalled
the maximum amount deductible by AMI under
Code Section 280G.

In a letter to AMI, dated July 1, 1993, Valliant
claimed that he was entitled to Termination Benefits
under § 8 of the Agreement,[FN2] and that such
benefits were not "parachute payments." Valliant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-45

74 F.3d 1245

74 F.3d 1245, 1996 WL 14227 (C.A.9 (Cal.))
(Cite as: 74 F.3d 1245)

sent another letter expanding on his arguments. He then met with Douglas E. Rabe at the AMI headquarters in Dallas, Texas on August 17, 1993. At that meeting, Rabe gave Valliant a letter disputing Valliant's claim.

On September 10, 1993, Appellees brought this action to secure a declaration by the district court that Valliant is not entitled to any further severance benefits under the Agreement. The case was transferred from the Northern District of Texas to the Northern District of California, after which time Valliant filed a counterclaim seeking the severance benefits.

II.

Whether exhaustion of administration remedies is required as a matter of law is reviewed de novo. *See Diaz*, 50 F.3d 1478, 1483 (9th Cir.1995) citing *Amato v. Bernard*, 618 F.2d 559, 566-68 (9th Cir.1980). The grant of summary judgment is also reviewed de novo. *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127 (9th Cir.1995).

*2 ERISA does not specifically provide an administrative exhaustion requirement. *Amato v. Bernard*, 618 F.2d 559, 566 (9th Cir.1980). As a general rule, however, a claimant must avail himself or herself of a plan's own internal review procedures before bringing suit in federal court. *Diaz v. United Agr. Employee Welf. Benefit Plan*, 50 F.3d 1478, 1483 (9th Cir.1995) (*citing Amato* at 566-68).

Valliant contends that there was no final determination by the plan administrator with respect to his claim for payment of benefits. On September 2, 1993, AMI notified Valliant by letter that his initial request for benefits was denied. On September 10, 1993, AMI and the Plan filed this action in the Northern District of Texas for declaratory relief. The action was thus filed before the running of the 60 day appeal period, provided in section 5.5(a) of the Plan, discussed *infra*.

Exceptions exist to the exhaustion requirement. *Diaz* at 1484. A district court has discretion to

waive the exhaustion requirement, *Southeast Alaska Conservation Council v. Watson*, 697 F.2d 1305, 1309 (9th Cir.1983), and should do so when exhaustion would be futile.

Appellees argue that exhaustion would be futile because Appellant was not proceeding in good faith throughout the negotiations. Additionally, Valliant failed to voice his concern regarding his loss of opportunity to exhaust until after the district court's order was issued.

Neither party can now complain about any failure to exhaust administrative remedies. Appellees abandoned the option to complain of a failure to exhaust on the part of Valliant when they instituted this action against him before he had a full opportunity to take advantage of that procedure. Valliant, in turn, waived any right to object to the company's action in depriving him of that opportunity when he failed to raise the issue in the district court. Hence, we will not require administrative exhaustion in this proceeding.

III.

Summary judgment in a contract case is proper when the contract is not ambiguous. Whether the contract is ambiguous is a question of law for the court. *United States v. Sacramento Mun. Util. Dist.*, 652 F.2d 1341 (9th Cir.1981). If the court determines that the contract is ambiguous and that the ambiguity is susceptible to more than one reasonable interpretation, a triable issue of fact is raised and summary judgment may not be granted. *International Bhd. of Elec. Workers v. Southern Cal. Edison Co.*, 880 F.2d 104, 107 (9th Cir.1989).

When Valliant tendered his resignation, he requested a Change in Control Payment because his resignation was for "Good Reason," pursuant to § 7 of the Agreement. AMI agreed, and paid him $292,670 in what AMI claimed was full satisfaction of the Change in Control Payment. AMI also paid Valliant $279,600 in cancellation of all of his stock options, pursuant to § 8(c)(ii) [FN3] of the Agreement. Also, pursuant to § 9 [FN4] of the Agreement, Arthur Anderson determined that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

$51,144 of the stock option payment was contingent on the change in control, thus qualifying as a parachute payment. Because the Change in Control payment plus that portion of the stock option payment that qualified as a parachute payment exceeded the cap on parachute payments imposed by § 9, AMI reduced his Change in Control payment by the amount that exceeded the cap. It was that reduction that led to the $292,670 payment, instead of a substantially higher one. AMI paid nothing to Valliant on account of § 8(c)(i).

*3 The dispute is whether Valliant's severance payments constitute "parachute payments" under § 8(c)(i), subject to the payment limitation. The relevant portion of Code Section 280G(b)(2)(A) defines "parachute payment" as compensation if the payment is contingent on a change in the ownership or effective control of the corporation or in the ownership of a substantial portion of the assets of the corporation.

We find several ambiguities contained in the Agreement. There was a lack of certainty among the parties over whether § 8 was subject to the parachute payment cap. It is not clear that the payments provided under that section were made as a consequence of the change in control. During oral argument, it appeared that the elimination of the international division might have occurred anyway.

There is also a question regarding whether the deduction of § 8(c)(i) benefits was proper in view of the § 7 provision precluding the use of § 7 to reduce the payments under any other section. Section 7(e) specifically states that the amounts due "shall not be offset against or reduce any other amounts due under this Agreement or under any AMI benefit plan, policy or program." This possible inconsistency in the Agreement was not addressed in detail by the district court. We find that this question warrants further consideration.

The issue whether some of the payments are or are not a bonus and thus exempted from § 9 is also unclear. AMI argued that an amount is not due under the Agreement if it is subject to the bonus

payment limitation of § 9. AMI thus asserts that § 9 takes precedence over § 7(e). However, nowhere in the Agreement is this assertion explained, and nothing would allow a reader to infer such precedence with any certitude.

Furthermore, § 9 is entitled "Bonus Payment Limitation," which would lead one to infer that the limitations in § 9 apply only to "bonus payments." Additionally, §§ 4(b) and 7(c) refer to employee "bonuses" for each fiscal year, and employees "bonuses" after a change in control, respectively. Whether the § 9 limitation should apply to any or all of these payments is yet another area that lacks clarity.

Finally, § 7 may itself be exempt from § 9, in view of subsection 7(e). The end result, apparently, was that $30,000 was deducted from the § 7 payments and all of the § 8(c)(i) payments were eliminated as well as some or all of the § 4 amounts.

There thus appear to be *some* ambiguities on the face of the contract. Valliant, the nonmoving party, presented a reasonable interpretation of the relevant conflicting sections. Because the dispute revolves around the intent of the parties in agreeing on these sections, summary judgment was inappropriate.

We affirm the district court's denial of Valliant's motion for attorney's fees.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS DISPOSITION.


FN* Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.


FN** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3.

FN1. For purposes of the Agreement, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-47

74 F.3d 1245

74 F.3d 1245, 1996 WL 14227 (C.A.9 (Cal.))
(Cite as: 74 F.3d 1245)

term 'parachute payment' is defined in accordance with Section 280(b)(2)(A)(ii) of the Internal Revenue Code of 1986, as amended. The relevant portion of this definition is:
(2) Parachute payment defined-
(A) In general-the term parachute payment means any payment in the nature of compensation to (or for the benefit of) a qualified individual if,
(i) such payment is contingent on a change-
(I) in the ownership or effective control of the corporation, or
(II) in the ownership of a substantial portion of the assets of the corporation....
However, the Agreement provides that, "[f]or purposes of this Section 9, the term 'parachute payment' shall have the meaning ascribed in Section 280(b)(2)(A) of the Code, without regard to Section 280G(b)(2)(A)(ii), but with regard to Section 280G(b)(4)(A); 'present value' shall be determined in accordance with Section 280G(d)(4)."

FN2. Section 8, entitled "Termination" provides:
This Agreement may be terminated by (i) Employee's death, disability or retirement, (ii) by Employee for Good Reason or (iii) by AMI as set forth below.
(a) *Resignation.* Employee may resign his position at any time. In the event of such resignation, except in the case of resignation for Good Reason (as defined below), Employee shall not be entitled to further compensation pursuant to this Agreement.
(b) *Retirement or Death.* [describes provisions]
(c) *Discharge.* [describes provisions]
(d) *Resignation for Good Reason.* [describes provisions]
(e) *Disability.* [describes provisions]
(f) *Notice of Termination.* [describes provisions]
(g) *Date of Termination, Etc.* [describes provisions]
(h) *Mitigation.* [describes provisions]

FN3. 8(c)(ii) reads:
If Employee's employment is terminated by AMI for any reason other than his Misconduct or Disability, then subject to the earlier termination pursuant to the maximum option period provided under the Stock Option Plans, all of the Employee's stock options shall continue to vest during the period Employee is entitled to receive Base Compensation pursuant to Subsection 8(c)(i) hereof (regardless of whether Employee elects to receive such Base Compensation in a lump sum),....

FN4. Section 9, entitled "Bonus Payment Limitation," provides in part:
In the event that it is determined that any " parachute payment" to be made by AMI for federal income tax purposes because of Section 280G of the Internal Revenue Code of 1986, as amended ("the Code"), then the "parachute payments" shall be reduced so that the aggregate "present value" of such "parachute payments" is equal to the maximum amount which will not cause any "parachute payment" to be nondeductible by AMI because of Section 280G of the Code....

C.A.9 (Cal.),1996.
American Medical Intern., Inc. v. Valliant
74 F.3d 1245, 1996 WL 14227 (C.A.9 (Cal.))

Briefs and Other Related Documents (Back to top)

• 1995 WL 17143657 (Appellate Brief) Reply Brief for Defendant/Appellant William E. Valliant (Aug. 01, 1995) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-48

Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

C

Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Judith BALOCK
v.
MARS ELECTRONICS INTERNATIONAL, INC.
**CIV. A. No. 89-1290.**

Jan. 2, 1990.

Virgie M. Vakil, Media, Pa., for plaintiff.
Jerome A. Hoffman, Philadelphia, Pa., for
defendant.

*MEMORANDUM AND ORDER*

GAWTHROP, District Judge.

*1 Plaintiff, Judith Balock, filed this action in state
court claiming that defendant, Mars Electronics
International, Inc. ("Mars") breached the provisions
of a separation agreement entered into between the
parties. Defendant removed the case to this court
on the ground that defendant's voluntary separation
plan qualifies as a plan under the Employee
Retirement Income Security Act of 1974 ("ERISA"
). Defendant now seeks summary judgment on the
basis that plaintiff's state law breach of contract
claim is preempted by ERISA. Plaintiff responds
that defendant's voluntary separation plan is not an
ERISA plan and that plaintiff is entitled to summary
judgment on the breach-of-contract claim.
Alternatively, plaintiff argues that the case should
be remanded to state court. Upon the reasoning set
forth in the following memorandum, I will grant the
defendant's motion for summary judgment, but
allow the plaintiff to file an amended complaint.

*FACTS*

Mars Electronics underwent a business
reorganization in the fall of 1988. As part of the
reorganization, Mars offered of severance benefits

to certain Mars employees pursuant to a voluntary
separation plan. Plaintiff Balock was an employee
in the quality control department at Mars. Ms.
Balock attended a group meeting in her department
on November 1, 1989, at which time defendant
alleges that she was informed that employees in her
department were not eligible for the voluntary
separation plan. On November 2, 1988, Ms.
Balock met with a member of the Mars personnel
department, and signed a separation agreement.
The agreement, also signed by a Mars's
representative, provided that Ms. Balock would
voluntarily resign her employment with Mars on
November 18, 1988, in return for, *inter alia,* a lump
sum payment of $30,004.88, payable on or about
December 2, 1988, and continuation of existing
medical, life and dental insurance benefits for the
twelve month period beginning November 18, 1988.

The day after Ms. Balock and Mars signed the
separation agreement, Mars notified her that she
was not eligible for the voluntary separation plan
and that Mars considered the separation agreement
to be invalid. Balock ended her employment at
Mars Electronics on November 18, 1988, as
provided for by the separation agreement.

*DISCUSSION*

I. *Applicability of ERISA to Mar's Voluntary
Separation Plan*

The Employee Retirement Income Security Act
(ERISA), 29 U.S.C. § 1002(a), defines an "
employee welfare benefit plan" as:

any plan, fund or program which was heretofore or
is hereafter established or maintained by an
employer or by an employee organization, or by
both, to the extent that such plan, fund, or program
was established or is maintained for the purpose of
providing for its participants or their beneficiaries,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 2

Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

**\*2** The Supreme Court addressed the meaning of the term "employee benefit plan" in *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1 (1987). The Court held that a state statute requiring certain employers, in the event of a plant closing, to provide a one-time severance payment to employees who were not covered by an express contract providing for severance payment, was not an employee benefit plan under ERISA. The Court reasoned that the state statute was not preempted by ERISA because the state law did not "relate to any employee benefit *plan*." 29 U.S.C. § 1144(a) (emphasis added). Since the state statute in question related only to employee benefits, rather than to a plan necessitating an administrative scheme, the regulatory concerns of ERISA were not implicated. *Fort Halifax*, 482 U.S. at 9-12.

Relying on the analysis in *Fort Halifax*, the Third Circuit held that a corporation's plan for awarding severance payments to certain management employees was an "employee benefit plan" within the meaning of ERISA. *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989). The court placed heavy reliance on the fact that the corporation's plan "required an administrative scheme." *Pane*, 868 F.2d at 635. The *Pane* court found that since the corporation's board of directors authorized the plan, and since the corporation's management identified a potential class of participants, those factors were sufficient to constitute an administrative scheme for purposes of ERISA. *Id.*

The employee benefit program in *Pane* is similar to the plan instituted by Mars at bar. Mars conducted an on-going administrative program to determine eligibility for its voluntary separation plan and to administer the plan's benefits to eligible persons.

Mars's plan for awarding severance benefits to certain employees was conceived during a series of meetings attended by Mar's upper management personnel. *See* Affidavit of Wayne Bozeman. Before entering into a voluntary separation agreement, a Mars employee was required to attend certain meetings where the employee's eligibility for the plan was assessed. *See* Affidavit of Wayne Bozeman. In addition to a lump sum payment, Mars's plan provided for a continuation of existing medical insurance benefits for a set period of time. In Ms. Balock's case, the agreement she entered into also provided for a continuation of life and dental insurance benefits for one year. The continuation of existing insurance benefits required on-going administration of the voluntary separation plan. The voluntary separation plan required an administrative scheme. Hence, under the reasoning of *Fort Halifax* and *Pane*, I find that Mars's voluntary separation plan is an employee benefit plan under ERISA.

Plaintiff urges that Mar's voluntary separation plan is not an employee benefit plan under ERISA because Mars failed to comply with various requirements of ERISA. However, "[t]he fact that the employer had not complied with the requirements of ERISA in operating [its employee benefit plan] therefore does not ... mean that no program for paying benefits was in existence." *Fort Halifax*, 482 U.S. at 18, n. 10. *See also Simmons v. Diamond Shamrock Chemicals Co.*, 658 F.Supp. 1053 (E.D.Mo.1987), *aff'd* 844 F.2d 517 (8th Cir.1988) (severance pay plan governed by ERISA despite employer's non-compliance with the procedural and technical requirements of ERISA.)

## II. *ERISA Preemption of State Law Claims*

**\*3** ERISA provides that it "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a) (1982). *See also Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987). The Supreme Court in *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, held that ERISA's preemption provision is to be construed broadly. A law " 'relates to' an employee benefit plan, in the normal sense of the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

| | | |
|---|---|---|
| **DAVID N. TERHUNE** | : | |
| **Plaintiff** | : | **Civil Action** |
| | : | |
| **v.** | : | |
| | : | |
| **APPLIED EXTRUSION** | : | **No. 06-360-KAJ** |
| **TECHNOLOGIES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JACKSON CRAIG** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TERRY SMITH** | : | |

---

### APPENDIX   (Continued)

James Green, Esquire (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

And

Alan B. Epstein, Esquire
[Admitted *Pro Hace Vice*]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103


Attorneys for Plaintiff
David N. Terhune

Dated: August 3, 2006

Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

phrase, if it has a connection with or reference to such a plan." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 1724, 1739 (1985) ( *quoting Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-97 (1983). Here, Ms. Balock's state law breach-of-contract claim relates to Mars's voluntary separation plan. Since Mars's voluntary separation plan qualifies as a plan under ERISA, ERISA supersedes plaintiff's state law breach-of-contract claim arising under that plan. Thus, I will grant defendant's motion for summary judgment as to plaintiff's state law breach-of-contract claim.

### III. *ERISA Claims*

Plaintiff, who originally filed this action in state court, brought no claims under ERISA. Plaintiff, who argues that the Mars's plan is not an ERISA plan, alleged only a state law breach of contract claim. Defendant had adequate notice that plaintiff's claim was potentially an ERISA claim, since defendant itself argues that ERISA preempts plaintiff's state law claim. Therefore, I will allow the plaintiff thirty days from the date of this order to file an amended complaint, stating a claim under federal law.

An order follows.

### *ORDER*

AND NOW, this 29th day of December, 1989, upon consideration of Defendant's Motion for Summary Judgment, Plaintiff's Cross-Motion for Summary Judgment, Plaintiff's Motion to Remand, and all responses thereto, it is hereby ORDERED that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Cross-Motion for Summary Judgment is DENIED, and Plaintiff's Motion to Remand is DENIED. It is further ORDERED that plaintiff is given thirty days from the date of this order to amend her complaint to state a claim under federal law.

E.D.Pa.,1990.
Balock v. Mars Electronics Intern., Inc.
Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-51

Not Reported in F.Supp.2d                                                              Page 1

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

**H**

United States District Court, W.D. Pennsylvania.
In re: CROWN AMERICAN REALTY TRUST
SECURITIES LITIGATION.
Robert JOHNSON, Sr., et al., Plaintiffs,
v.
Frank J. PASQUERILLA et al., Defendants.
**No. CIV. A. 95-202J.**

July 21, 1999.

*MEMORANDUM OPINION AND ORDER*

SMITH.

**\*1** Before the court is defendants' motion to dismiss plaintiffs' third amended complaint under Fed.R.Civ.P. 12(b)(6). For the following reasons, I will grant the motion in part and deny it in part, and further order that defendants refrain from filing any further pre-answer motions without leave of court.

I.

I have more than once set forth in detail plaintiffs' factual contentions behind this litigation. *See In re Crown American Realty Trust Securities Litig.* ("*Crown I*"), No. 95-202J, 1997 WL 599299, 1997 U.S. DIST. LEXIS 14609 (W.D.Pa. Sep. 15, 1997); *In re Crown Am. Realty Trust Securities Litig.* ("*Crown II*"), No. 95-202J, 1998 WL 777984, 1998 U.S. Dist. LEXIS 17503 (W.D.Pa. Nov. 2, 1998); *see also Warden v. Crown Am. Realty Trust* ("*Warden I*"), No. 96-25J, 1998 WL 725946, 1998 U.S. Dist. LEXIS 16194 (W.D.Pa. Oct. 15, 1998); *Warden v. Crown Am. Realty Trust* ("*Warden II*"), No. 96-25J, 1999 WL 476996, 1999 U.S. Dist. LEXIS 10262 (W.D.Pa. July 6, 1999). Familiarity with those opinions will accordingly be assumed. Stated again, but with brevity, this is a securities fraud suit in which plaintiffs allege that defendants manipulated the price of Crown's stock by promising earnings and dividends they knew or should have known were not sustainable in light of Crown's internal financial circumstances. In *Crown I,* I dismissed plaintiffs' first amended consolidated class action complaint because it failed either to state claims upon which relief could be granted under Rule 12(b)(6), or because plaintiffs failed to plead fraud with sufficient particularity under Rule 9(b). I dismissed portions of the complaint with prejudice, while others I dismissed with leave to amend.

Plaintiffs subsequently filed a second amended and consolidated class action complaint, dkt. no. 27, to which a renewed motion to dismiss was filed. On that round of motions, plaintiffs added a significant new allegation of defendants' motive and opportunity to commit securities fraud, specifically that the Pasquerilla defendants desperately needed to refinance certain obligations of their closely held hotel entities, and, to do so, relied on the dividends and underlying value of the Crown shares they controlled. Because the Crown shares would provide sufficient collateral only if earnings and dividends stayed high, plaintiffs averred that defendants had a strong motive to inflate the market for Crown shares until their personal refinancings were completed. I accepted this for purposes of adjudicating defendants' motion to dismiss, rejecting defendants' contention that their status as Crown's largest individual shareholders made plaintiffs' theory inherently implausible:

**\*2** It is possible that [plaintiffs] will be able to adduce sufficient evidence in discovery that the Pasquerillas were seriously in need of a lender and were willing to manipulate the stock price to find one, even if that meant that they themselves would suffer a temporary setback when the price of Crown shares inevitably fell. Defendants' implausibility argument--while it may ultimately prevail--is better resolved on a motion for summary judgment, or at trial.

*Crown II,* 1998 WL 777984 at \*4. Because this allegation of motive and opportunity applied only to the individual Pasquerilla defendants, however, I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

dismissed Crown American Realty Trust as a defendant. *Id.* I then cautioned:

> It is important at this stage to recapitulate what remains for adjudication in this case. Plaintiffs' § 10(b) claims have been limited to a very simple set of allegations that the Pasquerilla defendants, in the 1994 annual report and at the March 1995 REIT conference, made false or misleading statements about Crown's 1995 earnings and dividends, for the purpose of temporarily keeping the market value of Crown shares high enough to support the refinancing of the Pasquerillas' closely held hotel entities. That must remain the focus of discovery and subsequent dispositive motions. To that end, plaintiffs shall file a third amended complaint limited to this theory, and from which all matter that has been dismissed by this court has been excised.

*Id.* at *5.

Notwithstanding these explicit instructions, plaintiffs filed a third amended and consolidated class action complaint, dkt. no. 42, which repeats many of the allegations and theories already rejected and which defendants have been compelled to again move to dismiss. Defendants, in their motion to dismiss, dkt. no. 53, have ignored my ruling that plaintiffs' refinancing theory of motive and opportunity can only be resolved on a more developed record, and have once again--this time relying on additional documents not submitted before--attempted to resurrect their implausibility argument. It is against this background that I must decide the instant motion to dismiss.

## II.

Defendants seek dismissal of all claims previously rejected in *Crown I* and *Crown II*, but still pleaded in the third amended complaint. I will address these contentions *seriatim*.

### A.

Defendants first assert that plaintiffs' claims under § 20(a) of the Exchange Act against the Pasquerilla defendants must be dismissed because I have already dismissed Crown as a defendant and, they argue, the Pasquerillas cannot be held liable as "controlling persons" of an entity that itself is not

liable. Dkt. no. 54, at 3-4. Plaintiffs respond by contending that, because I permitted the § 20(a) claims to stand in *Crown II*, 1998 WL 777984 at *5, they may continue to be asserted. *See* dkt. no. 59, at 30 n.25. Neither party cites any statute or caselaw in support of its position. My earlier decision stands as law of the case and, in the absence of any new argument supported by authority, the 20(a) claims will not be dismissed at this time.

### B.

*3 Defendants also seek dismissal of plaintiffs' newly asserted theory that Crown is subject to *respondeat superior* liability under § 10(b) for the alleged actions of the individual defendants. Dkt. no. 54, at 4-8. *But see* dkt. no. 59, at 21-29 (plaintiffs' brief). In *Warden II*, I rejected plaintiffs' attempt to impute an underwriter's statement about Crown's IPO to Crown itself as that of an agent under § 10(b) of the Exchange Act, being bound by circuit precedent, *Rochez Bros. v. Rhoades*, 527 F.2d 880, 886 (3d Cir.1975), which held that agency liability is not an available theory of recovery. *Warden II*, 1999 WL 476996 at *4, 1999 U.S. Dist. LEXIS 10262 at *14. Therefore, I will again dismiss the § 10(b) claims against Crown with prejudice.

### C.

Defendants also argue that the following "claims" based upon certain statements, documents and theories should be dismissed because they have already been rejected in *Crown I* and *Crown II*: (1) the April 6, 1994 *Pittsburgh Post-Gazette* article; (2) the August 11, 1995 Dow Jones Report and the August 9, 1995 NatWest Report; (3) statements by other, unspecified third-party analysts; (4) failure to disclose the fair market value of Crown's properties; and (5) the motive of inducing investors to purchase shares in the IPO. Dkt. no. 54, at 8-10. Plaintiffs respond by admitting that they do not base their claims on any of the above, and that the paragraphs containing these allegations were included "merely ... to put defendants' misconduct in context." Dkt. no. 59, at 30. That admission having been made, and in light of my prior opinions, I need only reiterate that all such claims remain dismissed with prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

**(Cite as: 1999 WL 529581 (W.D.Pa.))**

### III.

The only substantial issue raised by the instant motion is whether the refinancing theory of motive and opportunity that I allowed to go forward is itself fatally flawed and must be dismissed. Defendants make three principal arguments in opposition to plaintiffs' theory of scienter: (1) that "the statements at issue were mere opinions of management[,]" dkt. no. 54, at 13; (2) that "the individual defendants continued to purchase unrestricted shares and suffered the largest losses as a result of the dividend cut [,]" *id.* at 14; and (3) "the terms of the refinancing precluded any concrete benefit to the individual defendants[,]" *id.* at 22. I will address these contentions in turn.

### A.

Based upon a Second Circuit decision issued two weeks after *Crown II, see Kowal v. IBM Corp (In re IBM Corp. Sec. Litig.),* 163 F.3d 102 (2d Cir.1998), defendants argue that plaintiffs' remaining § 10(b) claims should be dismissed as mere expressions of management's opinion. On the present state of the record, I disagree.

*4 In *IBM,* corporate executives issued a series of statements in which they opined that IBM's dividend was not at risk, despite the company's flagging earnings being insufficient to cover it. A few months after the last such statement, the board of directors announced a major dividend cut. *Id.* at 105-06. On defendants' motion for summary judgment, the court held that, since only the board had the authority to declare a dividend, management had neither actual nor apparent authority to enforce its predictions, and thus, their statements were "opinions and not guarantees." *Id.* at 107. Moreover, the court opined that the statements were not false when made because, *inter alia,* IBM had sufficient cash on hand to continue paying the higher dividend if it wished. *Id.* 108, 109.

Here, in contrast, the record is undeveloped, and, while it is true that Crown's board was vested with the sole power to set dividends, it is also evident that its cash was tight and would not be able to pay a $1.40 dividend unless earnings were sufficient to cover it. Crown's management, that is, the Pasquerilla defendants (all of whom were members of the board), indisputably did have authority over Crown's operations and would have been in the best position to know what its earnings likely would be. Thus, at this stage of the proceedings, I simply cannot say that their statements were merely expressions of management opinion and not actionable as a matter of law under *IBM.*

### B.

Defendants next argue that, because "the individual defendants continued to purchase unrestricted shares and suffered the largest losses as a result of the dividend cut[,]" dkt. no. 54, at 14, those defendants would have been the largest victims of any short-term scheme to inflate the price of Crown shares. I have already rejected this implausibility defense as a basis to dismiss in *Crown II,* 1998 WL 777984 at *4. Nevertheless, defendants have prepared a detailed chart from public filings that shows that Frank and Mark Pasquerilla individually purchased approximately 310,000 and 30,000 shares of unrestricted Crown shares from the time of the IPO until the dividend cut. Dkt. no. 54, at 16-21. Given that the price of each share declined by almost $5 per share, the individual defendants' combined losses from the eventual price drop would have been in the neighborhood of $1.7 million.

Although plaintiffs' theory of scienter hangs by the slenderest of reeds, it is impossible to say, on this record, whether it would have been implausible as a matter of law for defendants to have been willing to suffer a $1.7 million loss. To make that determination, it would be necessary to know, first, what they stood to lose had the closely held hotel portfolio not been successfully refinanced. Although it appears that the Pasquerilla hotel holdings are considerable and plaintiffs assert that they could have been lost without refinancing, that information is neither precisely nor conclusively determinable on this limited record. Second, I would have to know what defendants could hope to obtain by deliberately exposing themselves to a seven-figure loss on the value of their newly acquired Crown shares as a result of participating in their own stock manipulation scheme.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

*5 As a matter of basic economic reality, it would appear that defendants would have acted foolishly indeed to have purchased large amounts of Crown stock, knowing all the while that they would soon be forced to dramatically slash its dividend and, concomitantly, the value of the shares. While an insider might well not divest his shares, either because of the insider trading laws or to avoid "signaling the market" and causing a price decline, it is difficult to conceive of why he would make the affirmative decision to purchase shares at inflated prices, with one exception.

Although it is something of a reach, it is *possible* that a perpetrator of a securities fraud might purchase his own company's shares during the run-up to a dividend cut precisely for the purpose of avoiding liability in the subsequent and inevitable securities fraud suit that follows major price declines in publicly traded shares. Such a person could believe that by purchasing shares, he will place himself in a position to later argue to a court that the purchases made and losses suffered prove conclusively that his overall actions could not have been fraudulent, although it must be emphasized that he would gain only an argument for dismissal, not an absolute defense. If the "hit" that he must take on his shares is exceeded by the damages and legal fees he would stand to pay if he were found liable for securities fraud, such a perpetrator might find this sort of bargain worthwhile, especially if he believed that the share price would recover over the long term.

To recapitulate this somewhat convoluted theory, it is conceivable that a defendant, facing the loss of substantial real estate holdings for want of refinancing, might be willing to take even a $1.7 million loss on his own stock price manipulation scheme if that loss (occasioned by purposely buying stock that was sure to decline) insulated him from even greater liability in a securities fraud class action like the one *sub judice.* It is simply not impossible that those purchases could have been a sham, made for the purpose of later negating motive and escaping liability for securities fraud. For this theory to make any sense, however, three independent conditions must exist: (1) a defendant

who, for external reasons such as the need to refinance his closely held properties, feels he "must" commit the securities fraud; (2) a likely prospect of being able to use the share purchases during the class period to negate scienter and liability in the subsequent class action; and (3) the liability thus avoided must exceed the loss on the shares purchased.

I grant that this seems an unlikely scenario. Nevertheless, I cannot say that it departs from the zone of mere implausibility and travels into the territory of the impossible. I am therefore constrained to hold that the proper resolution of defendants' contentions must await a motion for summary judgment on a better developed record.

### C.

Finally, defendants argue that their scienter is negated "because the terms of the refinancing preclude[ ] any concrete benefit to [them.]" Dkt. no. 54, at 22. They cite the terms of the loan agreements by which the refinancing was accomplished, and point out that under the terms of those contracts, the decline in Crown's share price that occurred in 1995 triggered a default. Thus, they contend that there could have been no motive or opportunity to manipulate the share price in the short term when the inevitable drop in the stock's value would result in default and the loss of the very refinancing that the Pasquerilla defendants sought in the first place. For at least two reasons, this argument is problematic, and it cannot be adequately supported on this record.

*6 First, it is striking that defendants do not represent that the lenders actually declared a default. Thus, it appears that the refinancing remains in place and no benefit of the alleged fraud has been lost. For that reason alone, defendants' assertion that the terms of the loan agreements negated any possibility of scienter cannot supply a basis for dismissal at this stage.

Second, I cannot even consider these loan agreements in connection with a motion to dismiss. When a defendant attaches a document to such a motion, the circumstances under which a federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

court may consider it without converting the motion into one for summary judgment are very narrow. There are three basic instances under which consideration is possible, and they are "aimed at cases interpreting, for example, a contract. [They are] not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment[.]" *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998). Those circumstances are: (1) where the extrinsic document is incorporated by reference in plaintiffs' complaint, such as citation, quotation or paraphrasing; (2) where the document is a matter of public record, such as an SEC filing; and (3) where the document is otherwise central to plaintiffs' claim in the sense that the claim is based upon the document. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) ("document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"); *Crown I,* 1997 WL 599299 at *7 (same); *Warden II,* 1999 WL 476996 at *5 n. 3 (same); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) (SEC filings) (adopting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *Steinhardt Group Inc. v. Citicorp,* 126 F.3d 144, 145 (3d Cir.1997) ("court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document[ ]") (quoting *Pension Benefit Guar. Corp v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993)); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (similar); *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993); *see generally* Annotation, *What Matters Not Contained in Pleadings May Be Considered in Ruling on a Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure or Motion for Judgment on the Pleadings Under Rule 12(c) Without Conversion to Motion for Summary Judgment,* 138 A.L.R. Fed. 393 §§ 2, 3[a], 4, 5, 6[a], 9, 14, 15 (1997) (collecting and analyzing numerous cases).

*7 The loan agreements relied upon by defendants in their motion to dismiss, *see* dkt. no. 55, exhs. V, W, X, fall into none of these categories. Defendants

refer to these exhibits as "[u]ndisputedly authentic documents upon which claims are based[,]" dkt. no. 60, at 2-3, but that description is inconsistent with what the caselaw says about claims that are "based upon" a document. Here, while plaintiffs' theory of scienter is necessarily based upon the Pasquerilla defendants' need to refinance their hotel portfolio, it is not based upon any particular term or condition imposed by the lenders. Put another way, plaintiffs had to allege only that defendants were motivated to commit securities fraud by their need to refinance. They did not, however, have to allege what the terms of the refinancing were or append the loan agreements to their complaint; if that were required, it would be the rare case indeed that would not be subject to dismissal under Rule 9(b) for lack of particularity. Thus, while these documents may well be highly relevant to defendants' case on summary judgment, they cannot be considered now on the motion to dismiss, as they do not fall into that narrow category of documents upon which plaintiff's case rises or falls. *See Trump,* 7 F.3d at 368 n. 9 ("Because the complaint directly challenged the prospectus, the district court properly considered the prospectus in deciding whether to grant the Rule 12(b)(6) motion."); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988) (court considered, as central to plaintiffs' claims, magazine article submitted by defendant which plaintiffs would ultimately have to offer in order to prove their libel case); *In re AES Corp. Sec. Litig.,* 825 F.Supp. 578, 585 (S.D.N.Y.1993) (considering contract "because it is the sole document on which plaintiffs' fraud allegations" were based).

IV.

Accordingly, I will grant defendants' motion to dismiss in part and deny it in part. Moreover, as this is the third round of motions to dismiss this complaint and the interest in moving this four-year-old litigation to trial or settlement is becoming acute, I will also order that defendants shall file no response other than an answer, except by leave of court. Further, as the motion to dismiss is now resolved and even defendant agrees that discovery can now begin, plaintiffs' outstanding motion to compel, to the extent it seeks discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-56

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

calculated to lead to evidence relevant to the claims and theories that remain, [FN1] will be granted and defendants' motion to confirm stay of discovery will be denied. Finally, because I continue to believe that plaintiffs' theory of scienter, while adequate to survive a motion to dismiss, may well founder on summary judgment, I will grant defendants' motion to stay and defer class certification until it is determined whether any claims survive for trial. An appropriate order follows.

> FN1. The portion of plaintiffs' motion which seeks to compel discovery relative to its now-dismissed *respondeat superior* theory, dkt. no. 47 ¶ d, will be denied.

*ORDER*

*8 AND NOW, this _____ day of July 1999, consistent with the foregoing opinion, it is hereby

ORDERED AND DIRECTED that:

1. The defendants' motion to dismiss the third amended complaint, docket no. 53, is GRANTED IN PART and DENIED IN PART, as stated in the foregoing opinion.

2. Plaintiffs shall file a fourth amended complaint consistent with the rulings in the foregoing opinion on or before August 10, 1999. Defendants shall file an answer on or before August 30, 1998.

3. Plaintiffs' motion to compel, dkt. no. 47, to the extent it seeks discovery calculated to lead to evidence relevant to the claims and theories that remain, is GRANTED.

4. Defendants' motion to confirm stay of discovery, dkt. no. 52, is DENIED.

5. Defendants' motion to stay and defer class certification, dkt. no. 50, is GRANTED. All consideration of plaintiffs' motion to certify class, dkt. no. 44, is STAYED until a motion for summary judgment has been filed and adjudicated.

6. A case management conference shall be held at

319 Washington St., Johnstown, Pa., on Friday, September 10, 1999 at 10:00 A.M.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-57

Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

c

Only the Westlaw citation is currently available.
     United States District Court, E.D. Pennsylvania.
          Carl KOCMAN and Michael DiTondo
                           v.
          SAFEGUARD BUSINESS SYSTEMS.
                CIV. A. No. 88-5127.

                   June 28, 1989.

Neil B. Kitrosser, Brookman, Rosenberg, Brown &
Sandler, Philadelphia, Pa., for plaintiffs.
Michael J. Ossip, Morgan, Lewis & Bockius,
Philadelphia, Pa., Francis M. Milone, for Safeguard
Business Systems.

           *MEMORANDUM AND ORDER*

HUTTON, District Judge.
**\*1** Before this Court is plaintiffs' amended
complaint alleging breach of fiduciary duty, breach
of contract and violation of the Employment
Retirement Income Security Act (hereinafter "
ERISA") 29 U.S.C. § 2000 *et seq.* Defendants
move to dismiss and for summary judgment. Upon
due consideration, defendant's motion to dismiss
plaintiffs' complaint and for summary judgment is
denied. The facts are as follows.

Plaintiffs are former employees of defendant
Safeguard Business Systems, Inc. (hereinafter "
Safeguard"). In 1986 Safeguard was acquired by
Mason Best Company. As a result of the
acquisition and subsequent restructuring of the
company, several employees were terminated.
Among the benefits provided by Safeguard to its
employees was a written severance policy which
was embodied in a personnel manual (hereinafter "
basic severance policy"). The policy provides in
pertinent part:

"Severance pay will be granted to employees whose
termination is the result of

* reorganization

* staff cutback

* substantial change in position requirements

* undocumented unsatisfactory job performance"

[Plaintiffs' Exhibit B]

A second severance policy was formulated by
officials of defendant's company. This
supplemental severance policy known as "double
severance" provides for a lump sum payment equal
to the basic severance payment. This lump sum
payment was offered in addition to the maximum
severance payments provided for by the company
under the personnel policy. Plaintiff Kocman was
terminated from employment on October 28, 1987.
Kocman was paid severance payments totaling 24
weeks of his salary pursuant to the terms of the first
plan. Plaintiff DiTondo was terminated on
November 20, 1987. DiTondo was given
severance payments totaling 26 weeks of his salary
pursuant to the terms of the first plan. Neither
plaintiff received the additional severance monies.
On May 26, 1988, plaintiffs filed a complaint in
Philadelphia Court of Common Pleas seeking the
enhanced severance benefits. The matter was
removed to this Court because plaintiffs' claims
arise under the Employee Retirement Income
Security Act, 29 U.S.C. § 1001, *et seq.* Plaintiffs
filed an amended complaint on February 3, 1989.
Defendant now moves for summary judgment and
to dismiss plaintiffs' amended complaint.

In considering a motion to dismiss, this Court
accepts all well-plead allegations as true. *Conley v.
Gibson,* 355 U.S. 41, 45-46 (1957). Dismissal is
not appropriate unless it appears beyond a doubt
that plaintiffs can prove no set of facts in support of
their claims which would entitle them to relief. *Id.*
This Court must draw all reasonable inferences to
aid the pleader. *D.P. Enterprise v. Bucks County*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-58

Not Reported in F.Supp.

Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

*Community College,* 725 F.2d 943, 944 (3rd Cir.1984).

Federal Rule of Civil Procedure 12(b) states in pertinent part:

"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."

**\*2** Pursuant to Federal Rule of Civil Procedure 56(c), the moving party carries the burden of proving that accepting all facts of record and inferences reasonably drawn from the facts in light most favorable to the non-moving party, there is no genuine issue of fact. *Sorby v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200, 203 (3rd Cir.1987) , cert. denied, --- U.S. ----, 108 S.Ct. 730 (1988). Once the moving party has met its burden, the burden then shifts to the non-moving party to show that the evidence is such that a reasonable jury might enter a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is proper if:

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552 (1986).

ERISA was enacted "to promote the interest of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90 103 S.Ct. 2890 (1983), and "to protect contractually defined benefits." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S., 105 S Ct. 3085, 3089 (1985). *See, generally,* 29 U.S.C. § 1001. The term "employee benefit plan" was considered in *Fort Halifax Packing Co., Inc. v. Coyne,* 107 S.Ct. 2211 (1987). Under an ERISA plan "[a]n employer ... makes a commitment

systematically to pay certain benefits and undertakes a host of obligations such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax,* 107 S.Ct. at 2216. A plan participant is "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). A beneficiary is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

The court in *Fort Halifax* determined that "a lump sum payment, triggered by a single event was not an employee benefit plan for ERISA," *See, Pane v. RCA Corp.,* Civ. Action No. 88-5758 (3rd Cir. January 26, 1989), "since such an employee benefit would not require any administrative scheme whatsoever to meet the employer's statutory obligation." *Fort Halifax,* 107 S.Ct. at 2218.

Defendant argues that the lump-sum benefits are analogous to *Fort Halifax.* He contends that, as in *Fort Halifax,* the additional benefits were individualized offers of a lump-sum payment to specific employees in exchange for a release. An offer made apart from, and independent of, the company's severance pay plan. [Defendant's Memorandum at 9]. In *Fort Halifax,* the court ruled that the length of employment represented the only written eligibility requirement. In the case at bar, there is an additional requirement that the employee be specifically designated for these benefits. This requirement of employer designation presents more than "a lump sum payment, triggered by a single event," which is the standard under *Fort Halifax.*

**\*3** Defendant argues that plaintiffs do not meet the defendant's eligibility requirements because they were not "so designated" by defendant. An employee becomes eligible for the additional termination benefits if he is involuntarily terminated as a result of the restructuring associated with the Mason Best acquisition, and is "so designated by the company." Defendant defines "designation" as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-59

Not Reported in F.Supp.

Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

requiring the submission of a release and non-disclosure form. Those specifically designated employees were required to sign a general release and non-disclosure statement. This distinction does not answer the question as to why the plaintiffs were excluded.

In the instant case, the employee benefit plan is designed for certain designated employees. An employee becomes eligible for the additional termination benefits if he is involuntarily terminated as a result of the restructuring associated with the Mason Best acquisition, and is "so designated by the company." Plaintiffs argue that defendant has abused its discretion in excluding them from the supplemental plan.

Plaintiffs assert that they have a contractual right to the supplemental severance pay. ERISA pre-empts "any and all state laws insofar as they may now or hereafter relate to any benefit plan" covered by ERISA, 29 U.S.C. § 1144(a). The Supreme Court has held that a state law "relates to" an employee benefit plan if it "has a connection with or reference to such plan," and that the scope of this preemption clause is therefore not restricted to state laws dealing specifically with employee benefit plans. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-98, 103 S.Ct. 2890, 2899-2900 (1983). The ERISA pre-emption clause should be construed broadly, and is designed to "establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895 (1981). The pre-emption has been held to extend to state common law causes of action such as breach of employment contract. *Pane,* 667 F.Supp. at 172. Therefore, plaintiffs' common law breach of contract claims "relates to" the defendant's benefit plan and is thus pre-empted by ERISA. *Shaw,* 463 U.S. at 97; *Pane v. RCA,* 667 F.Supp. 168, 171 (D.N.J.1987).

Plaintiffs finally argue that defendant violated its fiduciary duty to plaintiffs. ERISA defines a fiduciary as one who "exercises any discretionary authority or control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(B)(i). Plaintiffs, citing

*Firestone,* argue that failure to comply with the established benefit plan may constitute a breach of fiduciary duty. [Plaintiffs' Memorandum in Opposition to Defendant's Motion]. In *Firestone Tire and Rubber Co. v. Bruch,* --- U.S. ---, 109 S.Ct. 948 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 109 S.Ct. at 956. If the plan gives an administrator discretionary authority to determine eligibility, the plan is reviewed under the arbitrary and capricious standard. *Firestone, supra.* As noted previously, this Court finds that the defendant's employee plan gives the administrator discretionary authority to determine eligibility for benefits. Thus, this Court must apply the arbitrary and capricious standard.

*4 Plaintiffs allege that they were arbitrarily excluded from inclusion in the additional severance benefit plan. Plaintiffs assert that *all* other employees who received the double severance lump sum payment in addition to the basic severance payments worked in job classifications similar to that of plaintiffs and were similar in all relevant employment considerations as plaintiffs. However, application of the "arbitrary and capricious" standard requires a factual determination. Therefore, defendant's motion to dismiss and for summary judgment is DENIED. An appropriate Order follows.

## ORDER

AND NOW, this 27th day of June, 1989, upon consideration of Defendant's Motion to Dismiss and for Summary Judgment and Plaintiffs' response thereto, IT IS HEREBY ORDERED that Defendant's Motion is DENIED.

E.D.Pa.,1989.
Kocman v. Safeguard Business Systems
Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-60

Westlaw.

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
**(Cite as: Not Reported in F.Supp.2d)**

**H**

United States District Court, E.D. Pennsylvania.
In re LINERBOARD ANTITRUST LITIGATION;
This Document Relates to all Actions (CIV NO.
98-5055 & 99-1341).
**No. MDL 1261.**

Oct. 4, 2000.

*ORDER & MEMORANDUM*
DUBOIS.

*ORDER*

*1 AND NOW, to wit, this 4th day of October,
2000, upon consideration of the following three
motions: (1) Stone Container Corporation's Motion
to Dismiss the Corrugated Box Amended Complaint
[FN1] and for Judgment on the Pleadings on Sheets
Complaint I [FN2] (MDL Doc. 29, filed Sep. 1,
1999); (2) the Joint Motion of the Non-Stone
Defendants to Dismiss the *Corrugated Box
Amended Complaint* [FN3] and *Sheets Complaint II* [FN4]
pursuant to Federal Rule of Civil Procedure 12
(MDL, Doc. 27, filed Sep. 1, 1999); and (3) Certain
Defendants' Motion for Relief Under Rule 12 [FN5]
(MDL Doc. 30, filed Sep. 1, 1999); as well as
documents relating to these motions, including the
parties' various submissions of recent authority; IT
IS ORDERED, as follows:

FN1. Four separate actions were filed
against Stone Container Corp. in the
Eastern District of Pennsylvania on behalf
of purchasers of corrugated boxes, as
follows: *Winoff Industries, Inc. v. Stone
Container Corp.,* Civil Action No.
98-5055 (filed Sep. 23, 1998, E.D.Pa.),
*Oak Valley Farms, Inc. v. Stone Container
Corp.,* Civil Action No. 98-5251 (filed
Oct. 2, 1998, E.D.Pa.), *Garrett Paper, Inc.*

*v. Stone Container Corp.,* Civil Action No.
98-5228 (filed Oct. 1, 1998, E.D.Pa.), and
*Local Baking Products, Inc. v. Stone
Container Corp.,* Civil Action No.
98-5384 (filed Oct. 9, 1998, E.D.Pa.). On
December 18, 1998 the four actions were
consolidated by this Court by stipulation
and order pursuant to Federal Rule of Civil
Procedure 42(a). A First Amended and
Consolidated Class Action Complaint ("
Corrugated Box Amended Complaint")
was filed on May 14, 1999. Stone
Container Corp. and twelve other
corporations were named as defendants in
the Corrugated Box Amended Complaint.
It is this complaint that Stone Container
Corp. presently seeks to dismiss.

FN2. The Corrugated Sheets Complaints
have been grouped into two
categories-Sheets Complaint I and Sheets
Complaint II. "Sheets Complaint I" refers
collectively to three class action
complaints, identical in all material
respects, originally filed in 1998 in the
Northern District of Illinois against Stone
Container Corp. on behalf of purchasers of
corrugated sheets: *General Refractories
Co. v. Stone Container Corp.,* Civil Action
No. 99-1341 (transferred on Mar. 16, 1999
to E.D.Pa.), and originally No. 98 C 3543
(filed June 8, 1998, N.D.Ill.); *Albert O
Halper Corrugated Box Co. v. Stone
Container Corp.,* Class Action No.
99-1396 (transferred on Mar. 19, 1999 to
E.D.Pa.), and originally No. 98 C 4659
(filed July 28, 1998, N.D.Ill.); and *Crest
Meat Co., Inc. v. Stone Container Corp.,*
Civil Action No. 99-1397 (transferred on
Mar. 19, 1998 to E.D.Pa.), and originally
No. 98 C 4612 (filed July 27, 1998,
N.D.Ill.). Stone Container Corp. filed a
motion to dismiss the three complaints in
the Northern District of Illinois and on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-61

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

January 8, 1999 Judge Blanche M. Manning denied that motion. Subsequently, on February 5, 1999. Stone Container Corp. filed a consolidated answer to the three complaints included in Sheets Complaint I. Presently before the Court is the motion of Stone Container Corp. for judgment on the pleadings with respect to Sheets Compliant I.

FN3. The Non-Stone Defendants refer to this complaint as the "Winoff Complaint" because Winoff Industries, Inc. is the lead plaintiff named in the Corrugated Box Amended Complaint filed on behalf of purchasers of corrugated boxes.

FN4. "Sheets Complaint II" refers to a separate class action complaint on behalf of purchasers of corrugated sheets filed on May 18, 1999 in the Eastern District of Pennsylvania against eleven "Non-Stone Defendants." These Non-Stone Defendants filed a motion to dismiss Sheets Complaint II which is presently before the Court. Stone Container Corp. joins in that motion on the theory that if the Non-Stone Defendants' motion is granted, it cannot be found liable for an antitrust conspiracy as a matter of law because all of the alleged co-conspirators will have been dismissed. The Non-Stone Defendants refer to Sheets Complaint II as the "General Refractories Complaint" because General Refractories, Inc. is the lead plaintiff named on behalf of the corrugated sheets plaintiffs.

FN5. This motion was filed under Federal Rile of Civil Procedure 12(e) by the Non-Stone Defendants. They seek a more definite statement with respect to the conspiracy alleged in the complaints against them-the Corrugated Box Amended Complaint and Sheets Complaint II.

1. Stone Container Corporation's Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings on Sheets Complaint I is

DENIED;

2. The Joint Motion of the Non-Stone Defendants to Dismiss the *Corrugated Box Amended Complaint* and *Sheets Complaint II* pursuant to Federal Rule of Civil Procedure 12 is DENIED; and

3. Certain Defendants' Motion for Relief Under Rule 12 is DENIED.

IT IS FURTHER ORDERED that Stone Container Corporation shall file and serve its answer to the Corrugated Box Amended Complaint within twenty days. One copy of the answer shall be served on the Court (Chambers, Room 12613) when the original is filed;

IT IS FURTHER ORDERED that the Non-Stone Defendants shall file and serve their answers to the Corrugated Box Amended Complaint and Sheets Complaint II within twenty days. One copy of each answer shall be served on the Court (Chambers, Room 12613) when the originals are filed;

IT IS FURTHER ORDERED that a conference under Federal Rule of Civil Procedure 16 will be scheduled in due course.

## MEMORANDUM

### I. BACKGROUND

This is an antitrust case involving allegations that several major U.S. manufacturers of linerboard [FN6] engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in their product, in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West 1997).

FN6. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard. The defendants named in the instant lawsuits are the major integrated manufacturers and sellers of both linerboard and corrugated sheets.

On May 18, 1998 the Federal Trade Commission (" FTC") filed an administrative complaint against Stone Container Corporation ("Stone"). *See In re Stone Container Corp.*, (May 18, 1998) (attached as an exhibit to both plaintiffs' and defendants' submissions) ("FTC Compl."). The FTC charged Stone with a unilateral violation of Section 5 of the Federal Trade Commission Act. According to the FTC, Stone had attempted to reduce linerboard inventories and had allegedly "invite[d]" some of its competitors to join in a "coordinated price increase. " *See* FTC Compl. at ¶ 3. The FTC did not allege that any other linerboard manufacturer had accepted Stone's "invitation," nor did it allege the existence of any conspiracy.

Stone and the FTC have entered into a consent decree. However, Stone did not admit liability for its alleged unilateral misconduct in so doing, and the consent decree has no preclusive effect on Stone in this private party action.

**\*2** Soon after the FTC filed its complaint, three lawsuits were filed in the Northern District of Illinois on behalf of purchasers of corrugated sheets ("Sheets Complaint I"): *General Refractories Co. v. Stone Container Corp.*, Civil Action No. 99-1341 (transferred on Mar. 16, 1999 to E.D.Pa.), and originally No. 98 C 3543 (filed June 8, 1998, N.D.Ill.); *Albert O Halper Corrugated Box Co. v. Stone Container Corp.*, Class Action No. 99-1396 (transferred on Mar. 19, 1999 to E.D.Pa.), and originally No. 98 C 4659 (filed July 28, 1998, N.D.Ill.); and *Crest Meat Co., Inc. v. Stone Container Corp.*, Civil Action No. 99-1397 (transferred on Mar. 19, 1998 to E.D.Pa.), and originally No. 98 C 4612 (filed July 27, 1998, N.D.Ill.). These cases named only Stone as a defendant, but plaintiffs alleged that there were unnamed co-conspirators involved in the alleged antitrust conspiracy, including *inter alia*, Jefferson

Smurfit Corp. *See id.* (all three complaints) at ¶ 9. The corrugated sheets plaintiffs in the cases included in Sheets Complaint I all claim they were harmed by an industry-wide combination to artificially raise the price of linerboard.

Four other lawsuits were filed against Stone in the Eastern District of Pennsylvania on behalf of purchasers of corrugated boxes at about the same time: *Winoff Industries, Inc. v. Stone Container Corp.*, Civil Action No. 98-5055 (filed Sep. 23, 1998, E.D.Pa.), *Oak Valley Farms, Inc. v. Stone Container Corp.*, Civil Action No. 98-5251 (filed Oct. 2, 1998, E.D.Pa.), *Garrett Paper, Inc. v. Stone Container Corp.*, Civil Action No. 98-5228 (filed Oct. 1, 1998, E.D.Pa.), and *Local Baking Products, Inc. v. Stone Container Corp.*, Civil Action No. 98-5384 (filed Oct. 9, 1998, E.D.Pa.). The corrugated box plaintiffs in these cases also claimed they were harmed by an industry-wide combination to artificially raise the price of linerboard. The four corrugated box actions in the Eastern District of Pennsylvania were consolidated by stipulation and order pursuant to Federal Rule of Civil Procedure 42(a) on December 17, 1998.

On December 17, 1998 this Court conducted a pretrial conference with the corrugated box plaintiffs and Stone. At that conference the Court ordered Stone to produce to plaintiffs copies of the documents it had produced to the FTC. The Court also granted the Corrugated Box Plaintiffs' request to serve subpoenas on other major manufacturers of linerboard in the United States; specifically, the Court authorized, over Stone's objections, a coordinated effort between the corrugated box plaintiffs in the Eastern District of Pennsylvania and the corrugated sheets plaintiffs in the Northern District of Illinois to issue subpoenas primarily calling for production of the documents that these other manufacturers had produced to the FTC in the course of its investigation.

All third-party recipients of the subpoenas objected to the production of documents and several moved to quash. With the exception of one document production, plaintiffs did not obtain the third-party documents they sought. Stone, however, produced voluminous documents to all plaintiffs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

*3 In late 1998 Stone filed a motion to dismiss Sheets Complaint I-that is, the three lawsuits originally filed against Stone in the Northern District of Illinois on behalf of purchasers of corrugated sheets. On January 8, 1999, Judge Blanche M. Manning of that court denied Stone's motion to dismiss. *See General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98 C 4659, 1999 WL 14498 (N.D.Ill. Jan.8, 1999). Soon thereafter, on February 5.1999, Stone filed a consolidated answer to the three complaints in the Northern District of Illinois. On February 12, 1999 the Judicial Panel on Multidistrict Litigation transferred the actions pending in the Northern District of Illinois to this Court for all pretrial proceedings.

On May 14, 1999 the corrugated box Plaintiffs filed the First Amended and Consolidated Class Action Complaint ("Corrugated Box Amended Complaint" ). Stone and the following "Non-Stone" Defendants were named in the Corrugated Box Amended Complaint: Jefferson Smurfit Corp., Smurfit-Stone Container Corp., International Paper Co., Georgia Pacific Corp., Weyerhaeuser Paper Co., Temple Inland Inc., Gaylord Container Corp., Union Camp Corp., Simpson Tacoma Kraft Co., Tenneco Inc., Tenneco Packaging, and Packaging Corp. of America. According to the Corrugated Box Amended Complaint, the Non Stone Defendants accepted Stone's "invitation" to restrict the production of linerboard and artificially raise prices, resulting in an antitrust conspiracy in violation of the Sherman Act.

On May 18, 1999 a separate class action complaint was filed in the Eastern District of Pennsylvania on behalf of purchasers of corrugated sheets ("Sheets Complaint II"). This complaint names eleven of the twelve Non-Stone Defendants identified in the Corrugated Box Amended Complaint.[FN7] Like the Corrugated Box Amended Complaint, Sheets Complaint II alleges that the named Non-Stone Defendants unlawfully conspired with Stone and each other to artificially raise the price of linerboard.[FN8]

FN7. Tenneco, Inc. is the sole Non-Stone

Defendant that was not made a party to the action brought by the Corrugated Sheets plaintiffs.

FN8. One of the defendants named in both the Corrugated Box Amended Complaint and Sheets Complaint II, Simpson Tacoma Kraft Co., was dismissed by agreement of all plaintiffs on November 8, 1999. *See* Stipulation of Dismissal in MDL No. 1261 (Doc. 43, filed Nov. 8, 1999). Thus, eleven Non-Stone defendants remain as parties to the Corrugated Box Amended Complaint, and ten Non-Stone defendants remain as parties to Sheets Complaint II.

On September 1, 1999 Stone filed the instant Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings with respect to the three complaints collectively referred to as Sheets Complaint I. Also on September 1, 1999, the Non-Stone Defendants filed a Joint Motion to Dismiss the Corrugated Box Amended Complaint and Sheets Complaint II. These motions are presently before the Court.[FN9]

FN9. One of the Non-Stone Defendants-Packaging Corporation of America-claims that it was never served with Sheets Complaint II. Therefore, it only joins in the Joint Motion to Dismiss as it applies to the Corrugated Box Amended Complaint.

In the Motions to Dismiss Stone and the Non-Stone Defendants essentially make the same arguments. First, all defendants argue that Sheets Complaints I & II and the Corrugated Box Amended Complaint are time-barred by the applicable statute of limitations. *See* 15 U.S.C.A. § 15(b) (West 1997). Next, all defendants argue that even if the complaints are deemed by this Court to have been timely filed, they should be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) .

The Non-Stone Defendants make additional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-64

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

arguments in which defendant Stone does not join. Specifically, the Non-Stone Defendants contend that the complaints against them-that is, the Corrugated Box Amended Complaint and Sheets Complaint II-should be dismissed based on certain " admissions" made by plaintiffs during the course of third-party discovery. According to the Non-Stone Defendants, plaintiffs admitted that they had no basis upon which to sue any party other than Stone. Finally, in the alternative, the Non-Stone Defendants move for an order requiring plaintiffs to amend the Corrugated Box Amended Complaint and Sheets Complaint II so as to provide a more definite statement with respect to the alleged conspiracy pursuant to Federal Rule of Civil Procedure 12(e).

## II. *STANDARD OF REVIEW*

*\*4* A defendant seeking to dismiss plaintiff's claims at the pleading stage must meet a very high standard. In antitrust actions in particular, Rule 12 motions should be scrutinized carefully and granted rarely. *See Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 958 F.Supp. 992, 995 (E.D.Pa.1997) ("The dismissal standard is even higher in antitrust cases than it is generally....").

Ordinarily, the statute of limitations is an affirmative defense which cannot be asserted on a motion to dismiss; an exception is made only where the complaint is facially noncompliant with the limitations period. *See Barkley v. FMP/Lakeside Assoc.,* 1999 WL 345567, \*2 (E.D.Pa. May 14, 1999).

With respect to a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them, and it must refrain from granting a dismissal unless it is certain that no relief can be granted under any set of facts which could be proved. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)). A motion for judgment on the pleadings under Rule 12(c) is judged under the same standards as a motion to dismiss pursuant to

Rule 12(b)(6). *See Jubilee v. Horn,* 975 F.Supp. 761, 763 (E.D.Pa.1997), *aff'd* 151 F.3d 1025 (3d Cir.1998).

## III. *LEGAL ANALYSIS*

### A. *Dismissal Based on Statute of Limitations.*

As a general rule, private causes of action under the Sherman Act "shall be forever barred unless commenced within four years after the cause of action accrued." *See* 15 U.S.C.A. § 15(b) (West 1997). However, a suit may be brought more than four years after the events that initially created the cause of action if the defendant commits "an act that by its very nature constitutes a 'continuing antitrust violation.' " *Zenith Radio Corp. v. Hazeltine Resch., Inc.,* 401 U.S. 321, 338 & n. 2, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). An act constitutes a "continuing antitrust violation" if it injures the plaintiff over a period of time. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 & n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) . Antitrust law provides that in the case of a continuing antitrust violation each overt act that is part of the violation and that injures the plaintiff, " starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *see also Hanover Shoe,* 392 U.S. at 502

Stone and the Non-Stone Defendants contend that all the complaints at issue-the Corrugated Box Amended Complaint and Sheets Complaints I & II-are time-barred because "the overt acts alleged [by plaintiffs] all occurred in 1993," and each of the complaints was filed more than four years later. *See, e.g.,* Memorandum of Law in Support of Stone's Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings on Sheets Complaint I ("Stone Memo"), at 5-8; Memorandum of Law in Support of the Non-Stone Defendants' Joint Motion to Dismiss Based on Failure to Plead an Antitrust Conspiracy and Statute of Limitations ("Joint Memo I"), at 16-18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

*5 The Corrugated Box Amended Complaint and Sheets Complaint I & II each allege a "class period" of a number of months and continuing injury to the class during that period,[FN10] and the complaints were filed within four years of the end of the respective class periods. Stone and the Non-Stone Defendants argue that plaintiffs' "conclusory allegations" of continuing injury during the class period are legally insufficient to establish a ' continuing' antitrust violation. *See id.* The Court disagrees.

FN10. The three complaints referred to as Sheets Complaint I allege a "class period" from October 1, 1993 through March 31, 1995. *See* Sheets Complaint I (all three complaints), at ¶ 1. Sheets Complaint II and the Corrugated Box Amended Complaint allege a class period from October 1, 1993 through November 30, 1995. *See* Sheets Complaint II, at ¶ 1; Corrugated Box Amended Complaint, at ¶ 5(b).

There is no heightened pleading requirement to allege a continuing antitrust violation, *see Leatherman v. Tarrant County Narcotics,* 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Rolite,* 958 F.Supp. at 995, except that the continuing overt acts alleged must be "new and independent" and must "inflict new and accumulating injury on the plaintiff," *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir.1999). Plaintiffs' complaints satisfy this standard.

The Corrugated Box Amended Complaint, after alleging many details of the conspiracy, states in paragraph 47 that "[i]n August, 1993 Stone implemented the first of a series of price increases that took place during the class period. This price increase was joined by virtually every major manufacture." The corrugated box plaintiffs alleged a class period from October 1, 1993 through November 30, 1995. *See* Corrugated Box Amended Complaint, at ¶ 5(b).

Sheets Complaint II alleges the conspiracy in even

more detail than the Corrugated Box Amended Complaint. *See* Sheets Complaint II, at ¶ 37(a)-(i). Then, in paragraph 37(j), the corrugated sheets plaintiffs allege that "beginning in or about the second half of 1993 and continuing thereafter, the defendants and their co-conspirators had communications with each other which were outside the ordinary course of business during which they agreed to implement and coordinate price increases on corrugated sheets in the United States. There were at least seven such coordinated price increases throughout the Class Period." The class period alleged in Sheets Complaint II is the same as the class period alleged by the corrugated box plaintiffs in the Corrugated Box Amended Complaint-from October 1, 1993 through November 30, 1995. *See* Sheets Complaint II, at ¶ 1.

Finally, the three complaints collectively referred to as Sheets Complaint I contain similar allegations of conspiracy. In paragraph 25 of those complaints plaintiffs state that "[b]eginning at least as early as October of 1993, the exact being unknown to plaintiff, and continuing thereafter at least through March of 1995, defendants Stone and its co-conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act which had the purpose and effect of fixing, raising and maintaining and stabilizing the prices of corrugated sheets at artificially high non competitive levels in the United States." *See* Sheets Complaint I (all three complaints), at ¶ 25. Plaintiffs in Sheets Complaint I allege a class period from October 1, 1993 through March 31, 1995.

*6 In light of the foregoing allegations, the Court finds that the complaints at issue adequately plead a continuing antitrust violation. They allege a price fixing conspiracy that brought about a series of unlawfully high priced sales over a period of years. Under those circumstances, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale [of linerboard or linerboard-based products to the plaintiffs,] "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr,* 521 U.S. at 189; *see also Morton's*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-66

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

*Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 827-29 (11th Cir.1999) (reversing a summary judgment on statute of limitations grounds and ruling that evidence of a continuing antitrust violation similar to that presented in this case raises genuine issues for trial).[FN11]

> FN11. The Court's conclusion regarding whether the complaints adequately plead a continuing antitrust violation is dispositive on the statute of limitations issue. Accordingly, the Court need not consider the remaining statute of limitations arguments raised by the parties-that is, tolling pursuant to 15 U.S.C.A. § 16(i) and the doctrine of fraudulent concealment.

### B. *Dismissal Based on Failure to State a Claim.*

In order to plead a claim under Section 1 of the Sherman Act, a plaintiff must allege: (1) the existence of a contract, combination or conspiracy; (2) a restraint on trade; and (3) an effect on interstate commerce. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218-21, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 (3d Cir.1991). Plaintiffs are not required to document all of their accumulated injuries in the complaint. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Stone and the Non-Stone Defendants contend that plaintiffs have failed to adequately plead an antitrust conspiracy, and that each of the complaints at issue should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Stone argues that the allegations against it in the Corrugated Box Amended Complaint and Sheets Complaint I are legally insufficient to state any claim of conspiracy because they fail to allege any concerted action. *See* Stone Memo, at 12-16. Similarly, the Non-Stone Defendants make several arguments in support of their position-that plaintiffs fail to identify an unlawful agreement in which they collectively participated, that plaintiffs' "boilerplate" conspiracy allegations are insufficient as a matter of law, and that plaintiffs fail to specify which of the Non-Stone

defendants joined the alleged conspiracy. *See* Joint Memo I, at 8-13. The Court rejects these arguments.

The Court finds that with respect to Stone and the Non-Stone Defendants, each of the complaints at issue in the case: (1) alleges a conspiracy, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 35-37; Sheets Complaint I (all three complaints), at ¶ 25; Sheets Complaint II, at ¶ 36; (2) identifies the conspiracy's participants by name, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 10-22; Sheets Complaint I (all three complaints), at ¶¶ 8-9; Sheets Complaint II, at ¶¶ 9-18; (3) alleges the defendants' purpose in engaging in the alleged conspiracy-that is, to artificially raise, stabilize and maintain prices of linerboard and corrugated containers, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 36-37; Sheets Complaint I (all three complaints), at ¶ 24; Sheets Complaint II, at ¶ 37; and (4) alleges the defendants' motive in engaging in the alleged conspiracy-that is, to eliminate competition in the linerboard industry nationwide, *see, e.g.,* Corrugated Box Amended Complaint, at ¶ 36; Sheets Complaint I (all three complaints), at ¶ 26; Sheets Complaint II, at ¶ 36. No more than this is required to plead a cause of action under Section 1 of the Sherman Act. *See Fuentes,* 946 F.2d at 202; *see also Leatherman,* 507 U.S. at 167 (holding that " notice pleading" under Fed.R.Civ.P. 8 requires only a short plain statement of the claims and does not requires the pleading of facts).

*7 In addition, with respect to the complaints against defendant Stone collectively referred to as Sheets Complaint I, the Court notes that a motion to dismiss was filed by Stone in the Northern District of Illinois before those cases were transferred to this Court. In that motion, which was denied by Judge Manning of the Northern District of Illinois, Stone argued that plaintiff failed to plead an antitrust conspiracy under Section 1 of the Sherman Act. To the extent that Stone makes a similar argument in its instant Motion for Judgment on the Pleadings, the argument is rejected for the reasons set forth above and in the opinion by Judge Manning in the cases before her, *see General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98 C 4659, 1999 WL 14498 (N.D.Ill. Jan.8, 1999).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

For the foregoing reasons, the Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint I adequately state a claim against defendant Stone to survive a Motion to Dismiss and a Motion for Judgment on the Pleadings, respectively. Similarly, the Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint II adequately state a claim against the Non-Stone Defendants to survive a Motion to Dismiss.

C. *Dismissal Based on Certain "Admissions."*

The Non-Stone Defendants argue that the complaints against them-the Corrugated Box Amended Complaint and Sheets Complaint II-should be dismissed based on numerous statements made by plaintiffs in the course of earlier discovery disputes. Specifically, the Non-Stone Defendants note that prior to filing lawsuits against them, the Corrugated Box Plaintiffs attempted to obtain third-party discovery from the Non-Stone Defendants, none of which had been named as defendants at that time. During the process, the Non-Stone Defendants contend, plaintiffs "admitted" that they had "no basis" upon which to sue any party other than Stone. *See* Memorandum of Law in Support of the Non-Stone Defendants' Joint Motion to Dismiss Based on Plaintiff's Admissions ("Joint Memo II"), at 1-2.

The Non-Stone Defendants' efforts to have the case dismissed under Federal Rule of Civil Procedure 12 based on these alleged extraneous admissions must fail at this stage of the proceedings. In evaluating motions to dismiss courts generally "are not permitted to go beyond the facts alleged in the complaint and the documents upon which the claims made therein were based." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir.1997). The Third Circuit has held that a court may consider "certain narrowly defined types of material without converting the motion to dismiss" to a motion for summary judgment, *see In re Rockefeller Center Properties, Inc. Sec. Litig.,* 184 F.3d 280, 286 (3d Cir.1999); however this narrow class of material may only include a "document integral to or explicitly relied upon in the complaint,

" or an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* at 287.

**\*8** The admissions which the Non-Stone Defendants purport to ascribe to plaintiffs simply do not fit within these narrow categories. Plaintiffs object to the characterization of their earlier statements as "admissions" at all. The statements are therefore not undisputed nor integral to the complaints. The Court may not consider them in the context of the instant Motion to Dismiss and dismissal based on the alleged "admissions" by plaintiffs is not warranted at this stage of the proceedings.

D. *Motion for a More Definite Statement*

In the alternative to a dismissal of the complaints against them, the Non-Stone Defendants move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) with respect to their involvement in the alleged conspiracy. This alternative motion is based on the argument that the complaints against them are so vague and ambiguous that they can not reasonably be required to respond. The Court disagrees.

Plaintiffs' complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a); *Leatherman,* 507 U.S. at 167. That is what plaintiffs have done in each of their complaints. As Judge Manning stated with respect to the three complaints filed against defendant Stone in her court-collectively referred to as Sheets Complaints I: "[r]educed to their simplest terms, the complaints allege that at sometime between June 1993 and March 1995 Stone, Smurfit and other market competitors[ [FN12] ] agreed to, and in fact did, artificially raise the price of their corrugated sheet products thereby causing customers to pay higher prices. Under *Leatherman's's* liberal notice pleading requirements, the Court believes that Stone could easily surmise the basis for the plaintiff's antitrust claims." *General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
**(Cite as: Not Reported in F.Supp.2d)**

C 4659, 1999 WL 14498, at *2 (N.D.Ill. Jan.8, 1999). This Court reaches the same conclusion with respect to the complaints in which the Non-Stone Defendants are named.

> FN12. The other competitors are currently named as defendants in the cases before this Court, but were not in the cases that originally before Judge Manning, that is the three complaints collectively referred to as Sheets Complaint I.

For the reasons previously stated, this Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint II adequately advise the Non-Stone Defendants of the conspiracy claims against them. Accordingly, the Court will not require plaintiffs to file amended complaints containing more specific allegations of conspiracy.

### IV. CONCLUSION

*9 For all the foregoing reasons, the motion by Stone to dismiss the Corrugated Box Amended Complaint and for judgment on the pleadings on Sheets Complaint I, and the joint motion by the Non-Stone Defendants to dismiss the Corrugated Box Amended Complaint and Sheets Complaint II will be denied. The motion by the Non-Stone Defendants for a more definite statement will also be denied.

The issues raised in defendants' motions presented the Court with close questions. Although plaintiffs' complaints were sufficient to withstand motions under Federal Rule of Civil Procedure 12, they were not models of antitrust pleading. In addition, the questions raised by the purported admissions of the corrugated box plaintiffs must be addressed at a later stage of the case. Under the Court's rulings, plaintiffs will be given an opportunity to prove what they have alleged in their complaints. Defendants will be given an opportunity after completion of relevant discovery to again challenge plaintiffs' claims by motions for summary judgment.

E.D.Pa.,2000.

In re Linerboard Antitrust Litigation
Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-69

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DAVID N. TERHUNE | : | |
| Plaintiff | : | Civil Action |
| | : | |
| v. | : | |
| | : | |
| APPLIED EXTRUSION | : | No. 06-360-KAJ |
| TECHNOLOGIES, INC. | : | |
| | : | |
| and | : | |
| | : | |
| JACKSON CRAIG | : | |
| | : | |
| and | : | |
| | : | |
| TERRY SMITH | : | |

**APPENDIX**   (Continued)

James Green, Esquire (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

And

Alan B. Epstein, Esquire
[Admitted *Pro Hace Vice*]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103


Attorneys for Plaintiff
David N. Terhune

Dated: August 3, 2006

Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

phrase, if it has a connection with or reference to
such a plan." *Metropolitan Life Ins. Co. v.
Massachusetts,* 471 U.S. 1724, 1739 (1985) (
*quoting Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85,
96-97 (1983). Here, Ms. Balock's state law
breach-of-contract claim relates to Mars's voluntary
separation plan. Since Mars's voluntary separation
plan qualifies as a plan under ERISA, ERISA
supersedes plaintiff's state law breach-of-contract
claim arising under that plan. Thus, I will grant
defendant's motion for summary judgment as to
plaintiff's state law breach-of-contract claim.

### III. *ERISA Claims*

Plaintiff, who originally filed this action in state
court, brought no claims under ERISA. Plaintiff,
who argues that the Mars's plan is not an ERISA
plan, alleged only a state law breach of contract
claim. Defendant had adequate notice that
plaintiff's claim was potentially an ERISA claim,
since defendant itself argues that ERISA preempts
plaintiff's state law claim. Therefore, I will allow
the plaintiff thirty days from the date of this order to
file an amended complaint, stating a claim under
federal law.

An order follows.

### ORDER

AND NOW, this 29th day of December, 1989, upon
consideration of Defendant's Motion for Summary
Judgment, Plaintiff's Cross-Motion for Summary
Judgment, Plaintiff's Motion to Remand, and all
responses thereto, it is hereby ORDERED that
Defendant's Motion for Summary Judgment is
GRANTED, Plaintiff's Cross-Motion for Summary
Judgment is DENIED, and Plaintiff's Motion to
Remand is DENIED. It is further ORDERED that
plaintiff is given thirty days from the date of this
order to amend her complaint to state a claim under
federal law.

E.D.Pa.,1990.
Balock v. Mars Electronics Intern., Inc.
Not Reported in F.Supp., 1990 WL 511 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-51

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

H

United States District Court, W.D. Pennsylvania.
In re: CROWN AMERICAN REALTY TRUST
SECURITIES LITIGATION.
Robert JOHNSON, Sr., et al., Plaintiffs,
v.
Frank J. PASQUERILLA et al., Defendants.
No. CIV. A. 95-202J.

July 21, 1999.

*MEMORANDUM OPINION AND ORDER*

SMITH.

**\*1** Before the court is defendants' motion to dismiss plaintiffs' third amended complaint under Fed.R.Civ.P. 12(b)(6). For the following reasons, I will grant the motion in part and deny it in part, and further order that defendants refrain from filing any further pre-answer motions without leave of court.

I.

I have more than once set forth in detail plaintiffs' factual contentions behind this litigation. *See In re Crown American Realty Trust Securities Litig.* *("Crown I"),* No. 95-202J, 1997 WL 599299, 1997 U.S. DIST. LEXIS 14609 (W.D.Pa. Sep. 15, 1997); *In re Crown Am. Realty Trust Securities Litig.* *("Crown II"),* No. 95-202J, 1998 WL 777984, 1998 U.S. Dist. LEXIS 17503 (W.D.Pa. Nov. 2, 1998); *see also Warden v. Crown Am. Realty Trust* *("Warden I"),* No. 96-25J, 1998 WL 725946, 1998 U.S. Dist. LEXIS 16194 (W.D.Pa. Oct. 15, 1998); *Warden v. Crown Am. Realty Trust ("Warden II"),* No. 96-25J, 1999 WL 476996, 1999 U.S. Dist. LEXIS 10262 (W.D.Pa. July 6, 1999). Familiarity with those opinions will accordingly be assumed. Stated again, but with brevity, this is a securities fraud suit in which plaintiffs allege that defendants manipulated the price of Crown's stock by promising earnings and dividends they knew or should have known were not sustainable in light of

Crown's internal financial circumstances. In *Crown I,* I dismissed plaintiffs' first amended consolidated class action complaint because it failed either to state claims upon which relief could be granted under Rule 12(b)(6), or because plaintiffs failed to plead fraud with sufficient particularity under Rule 9(b). I dismissed portions of the complaint with prejudice, while others I dismissed with leave to amend.

Plaintiffs subsequently filed a second amended and consolidated class action complaint, dkt. no. 27, to which a renewed motion to dismiss was filed. On that round of motions, plaintiffs added a significant new allegation of defendants' motive and opportunity to commit securities fraud, specifically that the Pasquerilla defendants desperately needed to refinance certain obligations of their closely held hotel entities, and, to do so, relied on the dividends and underlying value of the Crown shares they controlled. Because the Crown shares would provide sufficient collateral only if earnings and dividends stayed high, plaintiffs averred that defendants had a strong motive to inflate the market for Crown shares until their personal refinancings were completed. I accepted this theory for purposes of adjudicating defendants' motion to dismiss, rejecting defendants' contention that their status as Crown's largest individual shareholders made plaintiffs' theory inherently implausible:

**\*2** It is possible that [plaintiffs] will be able to adduce sufficient evidence in discovery that the Pasquerillas were seriously in need of a lender and were willing to manipulate the stock price to find one, even if that meant that they themselves would suffer a temporary setback when the price of Crown shares inevitably fell. Defendants' implausibility argument--while it may ultimately prevail--is better resolved on a motion for summary judgment, or at trial.

*Crown II,* 1998 WL 777984 at \*4. Because this allegation of motive and opportunity applied only to the individual Pasquerilla defendants, however, I

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

dismissed Crown American Realty Trust as a defendant. *Id.* I then cautioned:

> It is important at this stage to recapitulate what remains for adjudication in this case. Plaintiffs' § 10(b) claims have been limited to a very simple set of allegations that the Pasquerilla defendants, in the 1994 annual report and at the March 1995 REIT conference, made false or misleading statements about Crown's 1995 earnings and dividends, for the purpose of temporarily keeping the market value of Crown shares high enough to support the refinancing of the Pasquerillas' closely held hotel entities. That must remain the focus of discovery and of subsequent dispositive motions. To that end, plaintiffs shall file a third amended complaint limited to this theory, and from which all matter that has been dismissed by this court has been excised.

*Id.* at *5.

Notwithstanding these explicit instructions, plaintiffs filed a third amended and consolidated class action complaint, dkt. no. 42, which repeats many of the allegations and theories already rejected and which defendants have been compelled to again move to dismiss. Defendants, in their motion to dismiss, dkt. no. 53, have ignored my ruling that plaintiffs' refinancing theory of motive and opportunity can only be resolved on a more developed record, and have once again--this time relying on additional documents not submitted before--attempted to resurrect their implausibility argument. It is against this background that I must decide the instant motion to dismiss.

## II.

Defendants seek dismissal of all claims previously rejected in *Crown I* and *Crown II*, but still pleaded in the third amended complaint. I will address these contentions *seriatim*.

### A.

Defendants first assert that plaintiffs' claims under § 20(a) of the Exchange Act against the Pasquerilla defendants must be dismissed because I have already dismissed Crown as a defendant and, they argue, the Pasquerillas cannot be held liable as "controlling persons" of an entity that itself is not

liable. Dkt. no. 54, at 3-4. Plaintiffs respond by contending that, because I permitted the § 20(a) claims to stand in *Crown II*, 1998 WL 777984 at *5, they may continue to be asserted. *See* dkt. no. 59, at 30 n.25. Neither party cites any statute or caselaw in support of its position. My earlier decision stands as law of the case and, in the absence of any new argument supported by authority, the 20(a) claims will not be dismissed at this time.

### B.

*3 Defendants also seek dismissal of plaintiffs' newly asserted theory that Crown is subject to *respondeat superior* liability under § 10(b) for the alleged actions of the individual defendants. Dkt. no. 54, at 4-8. *But see* dkt. no. 59, at 21-29 (plaintiffs' brief). In *Warden II*, I rejected plaintiffs' attempt to impute an underwriter's statement about Crown's IPO to Crown itself as that of an agent under § 10(b) of the Exchange Act, being bound by circuit precedent, *Rochez Bros. v. Rhoades*, 527 F.2d 880, 886 (3d Cir.1975), which held that agency liability is not an available theory of recovery. *Warden II*, 1999 WL 476996 at *4, 1999 U.S. Dist. LEXIS 10262 at *14. Therefore, I will again dismiss the § 10(b) claims against Crown with prejudice.

### C.

Defendants also argue that the following "claims" based upon certain statements, documents and theories should be dismissed because they have already been rejected in *Crown I* and *Crown II*: (1) the April 6, 1994 *Pittsburgh Post-Gazette* article; (2) the August 11, 1995 Dow Jones Report and the August 9, 1995 NatWest Report; (3) statements by other, unspecified third-party analysts; (4) failure to disclose the fair market value of Crown's properties; and (5) the motive of inducing investors to purchase shares in the IPO. Dkt. no. 54, at 8-10. Plaintiffs respond by admitting that they do not base their claims on any of the above, and that the paragraphs containing these allegations were included "merely ... to put defendants' misconduct in context." Dkt. no. 59, at 30. That admission having been made, and in light of my prior opinions, I need only reiterate that all such claims remain dismissed with prejudice.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

**(Cite as: 1999 WL 529581 (W.D.Pa.))**

### III.

The only substantial issue raised by the instant motion is whether the refinancing theory of motive and opportunity that I allowed to go forward is itself fatally flawed and must be dismissed. Defendants make three principal arguments in opposition to plaintiffs' theory of scienter: (1) that "the statements at issue were mere opinions of management[,]" dkt. no. 54, at 13; (2) that "the individual defendants continued to purchase unrestricted shares and suffered the largest losses as a result of the dividend cut [,]" *id.* at 14; and (3) "the terms of the refinancing precluded any concrete benefit to the individual defendants[,]" *id.* at 22. I will address these contentions in turn.

### A.

Based upon a Second Circuit decision issued two weeks after *Crown II, see Kowal v. IBM Corp (In re IBM Corp. Sec. Litig.)*, 163 F.3d 102 (2d Cir.1998), defendants argue that plaintiffs' remaining § 10(b) claims should be dismissed as mere expressions of management's opinion. On the present state of the record, I disagree.

*4 In *IBM*, corporate executives issued a series of statements in which they opined that IBM's dividend was not at risk, despite the company's flagging earnings being insufficient to cover it. A few months after the last such statement, the board of directors announced a major dividend cut. *Id.* at 105-06. On defendants' motion for summary judgment, the court held that, since only the board had the authority to declare a dividend, management had neither actual nor apparent authority to enforce its predictions, and thus, their statements were "opinions and not guarantees." *Id.* at 107. Moreover, the court opined that the statements were not false when made because, *inter alia*, IBM had sufficient cash on hand to continue paying the higher dividend if it wished. *Id.* 108, 109.

Here, in contrast, the record is undeveloped, and, while it is true that Crown's board was vested with the sole power to set dividends, it is also evident that its cash was tight and would not be able to pay a $1.40 dividend unless earnings were sufficient to cover it. Crown's management, that is, the

Pasquerilla defendants (all of whom were members of the board), indisputably did have authority over Crown's operations and would have been in the best position to know what its earnings likely would be. Thus, at this stage of the proceedings, I simply cannot say that their statements were merely expressions of management opinion and not actionable as a matter of law under *IBM.*

### B.

Defendants next argue that, because "the individual defendants continued to purchase unrestricted shares and suffered the largest losses as a result of the dividend cut[,]" dkt. no. 54, at 14, those defendants would have been the largest victims of any short-term scheme to inflate the price of Crown shares. I have already rejected this implausibility defense as a basis to dismiss in *Crown II*, 1998 WL 777984 at *4. Nevertheless, defendants have prepared a detailed chart from public filings that shows that Frank and Mark Pasquerilla individually purchased approximately 310,000 and 30,000 shares of unrestricted Crown shares from the time of the IPO until the dividend cut. Dkt. no. 54, at 16-21. Given that the price of each share declined by almost $5 per share, the individual defendants' combined losses from the eventual price drop would have been in the neighborhood of $1.7 million.

Although plaintiffs' theory of scienter hangs by the slenderest of reeds, it is impossible to say, on this record, whether it would have been implausible as a matter of law for defendants to have been willing to suffer a $1.7 million loss. To make that determination, it would be necessary to know, first, what they stood to lose had the closely held hotel portfolio not been successfully refinanced. Although it appears that the Pasquerilla hotel holdings are considerable and plaintiffs assert that they could have been lost without refinancing, that information is neither precisely nor conclusively determinable on this limited record. Second, I would have to know what defendants could hope to obtain by deliberately exposing themselves to a seven-figure loss on the value of their newly acquired Crown shares as a result of participating in their own stock manipulation scheme.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

*5 As a matter of basic economic reality, it would appear that defendants would have acted foolishly indeed to have purchased large amounts of Crown stock, knowing all the while that they would soon be forced to dramatically slash its dividend and, concomitantly, the value of the shares. While an insider might well not divest his shares, either because of the insider trading laws or to avoid "signaling the market" and causing a price decline, it is difficult to conceive of why he would make the affirmative decision to purchase shares at inflated prices, with one exception.

Although it is something of a reach, it is *possible* that a perpetrator of a securities fraud might purchase his own company's shares during the run-up to a dividend cut precisely for the purpose of avoiding liability in the subsequent and inevitable securities fraud suit, that follows major price declines in publicly traded shares. Such a person could believe that by purchasing shares, he will place himself in a position to later argue to a court that the purchases made and losses suffered prove conclusively that his overall actions could not have been fraudulent, although it must be emphasized that he would gain only an argument for dismissal, not an absolute defense. If the "hit" that he must take on his shares is exceeded by the damages and legal fees he would stand to pay if he were found liable for securities fraud, such a perpetrator might find this sort of bargain worthwhile, especially if he believed that the share price would recover over the long term.

To recapitulate this somewhat convoluted theory, it is conceivable that a defendant, facing the loss of substantial real estate holdings for want of refinancing, might be willing to take even a $1.7 million loss on his own stock price manipulation scheme if that loss (occasioned by purposely buying stock that was sure to decline) insulated him from even greater liability in a securities fraud class action like the one *sub judice*. It is simply not impossible that those purchases could have been a sham, made for the purpose of later negating motive and escaping liability for securities fraud. For this theory to make any sense, however, three independent conditions must exist: (1) a defendant

who, for external reasons such as the need to refinance his closely held properties, feels he "must" commit the securities fraud; (2) a likely prospect of being able to use the share purchases during the class period to negate scienter and liability in the subsequent class action; and (3) the liability thus avoided must exceed the loss on the shares purchased.

I grant that this seems an unlikely scenario. Nevertheless, I cannot say that it departs from the zone of mere implausibility and travels into the territory of the impossible. I am therefore constrained to hold that the proper resolution of defendants' contentions must await a motion for summary judgment on a better developed record.

C.

Finally, defendants argue that their scienter is negated "because the terms of the refinancing preclude[ ] any concrete benefit to [them.]" Dkt. no. 54, at 22. They cite the terms of the loan agreements by which the refinancing was accomplished, and point out that under the terms of those contracts, the decline in Crown's share price that occurred in 1995 triggered a default. Thus, they contend that there could have been no motive or opportunity to manipulate the share price in the short term when the inevitable drop in the stock's value would result in default and the loss of the very refinancing that the Pasquerilla defendants sought in the first place. For at least two reasons, this argument is problematic, and it cannot be adequately supported on this record.

*6 First, it is striking that defendants do not represent that the lenders actually declared a default. Thus, it appears that the refinancing remains in place and no benefit of the alleged fraud has been lost. For that reason alone, defendants' assertion that the terms of the loan agreements negated any possibility of scienter cannot supply a basis for dismissal at this stage.

Second, I cannot even consider these loan agreements in connection with a motion to dismiss. When a defendant attaches a document to such a motion, the circumstances under which a federal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

(Cite as: 1999 WL 529581 (W.D.Pa.))

court may consider it without converting the motion into one for summary judgment are very narrow. There are three basic instances under which consideration is possible, and they are "aimed at cases interpreting, for example, a contract. [They are] not intended to grant litigants license to ignore the distinction between motions to dismiss and motions for summary judgment[.]" *Levenstein v. Salafsky,* 164 F.3d 345, 347 (7th Cir.1998). Those circumstances are: (1) where the extrinsic document is incorporated by reference in plaintiffs' complaint, such as citation, quotation or paraphrasing; (2) where the document is a matter of public record, such as an SEC filing; and (3) where the document is otherwise central to plaintiffs' claim in the sense that the claim is based upon the document. *See, e.g., Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996) ("document integral to or explicitly relied upon in the complaint, even though not attached to the complaint"); *Crown I,* 1997 WL 599299 at *7 (same); *Warden II,* 1999 WL 476996 at *5 n. 3 (same); *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1018 (5th Cir.1996) (SEC filings) (adopting *Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991)); *Steinhardt Group Inc. v. Citicorp,* 126 F.3d 144, 145 (3d Cir.1997) ("court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document[ ]") (quoting *Pension Benefit Guar. Corp v. White Consol. Indus., Inc.,* 998 F.2d 1192, 1196 (3d Cir.1993)); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir.1997) (similar); *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993); *see generally* Annotation, *What Matters Not Contained in Pleadings May Be Considered in Ruling on a Motion to Dismiss Under Rule 12(b)(6) of the Federal Rules of Civil Procedure or Motion for Judgment on the Pleadings Under Rule 12(c) Without Conversion to Motion for Summary Judgment,* 138 A.L.R. Fed. 393 §§ 2, 3[a], 4, 5, 6[a], 9, 14, 15 (1997) (collecting and analyzing numerous cases).

*7 The loan agreements relied upon by defendants in their motion to dismiss, *see* dkt. no. 55, exhs. V, W, X, fall into none of these categories. Defendants

refer to these exhibits as "[u]ndisputably authentic documents upon which claims are based[,]" dkt. no. 60, at 2-3, but that description is inconsistent with what the caselaw says about claims that are "based upon" a document. Here, while plaintiffs' theory of scienter is necessarily based upon the Pasquerilla defendants' need to refinance their hotel portfolio, it is not based upon any particular term or condition imposed by the lenders. Put another way, plaintiffs had to allege only that defendants were motivated to commit securities fraud by their need to refinance. They did not, however, have to allege what the terms of the refinancing were or append the loan agreements to their complaint; if that were required, it would be the rare case indeed that would not be subject to dismissal under Rule 9(b) for lack of particularity. Thus, while these documents may well be highly relevant to defendants' case on summary judgment, they cannot be considered now on the motion to dismiss, as they do not fall into that narrow category of documents upon which plaintiff's case rises or falls. *See Trump,* 7 F.3d at 368 n. 9 ("Because the complaint directly challenged the prospectus, the district court properly considered the prospectus in deciding whether to grant the Rule 12(b)(6) motion."); *Fudge v. Penthouse Int'l, Ltd.,* 840 F.2d 1012, 1015 (1st Cir.1988) (court considered, as central to plaintiffs' claims, magazine article submitted by defendant which plaintiffs would ultimately have to offer in order to prove their libel case); *In re AES Corp. Sec. Litig.,* 825 F.Supp. 578, 585 (S.D.N.Y.1993) (considering contract "because it is the sole document on which plaintiffs' fraud allegations" were based).

IV.

Accordingly, I will grant defendants' motion to dismiss in part and deny it in part. Moreover, as this is the third round of motions to dismiss this complaint and the interest in moving this four-year-old litigation to trial or settlement is becoming acute, I will also order that defendants shall file no response other than an answer, except by leave of court. Further, as the motion to dismiss is now resolved and even defendant agrees that discovery can now begin, plaintiffs' outstanding motion to compel, to the extent it seeks discovery

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 529581 (W.D.Pa.), Fed. Sec. L. Rep. P 90,539

**(Cite as: 1999 WL 529581 (W.D.Pa.))**

calculated to lead to evidence relevant to the claims and theories that remain, [FN1] will be granted and defendants' motion to confirm stay of discovery will be denied. Finally, because I continue to believe that plaintiffs' theory of scienter, while adequate to survive a motion to dismiss, may well founder on summary judgment, I will grant defendants' motion to stay and defer class certification until it is determined whether any claims survive for trial. An appropriate order follows.

> FN1. The portion of plaintiffs' motion which seeks to compel discovery relative to its now-dismissed *respondeat superior* theory, dkt. no. 47 ¶ d, will be denied.

*ORDER*

**\*8** AND NOW, this _____ day of July 1999, consistent with the foregoing opinion, it is hereby

ORDERED AND DIRECTED that:

1. The defendants' motion to dismiss the third amended complaint, docket no. 53, is GRANTED IN PART and DENIED IN PART, as stated in the foregoing opinion.

2. Plaintiffs shall file a fourth amended complaint consistent with the rulings in the foregoing opinion on or before August 10, 1999. Defendants shall file an answer on or before August 30, 1998.

3. Plaintiffs' motion to compel, dkt. no. 47, to the extent it seeks discovery calculated to lead to evidence relevant to the claims and theories that remain, is GRANTED.

4. Defendants' motion to confirm stay of discovery, dkt. no. 52, is DENIED.

5. Defendants' motion to stay and defer class certification, dkt. no. 50, is GRANTED. All consideration of plaintiffs' motion to certify class, dkt. no. 44, is STAYED until a motion for summary judgment has been filed and adjudicated.

6. A case management conference shall be held at

319 Washington St., Johnstown, Pa., on Friday, September 10, 1999 at 10:00 A.M.

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-57

**C**
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
Carl KOCMAN and Michael DiTondo
v.
SAFEGUARD BUSINESS SYSTEMS.
**CIV. A. No. 88-5127.**

June 28, 1989.

Neil B. Kitrosser, Brookman, Rosenberg, Brown & Sandler, Philadelphia, Pa., for plaintiffs.
Michael J. Ossip, Morgan, Lewis & Bockius, Philadelphia, Pa., Francis M. Milone, for Safeguard Business Systems.

*MEMORANDUM AND ORDER*

HUTTON, District Judge.
***1** Before this Court is plaintiffs' amended complaint alleging breach of fiduciary duty, breach of contract and violation of the Employment Retirement Income Security Act (hereinafter " ERISA") 29 U.S.C. § 2000 *et seq.* Defendants move to dismiss and for summary judgment. Upon due consideration, defendant's motion to dismiss plaintiffs' complaint and for summary judgment is denied. The facts are as follows.

Plaintiffs are former employees of defendant Safeguard Business Systems, Inc. (hereinafter " Safeguard"). In 1986 Safeguard was acquired by Mason Best Company. As a result of the acquisition and subsequent restructuring of the company, several employees were terminated.
Among the benefits provided by Safeguard to its employees was a written severance policy which was embodied in a personnel manual (hereinafter " basic severance policy"). The policy provides in pertinent part:

"Severance pay will be granted to employees whose termination is the result of

* reorganization

* staff cutback

* substantial change in position requirements

* undocumented unsatisfactory job performance"

[Plaintiffs' Exhibit B]

A second severance policy was formulated by officials of defendant's company. This supplemental severance policy known as "double severance" provides for a lump sum payment equal to the basic severance payment. This lump sum payment was offered in addition to the maximum severance payments provided for by the company under the personnel policy. Plaintiff Kocman was terminated from employment on October 28, 1987.
Kocman was paid severance payments totaling 24 weeks of his salary pursuant to the terms of the first plan. Plaintiff DiTondo was terminated on November 20, 1987. DiTondo was given severance payments totaling 26 weeks of his salary pursuant to the terms of the first plan. Neither plaintiff received the additional severance monies.
On May 26, 1988, plaintiffs filed a complaint in Philadelphia Court of Common Pleas seeking the enhanced severance benefits. The matter was removed to this Court because plaintiffs' claims arise under the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* Plaintiffs filed an amended complaint on February 3, 1989.
Defendant now moves for summary judgment and to dismiss plaintiffs' amended complaint.

In considering a motion to dismiss, this Court accepts all well-plead allegations as true. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). Dismissal is not appropriate unless it appears beyond a doubt that plaintiffs can prove no set of facts in support of their claims which would entitle them to relief. *Id.* This Court must draw all reasonable inferences to aid the pleader. *D.P. Enterprise v. Bucks County*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

*Community College,* 725 F.2d 943, 944 (3rd Cir.1984).

Federal Rule of Civil Procedure 12(b) states in pertinent part:

"If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."

*2 Pursuant to Federal Rule of Civil Procedure 56(c), the moving party carries the burden of proving that accepting all facts of record and inferences reasonably drawn from the facts in light most favorable to the non-moving party, there is no genuine issue of fact. *Sorby v. Pennsylvania Drilling Co., Inc.,* 821 F.2d 200, 203 (3rd Cir.1987) , cert. denied, --- U.S. ----, 108 S.Ct. 730 (1988). Once the moving party has met its burden, the burden then shifts to the non-moving party to show that the evidence is such that a reasonable jury might enter a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Summary judgment is proper if:

"if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2552 (1986).

ERISA was enacted "to promote the interest of employees and their beneficiaries in employee benefit plans," *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 90 103 S.Ct. 2890 (1983), and "to protect contractually defined benefits." *Massachusetts Mutual Life Ins. Co. v. Russell,* 473 U.S., 105 S Ct. 3085, 3089 (1985). *See, generally,* 29 U.S.C. § 1001. The term "employee benefit plan" was considered in *Fort Halifax Packing Co., Inc. v. Coyne,* 107 S.Ct. 2211 (1987). Under an ERISA plan "[a]n employer ... makes a commitment

systematically to pay certain benefits and undertakes a host of obligations such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments and keeping appropriate records in order to comply with applicable reporting requirements." *Fort Halifax,* 107 S.Ct. at 2216. A plan participant is "any employee or former employee ... who is or may become eligible to receive a benefit of any type from an employee benefit plan." 29 U.S.C. § 1002(7). A beneficiary is "a person designated by a participant, or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." 29 U.S.C. § 1002(8).

The court in *Fort Halifax* determined that "a lump sum payment, triggered by a single event was not an employee benefit plan for ERISA," See, *Pane v. RCA Corp.,* Civ. Action No. 88-5758 (3rd Cir. January 26, 1989), "since such an employee benefit would not require any administrative scheme whatsoever to meet the employer's statutory obligation." *Fort Halifax,* 107 S.Ct. at 2218.

Defendant argues that the lump-sum benefits are analogous to *Fort Halifax.* He contends that, as in *Fort Halifax,* the additional benefits were individualized offers of a lump-sum payment to specific employees in exchange for a release. An offer made apart from, and independent of, the company's severance pay plan. [Defendant's Memorandum at 9]. In *Fort Halifax,* the court ruled that the length of employment represented the only written eligibility requirement. In the case at bar, there is an additional requirement that the employee be specifically designated for these benefits. This requirement of employer designation presents more than "a lump sum payment, triggered by a single event," which is the standard under *Fort Halifax.*

*3 Defendant argues that plaintiffs do not meet the defendant's eligibility requirements because they were not "so designated" by defendant. An employee becomes eligible for the additional termination benefits if he is involuntarily terminated as a result of the restructuring associated with the Mason Best acquisition, and is "so designated by the company." Defendant defines "designation" as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-59

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

requiring the submission of a release and non-disclosure form. Those specifically designated employees were required to sign a general release and non-disclosure statement. This distinction does not answer the question as to why the plaintiffs were excluded.

In the instant case, the employee benefit plan is designed for certain designated employees. An employee becomes eligible for the additional termination benefits if he is involuntarily terminated as a result of the restructuring associated with the Mason Best acquisition, and is "so designated by the company." Plaintiffs argue that defendant has abused its discretion in excluding them from the supplemental plan.

Plaintiffs assert that they have a contractual right to the supplemental severance pay. ERISA pre-empts "any and all state laws insofar as they may now or hereafter relate to any benefit plan" covered by ERISA, 29 U.S.C. § 1144(a). The Supreme Court has held that a state law "relates to" an employee benefit plan if it "has a connection with or reference to such plan," and that the scope of this preemption clause is therefore not restricted to state laws dealing specifically with employee benefit plans. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96-98, 103 S.Ct. 2890, 2899-2900 (1983). The ERISA pre-emption clause should be construed broadly, and is designed to "establish pension plan regulation as exclusively a federal concern." *Alessi v. Raybestos-Manhattan, Inc.,* 451 U.S. 504, 523, 101 S.Ct. 1895 (1981). The pre-emption has been held to extend to state common law causes of action such as breach of employment contract. *Pane,* 667 F.Supp. at 172. Therefore, plaintiffs' common law breach of contract claims "relates to" the defendant's benefit plan and is thus pre-empted by ERISA. *Shaw,* 463 U.S. at 97; *Pane v. RCA,* 667 F.Supp. 168, 171 (D.N.J.1987).

Plaintiffs finally argue that defendant violated its fiduciary duty to plaintiffs. ERISA defines a fiduciary as one who "exercises any discretionary authority or control respecting management of [a] plan or exercises any authority or control respecting management or disposition of its assets." 29 U.S.C. § 1002(21)(B)(i). Plaintiffs, citing

*Firestone,* argue that failure to comply with the established benefit plan may constitute a breach of fiduciary duty. [Plaintiffs' Memorandum in Opposition to Defendant's Motion]. In *Firestone Tire and Rubber Co. v. Bruch,* --- U.S. ----, 109 S.Ct. 948 (1989), the United States Supreme Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is reviewed under a *de novo* standard unless the benefit plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone,* 109 S.Ct. at 956. If the plan gives an administrator discretionary authority to determine eligibility, the plan is reviewed under the arbitrary and capricious standard. *Firestone, supra.* As noted previously, this Court finds that the defendant's employee plan gives the administrator discretionary authority to determine eligibility for benefits. Thus, this Court must apply the arbitrary and capricious standard.

*4 Plaintiffs allege that they were arbitrarily excluded from inclusion in the additional severance benefit plan. Plaintiffs assert that *all* other employees who received the double severance lump sum payment in addition to the basic severance payments worked in job classifications similar to that of plaintiffs and were similar in all relevant employment considerations as plaintiffs. However, application of the "arbitrary and capricious" standard requires a factual determination. Therefore, defendant's motion to dismiss and for summary judgment is DENIED. An appropriate Order follows.

### ORDER

AND NOW, this 27th day of June, 1989, upon consideration of Defendant's Motion to Dismiss and for Summary Judgment and Plaintiffs' response thereto, IT IS HEREBY ORDERED that Defendant's Motion is DENIED.

E.D.Pa.,1989.
Kocman v. Safeguard Business Systems
Not Reported in F.Supp., 1989 WL 71492 (E.D.Pa.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                   Page 1

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
**(Cite as: Not Reported in F.Supp.2d)**

H

United States District Court, E.D. Pennsylvania.
In re LINERBOARD ANTITRUST LITIGATION;
This Document Relates to all Actions (CIV NO.
98-5055 & 99-1341).
**No. MDL 1261.**

Oct. 4, 2000.

*ORDER & MEMORANDUM*
DUBOIS.

*ORDER*

*1 AND NOW, to wit, this 4th day of October, 2000, upon consideration of the following three motions: (1) Stone Container Corporation's Motion to Dismiss the Corrugated Box Amended Complaint [FN1] and for Judgment on the Pleadings on Sheets Complaint I [FN2] (MDL Doc. 29, filed Sep. 1, 1999); (2) the Joint Motion of the Non-Stone Defendants to Dismiss the *Corrugated Box Amended Complaint* [FN3] and *Sheets Complaint II* [FN4] pursuant to Federal Rule of Civil Procedure 12 (MDL, Doc. 27, filed Sep. 1, 1999); and (3) Certain Defendants' Motion for Relief Under Rule 12 [FN5] (MDL Doc. 30, filed Sep. 1, 1999); as well as documents relating to these motions, including the parties' various submissions of recent authority; IT IS ORDERED, as follows:

FN1. Four separate actions were filed against Stone Container Corp. in the Eastern District of Pennsylvania on behalf of purchasers of corrugated boxes, as follows: *Winoff Industries, Inc. v. Stone Container Corp.,* Civil Action No. 98-5055 (filed Sep. 23, 1998, E.D.Pa.), *Oak Valley Farms, Inc. v. Stone Container Corp.,* Civil Action No. 98-5251 (filed Oct. 2, 1998, E.D.Pa.), *Garrett Paper, Inc.*

*v. Stone Container Corp.,* Civil Action No. 98-5228 (filed Oct. 1, 1998, E.D.Pa.), and *Local Baking Products, Inc. v. Stone Container Corp.,* Civil Action No. 98-5384 (filed Oct. 9, 1998, E.D.Pa.). On December 18, 1998 the four actions were consolidated by this Court by stipulation and order pursuant to Federal Rule of Civil Procedure 42(a). A First Amended and Consolidated Class Action Complaint (" Corrugated Box Amended Complaint") was filed on May 14, 1999. Stone Container Corp. and twelve other corporations were named as defendants in the Corrugated Box Amended Complaint. It is this complaint that Stone Container Corp. presently seeks to dismiss.

FN2. The Corrugated Sheets Complaints have been grouped into two categories-Sheets Complaint I and Sheets Complaint II. "Sheets Complaint I" refers collectively to three class action complaints, identical in all material respects, originally filed in 1998 in the Northern District of Illinois against Stone Container Corp. on behalf of purchasers of corrugated sheets: *General Refractories Co. v. Stone Container Corp.,* Civil Action No. 99-1341 (transferred on Mar. 16, 1999 to E.D.Pa.), and originally No. 98 C 3543 (filed June 8, 1998, N.D.Ill.); *Albert O Halper Corrugated Box Co. v. Stone Container Corp.,* Class Action No. 99-1396 (transferred on Mar. 19, 1999 to E.D.Pa.), and originally No. 98 C 4659 (filed July 28, 1998, N.D.Ill.); and *Crest Meat Co., Inc. v. Stone Container Corp.,* Civil Action No. 99-1397 (transferred on Mar. 19, 1998 to E.D.Pa.), and originally No. 98 C 4612 (filed July 27, 1998, N.D.Ill.). Stone Container Corp. filed a motion to dismiss the three complaints in the Northern District of Illinois and on

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-61

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

January 8, 1999 Judge Blanche M. Manning denied that motion. Subsequently, on February 5, 1999. Stone Container Corp. filed a consolidated answer to the three complaints included in Sheets Complaint I. Presently before the Court is the motion of Stone Container Corp. for judgment on the pleadings with respect to Sheets Compliant I.

FN3. The Non-Stone Defendants refer to this complaint as the "Winoff Complaint" because Winoff Industries, Inc. is the lead plaintiff named in the Corrugated Box Amended Complaint filed on behalf of purchasers of corrugated boxes.

FN4. "Sheets Complaint II" refers to a separate class action complaint on behalf of purchasers of corrugated sheets filed on May 18, 1999 in the Eastern District of Pennsylvania against eleven "Non-Stone Defendants." These Non-Stone Defendants filed a motion to dismiss Sheets Complaint II which is presently before the Court. Stone Container Corp. joins in that motion on the theory that if the Non-Stone Defendants' motion is granted, it cannot be found liable for an antitrust conspiracy as a matter of law because all of the alleged co-conspirators will have been dismissed. The Non-Stone Defendants refer to Sheets Complaint II as the "General Refractories Complaint" because General Refractories, Inc. is the lead plaintiff named on behalf of the corrugated sheets plaintiffs.

FN5. This motion was filed under Federal Rile of Civil Procedure 12(e) by the Non-Stone Defendants. They seek a more definite statement with respect to the conspiracy alleged in the complaints against them-the Corrugated Box Amended Complaint and Sheets Complaint II.

1. Stone Container Corporation's Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings on Sheets Complaint I is

DENIED;

2. The Joint Motion of the Non-Stone Defendants to Dismiss the *Corrugated Box Amended Complaint* and *Sheets Complaint II* pursuant to Federal Rule of Civil Procedure 12 is DENIED; and

3. Certain Defendants' Motion for Relief Under Rule 12 is DENIED.

IT IS FURTHER ORDERED that Stone Container Corporation shall file and serve its answer to the Corrugated Box Amended Complaint within twenty days. One copy of the answer shall be served on the Court (Chambers, Room 12613) when the original is filed;

IT IS FURTHER ORDERED that the Non-Stone Defendants shall file and serve their answers to the Corrugated Box Amended Complaint and Sheets Complaint II within twenty days. One copy of each answer shall be served on the Court (Chambers, Room 12613) when the originals are filed;

IT IS FURTHER ORDERED that a conference under Federal Rule of Civil Procedure 16 will be scheduled in due course.

*MEMORANDUM*

I. BACKGROUND

This is an antitrust case involving allegations that several major U.S. manufacturers of linerboard [FN6] engaged in a continuing combination and conspiracy in unreasonable restraint of trade and commerce in their product, in violation of Section 1 of the Sherman Act, 15 U.S.C.A. § 1 (West 1997).

FN6. Linerboard includes any grade of paperboard suitable for use in the production of corrugated sheets, which are in turn used in the manufacture of corrugated boxes and for a variety of industrial and commercial applications. Corrugated sheets are made by gluing a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

fluted sheet which is not made of linerboard, known as the corrugating medium, between facing sheets of linerboard. The defendants named in the instant lawsuits are the major integrated manufacturers and sellers of both linerboard and corrugated sheets.

On May 18, 1998 the Federal Trade Commission ("FTC") filed an administrative complaint against Stone Container Corporation ("Stone"). *See In re Stone Container Corp.*, (May 18, 1998) (attached as an exhibit to both plaintiffs' and defendants' submissions) ("FTC Compl."). The FTC charged Stone with a unilateral violation of Section 5 of the Federal Trade Commission Act. According to the FTC, Stone had attempted to reduce linerboard inventories and had allegedly "invite[d]" some of its competitors to join in a "coordinated price increase. " *See* FTC Compl. at ¶ 3. The FTC did not allege that any other linerboard manufacturer had accepted Stone's "invitation," nor did it allege the existence of any conspiracy.

Stone and the FTC have entered into a consent decree. However, Stone did not admit liability for its alleged unilateral misconduct in so doing, and the consent decree has no preclusive effect on Stone in this private party action.

*2 Soon after the FTC filed its complaint, three lawsuits were filed in the Northern District of Illinois on behalf of purchasers of corrugated sheets ("Sheets Complaint I"): *General Refractories Co. v. Stone Container Corp.*, Civil Action No. 99-1341 (transferred on Mar. 16, 1999 to E.D.Pa.), and originally No. 98 C 3543 (filed June 8, 1998, N.D.Ill.); *Albert O Halper Corrugated Box Co. v. Stone Container Corp.*, Class Action No. 99-1396 (transferred on Mar. 19, 1999 to E.D.Pa.), and originally No. 98 C 4659 (filed July 28, 1998, N.D.Ill.); and *Crest Meat Co., Inc. v. Stone Container Corp.*, Civil Action No. 99-1397 (transferred on Mar. 19, 1998 to E.D.Pa.), and originally No. 98 C 4612 (filed July 27, 1998, N.D.Ill.). These cases named only Stone as a defendant, but plaintiffs alleged that there were unnamed co-conspirators involved in the alleged antitrust conspiracy, including *inter alia*, Jefferson

Smurfit Corp. *See id.* (all three complaints) at ¶ 9. The corrugated sheets plaintiffs in the cases included in Sheets Complaint I all claim they were harmed by an industry-wide combination to artificially raise the price of linerboard.

Four other lawsuits were filed against Stone in the Eastern District of Pennsylvania on behalf of purchasers of corrugated boxes at about the same time: *Winoff Industries, Inc. v. Stone Container Corp.*, Civil Action No. 98-5055 (filed Sep. 23, 1998, E.D.Pa.), *Oak Valley Farms, Inc. v. Stone Container Corp.*, Civil Action No. 98-5251 (filed Oct. 2, 1998, E.D.Pa.), *Garrett Paper, Inc. v. Stone Container Corp.*, Civil Action No. 98-5228 (filed Oct. 1, 1998, E.D.Pa.), and *Local Baking Products, Inc. v. Stone Container Corp.*, Civil Action No. 98-5384 (filed Oct. 9, 1998, E.D.Pa.). The corrugated box plaintiffs in these cases also claimed they were harmed by an industry-wide combination to artificially raise the price of linerboard. The four corrugated box actions in the Eastern District of Pennsylvania were consolidated by stipulation and order pursuant to Federal Rule of Civil Procedure 42(a) on December 17, 1998.

On December 17, 1998 this Court conducted a pretrial conference with the corrugated box plaintiffs and Stone. At that conference the Court ordered Stone to produce to plaintiffs copies of the documents it had produced to the FTC. The Court also granted the Corrugated Box Plaintiffs' request to serve subpoenas on other major manufacturers of linerboard in the United States; specifically, the Court authorized, over Stone's objections, a coordinated effort between the corrugated box plaintiffs in the Eastern District of Pennsylvania and the corrugated sheets plaintiffs in the Northern District of Illinois to issue subpoenas primarily calling for production of the documents that these other manufacturers had produced to the FTC in the course of its investigation.

All third-party recipients of the subpoenas objected to the production of documents and several moved to quash. With the exception of one document production, plaintiffs did not obtain the third-party documents they sought. Stone, however, produced voluminous documents to all plaintiffs.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

*3 In late 1998 Stone filed a motion to dismiss Sheets Complaint I-that is, the three lawsuits originally filed against Stone in the Northern District of Illinois on behalf of purchasers of corrugated sheets. On January 8, 1999, Judge Blanche M. Manning of that court denied Stone's motion to dismiss. *See General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98 C 4659, 1999 WL 14498 (N.D.Ill. Jan.8, 1999). Soon thereafter, on February 5.1999, Stone filed a consolidated answer to the three complaints in the Northern District of Illinois. On February 12, 1999 the Judicial Panel on Multidistrict Litigation transferred the actions pending in the Northern District of Illinois to this Court for all pretrial proceedings.

On May 14, 1999 the corrugated box Plaintiffs filed the First Amended and Consolidated Class Action Complaint ("Corrugated Box Amended Complaint" ). Stone and the following "Non-Stone" Defendants were named in the Corrugated Box Amended Complaint: Jefferson Smurfit Corp., Smurfit-Stone Container Corp., International Paper Co., Georgia Pacific Corp., Weyerhaeuser Paper Co., Temple Inland Inc., Gaylord Container Corp., Union Camp Corp., Simpson Tacoma Kraft Co., Tenneco Inc., Tenneco Packaging, and Packaging Corp. of America. According to the Corrugated Box Amended Complaint, the Non Stone Defendants accepted Stone's "invitation" to restrict the production of linerboard and artificially raise prices, resulting in an antitrust conspiracy in violation of the Sherman Act.

On May 18, 1999 a separate class action complaint was filed in the Eastern District of Pennsylvania on behalf of purchasers of corrugated sheets ("Sheets Complaint II"). This complaint names eleven of the twelve Non-Stone Defendants identified in the Corrugated Box Amended Complaint.[FN7] Like the Corrugated Box Amended Complaint, Sheets Complaint II alleges that the named Non-Stone Defendants unlawfully conspired with Stone and each other to artificially raise the price of linerboard.
[FN8]

FN7. Tenneco, Inc. is the sole Non-Stone

Defendant that was not made a party to the action brought by the Corrugated Sheets plaintiffs.

FN8. One of the defendants named in both the Corrugated Box Amended Complaint and Sheets Complaint II, Simpson Tacoma Kraft Co., was dismissed by agreement of all plaintiffs on November 8, 1999. *See* Stipulation of Dismissal in MDL No. 1261 (Doc. 43, filed Nov. 8, 1999). Thus, eleven Non-Stone defendants remain as parties to the Corrugated Box Amended Complaint, and ten Non-Stone defendants remain as parties to Sheets Complaint II.

On September 1, 1999 Stone filed the instant Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings with respect to the three complaints collectively referred to as Sheets Complaint I. Also on September 1, 1999, the Non-Stone Defendants filed a Joint Motion to Dismiss the Corrugated Box Amended Complaint and Sheets Complaint II. These motions are presently before the Court.[FN9]

FN9. One of the Non-Stone Defendants-Packaging Corporation of America-claims that it was never served with Sheets Complaint II. Therefore, it only joins in the Joint Motion to Dismiss as it applies to the Corrugated Box Amended Complaint.

In the Motions to Dismiss Stone and the Non-Stone Defendants essentially make the same arguments. First, all defendants argue that Sheets Complaints I & II and the Corrugated Box Amended Complaint are time-barred by the applicable statute of limitations. *See* 15 U.S.C.A. § 15(b) (West 1997). Next, all defendants argue that even if the complaints are deemed by this Court to have been timely filed, they should be dismissed for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6)

The Non-Stone Defendants make additional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-64

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

arguments in which defendant Stone does not join. Specifically, the Non-Stone Defendants contend that the complaints against them-that is, the Corrugated Box Amended Complaint and Sheets Complaint II-should be dismissed based on certain " admissions" made by plaintiffs during the course of third-party discovery. According to the Non-Stone Defendants, plaintiffs admitted that they had no basis upon which to sue any party other than Stone. Finally, in the alternative, the Non-Stone Defendants move for an order requiring plaintiffs to amend the Corrugated Box Amended Complaint and Sheets Complaint II so as to provide a more definite statement with respect to the alleged conspiracy pursuant to Federal Rule of Civil Procedure 12(e).

## II. *STANDARD OF REVIEW*

*4 A defendant seeking to dismiss plaintiff's claims at the pleading stage must meet a very high standard. In antitrust actions in particular, Rule 12 motions should be scrutinized carefully and granted rarely. *See Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.,* 958 F.Supp. 992, 995 (E.D.Pa.1997) ("The dismissal standard is even higher in antitrust cases than it is generally....").

Ordinarily, the statute of limitations is an affirmative defense which cannot be asserted on a motion to dismiss; an exception is made only where the complaint is facially noncompliant with the limitations period. *See Barkley v. FMP/Lakeside Assoc.,* 1999 WL 345567, *2 (E.D.Pa. May 14, 1999).

With respect to a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them, and it must refrain from granting a dismissal unless it is certain that no relief can be granted under any set of facts which could be proved. *See Markowitz v. Northeast Land Co.,* 906 F.2d 100, 103 (3d Cir.1990) (citing *Ransom v. Marrazzo,* 848 F.2d 398, 401 (3d Cir.1988)). A motion for judgment on the pleadings under Rule 12(c) is judged under the same standards as a motion to dismiss pursuant to

Rule 12(b)(6). *See Jubilee v. Horn,* 975 F.Supp. 761, 763 (E.D.Pa.1997), *aff'd* 151 F.3d 1025 (3d Cir.1998).

## III. *LEGAL ANALYSIS*

### A. *Dismissal Based on Statute of Limitations.*

As a general rule, private causes of action under the Sherman Act "shall be forever barred unless commenced within four years after the cause of action accrued." *See* 15 U.S.C.A. § 15(b) (West 1997). However, a suit may be brought more than four years after the events that initially created the cause of action if the defendant commits "an act that by its very nature constitutes a 'continuing antitrust violation.' " *Zenith Radio Corp. v. Hazeltine Resch., Inc.,* 401 U.S. 321, 338 & n. 2, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). An act constitutes a "continuing antitrust violation" if it injures the plaintiff over a period of time. *See Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 502 & n. 15, 88 S.Ct. 2224, 20 L.Ed.2d 1231 (1968) . Antitrust law provides that in the case of a continuing antitrust violation each overt act that is part of the violation and that injures the plaintiff, " starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr v. A.O. Smith Corp.,* 521 U.S. 179, 189, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997); *see also Hanover Shoe,* 392 U.S. at 502

Stone and the Non-Stone Defendants contend that all the complaints at issue-the Corrugated Box Amended Complaint and Sheets Complaints I & II-are time-barred because "the overt acts alleged [by plaintiffs] all occurred in 1993," and each of the complaints was filed more than four years later. *See, e.g.,* Memorandum of Law in Support of Stone's Motion to Dismiss the Corrugated Box Amended Complaint and for Judgment on the Pleadings on Sheets Complaint I ("Stone Memo"), at 5-8; Memorandum of Law in Support of the Non-Stone Defendants' Joint Motion to Dismiss Based on Failure to Plead an Antitrust Conspiracy and Statute of Limitations ("Joint Memo I"), at 16-18.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
**(Cite as: Not Reported in F.Supp.2d)**

**\*5** The Corrugated Box Amended Complaint and Sheets Complaint I & II each allege a "class period" of a number of months and continuing injury to the class during that period,[FN10] and the complaints were filed within four years of the end of the respective class periods. Stone and the Non-Stone Defendants argue that plaintiffs' "conclusory allegations" of continuing injury during the class period are legally insufficient to establish a ' continuing' antitrust violation. *See id.* The Court disagrees.

> FN10. The three complaints referred to as Sheets Complaint I allege a "class period" from October 1, 1993 through March 31, 1995. *See* Sheets Complaint I (all three complaints), at ¶ 1. Sheets Complaint II and the Corrugated Box Amended Complaint allege a class period from October 1, 1993 through November 30, 1995. *See* Sheets Complaint II, at ¶ 1; Corrugated Box Amended Complaint, at ¶ 5(b).

There is no heightened pleading requirement to allege a continuing antitrust violation, *see Leatherman v. Tarrant County Narcotics,* 507 U.S. 163, 167, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993); *Rolite,* 958 F.Supp. at 995, except that the continuing overt acts alleged must be "new and independent" and must "inflict new and accumulating injury on the plaintiff," *Grand Rapids Plastics, Inc. v. Lakian,* 188 F.3d 401, 406 (6th Cir.1999). Plaintiffs' complaints satisfy this standard.

The Corrugated Box Amended Complaint, after alleging many details of the conspiracy, states in paragraph 47 that "[i]n August, 1993 Stone implemented the first of a series of price increases that took place during the class period. This price increase was joined by virtually every major manufacture." The corrugated box plaintiffs alleged a class period from October 1, 1993 through November 30, 1995. *See* Corrugated Box Amended Complaint, at ¶ 5(b).

Sheets Complaint II alleges the conspiracy in even

more detail than the Corrugated Box Amended Complaint. *See* Sheets Complaint II, at ¶ 37(a)-(i). Then, in paragraph 37(j), the corrugated sheets plaintiffs allege that "beginning in or about the second half of 1993 and continuing thereafter, the defendants and their co-conspirators had communications with each other which were outside the ordinary course of business during which they agreed to implement and coordinate price increases on corrugated sheets in the United States. There were at least seven such coordinated price increases throughout the Class Period." The class period alleged in Sheets Complaint II is the same as the class period alleged by the corrugated box plaintiffs in the Corrugated Box Amended Complaint-from October 1, 1993 through November 30, 1995. *See* Sheets Complaint II, at ¶ 1.

Finally, the three complaints collectively referred to as Sheets Complaint I contain similar allegations of conspiracy. In paragraph 25 of those complaints plaintiffs state that "[b]eginning at least as early as October of 1993, the exact being unknown to plaintiff, and continuing thereafter at least through March of 1995, defendants Stone and its co-conspirators engaged in a continuing combination and conspiracy in unreasonable restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act which had the purpose and effect of fixing, raising and maintaining and stabilizing the prices of corrugated sheets at artificially high non competitive levels in the United States." *See* Sheets Complaint I (all three complaints), at ¶ 25. Plaintiffs in Sheets Complaint I allege a class period from October 1, 1993 through March 31, 1995.

**\*6** In light of the foregoing allegations, the Court finds that the complaints at issue adequately plead a continuing antitrust violation. They allege a price fixing conspiracy that brought about a series of unlawfully high priced sales over a period of years. Under those circumstances, "each overt act that is part of the violation and that injures the plaintiff," e.g., each sale [of linerboard or linerboard-based products to the plaintiffs,] "starts the statutory period running again, regardless of the plaintiff's knowledge of the alleged illegality at much earlier times." *Klehr,* 521 U.S. at 189; *see also Morton's*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-66

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

*Market, Inc. v. Gustafson's Dairy, Inc.,* 198 F.3d 823, 827-29 (11th Cir.1999) (reversing a summary judgment on statute of limitations grounds and ruling that evidence of a continuing antitrust violation similar to that presented in this case raises genuine issues for trial).[FN11]

> FN11. The Court's conclusion regarding whether the complaints adequately plead a continuing antitrust violation is dispositive on the statute of limitations issue. Accordingly, the Court need not consider the remaining statute of limitations arguments raised by the parties-that is, tolling pursuant to 15 U.S.C.A. § 16(i) and the doctrine of fraudulent concealment.

### B. *Dismissal Based on Failure to State a Claim.*

In order to plead a claim under Section 1 of the Sherman Act, a plaintiff must allege: (1) the existence of a contract, combination or conspiracy; (2) a restraint on trade; and (3) an effect on interstate commerce. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218-21, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Fuentes v. South Hills Cardiology,* 946 F.2d 196, 198 (3d Cir.1991). Plaintiffs are not required to document all of their accumulated injuries in the complaint. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

Stone and the Non-Stone Defendants contend that plaintiffs have failed to adequately plead an antitrust conspiracy, and that each of the complaints at issue should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). Stone argues that the allegations against it in the Corrugated Box Amended Complaint and Sheets Complaint I are legally insufficient to state any claim of conspiracy because they fail to allege any concerted action. *See* Stone Memo, at 12-16. Similarly, the Non-Stone Defendants make several arguments in support of their position-that plaintiffs fail to identify an unlawful agreement in which they collectively participated, that plaintiffs' "boilerplate" conspiracy allegations are insufficient as a matter of law, and that plaintiffs fail to specify which of the Non-Stone defendants joined the alleged conspiracy. *See* Joint Memo I, at 8-13. The Court rejects these arguments.

The Court finds that with respect to Stone and the Non-Stone Defendants, each of the complaints at issue in the case: (1) alleges a conspiracy, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 35-37; Sheets Complaint I (all three complaints), at ¶ 25; Sheets Complaint II, at ¶ 36; (2) identifies the conspiracy's participants by name, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 10-22; Sheets Complaint I (all three complaints), at ¶¶ 8-9; Sheets Complaint II, at ¶¶ 9-18; (3) alleges the defendants' purpose in engaging in the alleged conspiracy-that is, to artificially raise, stabilize and maintain prices of linerboard and corrugated containers, *see, e.g.,* Corrugated Box Amended Complaint, at ¶¶ 36-37; Sheets Complaint I (all three complaints), at ¶ 24; Sheets Complaint II, at ¶ 37; and (4) alleges the defendants' motive in engaging in the alleged conspiracy-that is, to eliminate competition in the linerboard industry nationwide, *see, e.g.,* Corrugated Box Amended Complaint, at ¶ 36; Sheets Complaint I (all three complaints), at ¶ 26; Sheets Complaint II, at ¶ 36. No more than this is required to plead a cause of action under Section 1 of the Sherman Act. *See Fuentes,* 946 F.2d at 202; *see also Leatherman,* 507 U.S. at 167 (holding that "notice pleading" under Fed.R.Civ.P. 8 requires only a short plain statement of the claims and does not requires the pleading of facts).

*7 In addition, with respect to the complaints against defendant Stone collectively referred to as Sheets Complaint I, the Court notes that a motion to dismiss was filed by Stone in the Northern District of Illinois before those cases were transferred to this Court. In that motion, which was denied by Judge Manning of the Northern District of Illinois, Stone argued that plaintiff failed to plead an antitrust conspiracy under Section 1 of the Sherman Act. To the extent that Stone makes a similar argument in its instant Motion for Judgment on the Pleadings, the argument is rejected for the reasons set forth above and in the opinion by Judge Manning in the cases before her, *see General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98 C 4659, 1999 WL 14498 (N.D.Ill. Jan.8, 1999).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-67

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

For the foregoing reasons, the Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint I adequately state a claim against defendant Stone to survive a Motion to Dismiss and a Motion for Judgment on the Pleadings, respectively. Similarly, the Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint II adequately state a claim against the Non-Stone Defendants to survive a Motion to Dismiss.

### C. Dismissal Based on Certain "Admissions."

The Non-Stone Defendants argue that the complaints against them-the Corrugated Box Amended Complaint and Sheets Complaint II-should be dismissed based on numerous statements made by plaintiffs in the course of earlier discovery disputes. Specifically, the Non-Stone Defendants note that prior to filing lawsuits against them, the Corrugated Box Plaintiffs attempted to obtain third-party discovery from the Non-Stone Defendants, none of which had been named as defendants at that time. During the process, the Non-Stone Defendants contend, plaintiffs "admitted " that they had "no basis" upon which to sue any party other than Stone. See Memorandum of Law in Support of the Non-Stone Defendants' Joint Motion to Dismiss Based on Plaintiff's Admissions ("Joint Memo II"), at 1-2.

The Non-Stone Defendants' efforts to have the case dismissed under Federal Rule of Civil Procedure 12 based on these alleged extraneous admissions must fail at this stage of the proceedings. In evaluating motions to dismiss courts generally "are not permitted to go beyond the facts alleged in the complaint and the documents upon which the claims made therein were based." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1425 (3d Cir.1997). The Third Circuit has held that a court may consider "certain narrowly defined types of material without converting the motion to dismiss" to a motion for summary judgment, *see In re Rockefeller Center Properties, Inc. Sec. Litig.,* 184 F.3d 280, 286 (3d Cir.1999); however this narrow class of material may only include a "document integral to or explicitly relied upon in the complaint,

" or an "undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* at 287.

**\*8** The admissions which the Non-Stone Defendants purport to ascribe to plaintiffs simply do not fit within these narrow categories. Plaintiffs object to the characterization of their earlier statements as "admissions" at all. The statements are therefore not undisputed nor integral to the complaints. The Court may not consider them in the context of the instant Motion to Dismiss and dismissal based on the alleged "admissions" by plaintiffs is not warranted at this stage of the proceedings.

### D. Motion for a More Definite Statement

In the alternative to a dismissal of the complaints against them, the Non-Stone Defendants move for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) with respect to their involvement in the alleged conspiracy. This alternative motion is based on the argument that the complaints against them are so vague and ambiguous that they can not reasonably be required to respond. The Court disagrees.

Plaintiffs' complaints must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a); *Leatherman,* 507 U.S. at 167. That is what plaintiffs have done in each of their complaints. As Judge Manning stated with respect to the three complaints filed against defendant Stone in her court-collectively referred to as Sheets Complaints I: "[r]educed to their simplest terms, the complaints allege that at sometime between June 1993 and March 1995 Stone, Smurfit and other market competitors[ [FN12] ] agreed to, and in fact did, artificially raise the price of their corrugated sheet products thereby causing customers to pay higher prices. Under *Leathermans's* liberal notice pleading requirements, the Court believes that Stone could easily surmise the basis for the plaintiff's antitrust claims." *General Refractories et. al. v. Stone Container Corp.,* No. 98 C 3543, 98 C 4612 and 98

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-68

Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081
(Cite as: Not Reported in F.Supp.2d)

C 4659, 1999 WL 14498, at *2 (N.D.Ill. Jan.8, 1999). This Court reaches the same conclusion with respect to the complaints in which the Non-Stone Defendants are named.

> FN12. The other competitors are currently named as defendants in the cases before this Court, but were not in the cases that originally before Judge Manning, that is the three complaints collectively referred to as Sheets Complaint I.

For the reasons previously stated, this Court concludes that the Corrugated Box Amended Complaint and Sheets Complaint II adequately advise the Non-Stone Defendants of the conspiracy claims against them. Accordingly, the Court will not require plaintiffs to file amended complaints containing more specific allegations of conspiracy.

## IV. CONCLUSION

*9 For all the foregoing reasons, the motion by Stone to dismiss the Corrugated Box Amended Complaint and for judgment on the pleadings on Sheets Complaint I, and the joint motion by the Non-Stone Defendants to dismiss the Corrugated Box Amended Complaint and Sheets Complaint II will be denied. The motion by the Non-Stone Defendants for a more definite statement will also be denied.

The issues raised in defendants' motions presented the Court with close questions. Although plaintiffs' complaints were sufficient to withstand motions under Federal Rule of Civil Procedure 12, they were not models of antitrust pleading. In addition, the questions raised by the purported admissions of the corrugated box plaintiffs must be addressed at a later stage of the case. Under the Court's rulings, plaintiffs will be given an opportunity to prove what they have alleged in their complaints. Defendants will be given an opportunity after completion of relevant discovery to again challenge plaintiffs' claims by motions for summary judgment.

E.D.Pa.,2000.

In re Linerboard Antitrust Litigation
Not Reported in F.Supp.2d, 2000 WL 1475559 (E.D.Pa.), 2000-2 Trade Cases P 73,081

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A-69