## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | : | |
| | : | |
| | : | |
| **DAVID N. TERHUNE** | : | |
| **Plaintiff** | : | **Civil Action** |
| | : | |
| **v.** | : | |
| | : | |
| **APPLIED EXTRUSION** | : | **No. 06-360-KAJ** |
| **TECHNOLOGIES, INC.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **JACKSON CRAIG** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TERRY SMITH** | : | |

## MEMORANDUM IN SUPPORT OF THE
## MOTION OF PLAINTIFF DAIVD TERHUNE
## FOR THE PAYMENT OF LEGAL FEES AND COSTS OF LITIGATION

**I.    INTRODUCTION**

As fully set forth in the attached motion, pursuant to Section 12 of

Plaintiff's Employment Agreement ("Agreement"), Plaintiff is entitled to receive

immediate and ongoing payment for all court costs and reasonable legal fees

and expenses as they are incurred by him from AET pursuant to the terms of the

Agreement.

281271-1

II.    **STATEMENT OF THE CASE**

While employed by AET, Plaintiff served in the capacities of Chief

Financial Officer ("CFO") (1994-95), Chief Operating Officer ("COO") (1996-

2001), President and COO (2002-2004) and President and CEO (2005-2006) of

AET.

On March 8, 2005, Plaintiff and Defendant AET entered into the

Agreement the term of which assured Plaintiff that he would be employed as the

Company's Chief Executive Officer and President through December 31, 2006. A

copy of that Agreement is attached as Exhibit "A". The Agreement also provided

for severance benefits in the event that Terhune was terminated without cause.

Specifically, pursuant to Section 4(e) of the Agreement, upon termination,

Terhune was to receive the following benefits: "any unpaid Base Salary and

benefits accrued through the Termination Date, a lump sum payment within 60

days after the Termination Date, and any previously awarded but unpaid Bonus"

and continued participation in the benefit plans."

On February 7, 2006, Terhune was terminated without cause. Following

his termination, on or about April 11, 2006, AET transmitted a calculation of the

benefits owed under Section 4(e) of the Agreement in the amount of

$925,426.67. Contrary to the specific terms of the controlling Agreement,

Terhune has not received that severance payment from AET.

As a result of AET's failure to comply with the express terms of the

Agreement, Terhune filed a complaint on May 30, 2006 for violation of ERISA,

breach of contract, breach of the implied warranty of good faith and fair dealing,

violation of the Delaware Wage Payment and Collection Law, fraud in the inducement and libel and slander.

**III.    DISCUSSION**

Section 12 of Terhune's Agreement provides that "the Employer shall pay or reimburse Executive...for all costs and expenses (Including, without limitation, court costs and reasonable legal fees and expenses incurred by Executive) as a result of any claim, action or proceeding arising solely out of any claim by Executive that Employer wrongfully failed to make termination payments due under Sections 4(e) or (f) of this Agreement when due." *See* Employment Agreement attached as Exhibit "A" at Section 12(b). By the clear meaning of its stated terms that provision did not premise the payment of those fees and costs on the successful conclusion of any litigation instituted in that regard, but made such reimbursement mandatorily payable on the initiation of the Executive's claim of wrongful non-payment.

**IV.    CONCLUSION**

Plaintiff filed the Complaint in this action because AET wrongfully failed to make termination payments due under Section 4(e) of the Agreement. According to Section 12 of the agreement, it is clear that AET is obligated to pay "the court costs and reasonable legal fees and expenses incurred by Executive" in connection with this claim as they are incurred. Terhune has, and will continue, to incur attorney fees and costs associated with his claim that AET failed to make termination payments due under the Agreement. Therefore, Plaintiff, Terhune, respectfully requests that this Court enter an Order requiring the payment by

281271-1

Defendant AET of all counsel fees and cost of litigation paid to date and continue

to pay those incurred by him in connection with this proceeding.

Respectfully Submitted,

/s/ James S. Green, Sr.
James S. Green, Sr., Esq. (DE Bar No. 481)
Seitz, VanOgtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
Wilmington, DE 19899

And

Alan B. Epstein, Esquire
[Admitted *Pro Hace Vice*]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA 19103

Attorneys for Plaintiff
David N. Terhune

Dated:  August 16, 2006

281271-1

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2006, a true and correct copy of Plaintiff's Motion for Payment of Legal Fees and Litigation Expenses and the accompanying Memorandum of Law was served via electronic service and first-class mail, postage prepaid on the following:

Wendy K. Voss, Esquire
David E. Moore, Esquire
Potter Anderson & Corroon, L.L.P.
1313 North Market Street
P.O. Box 951
Wilmington, Delaware 19899-0951

Counsel for Defendants

/s/ James S. Green, Sr.,
James S. Green, Sr., Esq. (DE 0481)

281271-1

# EMPLOYMENT AGREEMENT

This Employment Agreement (the "Agreement") is made and entered into as of March 8, 2005 (the "Effective Date"), by and between Applied Extrusion Technologies, Inc., a Delaware corporation (the "Employer"), and David N. Terhune (the "Executive").

## RECITALS

1.   The Executive is currently employed by the Employer as its Chief Operating Officer and President pursuant to an Amended and Restated Employment Agreement dated as of August 1, 2002, as in effect on the date hereof (the "Prior Employment Agreement").

2.   The Employer desires to continue to employ the Executive and to make secure for itself the experience, abilities and services of the Executive and to prevent the loss of such experience, services and abilities.

3.   In consideration of the employment to be provided hereby and the amounts to be paid as provided herein, the Executive desires to continue to be employed by the Employer and to agree with the Employer as further provided herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1.   **Employment**.  The Employer shall continue to employ the Executive, and the Executive shall continue to perform services for and continue in the employment of the Employer, for the period (the "Employment Period") beginning on the Effective Date and ending on December 31, 2006, subject to extension as set forth herein (such final date, as from time to time in effect, being referred to herein as the "Expiration Date"); provided, however, that, unless either the Employer or the Executive shall give notice to the other (which notice may be given in the sole discretion of either party hereto) no later than ninety (90) days prior to the then-current Expiration Date (the "Current Expiration Date") that such party does not wish to have the Employment Period extended for another year past the Current Expiration Date, then, at the close of business on such date which is ninety (90) days prior to the Current Expiration Date, the Expiration Date shall automatically become the date which is exactly one (1) year after the Current Expiration Date; and provided, further, that the employment of the Executive by the Employer may be terminated prior to the Expiration Date in accordance with Section 4 hereof.

2.   **Capacity**.  During the Employment Period:

(a)   **Position and Duties**.  The Executive shall serve on a full-time basis in the capacity of Chief Executive Officer and President, shall report to the Board of Directors of the Employer (the "Board") and shall be accountable to, and shall have such other powers, duties and responsibilities consistent with his position and experience as may from time to time be prescribed by, the Board.  The Executive shall perform and discharge, faithfully, diligently and to the best of his ability, such duties and responsibilities.  The Executive shall devote substantially all of his working time and efforts to the business and affairs of the Employer.



(b)    Board Membership.  The Employer agrees to propose to the shareholders of the Employer at each appropriate meeting of such shareholders the reelection of the Executive as a member of the Board, so long as the Executive is otherwise eligible for such election; provided, however, that if the Executive's employment hereunder terminates for any reason, the Executive shall immediately be deemed to have resigned from the Board and from the board of directors of each subsidiary or affiliate of the Employer on which the Executive is then serving, if the Employer has paid all amounts owed to the Executive by virtue of the termination of his employment and is not otherwise then in default hereunder.

3.    Compensation and Benefits.

(a)    Salary.  During each year of the Employment Period, the Executive shall receive an annual base salary (the "Base Salary") of $430,000; provided, however, that effective January 1, 2006, and on each January 1 thereafter, the Base Salary then in effect shall be increased by the greater of (i) such increase as the Board may specify in its sole discretion or (ii) an amount equal to the then-current Salary *multiplied by* the percentage increase (if any) in the Consumer Price Index for All Urban Consumers (CPI-U) - U.S. City Average during the immediately preceding calendar year.

(b)    Incentive Bonus; Equity Incentives .

(i)    During each year of the Employment Period, the Executive shall be eligible to receive an incentive bonus (the "Bonus") based upon criteria that are defined annually by the Employer and targeted at fifty percent (50%) of Base Salary, with a maximum payout potential of one hundred percent (100%) of Base Salary.

(ii)    In consultation with the Executive, the Board will establish a plan providing for equity-based incentives for the senior management of the Employer. The Executive shall be entitled to participate in such plan at a level commensurate with his position as the Chief Executive Officer and President of the Employer.

(c)    Expenses.  The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him on behalf of the Employer consistent with Employer's past practices with Executive and in accordance with the Employer's business expense reimbursement policies.

(d)    Pension and Welfare Benefits.

(i)    The Executive shall be entitled, subject to eligibility requirements, to participate in or receive benefits under each disability insurance, health, pension, retirement and accident plan or arrangement generally made available by the Employer to its executives and key management employees, subject to and on a basis consistent with the terms, conditions and overall administration of such plans and arrangements.

(ii)    In consultation with the Executive, the Board will establish an executive deferred compensation retirement plan (the "EDCRP") that provides benefits substantially the same as the Employer's executive deferred compensation retirement plan established on September 1, 1994 and amended and restated August 10, 2001, pursuant to which the Executive will receive a "Company Credit" (as such term was defined in the Employer's plan) of twenty percent (20%) and pursuant to which the Executive will be fully vested in all benefits provided thereunder.

(iii)    The Employer shall provide to the Executive or, at the Executive's election, reimburse the Executive on an after tax basis for the cost of the following:

(A)    Long-term disability insurance providing not less than sixty-five percent (65%) of Base Salary replacement until age sixty-five (65), and

(B)    Life insurance protection providing total death benefits of not less than $1,875,000, payable to such person as the Executive has designated in a notice filed with the Employer (the "Designee"), or, if no such person has been designated, to his estate (the "Estate"), in each case consistent with the Employer's past practices regarding such insurance for executives.

(e)    Additional Fringe Benefits.  Without limiting the generality of the foregoing, during the Employment Period:

(i)    the Executive shall be furnished with an automobile, of a make and year reasonably satisfactory to the Employer and the Executive and consistent with the past practice of the Employer with the Executive , either owned or leased by the Employer or by way of an automobile allowance sufficient to permit the Executive to obtain the use of such an automobile;

(ii)    the Employer shall either pay the Executive's membership expenses (including fees and dues), or otherwise make available to the Executive at no cost to the Executive, membership at clubs chosen by the Executive with the consent of the Employer (not to be unreasonably withheld) and consistent with the past practice of the Employer with the Executive; and

(iii)    the Executive shall be entitled to a physical examination each calendar year, by a physician selected by the Executive, either pursuant to the Employer's health or other plans or otherwise at the expense of the Employer.

(f)    Change of Control.  If a "Change of Control" (as such term is defined and set forth in Exhibit A hereto) shall occur, then

(i)    all equity-based incentives previously granted to the Executive which, by their terms, have not yet vested, shall immediately vest and (as applicable) become exercisable and shall remain exercisable until the earlier of the Benefits Termination Date or the expiration date of the related grant of such equity-based incentives, regardless of employment status, and

(ii)    the Executive shall be entitled to carry out Executive's duties and responsibilities hereunder primarily from Executive's current office in New Castle, Delaware (or another facility serving such purpose and located within 15 miles of such current office) and will not be required to locate his primary place of business outside such area without his consent (which may be given or withheld in his sole discretion).

4.    Termination and Consequences Thereof.

(a)    Definitions.  As used herein, the following terms shall have the meanings indicated:

(i)    "Average Bonus" shall mean the greater of (A) the average annual Bonus accrued by the Employer as payable to the Executive with respect to the three (3) years immediately preceding the Termination Date or (B) twenty-five percent (25%) of the Base Salary payable in the year in which the Termination Date occurs.

(ii)    "Benefits Termination Date" shall mean the date which is eighteen (18) months after the Termination Date; provided, however, that in the case of a termination by the Company for Cause or by the Executive without Good Reason or if the Executive's employment hereunder shall terminate on the Expiration Date because the Executive has given the notice contemplated by the first proviso to Section 1 hereof, the Benefits Termination Date shall be the Termination Date.

(iii)    "Cause" shall mean (A) other than by reason of Executive's Disability, willful conduct by the Executive demonstrating gross misconduct and gross unfitness to serve and which has caused material harm to the business or interests of the Employer, or (B) the Executive's conviction of, or entry into a consent decree or substantially similar arrangement in connection with, a felony crime involving fraud, dishonesty or other conduct which materially and adversely affects the Employer.  For purposes of this Section 4, no act, or failure to act, on the Executive's part shall be considered "willful" unless done, or omitted to be done, by him knowing that such action or inaction would not be in the best interests of the Employer or otherwise done or omitted to be done in bad faith or with reckless disregard for the best interests of the Employer.

(iv)    "<u>Disability</u>" shall mean a physical or mental incapacity that prevents the Executive from performing the essential functions of his position with the Employer for a period of one hundred eighty (180) or more consecutive days as determined (A) in accordance with any long-term disability plan provided by the Employer, or (B) by the following procedure: The Executive agrees to submit to medical examinations by a licensed healthcare professional selected by the Employer, in its sole discretion, to determine whether a Disability exists. In addition, the Executive may submit to the Employer documentation of a Disability, or lack thereof, from a licensed healthcare professional of his choice. Following a determination of a Disability or lack of Disability by the Employer's or the Executive's licensed healthcare professional, the other party may submit subsequent documentation relating to the existence of a Disability from a licensed healthcare professional selected by such other party. In the event that the medical opinions of such licensed healthcare professionals conflict, such licensed healthcare professionals shall appoint a third licensed healthcare professional to examine the Executive, and the opinion of such third licensed healthcare professional shall be dispositive.

(v)    "<u>Good Reason</u>" shall mean a termination by the Executive due to the occurrence of one or more of the following: (A) failure of the Employer to continue the Executive in the position of Chief Executive Officer and President, (B) failure of the Executive to be elected to the Board, (C) material diminution in the nature or scope of the Executive's responsibilities, duties or authority, or (D) a decrease in the Executive's compensation, bonus opportunity and benefits, in the aggregate, including a failure to pay any such amounts when due; <u>provided</u>, <u>however</u>, that no termination by the Executive for Good Reason shall be effective unless and until the Executive has given thirty (30) days written notice to the Board of the reasons for the termination for Good Reason, and the Employer has failed to remedy such reasons; and <u>provided</u>, <u>further</u>, that no termination for Good Reason shall be effective if the reasons for the termination occurred more than sixty (60) days prior to the date on which the Executive has provided written notice to the Board.

(vi)    "<u>Termination Date</u>" shall mean the earlier of (A) the Expiration Date or (B) if the Executive's employment is terminated (1) by his death, the date of his death, (2) due to a Disability, the date that the Executive commences receiving long-term disability benefits pursuant to a plan provided by the Employer or, if later, is otherwise determined to have suffered a Disability in accordance with the process prescribed herein, or (3) for any other reason, the date on which such termination is to be effective pursuant to the notice of termination given by the party terminating the employment relationship. The Employment Period shall terminate on the Termination Date, and the Expiration Date shall automatically be changed and shall become the Termination Date.

(b)    Death. The Executive's employment hereunder shall terminate upon his death. In such event, the Employer shall provide the Designee or, if no such person has been designated, the Estate, with the following, in lieu of any other payments or benefits whatsoever:

(i)    as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

(ii)    any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date, and

(iii)    the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

(c)    Disability. The Employer, by action of the Board, may terminate the Executive's employment hereunder due to the Executive's Disability, in which event, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

(i)    as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

(ii)    any previously awarded but unpaid Bonus, together with an amount equal to the Average Bonus, pro rated for the period from the beginning of the calendar year through the Termination Date,

(iii)    during the period beginning on the Termination Date and ending on the Benefits Termination Date, shall continue Executive's the participation in the benefit plans referred to in Sections 3(d)(i), 3(d)(ii), 3(d)(iii)(B) (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to Section 3(e) hereof, and

(iv)    the Executive shall be deemed for all vesting requirements contained in any of the Employer's benefit plans, programs and offerings in which the Executive is participating on the Termination Date (including without limitation any equity-based incentive plans) to have been employed by the Employer until the Benefits Termination Date, with all vested equity-based incentives remaining exercisable (if applicable) until the Benefits Termination Date, provided they do not otherwise expire.

(d)     Termination by the Employer for Cause.  The Employer may terminate the Executive's employment hereunder for Cause, in which event, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for unpaid Base Salary and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(e)     Termination by the Employer Without Cause.  The Employer may terminate the Executive's employment hereunder, other than pursuant to Section 4(b) (relating to death), Section 4(c) (relating to Disability) or Section 4(d) (for to Cause), at any time.  In the event of such termination, or if the Executive's employment hereunder shall terminate on the Expiration Date because the Employer has given the notice contemplated by the first proviso to Section 1 hereof, the Employer shall provide the Executive with the following, in lieu of any other payments or benefits whatsoever:

(i)     as promptly as practicable after the Termination Date, an amount equal to any unpaid Base Salary and benefits accrued through the Termination Date,

(ii)     a lump sum payment, within 60 days after the Termination Date, equal to the aggregate amount of Salary and Average Bonus that would have been payable to the Executive over the period from the Termination Date to the Benefits Termination Date if the Executive had continued to be employed by the Employer through the Benefits Termination Date and received Salary and Average Bonus for periods after the Termination Date based upon the Salary he would have received under Section 3(a) if this Agreement was extended through the Benefits Termination Date (but excluding any cost of living or discretionary increases that would have occurred after the Termination Date),

(iii)     any previously awarded but unpaid Bonus,

(iv)     during the period beginning on the Termination Date and ending on the earlier of the Benefits Termination Date and the date on which the Executive first becomes eligible for substantially equivalent benefits provided by any other entity following the Termination Date, shall continue Executive's the participation in the benefit plans referred to in Sections 3(d)(i), 3(d)(ii), 3(d)(iii)(B) (or provide the equivalent thereof in all material respects if continued participation is not permitted under applicable law or the terms of such benefit plans) and extend to the Executive the benefits provided pursuant to Section 3(e) hereof, and

(v)     benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans, programs or arrangements in which the Executive is participating on the Termination Date (including without limitation any equity based incentive plans), subject to the following:  (A) with respect to all vesting requirements, the

Executive shall be deemed to have been employed by the Employer until the Benefits Termination Date, (B) any vested stock options shall remain exercisable until the earlier of the Benefits Termination Date and the date such options would expire according to the terms of the grant, provided they do not otherwise expire.

(f)    Termination by the Executive for Good Reason.  The Executive may terminate his employment hereunder for Good Reason in accordance with Section 4(a)(v).  In event of termination pursuant to this Section 4(f), the Employer shall provide the Executive with the payments and benefits set forth in Section 4(e), above, in lieu of any other payments or benefits whatsoever.

(g)    Termination by the Executive Other Than for Good Reason.  The Executive may terminate his employment hereunder other than for Good Reason.  In the event of termination of the Executive's employment pursuant to this Section 4(g), or if the Executive's employment hereunder terminates on the Expiration Date because the Executive has given the notice contemplated by the first proviso to Section 1 hereof, the Employer shall have no further obligations to the Executive hereunder after the Termination Date, except for payment of any unpaid Base Salary earned and benefits accrued through the Termination Date in accordance with the terms and conditions of any of the Employer's benefit plans in which the Executive is participating on the Termination Date.

(h)    Effect of Termination.  This Section 4 sets forth all obligations of the Employer to the Executive upon termination of his employment hereunder, including any payments or benefits due under any severance plans or policies administered by the Employer.  The provisions of this Section 4 and of Sections 5, 6, 7, 8, 9, 10, 11 and 12 hereof shall survive the Termination Date.

(i)    Consulting Services.  Following termination of his employment hereunder pursuant to the provisions of Section 4(e) or Section 4(f) hereof, and in partial consideration for the payments provided pursuant thereto, during the period from the Termination Date until the Benefits Termination Date, the Executive shall provide to the Employer no less than eight (8) hours per month of consulting services as reasonably requested by Employer.  Such consulting services shall be provided from locations and at times reasonably acceptable to both parties.  The Executive shall be entitled to receive prompt reimbursement for all reasonable business expenses incurred by him in connection with the provisions of consulting services to the Employer, subject to the Executive providing appropriate documentation of the same.

(j)    Non-Duplication of Benefits.  Notwithstanding the foregoing, nothing in this Agreement shall result in a duplication of payments or benefits provided under this Section 4, nor shall anything in this Agreement require the Employer to make any payment or to provide any benefit to the Executive that the Employer is otherwise required to provide under any other contract, agreement or arrangement except to the extent that this Agreement specifically provides that Executive shall be entitled to the benefits under a policy or program maintained by Employer.

(k)  General Release.  No payments or benefits payable to the Executive upon the Termination of his employment pursuant to this Section 4 shall be made to the Executive unless and until the Executive executes a general release in favor of the Employer in a form reasonably satisfactory to the Employer and the Executive and such general release becomes effective pursuant to its terms.

(l)  No interest shall accrue on or be paid with respect to any portion of any payments hereunder, except as required by law.

5.  Duty of Loyalty.

(a)  General.  The Employer is engaged in a continuous program of research, design, development, production, marketing and servicing with respect to its businesses and the clients and customers it services, and the Executive's employment with the Employer creates a relationship of confidence and trust between the Executive and the Employer with respect to the business of the Employer and its Affiliates (as hereinafter defined) and to the business of any client or customer of the Employer or its Affiliates.

(b)  Definitions.  For the purposes of this Agreement, the following terms shall have the following meanings:

(i)  "Affiliate" shall mean any person, corporation or other entity directly or indirectly under the common control of the Employer.  For the purposes of this definition, "control" when used with respect to any person, corporation or other entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise.  The terms "controlling" and "controlled" have meanings correlative to the foregoing.

(ii)  "Competitor" shall mean a person or entity (including, without limitation, the Executive) that in any way:

(A)  conducts, operates, carries out or engages in the business of manufacturing oriented polypropylene films, or

(B)  conducts, operates, carries out, engages in or is involved in any other business which the Employer or any Affiliate may in the future conduct, in any geographic area in which such business is conducted by the Employer or any Affiliate.

The terms "competition," "competitive" and "compete" have meanings correlative to the foregoing.

(iii)  "Confidential Information" means all confidential, proprietary or other non-public information relating to the Employer and its Affiliates and their businesses, and includes without limitation all such information relating to: (A) the development, research, testing, manufacturing and marketing activities of the Employer, (B) the products manufactured, sold or

distributed by the Employer, (C) the costs, sources of supply and strategic plans of the Employer, (D) the identity and special needs of the customers of the Employer, (E) the financial arrangements and capital structure of the Employer, (F) the management and operation of the Employer, and (G) people and organizations with whom the Employer has business relationships and those relationships, regardless in any instance of whether such information has been reduced to documentary form. Confidential Information also includes comparable information that the Employer may receive or has received belonging to customers or others who do business with the Employer. Confidential Information shall not include information which is publicly known, or becomes publicly known, through no fault of the Executive or is generally known or readily obtainable by the public.

(iv)    "Restricted Period" shall mean the twenty-four (24) month period following the Benefits Termination Date.

(c)    Restricted Activities.  As a condition of the Executive's having access to Confidential Information, and in consideration of the payments and benefits provided hereunder, the Executive agrees that the Executive will not, directly or indirectly, either for himself or for any other person or entity, whether as an owner, partner, agent, consultant, employee, officer, director, investor, shareholder, proprietor or in any other individual or representative capacity (excluding the holding for investment of less that five percent (5%) of the outstanding securities of any corporation which are regularly traded on a recognized stock exchange), do any of the following:

(i)    Nondisclosure and Nonuse of Confidential Information.  The Executive shall not disclose to any other person (except as required by applicable law or in connection with the performance of his duties and responsibilities hereunder), or use for his own benefit or gain, any Confidential Information.  The Executive understands that this restriction shall continue to apply after the Executive's employment terminates, regardless of the reason for such termination.

(ii)    Non-Interference with Business Relationships.  During the Restricted Period, the Executive shall not:

(A)    Engage in Competition with the Employer without the Employer's prior express written approval;

(B)    Divert or take away (or attempt to divert or take away) any of the Employer's present, former or prospective customers, including, but not limited to, those upon whom he called, met with or became acquainted with while engaged as an employee of the Employer;

(C)    Interfere with the contractual or business relationships of the Employer;

(D)    Solicit or attempt to solicit any clients of the Employer; or

(E)    Slander or disparage the Employer, or undertake any activity which adversely impacts, or is reasonably likely to impact, the goodwill of the Corporation and its business opportunities.

(iii)    <u>Non-Solicitation</u>.  During the Restricted Period, the Executive shall not:

(A)    Knowingly, nor shall the Executive knowingly attempt to or assist any other person in attempting to, employ or engage or solicit for employment any person who is then, or at any time during the one hundred eighty (180) day-period prior thereto was, (x) an officer; (y) an employee; or (z) a consultant, agent or independent contractor (in each case, if exclusively dedicated to service to the Employer) of the Employer or otherwise provided services to the Employer in a similar, full-time capacity; or encourage any such person to terminate such relationship with the Employer, without the express written consent of the Board; or

(B)    Solicit, pursue, call upon or take away, either for himself or for the benefit of any other person or entity, any of the customers of the Employer upon whom he called or with whom he became acquainted during his employment with the Employer as it relates to the business of the Employer.

(d)    <u>Documents, Materials and Property</u>.  Upon termination of the Executive's employment with the Employer or at any other time upon the Employer's request, the Executive will promptly deliver to the Employer i) without retaining any copies, all documents and other materials furnished to the Executive by the Employer, prepared by the Executive for the Employer or otherwise relating to the Employer's business, if and to the extent that the information therein constitutes Confidential Information, and (ii) any other property of the Employer in the Executive's possession, custody or control.

(e)    <u>Duty to Disclose</u>.  The Executive will inform the Employer in writing of any offer of employment or engagement that he receives during his employment with the Employer or during the Restricted Period from a Competitor, or any person or entity who might reasonably be viewed to be a Competitor, prior to accepting such offer.  Without limiting the foregoing, if the Executive seeks employment with a company that has several divisions, only certain of which are Competitive with the Employer, and the Executive seeks employment with such non-competitive division, the Executive may accept such employment, provided that the Employer is informed in writing of the offer in accordance with the preceding sentence, and the new employer is informed of the restrictions and obligations set forth herein.

(f)    Reasonableness of Restrictions. The Executive represents that his experience, capabilities and circumstances are such that the provisions of this Section 5 will not prevent him from earning a livelihood. The Executive further agrees that the limitations set forth in this Section 5 are reasonable in duration, geographic area and scope and are properly required for the adequate protection of the business interests of the Employer. It is understood and agreed that the covenants made by the Executive in this Section 5 shall survive any termination of the Executive's employment with the Employer.

(g)    Relief; Interpretation. The Executive agrees that the Employer shall, in addition to any other remedies available to it, be entitled to preliminary and permanent injunctive relief against any breach by him of the covenants and agreements contained in this Section 5 without having to post bond. In the event that any provision of this Section 5 hereof shall be determined by any court of competent jurisdiction to be unenforceable by reason of its being extended over too great a time, too large a geographic area or too great a range of activities, it shall be interpreted to extend only over the maximum period of time, geographic area or range of activities as to which it may be enforceable. Each of the covenants of this Section 5 shall be construed as separate covenant covering the subject matter in each of the separate counties and states in the United States and governmental subdivisions outside of the United States (collectively, the "Governmental Units"). To the extent that any covenant is determined by a court of competent jurisdiction to be unenforceable in any one or more of said Governmental Units, said covenant shall not be affected with respect to any other Governmental Unit, each covenant with respect to each Governmental Unit being construed as severable and independent. For purposes of this Section 5 the term "Employer" shall mean the Employer and any of its Affiliates to the extent that such enterprises are, during the term of the Executive's employment by the Employer, engaged in the same line of business as the Employer.

6.    Conflicting Agreements. The Executive hereby represents and warrants that the execution of this Agreement and the performance of his obligations hereunder will not breach or be in conflict with any other agreement to which he is a party or is bound, and that he is not now subject to any covenants against competition or similar covenants which would affect the performance of his obligations hereunder. The Executive will not disclose to or use on behalf of the Employer any proprietary information of a third party without such party's consent. The Executive will not enter into any agreement, whether written or oral, conflicting with the provisions of this Agreement.

7.    Taxes.

(a)    All payments made by the Employer under this Agreement shall be reduced by any tax or other amounts required to be withheld by the Employer under applicable law.

(b)    Notwithstanding the immediately preceding sentence, in the event that it is determined that any payments or benefits provided by the Employer to or for the benefit of the Executive will be subject to the excise tax imposed by Section 4999 of the Internal Revenue Code or any successor provision ("Section 4999"), the Employer will, immediately prior to the date on which any amount of the excise tax must be paid or withheld, make an additional lump-sum payment (the "gross-up payment") to the Executive. The gross-up payment will be sufficient, after giving effect to all federal, state and other taxes (including any excise tax under

Section 4999) and charges (including interest and penalties, if any) with respect to the gross-up payment, to make the Executive whole for all taxes (including withholding taxes) and any associated interest and penalties imposed under or as a result of Section 4999 with respect to all payments and benefits provided by the Employer to or for the benefit of the Executive. Determinations under this Section 7 will be made by the Employer's independent auditors unless the Executive has reasonable objections thereto, in which case the determinations will be made by a comparable auditor chosen by the Executive after consultation with the Employer (the firm making the determinations to be referred to as the "*Firm*"). The determinations of the Firm will be binding upon the Employer and the Executive except as the determinations are established in resolution (including by settlement) of a controversy with the Internal Revenue Service to have been incorrect. All fees and expenses of the Firm will be paid by the Employer. If the Internal Revenue Service asserts a claim that, if successful, would require the Employer to make a gross-up payment or an additional gross-up payment, the Employer and the Executive will cooperate fully in resolving the controversy with the Internal Revenue Service. The Employer will make or advance such gross-up payments as are necessary to prevent the Executive from having to bear the cost of payments made to the Internal Revenue Service in the course of, or as a result of, the controversy. The Firm will determine the amount of such gross-up payments or advances and will determine after resolution of the controversy whether any advances must be returned by the Executive to the Employer. The Employer will bear all expenses of the controversy and will gross the Executive up for any additional taxes that may be imposed upon the Executive as a result of its payment of such expenses.

8.    Indemnification. To the maximum extent permitted under the Employer's by-laws, the Employer hereby agrees to indemnify the Executive and hold him harmless from, against and in respect of any and all damages, deficiencies, actions, suits, proceedings, demands, assessments, judgments, claims, losses, costs, expenses, obligations and liabilities arising from or related to the performance of this Agreement or the Prior Employment Agreement by the Executive, other than for gross negligence, willful misconduct or willful violation of this Agreement, provided that the Executive gives the Employer prompt notice of any matter to which he is claiming indemnification, including any threats thereof, and subject to such procedural requirements that the Employer may impose.

9.    Notices. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered personally or three (3) days after being mailed by registered or certified mail (return receipt requested) to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

(i)    If to Employer, to it at:

Applied Extrusion Technologies, Inc.
15 Read's Way
New Castle, Delaware 19720
Attention: Chief Financial Officer

and to:

Ropes & Gray LLP
One International Place
Boston, Massachusetts  02110
Attention:  Winthrop G. Minot

(ii)    If to the Executive, to him at:

Applied Extrusion Technologies, Inc.
15 Read's Way
New Castle, Delaware  19720

with a copy to him at:

Box 299
Montchanin, Delaware  19710

10.    Assignment.  Neither the Employer nor the Executive may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other party; provided, however, that the Employer may assign its rights and obligations under this Agreement without the consent of the Executive in the event that the Employer shall hereafter effect a reorganization, consolidate with, or merge into any other person or transfer all or substantially all of its properties or assets to any other person.  This Agreement shall inure to the benefit of and be binding upon the Employer and the Executive, their respective successors, executors, administrators, heirs and permitted assigns

11.    Cooperation.  As of the Effective Date and at all times thereafter, the Executive hereby agrees to cooperate in all reasonable respects (after taking into account any employment obligations the Executive may have during periods after the Termination Date) with the Employer and its subsidiaries, affiliates, directors, officers, attorneys and experts in connection with the conduct of any action, proceeding, investigation or litigation involving the Employer, either directly or indirectly, including any such action, proceeding, investigation or litigation in which the Executive is called to testify.  In connection with the Executive's compliance with this Section 11, the Employer will provide the Executive with reimbursement for any reasonable out-of-pocket expenses incurred by the Executive.

12.    Legal Fees.

(a)    In the event of litigation concerning the interpretation or application of any provision of this Agreement or concerning any other issue arising out the Executive's employment, the court or other tribunal deciding the dispute shall have the authority to direct the party that does not prevail to pay the reasonable attorneys fees of the prevailing party.

(b)    Notwithstanding the provisions of section 12(a), the Employer shall pay or reimburse Executive on an after-tax basis for all costs and expenses (including, without limitation, court costs and reasonable legal fees and expenses incurred by Executive) as a result of any claim, action or proceeding arising solely out of any claim by Executive that Employer

wrongfully failed to make termination payments due under Sections 4(e) or (f) of this Agreement when due. Such payments or reimbursements shall be made promptly following, receipt by the Employer of request by Executive for such payment or reimbursement, including an invoice detailing any such legal fees and expenses. Requests for payment or reimbursement hereunder may be delivered no more frequently than monthly. Notwithstanding the foregoing, the Executive shall reimburse the Employer for any fees or expenses previously paid or reimbursed by Employer in connection with a dispute if the relevant trier-of-fact determines that Executive's claim for termination payments under Sections 4(e) or (f) was not brought or asserted in good faith.

13.    Miscellaneous.

(a)    Entire Agreement.  This Agreement constitutes the entire agreement between the parties and supersedes all prior and contemporaneous communications, agreements, representations, understandings and negotiations, whether oral or written, with respect to the subject matter hereof.  As of the Effective Date, the Prior Employment Agreement is hereby terminated with respect to the employment of the Executive by the Employer, and shall be of no further force or effect with respect to such employment.

(b)    Amendments.  No amendment to this Agreement shall be effective unless it shall be in writing and signed by each party hereto.  No oral waiver, amendment or modification will be effective under any circumstances whatsoever.

(c)    Waiver.  The waiver by either party of a breach of any provision of this Agreement by the other party will not operate or be construed as a waiver of any other subsequent breach by the other party.

(d)    Severability.  The invalidity or unenforceability of any term or provision hereof shall not affect the validity or enforceability of any other term or provision hereof.

(e)    Headings.  The headings in this Agreement are for convenience of reference only and shall not alter or otherwise affect the meaning hereof.

(f)    Counterparts.  This Agreement may be executed in any number of counterparts which together shall constitute one instrument.

(g)    Governing Law.  This Agreement shall be governed and construed in accordance with the domestic substantive laws of the State of Delaware without regard to any choice or conflict of laws rules or principles that would cause the application of the domestic substantive laws of any jurisdiction other than the State of Delaware.

(h)    Acknowledgement.  By signing this Agreement, the Executive hereby acknowledges and confirms that:

(i)    he has consulted with legal counsel of his choice regarding the terms of this Agreement;

(ii)    he has read the Agreement carefully and completely and understands each of the terms hereof; and

(iii)    he is entering into this Agreement of his own free will and has not been subject to any coercion or duress in this regard.


IN WITNESS WHEREOF, the parties hereto have executed this Employment Agreement as of the date first written above.

APPLIED EXTRUSION TECHNOLOGIES, INC.


By: _____
        Brian Crescenzo
        Chief Financial Officer


EXECUTIVE

_____
        David N. Terhune

EXHIBIT A

Definition of Change of Control

A Change of Control will occur for purposes of this Agreement if:

(a)    any individual, corporation, partnership, company or other entity (including a "group" of the type referred to in Rule 13d-5 under the Securities Exchange Act of 1934, as amended (the "Act"), (a "Person") becomes the "beneficial owner" (as defined in Rule 13d-3 under the Act) of securities of the Employer representing more than thirty percent (30%) of the combined voting power of the Employer's then-outstanding securities (other than as a result of acquisitions of such securities from the Employer),

(b)    there is a change of control of the Employer of a kind which would be required to be reported under Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Act (or a similar item in a similar schedule or form), whether or not the company is then subject to such reporting requirement,

(c)    the Employer is a party to, or the stockholders approve, a merger, consolidation, or other reorganization (other than a merger, consolidation or other reorganization which would result in the voting securities of the Employer outstanding immediately prior thereto continuing to represent, either by remaining outstanding or by being converted into voting securities of the surviving entity, more than fifty percent (50%) of the combined voting power of the voting securities of the Employer or such surviving entity outstanding immediately after such merger, consolidation, or other reorganization), a sale of all or substantially all assets, or a plan of liquidation, or

(d)    individuals who, at the date hereof, constitute the Board cease for any reason to constitute a majority thereof; provided, however, that any director who is not in office at the date hereof but whose election by the Board or whose nomination for election by the Employer's shareholders was approved by a vote of at least a majority of the directors then still in office who either were directors at the date hereof or whose election or nomination for election was previously so approved (other than an election or nomination of an individual whose initial assumption of office is in connection with an actual or threatened election contest relating to the election of the Directors of the Employer, as such terms are used in Rule 14a-11 of Regulation 14A promulgated under the Act) shall be deemed to have been in office at the date hereof for purposes of this definition.

Notwithstanding the foregoing provisions of this Exhibit A, a "Change of Control" will not be deemed to have occurred solely because of the acquisition of securities of the Employer (or any reporting requirements under the Act relating thereto) by an employment benefit plan maintained by the Employer for its employees.

NY2:#4602799v15