## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DAVID N. TERHUNE,          )
                               )

       Plaintiff,        )

                               )     C.A. No. 06-360-MPT
       v.            )

                               )

APPLIED EXTRUSION         )
TECHNOLOGIES, INC., JACKSON    )
CRAIG and TERRY SMITH,     )

                               )

       Defendants.     )
                               )

## DEFENDANTS APPLIED EXTRUSION TECHNOLOGIES, INC., JACKSON CRAIG AND TERRY SMITH'S OPENING BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

Wendy K. Voss (#3142)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street
P. O. Box 951
Wilmington, Delaware 19899-0951
(302) 984-6000
wvoss@potteranderson.com
dmoore@potteranderson.com

OF COUNSEL:

Anthony D. Rizzotti
Christopher J. Powell
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

*Attorneys for Defendants*
*Applied Extrusion Technologies, Inc.,*
*Jackson Craig and Terry Smith*

Dated:  March 23, 2007
785280 / 22036-002

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS ....................................................................1

SUMMARY OF ARGUMENT ......................................................................................2

STATEMENT OF FACTS ...........................................................................................3

LEGAL ARGUMENT.................................................................................................7

I.   Count I Of The Amended Complaint Fails To State A Claim
     for Which Relief Can Be Granted ....................................................................8

     A.   Terhune Has Failed Adequately To Allege The
          Existence Of An ERISA Plan. ................................................................8

     B.   Terhune Has Failed To Allege That He Is Entitled To
          Any Severance Payments Under The Agreement...................................15

II.  Counts II and IV Of The Amended Complaint Fail To State A
     Claim for Which Relief Can Be Granted As to Severance
     Payments Due Under Section 4 of the Agreement .........................................16

III. Count III of the Amended Complaint Fails to State a Claim for
     Breach of The Duty of Good Faith and Fair Dealing .....................................18

IV.  In The Absence of Count I, The Court Lacks Subject Matter
     Jurisdiction Over Counts II - VI Of The Amended Complaint .......................20

CONCLUSION.......................................................................................................21

# TABLE OF AUTHORITIES

## CASES

*ALA, Inc. v. CCAIR, Inc.*,
    29 F.3d 855 (3d Cir. 1994)...................................................................................7, 15

*Angst v. Mack Trucks, Inc.*,
    969 F.2d 1530 (3d Cir. 1992)..................................................................12, 13, 14, 20

*Aspen Advisors LLC v. United States Artists Theatre Co.*,
    861 A.2d 1251 (Del. 2004) .................................................................................18, 19

*Bauer v. Summit Bancorp*,
    325 F.3d 155 (3d Cir. 2003)......................................................................................15

*In re Burlington Coat Factory Securities Litigation*,
    114 F.3d 1410 (3d Cir. 1997)......................................................................................7

*Colburn v. Upper Darby Twp.*,
    838 F.2d 663 (3d Cir. 1988)........................................................................................7

*Conley v. Gibson*,
    355 U.S. 41 (1957).....................................................................................................7

*Corporate Prop. Associate 6 v. The Hallwood Group Inc.*,
    792 A.2d 993 (Del. Ch. 2002) *rev'd on other grounds*,
    817 A.2d 777 (Del. 2003) ........................................................................................18

*Del. Bay Surgical Services v. Swier*,
    No. 370, 2005, 2006 WL 1419394 (Del. May 22, 2006)
    aff'd 900 A.2d 646, 652 (Del. 2006) .......................................................................17

*Delaye v. Agripac, Inc.*,
    39 F.3d 235 (9th Cir. 1994) ..........................................................................12, 13, 14

*Donovan v. Dillingham*,
    688 F.2d 1367 (11th Cir. 1982) .........................................................................10, 11

*Emmett S. Hickman Co. v. Emilio Cataldi Developer, Inc.*,
    251 A.2d 571 (Del. Super. Ct. 1969)........................................................................16

*Enzo Life Sciences, Inc., v. Digene Corp.*,
    295 F. Supp. 2d 424 (D. Del. 2003)............................................................................7

*Fort Halifax Packing Co. v Coyne,*
   482 U.S. 1 (1987) ...............................................................................12, 13, 14

*Harris v. Arkansas Book Co.,*
   794 F.2d 358 (8th Cir. 1986) ...................................................................10

*Henglein v. Informal Plan for Plant Shutdown Benefits for Salaried Employees,*
   974 F.2d 391 (3d Cir. 1992)....................................................................8, 9

*Kelly v. McKesson HBOC, Inc.,*
   No. 99C-09-265 (WCC), 2002 WL 88939 (Del. Super. Ct. Jan. 17, 2002) ..........18, 19

*Kost v. Kozakiewicz,*
   1 F.3d 176 (3d Cir. 1993).........................................................................7

*Lovell Manufacturing v. Export-Import Bank of the United States,*
   843 F.2d 725 (3d Cir. 1988)......................................................................20

*Merchantwired, LLC v. Transaction Network Serv., Inc.*
   No. 02C-08-244 (FSS), 2003 WL 21689647 (Del. Super. Ct. July 16, 2003).............16

*Metropolitan Communication Corp. BVI v. Advanced Mobilecomm Techs. Inc.,*
   854 A.2d 121 (Del. Ch. 2004).....................................................................19

*Pane v. RCA Corp.,*
   868 F.2d 631 (3d Cir. 1989) ...............................................................12, 14

*Pane v. RCA Corp.,*
   667 F. Supp. 168 (D.N.J. 1987) .................................................................14

*Morse v. Lower Merion School District,*
   132 F.3d 902 (3d Cir. 1997)........................................................................7

*Sendi v. NCR Comten, Inc.,*
   619 F. Supp. 1577 (E.D. Pa. 1985), *aff'd,* 800 F.2d 1138 (3d Cir. 1986) ....................18

*Smith v. Hartford Insurance Group,*
   6 F.3d 131 (3d Cir. 1993)......................................................................10, 11

*Steinhardt Group, Inc. v. Citicorp,*
   126 F.3d 144 (3d Cir. 1997)................................................................8, 11, 16

*Swier v. Del. Bay Surgical Servs.,*
   No. 03C-03-030 (THG), 2004 WL 2827895 (Del. Super. Ct. Nov. 30, 2004)......17, 18

*USX Corp. v. Prime Leasing Inc.*,
   988 F.2d 433 (3d Cir. 1993)........................................................................19

*Weldon v. Kraft*,
   896 F.2d 793 (3d Cir. 1990).................................................................17, 18

## STATUTES AND RULES

19 Del. C. § 1109 ..........................................................................................17

Employee Retirement Security Act § 502(a)(1)(B),
29 U.S.C. § 1132(a)(1)(B) (1974)..................................................................8, 9

Fed. R. Civ. P. 10(c) ......................................................................................7

Fed. R. Civ. P. 12(b)(1)..................................................................................20

Fed. R. Civ. P. 12(b)(6) ..................................................................................7

## MISCELLANEOUS

Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1357 (2d ed. 1990) .......................................7

## NATURE AND STAGE OF PROCEEDINGS

This lawsuit arises out of a terminated employment relationship. Plaintiff David N. Terhune ("Terhune"), the former Chief Executive Officer and President of Applied Extrusion Technologies, Inc. ("AET"), has brought this lawsuit against AET and individual defendants Jackson Craig and Terry Smith (collectively, "Defendants"). Following briefing on Defendants' Motion to Dismiss his initial complaint (the "Complaint"), Terhune has filed an amended complaint [Docket No. 49] (the "Amended Complaint"). Like the Complaint, the Amended Complaint contains six counts.

In Count I, Terhune claims that AET is in violation of the Employment Retirement Income Security Act of 1974 ("ERISA") because it has not permitted him to participate in an equity-based incentive plan that, he has acknowledged, does not exist, and because it has not made certain payments into an executive deferred compensation plan pursuant to the severance provisions of the Employment Agreement (the "Agreement") between the parties, despite that the severance provisions of the Agreement are not a "plan" within the meaning of ERISA. Federal subject-matter jurisdiction is based solely on the alleged existence of a federal question in Count I.

The remaining counts allege several Delaware state law variations on Terhune's broader claim that he is entitled to severance payments, despite his admitted failure to execute a general release in favor of AET before any such payments become due under the Agreement, including breach of contract (Count II), breach of the covenant of good faith and fair dealing (Count III), and violation of the Delaware Wage Payment and Collection Law (Count IV). The remaining two counts are for fraud in the inducement (Count V), and defamation (Count VI).

Defendants move for dismissal of all counts. As explained in more detail below, Count I fails to state a claim for which relief may be granted because it fails to allege the existence of an ERISA plan under which Terhune is entitled to benefits. Further, Counts I, II, III, and IV fail because — as Terhune concedes — he has not executed a general release of the Company as required by the Agreement as a condition precedent of receiving any severance payments. Moreover, after Count I is dismissed, this Court must dismiss the state law claims in Counts II through VI for lack of subject matter jurisdiction.

## SUMMARY OF ARGUMENT

Plaintiff can prove no set of facts that would entitle him to relief on Counts I, II III and IV of his Amended Complaint.

Terhune's claim for benefits pursuant to ERISA fails because there is no ERISA plan under which he is entitled to benefits. As a matter of law, AET's statement that it intended to create an equity-based incentive plan did not create a "plan" within the meaning of the statute. Likewise, consideration of the Agreement, which Terhune attached to the Amended Complaint, demonstrates that the severance package is not a "plan" within the meaning of the statute. And on the facts alleged by Terhune, he has not complied with the Agreement's requirement that he execute a general release before receiving any severance payments. Therefore, he is not entitled to those payments.

The claims for breach of contract (Count II), and violation of the Delaware Wage Payment and Collection Law (Count IV) fail to state a claim for which relief can be granted because Terhune has not yet performed the condition precedent to his receipt of severance payments, *i.e.*, executing a general release.

-2-

The claim for breach of the implied covenant of good faith and fair dealing (Count III) fails to state a claim for which relief can be granted because it merely restates the contract claim. It does not and cannot allege the existence of a duty to refrain from conduct the parties would have thought to proscribe if they had thought to negotiate the matter, as required under Delaware law. To the contrary, it attempts to undo the parties' bargain by seeking judicial intervention to undo the negotiated requirement that Terhune execute a general release before receiving any severance payments.

Finally, this Court will lack federal subject matter jurisdiction over the Delaware state law claims in Counts II through VI if it dismisses, as it must, the ERISA claim in Count I.

## STATEMENT OF FACTS

Terhune was employed by AET in the position of Chief Executive Officer and President pursuant to the terms of a written employment agreement, which is attached to the Amended Complaint as <u>Exhibit A</u> (the "Agreement"). (Am. Compl. ¶ 14.) Under the Agreement, Terhune received a salary of Four Hundred Thirty Thousand Dollars ($430,000) adjusted annually based upon the Consumer Price Index, received an incentive bonus, participated in various AET benefits plans, and enjoyed a variety of other fringe benefits. (Am. Compl. ¶ 15.) The benefits provided to Terhune included participation in AET's disability insurance, health insurance, pension, retirement and accident insurance plans. (Am. Compl. ¶ 15(e)-(h); Agreement § 3(d)(i).) He was also entitled to participate in an Executive Deferred Compensation Plan (the "EDCRP"). (Am. Compl. ¶ 15(d); Agreement § 3(d)(ii).)

The Agreement also contained a provision addressing the creation of an equity-based incentive plan:

> In consultation with the Executive, the Board will establish
> a plan providing for equity-based incentives for the senior
> management of the Employer. The Executive shall be
> entitled to participate in such plan at a level commensurate
> with his position as the Chief Executive Officer and
> President of the Employer.

(Agreement § 3(b)(ii).). This proposed executive equity incentive plan (the "Proposed

Equity Incentive Plan") was being considered as part of AET's emergence from Chapter

11 bankruptcy reorganization, as described in the Solicitation and Disclosure Statement

(the "Solicitation Statement") attached to the Amended Complaint as Exhibit C. (Am.

Compl. Exh. C.)[1] And while the Solicitation Statement specifies that the Proposed Plan

was to represent five percent or the equivalent of five percent of the common stock of the

newly-reorganized entity, it does not specify who was to participate in that plan, or to

what benefits any particular participant would be entitled under the plan. (Am. Compl.

Exh. C.) Likewise, while Terhune's Agreement does specify that he would be entitled to

participate, it is silent as to what share of the equity in the Proposed Plan he would be

entitled. (Agreement § 3(b)(ii).).

Section 4 of the Agreement contained detailed provisions concerning termination

of the Agreement, and the obligations of the parties upon such termination. (Agreement

§ 4.) AET's obligations to Terhune depended on whether Terhune's employment was

terminated by AET for cause, by AET without cause, by Terhune for good reason, by

Terhune without good reason, by death or by reason of disability. (Agreement § 4.) For

example, if AET terminated Terhune for cause or Terhune resigned without good reason,

AET would have no obligation to him other than to pay any outstanding earned salary,

---

[1] For reasons beyond the scope of this Motion, that plan was not established, a fact
conceded in the Complaint. (Compl. ¶ 23.)

bonus and benefits. (Agreement §§ 4(d) and (h).) Each of these terms – "cause", "good

reason", "death" and "disability" – were clearly defined in the Agreement. (Agreement §

4(a).)

On February 7, 2006, AET terminated Terhune's employment without cause.

(Am. Compl. ¶ 18.) Under Section 4 of the Agreement, upon his termination without

cause, Terhune was entitled to the following:

    1)      payment of all unpaid base salary, benefits and bonus earned through the date of termination;

    2)      payment in a lump sum of an amount equivalent to the sum of the base pay and bonus he would have earned for an eighteen (18) month period following his termination;

    3)      continuation for eighteen (18) months of his participation in AET's benefits plans, including the disability insurance, health insurance, pension, retirement and accident insurance plans, as well as the EDCRP;[2]

    4)      vesting in all benefits plans as if his employment had continued for an eighteen (18) month period following his termination; and

    5)      continued coverage under various fringe benefits available under the Agreement for eighteen (18) months following his termination.

(Am. Compl. ¶ 16; Agreement § 4(e)). The Agreement contained timetables for the

various payments (Agreement § 4(e)) as well as a formula for calculating the bonus

Terhune would have earned in the eighteen months subsequent to his termination.

(Agreement § 4(a)(1))

However, the Agreement conditioned payment of the various monies and benefits

due Terhune in case of termination without cause on his execution of a general release in

---

[2] The EDCRP itself does not include any provision for post-employment contributions by
AET. Under the EDCRP, AET's obligation was to pay a "Company Credit" to Terhune's
account each June 30 if and only if he remained employed as an eligible employee on
such June 30. (Applied Extrusion Technologies, Inc. 2005 Executive Retirement and
Deferred Compensation Plan, attached hereto as Exhibit 1.) Terhune was not employed
by AET on June 30, 2006.

favor of AET. (Am. Compl. ¶ 17, Agreement § 4(k)). The terms of the Agreement are clear:

> (k) General Release. No payments or benefits payable to the Executive upon the termination of his employment pursuant to this Section 4 shall be made to the Executive unless and until the Executive executes a general release in favor of the Employer in a form reasonably satisfactory to the Employer and the Employee and such general release becomes effective pursuant to its terms.

(Agreement § 4(k)) (emphasis in original). Despite the clarity of the Agreement on this issue, Terhune has not executed a mutually acceptable general release, though during negotiations with AET following his termination he did proffer an unexecuted one. (Am. Compl. ¶ 19.)

On or about April 11, 2006, AET sent Terhune a letter, attached to the Amended Complaint as Exhibit B (the "April 11 Letter"), containing a correct calculation of the Severance Package. (Am. Compl. ¶ 19). The April 11 Letter also contained proposed provisions for a general release of claims in a form acceptable to AET. (April 11 Letter § 9.) On May 3, 2006, Terhune, through his attorney, rejected the proposed general release of claims proffered by AET in the April 11 Letter. (Letter dated May 3, 2003 attached hereto as Exhibit 2.) Instead, he proffered an unexecuted general release in a form acceptable to him and demanded the immediate payment of the sums due him under the Agreement. (Am. Compl. ¶ 19; Exhibit 2.) Because Terhune had rejected the initial proposed general release, AET provided, by its attorney, on May 13, 2006, a new form of proposed general release in a form acceptable to it. (See Electronic Mail dated May 13, 2006 attached hereto as Exhibit 3.) In that May 13 e-mail, AET's counsel made clear that it was prepared to provide the severance package upon Terhune's execution of the new proposed form of general release. Id. Rather than execute the general release or continue

discussions with AET to reach a mutually acceptable form of general release, Terhune filed this lawsuit.

## LEGAL ARGUMENT

A motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure Rule 12(b)(6) must be granted where a "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). While the court must assume the truth of all well-pled allegations and construe the complaint in the light most favorable to the plaintiff, *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 665-66 (3d Cir. 1988), the court need not accept "bald assertions" or "legal conclusions" when determining if a complaint is sufficient to survive a motion to dismiss. *In re Burlington Coat Factory Secs. Litig.,* 114 F.3d 1410, 1429 (3d Cir. 1997); *see also Enzo Life Scis., Inc., v. Digene Corp.,* 295 F. Supp. 2d 424, 426-27 (D. Del. 2003). Legal conclusions couched as factual allegations are not given a presumption of truthfulness and conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss. *Morse v. Lower Merion Sch. District*, 132 F.3d 902, 905 (3rd Cir. 1997). Rather, the plaintiff is required to "set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." *Kost v. Kozakiewicz*, 1 F.3d 176, 173 (3d Cir. 1993) (citing Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 340 (2d ed. 1990)). In evaluating the factual sufficiency of the Amended Complaint, the Court may properly consider exhibits attached to it, *ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 (3d Cir. 1994) (noting that pursuant to Fed. R. Civ. P. 10(c), exhibits attached to a pleading become a part of the pleading "for all purposes"), as well as undisputedly authentic documents on which the plaintiff relies that are submitted by the

defendant with a motion to dismiss. *Steinhardt Group, Inc. v. Citicorp*, 126 F.3d 144,

145 (3d Cir. 1997) (affirming dismissal of "passive investor" securities law claim based

on letter agreement between parties that demonstrated that plaintiff retained pervasive

control over its investment).

## I.    Count I Of The Amended Complaint Fails To State A Claim for Which Relief Can Be Granted

### A.    Terhune Has Failed Adequately To Allege The Existence Of An ERISA Plan.

Count I of the Amended Complaint alleges a violation of Section 1132(1)(B) of

the Employee Retirement Income Security Act of 1974 ("ERISA"). While no such

section exists, Terhune is apparently referring to ERISA § 502(a)(1)(B), 29 U.S.C. §

1132(a)(1)(B), which provides a private cause of action for plan participants to recover

benefits under a plan covered by ERISA.[3] As such, the existence of a plan within the

meaning of ERISA is an essential element of his claim. *See Henglein v. Informal Plan*

*for Plant Shutdown Benefits for Salaried Employees*, 974 F.2d 391, 397-98 (3d Cir.

1992). But nowhere in the Amended Complaint does Terhune allege the existence of a

plan under which he is entitled to benefits. In fact, he cannot do so, because there are no

ERISA plans at issue here. This is clear on the face of the Amended Complaint. Thus,

because he fails to allege the existence of a plan and can prove no set of facts that would

---

[3] The statutory language provides:

A civil action may be brought--

(1) by a participant or beneficiary--

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.

29 U.S.C.A. § 1132(a)(1)(B) (West 2005).

establish the existence of such a plan, Terhune has failed to state a claim for which relief
can be granted and Count I of the Amended Complaint must be dismissed.  *See id.*

Nowhere in the Amended Complaint does Terhune allege the existence of an
ERISA plan under which he claims to be entitled to benefits.  Count I merely alleges that:

> 23.  The actions of AET in failing to deposit the sum of
> $107,500 into the established AET Executive
> Compensation Retirement Plan ("EDCRP") in accordance
> with the terms of the controlling terms of the Employment
> Agreement and to permit Plaintiff participation in the
> mandated equity-incentive plan mandated to be established
> by April 8, 2006 are in direct violation of the provisions of
> ERISA as set forth at Section 1132(1)(B).

(Compl. ¶ 23.)  Both of the entitlements Terhune asserts arise from the Agreement, not
from an ERISA plan.  The post-employment EDCRP contribution is a severance benefit
provided by Section 4(e)(iv) of the Agreement.  Terhune's right to participate in the
never-established Proposed Equity Incentive Plan was provided by Section 3(b)(ii) of the
Agreement.  In neither case does Terhune allege that he is entitled to a benefit under an
ERISA plan.  Since Terhune has not alleged the existence of an ERISA plan under which
he is entitled to a benefit, an essential element of his claim for relief under ERISA §
502(a)(1)(B), Count I of the Amended Complaint should be dismissed.

With regard to the Proposed Equity Incentive Plan, under a fair reading of the
Complaint, Terhune does not allege that it exists.  He says that AET violated ERISA by
failing "to permit Plaintiff participation in the mandated equity-incentive plan <u>mandated</u>
<u>to be established by April 8, 2006</u>."  Had he wished to allege that the Proposed Equity
Incentive Plan had been established, and that AET refused to let him participate in it, the
underlined language would be superfluous.  Terhune chose his words with care here,
because he knows very well that the Proposed Equity Incentive Plan was never

established. Indeed, he had conceded the point in the Complaint, where he alleged that the violation of ERISA lay in AETs "failing . . . to institute the equity-based incentive plan". (Compl. ¶ 23.) The fact is, no equity-based incentive plan was ever created, and Terhune knows this. And it is only common sense that AET cannot allow Terhune to "participate" in a plan that was never created. Terhune's re-characterization of the nature of the claim does nothing to change the fact that there is no equity-based incentive plan under which he could receive benefits.

Even if Count I of the Amended Complaint is interpreted as alleging that the failure to implement the Proposed Equity Incentive Plan violated ERISA, Terhune has failed to state a claim. Indeed, such a claim would be incoherent; because ERISA § 502(a)(1)(B) provides only a vehicle by which plan participants can seek benefits due them under a plan, Terhune would have to argue that he is entitled to benefits under a plan he alleges was never established. Acknowledging the incoherence of the argument Terhune would be trying to make, courts have recognized that a mere promise to offer certain benefits, without more, does not establish the existence of a plan. *See Smith v. Hartford Ins. Group*, 6 F.3d 131, 136 (3d Cir. 1993) (affirming summary judgment for defendants; holding that hospital's oral and written representations recording a decision to offer certain benefits did not create an enforceable ERISA plan). *See also Harris v. Ark. Book Co.*, 794 F.2d 358, 360-61 (8th Cir. 1986) (holding that a promise to pay an employee after retirement, coupled with payments to another retired employee, did not create an ERISA plan); *Donovan v. Dillingham*, 688 F.2d 1367, 1373 (11th Cir. 1982) ("A decision to extend benefits is not the establishment of a plan or program.").

Application of the judicial test for the existence of a plan brings this point home. The Third Circuit applies the test first articulated by the Eleventh Circuit in *Donovan,* in which a court considers whether "from the surrounding circumstances a reasonable person could ascertain the intended benefits, a class of beneficiaries, the source of financing and procedures for receiving benefits" in determining whether a plan exists. *Smith,* 6 F.3d at 136. Terhune has alleged no facts that would allow a reasonable person to make such determinations, and since the Proposed Equity Incentive Plan was never instituted, he cannot prove any set of facts that would permit those determinations to be made. The Agreement tells us only that Terhune would be entitled to participate, and the Solicitation Statement tells us only that the overall plan was to represent five percent or the equivalent of five percent of the common stock of the newly-reorganized entity. Neither document specifies to what benefits Terhune was to have been entitled. Accordingly, he has failed adequately to allege the existence of an equity-based incentive plan the terms of which this Court could enforce and Count I, insofar as it purports to claim benefits under an equity-based incentive plan, fails to state a claim for which relief can be granted.

Likewise, to the extent that Count I claims an entitlement to a payment into the EDCRP due Terhune pursuant to Section 4 of the Agreement, he has not and cannot allege facts that would establish that the Agreement is a plan within the meaning of ERISA.[4] While severance pay plans can be subject to ERISA, not every promise or

---

[4] Terhune has not, and cannot, claim that he is entitled to the payments under the EDCRP itself because the EDCRP conditions payment of "Company Credit" on continued employment on June 30 of the year following the year for which the Company Credit is received. *See Steinhardt Group, Inc.,* 126 F.3d at 145 (3d Cir. 1997) (in ruling on a

obligation to make severance payments creates an ERISA plan. Rather, severance pay

plans are not subject to ERISA "unless they require the establishment and maintenance of

a separate and ongoing administrative scheme." *Angst v. Mack Trucks, Inc.*, 969 F.2d

1530, 1538 (3d Cir. 1992) (holding that buyout plan offering one-time severance payment

was not subject to ERISA) (citing *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1 (1987)

(holding that Maine statute requiring one-time lump-sum severance payments in

connection with plant closings did not implicate ERISA)). *Contra Pane v. RCA Corp.*,

868 F.2d 631, 635 (3d Cir. 1989) (holding that severance pay plan that required the

creation of an administrative scheme was subject to ERISA). Thus, unless the terms of

the Agreement require the creation of a separate and ongoing administrative scheme,

which they do not, Terhune has failed to state a claim under ERISA.

   The Ninth Circuit's decision in *Delaye v. Agripac, Inc.*, 39 F.3d 235 (9th Cir.

1994) teaches that the severance package offered under the Agreement did not require the

establishment of a separate and ongoing administrative scheme. There, the plaintiff's

employment contract provided for payment of a severance package only if he were

terminated without cause. *Id.* at 236. In such a case, the plaintiff was entitled to twenty-

four months of payments according to an established formula, payment of his accrued

vacation benefit, and continued coverage under the employer's accident, health and

insurance plans for twenty-four months or until he was reemployed, whichever came

first. *Id.* Reversing a judgment for the employee, the Ninth Circuit held that there was

---

motion to dismiss for failure to state a claim, a federal court may refer to undisputedly
authentic documents on which the plaintiff relies that are submitted by the defendant).

no ERISA plan, because there was no need for an ongoing administrative scheme. *Id.* at

237. As the Court observed:

> While payment could continue for as long as two years,
> there is nothing discretionary about the timing, amount or
> form of the payment. Sending [the plaintiff], a single
> employee, a check every month plus continuing to pay his
> insurance premiums for the time specified in the
> employment contract does not rise to the level of an
> ongoing administrative scheme.

*Id.* Likewise here, once AET terminated Terhune without cause, it was obliged to

provide him with certain fixed severance benefits, none of which involved the creation of

a separate and ongoing administrative scheme. Rather, he would receive lump sum

payouts in fixed amounts, and AET would continue to pay his insurance premiums and

make contributions to the EDCRP, as well as the retirement and pension plans, each of

which would be handled by existing administrative schemes. There is no reason to

distinguish contributions to the EDCRP here from payment of accident, health and

insurance premiums in *Delaye*; each involves nothing more than writing a check to the

appropriate entity. As the Supreme Court noted in *Fort Halifax*, "[t]o do little more than

write a check hardly constitutes the operation of a benefit plan." 482 U.S. at 12. Thus,

on the very facts alleged by Terhune, the Court must conclude that he cannot establish

any set of facts that would enable him to prove that the severance package in the

Agreement constituted an ERISA plan pursuant to which he is entitled to post-

employment payments into the EDCRP and therefore Count I must be dismissed.

The *Delaye* court's view that a severance package in an executive's employment

agreement is not an ERISA plan by virtue of providing for ongoing payments to existing

health and insurance plans is consistent with Third Circuit law. In *Angst v. Mack Trucks,*

*Inc.*, the Court held that a severance package that provided for a lump sum payment and

-13-

one year's continuation of benefits under existing benefits plans did not implicate ERISA. 969 F.2d at 1538-39. The Court reasoned that, since the severance package neither required the creation of a separate and ongoing administrative scheme, nor materially altered the existing benefits programs, under *Fort Halifax,* it did not implicate ERISA. The same reasoning holds true here. AET will be obliged only to continue making payments to existing benefits plans, including the EDCRP, for a specified period of time. No separate and ongoing administrative scheme will be necessary, and there will be no changes to the existing benefits plans. Thus, the Agreement does not create an ERISA plan.

Terhune may argue that the *Delaye* analysis is inconsistent with the Third Circuit's holding in *Pane*, but that argument does not withstand scrutiny. In *Pane,* the Court affirmed the decision of the district court that a severance plan issued by the defendant employer's board of directors to cover a number of top executives was an ERISA plan because it required the creation of a separate administrative scheme. 868 F.2d at 635. The District Court had reasoned that the plan required a separate administrative scheme because it conditioned eligibility for benefits on the occurrence of a "triggering event" such as termination without cause and thus required a mechanism for making a "separate determination of each employee's eligibility for benefits." *Pane v. RCA Corp.*, 667 F. Supp. 168, 170-71 (D.N.J. 1987). Thus, in *Pane*, the plan at issue was not a single promise to pay a top executive a severance package depending on the circumstances of his termination, as here, rather it required the employer to make multiple decisions about multiple employees over time—obviously requiring the creation of an ongoing administrative scheme. No such scheme is necessary here.

B.    Terhune Has Failed To Allege That He Is Entitled To Any Severance
       Payments Under The Agreement.

Even if the Court were to conclude that the severance provisions of the

Agreement constituted an ERISA plan, the facts alleged by Terhune establish

conclusively that he is not entitled to any severance payments, including post-

employment payments into the EDCRP, under the Agreement.  Therefore, he has failed

to state a claim for relief under ERISA § 502(a)(1)(B) and Count I must be dismissed.

By the plain terms of the Agreement, Terhune's entitlement to any severance

benefits provided under Section 4 is conditioned on his executing a general release in a

form reasonably acceptable to AET which takes effect pursuant to its terms.  Federal

courts are generally required to enforce plans as they are written.  *Bauer v. Summit

Bancorp*, 325 F.3d 155, 160 (3d Cir. 2003).  The Agreement is unambiguous in its

command that no benefits under Section 4 are due "unless and until" Terhune executes a

general release and that release becomes effective by its terms.  (Agreement § 4(k).)

Thus, even assuming the Agreement created an ERISA plan, which it did not, the Court

must enforce the condition on Terhune's entitlement to benefits.

Terhune has not and cannot allege facts that would demonstrate that he is entitled

to benefits because he has not executed an effective general release.  Terhune's

conclusory claim of entitlement to payment because of his "complete compliance with

the terms of the Employment Agreement, including the proffer of an appropriate release

of AET" (Compl. ¶ 19) must be disregarded because it conflicts with the plain language

of the Agreement.  *See ALA, Inc.*, 29 F.3d at 859-62 & n.8 (holding that plain language of

written document demonstrated that it merely evidenced negotiations and not the

existence of a contract as alleged).  Moreover, it is obvious from the face of the general

-15-

release he did proffer, that it is unexecuted. *See Steinhardt Group, Inc.*, 126 F.3d at 145 (3d Cir. 1997) (in ruling on a motion to dismiss for failure to state a claim, a federal court may refer to undisputedly authentic documents on which the plaintiff relies that are submitted by the defendant). Therefore, Terhune has failed to state a claim that he is entitled to benefits under the Agreement, and Count I must be dismissed.

**II.     Counts II and IV Of The Amended Complaint Fail To State A Claim for Which Relief Can Be Granted As to Severance Payments Due Under Section 4 of the Agreement**

For much the same reasons discussed in the preceding section, Terhune has failed to state a claim for relief under Delaware contract law on his broader claim that AET has breached the contract by not making any severance payments. A party's failure to perform all conditions precedent is "fatal" to a claim that the other party has breached the contract. *Merchantwired, LLC v. Transaction Network Serv., Inc.,* No. 02C-08-244 (FSS), 2003 WL 21689647, at *2 (Del. Super. Ct. July 16, 2003) (dismissing complaint) (attached hereto as Exhibit 4). Likewise, a party seeking damages for breach of contract must demonstrate his own substantial compliance with all provisions of the contract. *Emmett S. Hickman Co. v. Emilio Cataldi Developer, Inc.*, 251 A.2d 571, 573 (Del. Super. Ct. 1969). Here, Terhune has not only failed to allege that he has substantially complied with the requirement that he execute an effective general release, his own pleading establishes that he has failed to do so. Therefore, Terhune can prove no set of facts that would entitle him to relief, and Count II must be dismissed.

Count IV fails to state a claim for relief under the Delaware Wage Payment and Collection Law ("DWPCL") for the same reason. Terhune does not specify under what provision of the DWPCL he believes AET is liable, but because he claims that AET is

wrongfully withholding his severance payments, his claim seems to arise under Section 1109, which provides in pertinent part:

> (a) Any employer who is party to an agreement to pay or provide benefits or wage supplements to any employee shall pay the amount or amounts necessary to provide such benefits or furnish such supplements within 30 days after such payments are required to be made; provided, however, that this section shall not apply to employers subject to Part I of the Interstate Commerce Act.
>
> (b) As used herein, "benefits or wage supplements" means compensation for employment other than wages, including, but not limited to, reimbursement for expenses, health, welfare or retirement benefits, and vacation, separation or holiday pay, but not including disputed amounts of such compensation subject to handling under dispute procedures established by collective bargaining agreements.

19 Del. C. § 1109. In cases brought under the DWPCL, courts look to the agreement between the parties to determine when payments are due. *See e.g.*, *Swier v. Del. Bay Surgical Servs.*, No. 03C-03-030 (THG), 2004 WL 2827895, at *3 (Del. Super. Ct. Nov. 30, 2004), *aff'd*, 900 A.2d 646, 652 (Del. 2006) (looking to parties' agreement to determine that final payment to doctor was due 100 days after termination) (attached hereto as <u>Exhibit 5</u>).[5] *Id.* The Third Circuit has interpreted a similar law, the Pennsylvania Wage Payment and Collection Law, as creating only a statutory vehicle for the enforcement of employee's contractual rights. *See Weldon v. Kraft*, 896 F.2d 793, 801 (3d Cir. 1990). As the Third Circuit explained, the Pennsylvania law:

---

[5] The Supreme Court of Delaware affirmed this portion of the Superior Court's opinion. *See Del. Bay Surgical Servs. v. Swier*, 900 A.2d 646, 652 (Del. 2006). The Supreme Court specifically rejected the employer's argument that, because the parties' agreement provided for an extended period of time before the final payment would be due to allow for proper accounting, the payment was not "wages" under the DWPCL. The Court thus joined the Superior Court in deferring to the parties' agreement in determining when payment would be due for purposes of the DWPCL.

> does not create a right to compensation. Rather, it provides
> a statutory remedy when the employer breaches a
> contractual obligation to pay earned wages. The contract
> between the parties governs in determining whether
> specific wages are earned.

*Id. See also Sendi v. NCR Comten, Inc.*, 619 F. Supp. 1577 (E.D. Pa.1985), *aff'd,* 800

F.2d 1138 (3d Cir. 1986) (granting summary judgment; holding that terms of parties'

agreement governed claim for unpaid commissions). The same rationale holds true for

the DWPCL. Thus, because Terhune's claim fails as a matter of contract law, as

described above, it also fails under the DWPCL.

Accordingly, Counts II and IV of the Amended Complaint fail to state a claim for

which relief can be granted and must be dismissed.

## III.     Count III of the Amended Complaint Fails to State a Claim for Breach of The Duty of Good Faith and Fair Dealing

Terhune has also failed to plead facts sufficient to support a claim for breach of

the duty of good faith and fair dealing. Although there is an implied duty of good faith

and fair dealing in every contract, that duty is implicated only in those rare instances in

which it is clear from the express agreement of the parties that they would have

proscribed the challenged conduct if they had thought to negotiate that matter. *Kelly v.*

*McKesson HBOC, Inc.*, No. 99C-09-265 (WCC), 2002 WL 88939, at *10 (Del. Super. Ct.

Jan. 17, 2002) (attached hereto as <u>Exhibit 6</u>); *Corporate Prop. Assoc. 6 v. The Hallwood*

*Group Inc.*, 792 A.2d 993, 1002 (Del. Ch. 2002) *rev'd on other grounds,* 817 A.2d 777

(Del. 2003).[6] Moreover, a cause of action for breach of the duty of good faith and fair

---

[6] The Delaware Supreme Court has cautioned that, "implying obligations based on the covenant of good faith and fair dealing is a cautious enterprise, and those cases should be rare." *Aspen Advisors LLC v. U.S. Artists Theatre Co.*, 861 A.2d at 1251, 1259 (Del. 2004) (internal quotations omitted).

dealing will fail if the claimed implied contractual duty has already been addressed by the express terms of the contract. *Aspen Advisor*, 861 A.2d at 1260-61.[7]

Through this additional claim, Terhune is simply restating his contract claim(s) and, if that fails, attempting to obtain by judicial intervention contractual rights that he failed to secure during his negotiations with AET. Indeed, to the extent he seeks payment of severance benefits, Plaintiff's claim for breach of the duty of good faith and fair dealing is based on the erroneous contention that AET was required to pay certain benefits to Plaintiff even in the absence of an executed release from him. As explained above, Plaintiff's agreement with AET contains no such obligation – to the contrary, it requires Plaintiff to execute a release that is reasonably acceptable in form to both the parties, not just to "proffer" an unsigned release in a form that has not been agreed to by AET.[8] As the cases cited above make clear, Plaintiff's attempt to invoke the duty of good faith and fair dealing to re-write the parties' contract and materially change AET's obligations fails as a matter of Delaware law.

To the extent Plaintiff seeks through his claim for the breach of the duty of good faith and fair dealing to secure the benefits of a qualified executive equity-based incentive plan, this claim too must fail. Again, Plaintiff simply restates his breach of

---

[7] *See also Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 142, n.32 (Del. Ch. 2004) (citing *USX Corp. v. Prime Leasing Inc.*, 988 F.2d 433, 439 (3d Cir. 1993)) (If a contract provision makes defendant directly liable, "then there is no room for the implied covenant to apply."); *Kelly*, 2002 WL 88939 at *10 ("[T]he Court will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.").

[8] Plaintiff's conclusory allegation in paragraph 19 of the Amended Complaint that the proffered release was "appropriate" is of no effect, since he fails to allege that AET agreed to the form of the release or otherwise found it reasonably satisfactory.

contract claim without the benefit of any allegations that might support this additional claim.

**IV.      In The Absence of Count I, The Court Lacks Subject Matter Jurisdiction Over Counts II - VI Of The Amended Complaint**

If the Court dismisses Count I, as it must, then it lacks subject matter jurisdiction over Counts II through VI of the Amended Complaint and should dismiss them as well pursuant to Federal Rule of Civil Procedure Rule 12(b)(1).  The Third Circuit's "established rule [is] that 'once all federal claims have been dropped from a case, the case simply does not belong in federal court." *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530, 1535 (3d Cir. 1992) (quoting *Lovell Mfg. v. Export-Import Bank of the United States,* 843 F.2d 725 (3d Cir. 1988).  Because the sole basis for federal court jurisdiction in this case is the alleged violation of ERISA, once that claim has been dismissed, the remaining Counts must also be dismissed.[9]

---

[9] There is no basis for diversity jurisdiction, as both Terhune and AET are residents of Delaware.  (Compl. ¶¶ 5, 7.)

## CONCLUSION

For all the foregoing reasons, Defendants AET, Inc., Jackson Craig and Terry Smith respectfully request that the Court (a) dismiss Count I of the Amended Complaint for failure to state a claim, (b) dismiss Counts II, III and IV for failure to state a claim or in the alternative for lack of subject matter jurisdiction, and (c) dismiss Counts V and VI for lack of subject matter jurisdiction.

POTTER ANDERSON & CORROON LLP

By: /s/ David E. Moore
     Wendy K. Voss (#3142)
     David E. Moore (#3983)

OF COUNSEL:

Anthony D. Rizzotti
Christopher J. Powell
ROPES & GRAY LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Dated:  March 23, 2007
785280 / 22036-002

     Hercules Plaza, Sixth Floor
     1313 North Market Street
     P. O. Box 951
     Wilmington, Delaware 19899-0951
     (302) 984-6000
     wvoss@potteranderson.com
     dmoore@potteranderson.com

*Attorneys for Defendants*
*Applied Extrusion Technologies, Inc.,*
*Jackson Craig and Terry Smith*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on March 23, 2007, the attached document was hand delivered to the following persons and was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading:

James S. Green, Esq.
Seitz, Van Ogtrop & Green, P.A.
222 Delaware Avenue, Suite 1500
P.O. Box 68
Wilmington, Delaware 19899

I hereby certify that on March 23, 2007, I have Electronically Mailed the documents to the following:

Alan B. Epstein
Spector Gadon & Rosen, P.C.
1635 Market Street, Seventh Floor
Philadelphia, PA  19103
aepstein@lawsgr.com

_/s/ David E. Moore_____
Wendy K. Voss (#2874)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, Sixth Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000 - Telephone
(302) 658-1192 - Facsimile
wvoss@potteranderson.com
dmoore@potteranderson.com

739635

# EXHIBIT 1

**APPLIED EXTRUSION TECHNOLOGIES, INC.**
**2005 EXECUTIVE RETIREMENT AND DEFERRED COMPENSATION PLAN**
**(Effective as of March 15, 2005)**

### Article 1. - INTRODUCTION

**1.1. Establishment of Plan**. This Plan is established and effective as of March 15, 2005.

**1.2. Purpose of Plan.** Applied Extrusion Technologies, Inc. has adopted the Plan set forth herein to provide a competitive level of retirement benefits to certain employees by providing them with Company Credits and by allowing them to defer receipt of designated percentages of their compensation.

**1.3. Status of Plan.** The Plan is intended to be "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" within the meaning of Sections 201(2), 301(a)(3), 401(a)(1), and 4021(b)(6) of ERISA, and shall be interpreted and administered to the extent possible in a manner consistent with that intent.

### Article 2. - DEFINITIONS

Wherever used herein, the following terms have the meanings set forth below, unless a different meaning is clearly required by the context:

**2.1. "Account"** means, for each Participant, the account established for his or her benefit under Section 5.1.

**2.2. "Administrator"** means the Compensation Advisory Group of the Board of Directors of the Company, or such other group or committee of officers of the Company as may be appointed by the Board of Directors from time to time.

**2.3. "Code"** means the Internal Revenue Code of 1986, as amended from time to time. Reference to any section or subsection of the Code includes reference to any comparable or succeeding provisions of any legislation which amends, supplements, or replaces such section or subsection.

**2.4. "Company"** means Applied Extrusion Technologies, Inc., any affiliates that adopt the Plan with the knowledge and consent of the Company, and any successor to all or a major portion of the Company's assets or business which assumes the obligations of the Company generally.

**2.5. "Company Credit"** means any credit which is received by a Participant under Section 4.1.

**2.6. "Compensation"** for a calendar year with respect to a Participant means the amount of "wages, tips and other compensation" from the Company reported to the Participant in Box 1 on IRS Form W-2 for the given calendar year, plus any amount by which such compensation was reduced under Section 4.2 below or a plan maintained by the Company under Code section 401(k) or 125.

**2.7. "Effective Date"** means March 15, 2005.

**2.8. "Elective Deferral"** means the portion of compensation which is deferred by a Participant under Section 4.2

**2.9. "Eligible Employee"** means an employee of the Company who is selected by the Administrator or the Chief Executive Officer of the Company as eligible to participate in the Plan from among the group of highly compensated or managerial employees of the Company, which group shall include, without limitation, the President, Vice Presidents, Directors, and Senior Managers of the Company. An Eligible Employee shall be designated as eligible for Company Credits, Elective Deferrals, or both.

**2.10. "ERISA"** means the Employee Retirement Income Security Act of 1974, as amended from time to time. Reference to any section or subsection of ERISA includes reference to any comparable or succeeding provisions of any legislation which amends, supplements, or replaces such section or subsection.

**2.11. "Participant"** means any individual who participates in the Plan in accordance with Article 3.

**2.12. "Plan"** means the Applied Extrusion Technologies, Inc. Executive Retirement and Deferred Compensation Plan set forth herein and all subsequent amendments hereto.

**2.13. "Plan Year"** means the calendar year.

## Article 3. - PARTICIPATION

**3.1. Commencement of Participation.** Any individual who is an Eligible Employee shall become a Participant on the earlier of the date he or she receives a Company Credit in accordance with Section 4.1 or the date he or she elects to defer part of his or her regular salary or bonus in accordance with Section 4.2.

**3.2. Continued Participation.** Subject to Section 3.3, an individual who has become a Participant in the Plan shall continue to be a Participant so long as any amount remains credited to his or her Account.

**3.3. Termination of Participation.** The Administrator may terminate an employee's participation in the Plan prospectively or retroactively for any reason, including but not limited to the Administrator's determination that such termination is necessary in order to maintain the Plan as a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or

highly compensated employees" within the meaning of sections 201(2), 301(a)(3), 401(a)(1), and 4021(b)(6) of ERISA. Amounts credited to a Participant's Account shall be paid out to such Participant in a single lump sum cash payment as soon as reasonably practical following termination of participation hereunder.

### Article 4. – DEFERRALS AND CREDITS

#### 4.1. Company Credits.

(a) **In general.** As of June 30, 2005, and each June 30 thereafter while the Plan is in effect, the Company will make a Company Credit to the Account of each individual who

(i) was an Eligible Employee on the last day of the previous Plan Year and

(ii) remains employed as an Eligible Employee on such June 30th or, in the case of an Eligible Employee who was fully vested in his or her Company Credit Account, died while an Employee after the close of the previous Plan Year but prior to such June 30th.

The amount of Company Credit shall be:

- if such individual is the President and Chief Executive Officer of the Company, 20% of such Eligible Employee's Compensation for the prior calendar year

- if such individual is a Vice President of the Company, 15.0% of such Eligible Employee's Compensation for the prior calendar year

- if such individual is a Director or Senior Manager or other Eligible Employee of the Company, 7.5% of such Eligible Employee's Compensation for the prior calendar year.

(b) **2004 Company Credit.** Notwithstanding section 4.1(a), as of the Effective Date the Company will credit to the Account of each individual, with the exception of the President of the Company, who would have been an eligible for a Company Credit as of such June 30, 2004, a Company Credit equal the amount that would have been credited to the Eligible Employee's Account had this Plan been in effect on June 30, 2004.

#### 4.2. Elective Deferrals.

(a) **In general.** An Eligible Employee may elect to defer a designated portion of regular salary to be earned during a Plan Year, by filing a written election with the Company prior to the first day of the Plan Year in which such salary is to be earned. Such Eligible Employee may also elect to defer a designated portion of any bonus by

filing a written election with the Company prior to the first day of the Plan Year in which such bonus is to be determined and paid. An individual who first becomes an Eligible Employee on or after the first day of any Plan Year may elect to defer a portion of base salary to be earned, and/or bonus to be determined and paid, during the remainder of the Plan Year and after the written election is filed with the Company in a manner consistent with Code section 409A.

(b) **Nature of Election.** Each election under this Section 4.2 for a Plan Year (or the balance of a Plan Year) shall be made on a form approved or prescribed by the Company, shall be irrevocable by the Participant for the Plan Year, and (except as provided in Section 4.2(a)) shall apply only to regular salary or bonus earned after the date the election form is completed and filed with the Company. The election form shall also specify whether the deferral election is to apply to payments of base salary, bonuses or both, and shall specify the whole percentage or flat dollar amount of each that is to be deferred. The deferred amounts shall be credited to the Participant's Account as of the date such compensation would otherwise have been paid to the Participant.

## Article 5. - ACCOUNTS; INTEREST

**5.1. Accounts.** The Administrator shall establish and maintain an Account for each Participant reflecting Company Credits, Elective Deferrals, and any adjustments hereunder. As soon as reasonably practicable after the end of each Plan Year, the Administrator shall provide the Participant with a statement of his or her Account.

**5.2. Earnings Measurement.** The Administrator shall identify one or more funds (such as mutual or bank collective funds) from time to time for the purpose of measuring earnings credits to Participants' Accounts. Each Participant may specify which one or more of such funds he or she wishes to have used as a measuring vehicle for designated percentages of his or her Account, in such form and manner, and with such notice, as the Administrator may prescribe, provided that such directions may be given on a prospective basis only. Changes in Participant directions hereunder may be made as of the first business day of any calendar quarter (or such other times as the Administrator may prescribe). Each Participant's Account shall be adjusted from time to time (at least quarterly) to reflect the fair market value that would be ascribed to the Account if the amounts credited to the Account were actually invested in the funds as directed by the Participant. For purposes of both Company Credits and Elective Deferrals, earnings credits (if any) shall begin to accrue as of the actual date of contribution and investment by the Company of funds into a grantor trust pursuant to Section 9.1 hereof.

**5.3. Payments.** Each Participant's Account shall be reduced by the amount of any payment made to or on behalf of the Participant under Article 6 as of the date such payment is made.

**5.4. Vesting.** A Participant will at all times be 100% vested in the portion of his or her Account attributable to Elective Deferrals, and will earn a nonforfeitable interest to be vested in the portion of the Account attributable to any Company Credits according to the following schedule, based on his or her aggregate years of service with the Company or its affiliates, including all such service prior to the date Company Credits are first made and all such service prior to the Effective Date.

| Years of Service | % Vested |
|---|---|
| less than 5 | 0 |
| 5 or more | 100 |

## Article 6. - PAYMENTS

**6.1. Severe Financial Hardship (Elective Deferrals).** A Participant who believes he or she is suffering a severe financial hardship within the meaning of Code section 409A may apply to the Administrator for a distribution under the Plan in order to alleviate such hardship. The Administrator, in its sole discretion (but after taking into account, among other factors, the nature and foreseeability of the alleged hardship, the Participant's other resources, and the potential effect of making a distribution on the intended tax status of the deferrals made under the Plan), may direct the Company to pay to the Participant an amount which it determines is necessary or appropriate, not to exceed the Participant's total Account balance attributable to Elective Deferrals under Section 4.2, if any, and the Company shall pay such amount to the Participant in a single lump sum cash payment.

**6.2. Termination of Employment.** As soon as reasonably practicable following termination of employment for any reason including retirement or death, a Participant shall receive distributions in five annual cash installments, the first such installment to be made as soon as reasonably practicable following termination of employment, and succeeding installments to be made approximately at each of the four following anniversaries thereof. The amount of each installment shall be determined by dividing the Participant's Account balance (adjusted through the day before the installment) by the number of installments remaining (determined as of such date).

**6.3. Beneficiary Designation.** A Participant shall designate a beneficiary who shall be entitled to receive the single lump sum cash payment due the Participant under the Plan in the event of the Participant's death. Such designation shall be made in writing on a form approved or prescribed by the Company, and may be changed by the Participant at any time. If there is no such designation or no designated beneficiary survives the Participant, payment shall be made to the Participant's estate.

## Article 7. - ADMINSTRATOR

**7.1. Plan Administration and Interpretation.** The Administrator shall oversee the administration of the Plan. The Administrator shall have complete discretionary control and authority to administer all aspects of the Plan, including without limitation the power to appoint agents and counsel, and to determine the rights and benefits and all claims, demands

and actions arising out of the provisions of the Plan of any Participant, beneficiary, deceased Participant, or other person having or claiming to have any interest under the Plan, in a manner consistent with the claims procedures adopted pursuant to Section 7.2. The Administrator shall have the exclusive discretionary power to interpret the Plan and to decide all matters under the Plan. Such interpretation and decision shall be final, conclusive and binding on all Participants and any person claiming under or through any Participant, in the absence of clear and convincing evidence that the Administrator acted arbitrarily and capriciously. Any individual serving as Administrator, or on a committee acting as Administrator, who is a Participant will not vote or act on any matter relating solely to himself or herself. When making a determination or calculation, the Administrator shall be entitled to rely on information furnished by a Participant, a beneficiary, or any other person or entity. The Administrator shall be deemed to be the Plan administrator with responsibility for complying with any reporting and disclosure requirements of ERISA.

     **7.2. <u>Claims and Review Procedures</u>**. The Administrator shall adopt procedures for the filing and review of claims in accordance with Section 503 of ERISA.

     **7.3. <u>Indemnification of Administrator and Assistants</u>**. The Company agrees to indemnify and to defend to the fullest extent permitted by law any director, officer or employee of the Company or any affiliated company who serves as the Administrator or as a member of a committee appointed to serve as Administrator, or who assists the Administrator in carrying out its duties as part of his employment (including any such individual who formerly served in any such capacity) against all liabilities, damages, costs and expenses (including attorneys' fees and amounts paid in settlement of any claims approved by the Company) occasioned by any act or omission to act in connection with the Plan, if such act or omission is in good faith.

## Article 8. - AMENDMENT, TERMINATION OR ASSIGNMENT

     **8.1. <u>Amendments</u>**. The Company shall have the right to amend this Plan from time to time, subject to Section 8.3, by an instrument in writing which has been executed on its behalf by an officer thereof or by vote of its Board of Directors.

     **8.2. <u>Termination of Plan</u>**. This Plan is strictly a voluntary undertaking on the part of the Company. The Company reserves the right to terminate this Plan at any time, subject to Section 8.3, by an instrument in writing which has been executed on its behalf by an officer thereof or by vote of its Board of Directors.

     **8.3. <u>Existing Rights</u>**. No amendment or termination of the Plan shall adversely affect the rights of any Participant with respect to amounts credited to his or her Account as of the date of such amendment or termination (subject to future adjustments as a result of investment measurements).

     **8.4. <u>Assignment</u>**. The rights and obligations of the Company shall inure to the benefit of and shall be binding upon its successors and assigns.

## Article 9. - MISCELLANEOUS

**9.1. Grantor Trust.** The Company shall establish a trust of which the Company is treated as the owner under Subpart E of Subchapter J, Chapter 1 of the Internal Revenue Code of 1986, as amended (a "grantor trust") and as soon as practicable (but in any event within 30 days) after an amount is credited to an Account hereunder, shall deposit with the trustee of the trust an amount of cash or marketable securities sufficient to cause the fair market value of the assets held in the trust to be not less than the sum of the Account balances under the Plan. Any such deposits shall be irrevocable and for the exclusive purpose of paying benefits under the Plan and such other purposes as may be set forth in the trust. Except for the foregoing, nothing in this Plan will be construed to create a trust or to obligate the Company or any other person to segregate a fund, purchase an insurance contract, set aside any shares of Company stock, or in any other way currently to fund the future payment of any benefits hereunder, nor will anything herein be construed to give any employee or any other person rights to any specific assets of the Company or of any other person. Any benefits which become payable hereunder that are not paid out of the grantor trust shall be paid from the general assets of the Company.

**9.2. Nature of Claim for Payment.** Each Participant and beneficiary will be an unsecured general creditor of the Company with respect to all benefits payable under the Plan. Except with respect to amounts deposited in a grantor trust and consistent with the terms of any such trust, nothing in this Plan will be construed to give any individual rights to any specific assets of the Company or other person or entity.

**9.3. Nonalienation of Benefits.** None of the benefits, payments, proceeds or claims of any Participant or beneficiary shall be subject to any claim of any creditor and, in particular, the same shall not be subject to attachment or garnishment or other legal process by any creditor, nor shall any Participant or beneficiary have any right to alienate, anticipate, commute, pledge, encumber or assign any of the benefits or payments or proceeds which he or she may expect to receive, contingently or otherwise, under this Plan.

**9.4. No Contract of Employment.** Participation in this Plan shall not give any Eligible Employee (or any other employee) the right to be retained in the employ of the Company or any right or interest in the Plan other than as herein provided. The Plan shall not be deemed to constitute a contract between the Company and any Eligible Employee (or any other employee) or a consideration for, or an inducement or condition of employment for, the performance of services by any Eligible Employee (or any other employee).

**9.5. Receipt and Release.** Any payment to any Participant or beneficiary in accordance with the provisions of this Plan shall, to the extent thereof, be in full satisfaction of all claims against the Company and the Administrator under this Plan, and the Administrator may require such Participant or beneficiary, as a condition precedent to such payment, to execute a receipt and release to such effect. If any Participant or beneficiary is determined by the Administrator to be incompetent by reason of physical or mental disability (including minority) to give a valid receipt and release, the Administrator may cause the payment or payments becoming due to such person to be made to another person for his or her

benefit without responsibility on the part of the Administrator or the Company to follow the application of such funds.

**9.6.  Severability of Provision.**  If any provision of this Plan shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions hereof, and this Plan shall be construed and enforced as if such provision had not been included.

**9.7.  Government Regulations.**  It is intended that this Plan will comply with all applicable laws and government regulations, and the Company shall not be obligated to perform an obligation hereunder in any case where, in the opinion of the Company's counsel, such performance would result in the violation of any law or regulation.

**9.8.  Tax Withholding.**  The Company may withhold or cause to be withheld from any benefit payment or from other payments owed to a Participant any withholding or other taxes required to be withheld with respect to the Participant's payments or entitlements under the Plan.

**9.9.  Governing Law.**  This Plan shall be construed, administered, and governed in all respects under and by the laws of the State of Delaware.  If any provision shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions hereof shall continue to be fully effective.

**9.10.  Headings and Subheadings.**  Headings and subheadings in this Plan are inserted for convenience only and are not to be considered in the construction of the provisions hereof.

IN WITNESS WHEREOF, Applied Extrusion Technologies, Inc. has caused this Plan to be executed by its duly authorized officer this 15th day of March, 2005.

APPLIED EXTRUSION TECHNOLOGIES, INC.

By: _____

-8-

# EXHIBIT 2

# SPECTOR GADON & ROSEN, P.C.

ATTORNEYS AT LAW
SEVEN PENN CENTER
1635 MARKET STREET
SEVENTH FLOOR
PHILADELPHIA, PENNSYLVANIA 19103
[215] 241-8888
FAX: [215] 241-8844
WWW.LAWSGR.COM

NEW JERSEY OFFICE:
1000 LENOLA ROAD
P.O. BOX 1001
MOORESTOWN, NJ 08057
[856] 778-8100
FAX: [856] 722-5344

FLORIDA OFFICE:
360 CENTRAL AVENUE
SUITE 1550
ST. PETERSBURG, FL 33701
[727] 896-4600
FAX: [727] 896-4604

*Alan B. Epstein*

E-MAIL
aepstein@lawsgr.com

DIRECT DIAL NUMBER
[215] 241-8832

May 3, 2006

*Via email (Winthrop.minot@ropesgray.com)*

Winthrop G. Minot
Ropes & Gray
One International Place
Boston, MA 02110-2624

Re:   David N. Terhune

Dear Mr. Minot:

As you are aware, Applied Extrusion Technologies, Inc.("AET") terminated the employment of David N. Terhune as its President and Chief Executive Officer without cause effective February 8, 2006. Pursuant to the applicable provisions of the Employment Agreement of March 8, 2006 (the "Agreement"), Mr. Terhune is entitled to receive, in exchange for a general release (to be executed by him pursuant to Section 4 (k) "in favor of the Company"), a lump sum monetary payment and continuing benefits from the Company as fully outlined in Sections 3 and 4 of that Agreement. Unfortunately, AET has chosen to violate the mandatory terms of the Agreement and conditioned his receipt of the required sums and benefits on the execution of a severance agreement that does not reflect the original employment contract provisions between David and the Company.

Accordingly, in exchange for David's execution of the required release of the Company, a copy of which is attached hereto, demand is hereby made for the immediate payment of all monies and benefits due to him.

Additionally, as fully outlined in the attached draft Complaint, the individual actions of AET Officers and Directors have caused him serious harm not covered by the release that will be executed in favor of the Company. I believe that those issues also can be resolved without the necessity of litigation and I would appreciate you contacting me after you have had an opportunity to review this matter with your client.

**SPECTOR GADON & ROSEN, P.C.**
ATTORNEYS AT LAW

May 3, 2006
Page -2-

However, because of the substantial sums and obligations due and owing to David at the present time, and in light of the liquidity challenges that the Company has professed as the reason for its non-compliance with the controlling Agreement, if that exchange and payment are not completed within five business days of the date of your receipt of this letter and its attachments, I will be required to institute suit in accordance with the allegations set forth in the attached draft Complaint and take appropriate action to secure the immediate payment of the sums owed.

I look forward to discussing this important matter with you.

Very truly yours,

*Alan*

Alan B. Epstein

AE/bm
Attachments

Cc:    David N. Terhune

263014-1

As required by the provisions of Section 4(k) of the Employment Agreement of March 8, 2005 ("Employment Agreement"), I, David N. Terhune, on my own behalf and that of my heirs, executors, administrators, beneficiaries, personal representatives and assigns, in full and final settlement of any and all causes of action, rights or claims, whether known or unknown, that I have had in the past, now have, might now have against Applied Extrusion Technologies, Inc.("AET") relating to, connected with or arising out of my employment or its termination brought pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the fair practices statutes of the state or states in which I have provided services to AET or any other federal, state or local law, regulation or other requirement, hereby release and forever discharge AET and its subsidiaries, and their successors and assigns, from any such causes of action, rights or claims; *provided however*, that the foregoing shall not apply to any causes of actions, rights, or claims that you may have to vested benefits or under Sections 7 or 8 of the Employment Agreement.

_____
David N. Terhune

Dated: _____

263005-1

# EXHIBIT 3

| From: | Rizzotti, Anthony D. |
|---|---|
| Sent: | Saturday, May 13, 2006 2:46 PM |
| To: | 'Alan Epstein' |
| Cc: | Minot, Winthrop G. |
| Subject: | AET/David Terhune |

Alan:

I have enclosed a form of general release. Regarding the threatened litigation, as you know, no payments are due under the Employment Agreement until an effective general release is executed. My client is ready and willing to comply with its obligations under the agreement after your client fulfills his obligation to sign and deliver a general release in a form acceptable to the Company. While I continue to believe that the draft Separation Agreement better serves our clients' interests, if you would prefer a release only, that is acceptable.

With respect to the issues you raised, my client remains willing to discuss a modification of the non-competition obligation. However, it is difficult for the Company to negotiate with itself. The Company made a fair and reasonable proposal on this issue. If you have a counterproposal, please provide it.

Let's try to discuss this matter on Monday on the telephone, as opposed to through e-mail.

Regards,

Tony



Terhune
Release.pdf (38 KB)

## GENERAL RELEASE OF ALL CLAIMS

FOR AND IN CONSIDERATION OF the benefits to be provided me pursuant to Section 4(e) of the Employment Agreement between Applied Extrusion Technologies, Inc. (the "Company") and me dated as of March ___, 2005 (the "Agreement") (which benefits are conditioned on my signing this Release of Claims, which represent all that I am entitled to under the Agreement or otherwise, and to which I am not otherwise entitled) and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, I, on my own behalf and on behalf of my heirs, executors, administrators, beneficiaries, representatives and assigns, and all others connected with me, hereby release and forever discharge the Company and its Affiliates (as defined below) and all of their respective past, present and future officers, directors, trustees, shareholders, employees, agents, advisers, consultants, attorneys, general and limited partners, members, managers, joint venturers, representatives, insurers, successors and assigns, and all others connected with any of them, both individually and in their official capacities (the "Released Parties"), from any and all causes of action, rights and claims of any type or description, whether in law or in equity, known or unknown, which I have had in the past, now have, or might now have, through the date of my signing of this Release of Claims, including, without limitation, any and all causes of action, rights and claims in any way resulting from, arising out of or connected with my employment by the Company or any of its Affiliates or the termination of that employment, for breach of contract or pursuant to any federal, state or local law, regulation or other requirement (including without limitation Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the fair employment practices laws of the state or states in which I have been employed by the Company or any of its Affiliates, each as amended from time to time). For purposes of this Release of Claims, "Affiliates" means all persons and entities directly or indirectly controlling, controlled by or under common control with the Company, where control may be by management authority, equity interest or otherwise. In the event that I initiate in any court whatsoever any claim against any of the Released Parties that is within the scope of this Release of Claims, I agree to reimburse each of the Released Parties for its attorneys' fees and costs incurred in the defense of any such action.

In signing this Release of Claims, I acknowledge my understanding that I may consider the terms of this Release of Claims for up to twenty-one (21) days from the date I received this Release of Claims. I also acknowledge that I am advised by the Company and its Affiliates to seek the advice of an attorney prior to signing this Release of Claims; that I have had sufficient time to consider this Release of Claims and to consult with an attorney, if I wished to do so, or to consult with any other person of my choosing before signing; and that I am signing this Release of Claims voluntarily and with a full understanding of its terms.

I further acknowledge that, in signing this Release of Claims, I have not relied on any promises or representations, express or implied, that are not set forth expressly in the Agreement. I understand that I may revoke this Release of Claims at any time within seven (7) days of the date of my signing by written notice to the Chairman of the Board of Directors of the Company and that this Release of Claims will take effect only upon

___ Initial

the expiration of such seven-day revocation period and only if I have not timely revoked it.

Intending to be legally bound, I have signed this Release of Claims as a document under seal as of the date written below.

Signature: _____

Name (please print): _____

Date Signed: _____

On this _____ day of _____, 2006, before me, the undersigned notary public, personally appeared David Terhune, proved to me through satisfactory evidence of identification, to be the person whose name is signed on this document, and acknowledged to me that he signed it voluntarily for its stated purpose.

_____
Notary Public
My Commission Expires:

____ Initial

# EXHIBIT 4



Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21689647 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

**H**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Superior Court of Delaware.
MERCHANTWIRED, LLC; Macerich MerchantWired,
LLC; Rouse-MerchantWired, Inc.; Simonwired Investment,
LLC; TRG Telecom LLC; Urban MerchantWired LLC; and
Westfield MerchantWired, Inc., Plaintiffs,
v.
TRANSACTION NETWORK SERVICES, INC., Defend-
ant.
**No. Civ.A.02C-08-244FSS.**

Submitted May 7, 2003.
Decided July 16, 2003.

Upon Defendant's Motion to Dismiss-Granted as to Count I
With Leave to Amend, and Denied as to Counts II and III.

Arthur G. Connolly, Jr., Connolly Bove Lodge & Hut, LP,
Wilmington, Delaware, for Plaintiffs.
Philip A. Rovner, Potter Anderson & Corroon LP, Wilming-
ton, Delaware, for Defendant.

ORDER

SILVERMAN, J.
*1 This is a contract dispute between two corporate joint
venturers. Plaintiff, MerchantWired LLC, argues that De-
fendant, Transaction Network Services, Inc., breached their
contract when TNS did not purchase MerchantWired. TNS
argues that MerchantWired's own complaint reveals that the
deal fell through because MerchantWired failed to perform
several, important conditions precedent. MerchantWired of-
fers reasons why it did not meet the contract's terms. Most
importantly, MerchantWired alleges that TNS gave it an ex-
tension, but TNS backed out before MerchantWired could
perform. The court must read the complaint, including the
contract, and decide whether MerchantWired potentially has
a case.

I.

MerchantWired was created in 1999 through a collaboration
between six of the largest retail property owners in the

United States in order to provide high-speed network ser-
vices to shopping mall retailers. By late 2001, Mer-
chantWired was teetering on the brink, looking for its finan-
cial salvation. Along came TNS, a larger data telecommu-
nication company providing similar broadband services to a
wider market. In November 2001, representatives from both
companies began discussing a potential "transaction."

MerchantWired's complaint alleges that on April 15, 2002,
MerchantWired and TNS signed a contract. The contract
provided that TNS would acquire MerchantWired at an
agreed upon price if MerchantWired met twenty-four pre-
conditions by:
the later of (I) April 19, 2002; and (ii) a business day mutu-
ally agreed upon by the parties after all conditions to closing
set forth in this Agreement have been satisfied; provided,
however, that such date shall occur on or before the outside
termination date [on or before May 31, 2002.]

MerchantWired does not allege that it fulfilled all twenty-
four preconditions.[FN1] Instead, MerchantWired explains
here that TNS gave MerchantWired an extension, or it
waived the deadline. Before the extension or waiver ex-
pired, however, TNS backed out of the deal, leaving Mer-
chantWired stranded.

FN1. See Superior Court Civil Rule 9(c).

II.

In its complaint, MerchantWired comes at TNS three ways:
First, MerchantWired alleges that TNS breached their con-
tract. Second, MerchantWired alternatively alleges that if
the contract fails, then MerchantWired has a promissory es-
toppel claim. Finally, in its third count, MerchantWired al-
leges fraud against TNS.

MerchantWired filed suit on August 26, 2002. Instead of fil-
ing an answer, TNS moved to dismiss the complaint in its
entirety. TNS argues that the complaint, itself, reveals that
MerchantWired failed to meet all the conditions precedent,
and some of MerchantWired's failures obviously are materi-
al. As for the alleged extension or waiver, TNS concedes
nothing. But it argues that even if there were an extension, it
is apparent that the extension was a nullity because it was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                      Page 2
Not Reported in A.2d, 2003 WL 21689647 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

granted after MerchantWired had already missed the dead-
line. Thus, any purported extension was ineffective. Along
the same line, TNS argues that MerchantWired fails to al-
lege any consideration for an extension.

**\*2** TNS challenges MerchantWired's promissory estoppel
claim by pointing out that MerchantWired's first count al-
leges a written **contract**. TNS contends that, in the face of a
written **contract**, MerchantWired's promissory estoppel
claim is mutually exclusive.

Finally, as to MerchantWired's fraud claim, TNS argues that
claim is coextensive with, and subsumed in, Mer-
chantWired's **breach** of **contract** claim. TNS emphasizes
that MerchantWired makes no fraud allegations, beyond
contending that TNS failed to live up to its bargain.

III.

It appears from MerchantWired's complaint that it did not
meet material **conditions precedent** before the **contract's**
deadline.<sup>FN2</sup> For example, MerchantWired admits it did
not provide final Network Service Agreements to TNS, nor
did it provide information related to these agreements until
June 1, 2002. To the extent that the complaint's Count I at-
tempts to avoid the deadline by alleging an extension, the
court is less concerned about the purported extension's tim-
ing. But the complaint barley alleges an extension: "TNS
waived the outside termination date by representing to
plaintiffs that a closing after May 31, 2002 would be accept-
able." And the complaint does not allege at all that the ex-
tension was supported by consideration.<sup>FN3</sup> The com-
plaint's vagueness concerning the who, what, where and
when surrounding the alleged extension will have to be ad-
dressed before this litigation continues. Meanwhile, the
complaint's failure to allege performance of all conditions
precedent, or an extension supported by consideration, is
fatal.

> FN2. *See Rhone-Poulenc Basic Chems. Co. v.*
> *American Motorists Ins. Co.*, 616 A.2d 1192, 1198
> (Del.1992) (affirming summary judgment for
> plaintiff on its declaratory judgment claim where
> defendant failed to satisfy all conditions precedent
> in insurance contract).

> FN3. *Continental Insurance Co. v. Rutledge & Co.,*
> *Inc.*, 750 A.2d 1219, 1232-1233 (Del. Ch.2000)
> (finding no oral modification because of lack of
> consideration.)

IV.

TNS's challenge to the promissory estoppel claim, Count II,
seems to ignore the alternative nature of MerchantWired's
second count. At this point, TNS has not answered the com-
plaint. Accordingly, it remains to be seen whether TNS ad-
mits the contract. So far, TNS seems primed to deny the
contract. So, Count II potentially makes sense as a pleading
in the alternative.

Preliminarily, the court tends to agree that if Mer-
chantWired establishes TNS breached the contract during
the alleged extension, MerchantWired's promissory estoppel
claim will be inconsistent or duplicative.<sup>FN4</sup> Nevertheless,
for now the promissory estoppel survives.

> FN4. *Genencor Int'l., Inc. v. Novo Nordisk A/S,*
> 766 A.2d 8, 12 (Del.2000); *In re U.S. West, Inc.*
> *Securities Litig.*, 201 F. Supp 2d 302, 308 (D. Del
> 2002); *Weiss v. Northwest Broadcasting, Inc.*, 140
> F.Supp.2d 336, 345 (D. Del 2001).

V.

And finally, the same reasoning that applies to Count II also
applies to TNS's attack on MerchantWired's fraud claim. If
TNS admits the contract or MerchantWired establishes it,
MerchantWired's fraud claim will be subsumed in its breach
of contract claim.<sup>FN5</sup> As TNS observes, the fraud claim al-
leges nothing more than TNS's breach of contract. Mer-
chantWired alleges no additional fraudulent acts. Thus, if
MerchantWired amends its complaint to properly allege an
extension supported by consideration and if MerchantWired
proves TNS breached during the extension, then Count III
will be subject to a dispositive motion.

> FN5. *Christiana Marine Serv. Corp. v. Texaco*
> *Fuel and Marine Mktg., Inc.*, 2002 WL 1335360, at
> \*5, (Del.Super.Ct.).

VI.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2003 WL 21689647 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

For the foregoing reasons, Defendant's Motion To Dismiss is *GRANTED* with leave to amend as to Count I, and *DENIED* as to Counts II and III. If MerchantWired, consistent with Superior Court Civil Rules 9(c) and 11, files an amended complaint alleging that MerchantWired performed all conditions precedent, or TNS granted MerchantWired an extension supported by specified consideration, Count I will go forward. Otherwise, this dismissal of Count I shall be with prejudice.

**\*3** If MerchantWired files an amended complaint and TNS answers it, admitting the contract and the extension, TNS has leave to file a motion for summary judgment on Counts II and III. But the court anticipates the case will go forward, centering on whether there was an extension supported by consideration and if so, whether TNS breached the extended contract.

For now, it is difficult to see how MerchantWired will establish that with an extension it would have met the twenty-four preconditions. This also leaves open litigation over MerchantWired's alleged damages. It is difficult to see how MerchantWired's potential damage claim is more than speculative. Nevertheless, MerchantWired should have the opportunity to prove that TNS gave MerchantWired a valid extension and then pulled the rug out from under it, which caused a quantifiable loss. Or alternatively, that TNS is liable under promissory estoppel or fraud.

IT IS SO ORDERED.

Del.Super.,2003.
Merchantwired, LLC v. Transaction Network Services, Inc.
Not Reported in A.2d, 2003 WL 21689647 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2827895 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 1

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Superior Court of Delaware.
SWIER
v.
DELAWARE BAY SURGICAL SERVICES
No. Civ.A. 03C-03-030.

Submitted Sept. 1, 2004.
Decided Nov. 30, 2004.

Dear Counsel:

GRAVES, J.
*1 This is the Court's final Decision and Order in the case of
*Swier v. Delaware Bay Surgical Services.* The parties sub-
mitted post-trial memoranda concerning whether the applic-
ation of the Delaware Wage Act is appropriate in this case.
For the following reasons, damages are awarded to the
Plaintiff.

In March 2001, Plaintiff, Dr. Patrick Swier ("Dr.Swier")
began working part time for the Defendant, Delaware Bay
Surgical Services ("DBSS"). The terms of his employment
were set forth in an employment agreement dated February
2001. Dr. Swier practiced part time with DBSS and part
time with a practice in Baltimore, Maryland. Sometime
later, the parties began discussions to increase Dr. Swier's
workload to full time practice with DBSS. They began to
negotiate the terms of an adjusted employment agreement.
Negotiations were extensive, but eventually soured before
reaching an agreement. Each party contends that the other
was responsible for the termination of Dr. Swier's employ-
ment. Nonetheless, Dr. Swier submitted a letter to DBSS
resigning on February 7, 2002. An early termination penalty
provision contained in the contract required a breaching
party to pay $25,000 upon the termination of the agreement
without good cause. On July 19, 2002, DBSS sent Dr. Swier
a letter requesting that he pay the difference between the ad-
mitted wages owed to him, $18,356.52 and the $25,000 in
liquidated damages for terminating the employment agree-
ment without good cause. Dr. Swier refused to accept the
terms of the arrangement set forth by DBSS and instituted
this action.

The parties were in serious disagreement about who termin-
ated the employment contract, and became consequently li-
able for the $25,000 in liquidated damages. Liquidated dam-
ages clauses are permissible inclusions in contracts if the
potential damages are uncertain and the amount agreed upon
is reasonable. [FN1] A liquidated damages award is appropri-
ate unless its enforcement would serve as a penalty, rather
than a reasonable assessment of anticipated damages.[FN2]
The Court considers persuasive the fact that both parties be-
lieved what they labeled as a penalty clause was, in reality, a
liquidated damages clause. Each has attempted to enforce
the liquidated damages provision against the other arguing
that $25,000.00 is an appropriate and reasonable estimate of
the damages caused by the early termination of this contract.

> FN1. *See Lee Builders v. Wells,* 103 A.2d 918, 919
> (Del. Ch.1954).

> FN2. *See Wilmington Housing Authority v. Pan
> Builders, Inc.,* 665 F.Supp. 351, 354 (D.Del.1987).

Dr. Swier argued that DBSS breached the employment con-
tract by instructing him to seek employment elsewhere. At
trial, however, the Court found that Dr. Swier breached the
employment agreement by terminating his employment
without cause on March 1, 2002. This breach implicates the
enforcement of Section 12 of the employment agreement,
which mandates that a breaching party must pay the other
the sum of $25,000.00 for its expenses in procuring and
maintaining Dr. Swier as a physician in the practice.[FN3] Dr.
Swier, is therefore liable to DBSS for $25,000, the amount
specified in the contract as an early termination penalty.

> FN3. (Emplymt. Agmt. of 3/01/2001, at 4).

*2 Dr. Swier's claim for unpaid wages is a separate issue.
The failure of DBSS to pay Dr. Swier his earned wages fol-
lowing termination is a violation of Section 1103 of the
Delaware Wage Act.[FN4] The consequences for an employ-
er's failure to pay wages when due can be severe. The stat-
utory penalty requires that an employer "be liable to the em-
ployee for liquidated damages in the amount of ten (10) per-
cent of the unpaid wages for each day, except Sunday and
legal holidays, upon which such failure continues after the
day upon which payment is required or in an amount equal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2827895 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 2

to the unpaid wages, whichever is smaller." <sup>FN5</sup>

    FN4. *See* 19 Del. C. § 1103(a).

    FN5. *See* 19 Del. C. § 1103(b).

Section 2 of the Employment Agreement between Dr. Swier and DBSS establishes that wages will be determined on the fifteenth of every month.<sup>FN6</sup> The agreement entitles Dr. Swier to fifty (50) percent of all monthly collected receipts, adjusted by the salary advanced and expenses incurred for that month.<sup>FN7</sup> "Wages" as defined by Section 1101(a)(2) are "compensation for labor or services rendered by an employee, whether the amount is fixed or determined on a time, task, piece, commission or other basis of calculation. <sup>FN8</sup> Therefore, the word "wages" was used to refer to the regular direct compensation which would ordinarily be paid at the end of each period of a certain number of work days." <sup>FN9</sup> The expansive definition of wages demonstrates the broad application of the Wage Act. The statute recognizes that wage allocations and arrangements vary greatly. Dr. Swier's wages were determined on a monthly basis. The fact that a payday is not date certain does not affect the classification of those earnings as wages.

    FN6. (Emplymt. Agmt. of 3/01/2001, at 2).

    FN7. *See id.*

    FN8. *See* 19 Del. C. § 1101(a)(2).

    FN9. *See Department of Labor ex rel. Commons v. Green Giant Co.,* 394 A.2d 753, 755 (Del.Super.1978).

The Defendant's related argument asserting that the final payment made to Dr. Swier was really a severance payment is unpersuasive. DBSS argues that severance payments fall outside of the penalty provisions of the Wage Act. But, a severance payment is an additional payment made to an employee upon their departure. The $18,356.52 owed by DBSS to Dr. Swier was for services rendered, based upon the contract's terms. The amount was determined by dividing the collected receipts from the date of the agreement through ninety days past Dr. Swier's termination, minus the previously paid salary and expenses. The attempt by DBSS to

classify the sum as a severance package fails.

DBSS argues that since the statute requires paydays to be at least monthly, but the agreement requires one-hundred days to settle accounts, the wage statute should not be applicable. The Agreement sets forth the procedure to determine wages in the event of Dr. Swier's termination with DBSS. It calls for Dr. Swier's "final payment" to be determined as fifty (50) percent of the collected receipts for a period of ninety days after his date of termination, to be paid on the one-hundredth day after termination. The Agreement appears to take into account the delay in collections that is commonplace in medical practices. The provision of a ninety-day period following Dr. Swier's termination allows for any delayed payments for services rendered to be processed and accredited to him. The fact that this "final payment" was identically structured to Dr. Swier's regular fee schedule indicates that it reflects compensation for services performed, not a special fee allotted because of his departure from the office. The fact that this served as Dr. Swier's "final payment" does not remove it from the realm of "wages" for services rendered. Therefore, the Wage Act applies.

*3 The Delaware Wage Act requires that "[w]henever an employee quits, resigns, is discharged, suspended or laid off, the wages earned by the employee shall become due and payable by the employer on the next regularly scheduled payday(s) ... as if the employment had not been suspended or terminated." <sup>FN10</sup> DBSS failed to comply with the requirements of its own agreement and the Delaware Wage Act by not supplying Dr. Swier with his earned wages on the hundredth day after termination. Dr. Swier's wages were determined on the fifteenth of every month normally. Upon termination, the scheduled payday became the hundredth day from that date, according to Section 2 of the Employment Agreement.<sup>FN11</sup> Therefore, DBSS had until June 10, 2002 to pay Dr. Swier for his services rendered. It was not until July 19, 2002 that DBSS attempted to make its "final payment" to Dr. Swier. Instead of a payment, DBSS requested that Dr. Swier pay the $6,643.48 difference between $18,356.52 in "severance pay" and $25,000.00 in liquidated damages for Dr. Swier's breach of the employment agreement. The delay and insufficiency of the wage payment are violations of the Delaware Wage Act.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2004 WL 2827895 (Del.Super.)
(Cite as: Not Reported in A.2d)

FN10. *See* 19 Del. C. § 1103(a).

FN11. (Emplymt. Agmt. of 3/01/2001, at 2).

Having determined that the $18,356.52 figure does constitute Dr. Swier's earned wages, and that DBSS did not distribute them on the scheduled payday, the Court must next determine whether DBSS was justified in withholding payment beyond the scheduled payday. DBSS claims that it was not obligated to pay Dr. Swier because he terminated his employment contract without cause, making him liable for $25,000 in liquidated damages, exceeding the amount due to him for services rendered. However, under Section 1107 of the Wage Act, employers are permitted to withhold wages in only three situations.FN12 The early termination penalty or offset as claimed by DBSS does not fall within any of these exceptions.

> FN12. *See* 19 Del. C. § 1107. An employer may not withhold or divert wages from an employee unless:
> (1) the employer is required or permitted to do so under state or federal law; or
> (2) the deductions or withholdings are for medical, surgical or hospital care, without financial benefit to the employer, and are recorded in due course and clearly in the employer's records; or
> (3) the employer has a signed authorization by the employee for lawful deductions accruing to the benefit of the employee. *See* 19 Del. C. 1107(1)-(3).

Under Section 1103(b), an employer may avoid a penalty by asserting defenses to the wage claim, as long as the defenses are reasonable and pertain to the validity of the wage claim itself.FN13 The Defendants argue that *Peirson v. Hollingsworth* interprets Section 1103(b) to permit set-offs as proper justification for withholding wages. But in *Peirson,* Judge Wright ruled that "an employer would not be precluded from asserting a legal defense as a set-off if it related to the validity of the wage claim itself."FN14

FN13. *See* 19 Del. C. 1103(b).

FN14. *See Peirson v. Hollingsworth,* 251 A.2d 350, 352 (Del.Super.1969)(emphasis added).

The purpose of the wage payment statute seems clear. Most employees are economically dependent on the cash flow provided by their regular wage payments. If employers could delay or withhold an employee's wages then the mischief and injury to the employee that might result is obvious. While employers may feel that it is unfair to be prohibited from making adjustments to the "wages" owed to an employee based upon financial obligations or damages the employee may have accrued, the statute's design is to prevent non-wage related set-offs. Employers, all too frequently, could hold its employees, especially one who was been terminated, at a serious disadvantage if they were permitted to unilaterally determine "damages" and then subtract them from the wages owed. It makes no difference if the employer is ultimately determined to be right in its assessment of damages. Wages must be paid first. Then, collateral economic issues, not relevant to wages, can be addressed or ultimately resolved in the proper forum.

*4 From the outset, DBSS acknowledged that it owed Dr. Swier $18,356 .52 in wages. The early termination penalty is entirely separate from Dr. Swier's wage claim. It is a contract claim and is not a part of the wages calculation. For example, if the Court found that DBSS has wrongfully terminated Dr. Swier, the $25,000 owed would not be considered "wages", thereby subjecting DBSS to the requirements and potential consequences of the Wage Act. The reason being simply that the liquidated damages provision has nothing to do with "wages". DBSS was not entitled to withhold Dr. Swier's wages under Section 1107 nor exempted from the penalty under Section 1103(b).

Dr. Swier's breach of the employment agreement did not waive his rights under the Wage Act. Despite the breach, he is still entitled to receive payment for the services he rendered while employed with DBSS. The Wage Act was enacted to protect employees by ensuring that they reap the fruits of their labor, despite soured employment relationships or unmet contractual obligations.

Section 1103(b) provides that an employer who, without reasonable grounds, fails to pay an employee for services rendered after their termination will "be liable to the employee for liquidated damages in the amount of 10 percent of the unpaid wages for each day, except Sunday and legal

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



holidays, upon which such failure continues after the day upon which such payment is required or in an amount equal to the unpaid wages, whichever is smaller." [FN15] DBSS failed to pay Dr. Swier the wages rightfully owed to him. Its failure to do so results in its liability for the $18,356.52 in wages owed Dr. Swier *plus* $18,356.52 as a penalty under Section 1103(b).

> FN15. *See* 19 Del. C. § 1103(b).

Section 1113(c) mandates that "any judgment entered for a plaintiff in an action brought under this section *shall* include an award for the costs of the action, the necessary costs of prosecution and reasonable attorney's fees, all to be paid by the defendant." [FN16] Therefore, the Court is left to resolve what constitutes "reasonable attorney's fees" as mandated by the Wage Act. I note that the $18,356.52 wage claim has never been in dispute. The pretrial stipulation evidences that both parties agreed on this figure. The primary issue in this litigation was the finger-pointing involved in who caused the breakup of the employment relationship, thus triggering the $25,000 liquidated damages obligation. Therefore, an award of all Plaintiff's attorney's fees is inappropriate. I ask that Plaintiff's counsel submit an affidavit as to fees claimed so the Court can make a determination of what is "reasonable" in this case.

> FN16. *See* 19 Del. C. § 1113 (c).

Judgment is entered as follows:
(a) for Defendant, $25,000 as to its contract claim;
(b) for Plaintiff, $36,713.04 as to the wage claim, together with costs; and
(c) for Plaintiff, as to attorney's fees. The reasonableness to be determined upon the filing of Plaintiff's counsel's affidavit.

IT IS SO ORDERED.

Del.Super.,2004.
Swier v. Delaware Bay Surgical Service
Not Reported in A.2d, 2004 WL 2827895 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 6



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

**C**

Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BE-
FORE CITING.

Superior Court of Delaware.
Judy KELLY, Harriette Owens Waldron, Scott Symons and
Michael Putnick, Plaintiffs,
v.
MCKESSON HBOC, INC., Mark A. Pulido, Charles W.
McCall and Richard H. Hawkins, Defendants.
No. CIV.A. 99C-09-265WCC.

Submitted: Oct. 18, 2001.
Decided: Jan. 17, 2002.

Shareholders in acquired corporation brought claims for
breach of contract, violation of implied covenant of good
faith and fair dealing, and violations of federal securities
law against acquiring corporation, which had acquired a
third-party corporation by merger before the completion of
the merger with acquired corporation, and against successor
corporation to acquiring corporation and executive officers
and directors of acquiring corporation and successor corpor-
ation, alleging that third corporation's restatement of earn-
ings because of accounting irregularities caused sharehold-
ers of acquired corporation to receive fewer shares of suc-
cessor corporation pursuant to the merger agreement. On
shareholders' motion for partial summary judgment and de-
fendants' motion to dismiss, the Superior Court, New Castle
County, Carpenter, J., held that: (1) neither "bespeaks cau-
tion" doctrine nor pre-existing duty rule precluded the
breach of contract claim; (2) genuine issues of material fact
precluded summary judgment on the breach of contract
claim; (3) acquiring corporation had duty, under implied
covenant of good faith and fair dealing, to refrain from dis-
torting its financial condition; (4) stock in acquiring corpor-
ation was exchanged for stock in acquired corporation pur-
suant to a "public offering," for purposes of Section 11 and
Section 12 of the federal Securities Act of 1933; (5) genuine
issue of material fact precluded summary judgment on fed-
eral securities law claims; (6) Delaware court did not have
personal jurisdiction over officers and directors, pursuant to
Delaware statutes; and (7) provision of federal Securities
Act of 1933 conferring subject matter jurisdiction to state

courts does not also permit plaintiffs to use the Act's nation-
wide service of process provision to acquire personal juris-
diction over defendants in state court.

Shareholders' motion denied; successor corporation's motion
denied; officers' and directors' motions granted.

West Headnotes

**[1] Corporations 101 ☞587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation.
Most Cited Cases
The actions of either the pre-merger acquiring corporation,
or the post-merger successor corporation which had merged
with a third corporation before the merger of acquired cor-
poration into the successor corporation had been completed,
could form the basis of a breach of contract claim by share-
holders of acquired corporation, relating to express war-
ranties and representations made in the merger agreement
relating to accuracy of documents filed with Securities and
Exchange Commission (SEC) and financial statements and
alleging that third corporation's restatement of earnings be-
cause of accounting irregularities caused shareholders of ac-
quired corporation to receive fewer shares of successor cor-
poration pursuant to the merger agreement.

**[2] Corporations 101 ☞587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation.
Most Cited Cases
Whether acquiring corporation, in merger agreement with
acquired corporation, gave warranties regarding the accur-
acy of financial information provided by third corporation
which merged into acquiring corporation before the merger
with acquired corporation was completed was issue for jury,
in action by shareholders of acquired corporation for breach
of contract, alleging that third corporation's restatement of
earnings because of accounting irregularities caused share-
holders of acquired corporation to receive fewer shares of
acquiring corporation pursuant to merger agreement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 2

**[3] Corporations 101 &#8680;572**

101 Corporations
101XIII Reincorporation and Reorganization
101k572 k. Right of Purchasers of Corporate Franchise and Property to Reorganize. Most Cited Cases
Mere allegation that third-party corporation, which had merged into acquiring corporation before acquired corporation completed its merger into acquiring corporation, provided acquiring corporation with documentation that subsequently was found to be false did not establish that acquiring corporation breached express warranties and representations made in merger agreement with acquired corporation relating to accuracy of documents filed with Securities and Exchange Commission (SEC) and financial statements, in action by shareholders of acquired corporation for breach of contract, alleging that third corporation's restatement of earnings because of accounting irregularities caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to merger agreement.

**[4] Judgment 228 &#8680;181(31)**

228 Judgment
228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(31) k. Stock and Stockholders, Cases Involving. Most Cited Cases
Genuine issue of material fact as to what was reasonably known by acquiring corporation, about the inaccuracy of information supplied to acquiring corporation by third-party corporation which had merged into acquiring corporation before acquired corporation merged into acquiring corporation, precluded summary judgment for shareholders of acquired corporation who alleged acquiring corporation's breach of express warranties and representations in the merger agreement with acquired corporation relating to accuracy of documents filed with Securities and Exchange Commission (SEC) and financial statements and alleged that third corporation's restatement of earnings because of accounting irregularities caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to merger agreement.

**[5] Corporations 101 &#8680;587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation. Most Cited Cases
Merger agreement, in which acquiring corporation provided express warranties to acquired corporation regarding accuracy of documents filed with Securities and Exchange Commission (SEC), did not clearly exclude from the warranties documents submitted by acquiring corporation to the SEC after the date of the merger agreement but before the date of the closing of the merger.

**[6] Corporations 101 &#8680;587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation. Most Cited Cases
"Bespeaks caution" doctrine did not preclude shareholders of acquired corporation from bringing action against acquiring corporation for breach of warranties and representations in merger agreement relating to accuracy of documents filed with Securities and Exchange Commission (SEC) and financial statements, alleging that third-party corporation's restatement of earnings because of accounting irregularities caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to merger agreement with acquiring corporation, though joint proxy and prospectus for merger of acquiring corporation with third corporation contained warnings and cautionary language; the allegedly false and misleading language in the joint proxy and prospectus did not involve projections of future results, and the warnings and cautionary language in the joint proxy and prospectus were not abundant.

**[7] Corporations 101 &#8680;587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation. Most Cited Cases
Pre-existing duty rule did not preclude shareholders of acquired corporation from bringing action against acquired



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 3

corporation for breach of contract, relating to merger agreement's representation that documents acquiring corporation submitted to Securities and Exchange Commission (SEC) did not contain material misstatements or omissions; the representation was more than a simple attempt to enforce acquiring corporation's pre-existing legal duty to comply with federal securities laws.

**[8] Contracts 95 ⟘205.20**

95 Contracts
95II Construction and Operation
95II(C) Subject-Matter
95k205 Warranties
95k205.20 k. Reliance. Most Cited Cases
A plaintiff must establish reliance as a prerequisite for a breach of warranty claim.

**[9] Judgment 228 ⟘181(31)**

228 Judgment
228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(31) k. Stock and Stockholders, Cases Involving. Most Cited Cases
Genuine issue of material fact as to whether acquired corporation's shareholders relied on acquiring corporation's representations in merger agreement regarding accuracy of documents filed with Securities and Exchange Commission (SEC) and financial statements precluded summary judgment for shareholders on their claim for breach of warranty, alleging that restatement of earnings by third-party corporation, which merged into acquiring corporation before completion of acquired corporation's merger into acquiring corporation, caused shareholders of acquired corporation to receive fewer shares of acquiring corporation pursuant to the merger agreement.

**[10] Contracts 95 ⟘168**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k168 k. Terms Implied as Part of Contract. Most Cited

Cases
Every contract in Delaware has an obligation of good faith and fair dealing, which is implied into the agreement by law; as such, a party to a contract has made an implied covenant to act reasonably to fulfill the intent of the parties to the agreement.

**[11] Contracts 95 ⟘168**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k168 k. Terms Implied as Part of Contract. Most Cited Cases
Implied covenant of good faith and fair dealing was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain.

**[12] Contracts 95 ⟘168**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k168 k. Terms Implied as Part of Contract. Most Cited Cases
When a claim is brought under the implied covenant of good faith and fair dealing, the court must extrapolate the spirit of the agreement through the express terms and determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose.

**[13] Contracts 95 ⟘168**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k168 k. Terms Implied as Part of Contract. Most Cited Cases
The court will not readily imply a contractual obligation, under the implied covenant of good faith and fair dealing, where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 4

**[14] Contracts 95 ⌬168**

95 Contracts
95II Construction and Operation
95II(A) General Rules of Construction
95k168 k. Terms Implied as Part of Contract. Most Cited
Cases
The implied covenant of good faith and fair dealing cannot
contravene the parties' express agreement and cannot be
used to forge a new agreement beyond the scope of the writ-
ten contract.

**[15] Contracts 95 ⌬326**

95 Contracts
95VI Actions for Breach
95k326 k. Grounds of Action. Most Cited Cases
To state a claim for breach of an implied covenant of good
faith and fair dealing, the plaintiffs must identify a specific
implied contractual obligation.

**[16] Corporations 101 ⌬587**

101 Corporations
101XIV Consolidation
101k587 k. Right to Stock in Consolidated Corporation.
Most Cited Cases
Acquiring corporation had duty, under implied covenant of
good faith and fair dealing in merger agreement, to refrain
from distorting its financial condition, so as to not artifi-
cially inflate the value of its stock, which was to be ex-
changed for acquired corporation's stock in the merger.

**[17] Securities Regulation 349B ⌬18.12**

349B Securities Regulation
349BI Federal Regulation
349BI(B) Registration and Distribution
349BI(B)3 Exempt Transactions
349Bk18.12 k. Number of Offerees or Purchasers. Most
Cited Cases
Stock in acquiring corporation was exchanged for stock in
acquired corporation pursuant to a "public offering," and
thus, the transaction was subject to Section 11 and Section
12 of the federal Securities Act of 1933 regarding misstate-
ments or omissions of material facts in registration state-

ments, prospectuses, and oral communications for public of-
ferings of securities, where acquiring corporation filed re-
gistration statement for publicly registered shelf offering,
though a private-offering exemption from public registration
may have been warranted because acquired corporation had
only five shareholders, four of whom had certified them-
selves as accredited investors and all of whom had access to
financial information pursuant to merger agreement. Secur-
ities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A.
§§ 77, 77k(a)(2); 17 C.F.R. § 230.415.

**[18] Securities Regulation 349B ⌬25.18**

349B Securities Regulation
349BI Federal Regulation
349BI(B) Registration and Distribution
349BI(B)4 Registration Statements
349Bk25.17 False Statements or Omissions; Accuracy
349Bk25.18 k. In General. Most Cited Cases

**Securities Regulation 349B ⌬25.57**

349B Securities Regulation
349BI Federal Regulation
349BI(B) Registration and Distribution
349BI(B)5 Prospectuses and Communications
349Bk25.55 False Statements or Omissions; Accuracy
349Bk25.57 k. Particular Prospectuses or Communications.
Most Cited Cases
Statements in joint proxy and prospectus for merger of ac-
quiring corporation with acquired corporation and in Form
8-K filed with Securities and Exchange Commission (SEC),
regarding financial results for periods before date of filing,
were not "forward-looking statements" that were within safe
harbor exception to liability under Section 11 and Section
12 of the federal Securities Act of 1933 regarding misstate-
ments or omissions of material facts in registration state-
ments, prospectuses, and oral communications for public of-
ferings of securities. Securities Act of 1933, §§ 11, 12(a)(2),
as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 17 C.F.R. §
230.415; 7 C.F.R. § 230.175.

**[19] Judgment 228 ⌬181(31)**

228 Judgment



Not Reported in A.2d                                                                    Page 5
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

228V On Motion or Summary Proceeding
228k181 Grounds for Summary Judgment
228k181(15) Particular Cases
228k181(31) k. Stock and Stockholders, Cases Involving.
Most Cited Cases
Genuine issue of material fact as to whether misstatements in or omissions from registration statement for public offering of stock were material precluded summary judgment for offerees, in action under Section 11 of the federal Securities Act of 1933. Securities Act of 1933, § 11, as amended, 15 U.S.C.A. § 77.

**[20] Courts 106 ⇆12(2.20)**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k10 Jurisdiction of the Person
106k12 Domicile or Residence of Party
106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases
Delaware statute regarding personal jurisdiction over nonresident corporate directors of Delaware corporations did not confer personal jurisdiction in Delaware state courts as to offerees' claims against nonresident directors of offeror, under Section 11 and Section 12 of the federal Securities Act of 1933, for misstatements or omissions of material facts in registration statements and prospectuses for public offering of securities; offerees did not allege breach of fiduciary duty and instead relied solely on directors' status as directors. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 10 Del.C. § 3114.

**[21] Courts 106 ⇆12(2.20)**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k10 Jurisdiction of the Person
106k12 Domicile or Residence of Party
106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
106k12(2.20) k. Persons Acting in Representative Capacity, Jurisdiction Of; Fiduciary Shield. Most Cited Cases
Conduct of nonresident executive vice president and chief

financial officer (CFO) of Delaware corporation in signing, in California, registration statement for public offering of stock was not actual conduct in Delaware, and thus, Delaware state courts did not have personal jurisdiction, under provision of long-arm statute relating to persons transacting business in Delaware, of offerees' claim under Section 11 and Section 12 of the federal Securities Act of 1933, for misstatements or omissions of material facts in registration statements and prospectuses. Securities Act of 1933, §§ 11, 12(a)(2), as amended, 15 U.S.C.A. §§ 77, 77k(a)(2); 10 Del.C. § 3114; 10 Del.C. § 3104(c)(1).

**[22] Courts 106 ⇆12(2.1)**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k10 Jurisdiction of the Person
106k12 Domicile or Residence of Party
106k12(2) Actions by or Against Nonresidents; "Long-Arm" Jurisdiction in General
106k12(2.1) k. In General. Most Cited Cases
Provision of Securities Act of 1933 conferring subject matter jurisdiction to state courts does not also permit plaintiffs to use the Act's nationwide service of process provision to acquire personal jurisdiction over defendants in state court. Securities Act of 1933, § 22(a), as amended, 15 U.S.C.A. § 77v(a).

**[23] Courts 106 ⇆25**

106 Courts
106I Nature, Extent, and Exercise of Jurisdiction in General
106k22 Consent of Parties as to Jurisdiction
106k25 k. Of the Person. Most Cited Cases
Individual who served as president, chief executive officer (CEO), and director of acquiring corporation and individual who served as chief executive officer (CEO) of acquired corporation and later served as chairman of acquiring corporation's board of directors did not consent to personal jurisdiction in Delaware state courts as to disputes under the merger agreement, though the agreement contained a consent to jurisdiction provision, where those individuals were neither named parties nor signatories to the merger agreement.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Plaintiffs' Motion for Partial Summary Judgment. Denied.
Defendant McKesson HBOC, Inc.'s Motion to Dismiss. Denied.
Plaintiffs' Motion to Strike Exhibit A of Defendant McKesson HBOC, Inc.'s Opening Brief. Denied.
Defendant Mark A. Pulido's Motion to Dismiss. Granted.
Defendant Charles W. McCall's Motion to Dismiss. Granted.
Defendant Richard H. Hawkins's Motion to Dismiss. Granted.

Jeffrey S. Goddess, Esquire, and Joseph A. Rosenthal, Esquire, Wilmington, Sherrie R. Savett, Esquire and Lawrence J. Lederer, Esquire, Philadelphia, PA, for Plaintiffs.
Anthony W. Clark, Esquire, Paul J. Lockwood, Esquire, and Thomas G. Macauley, Esquire, Wilmington, for Defendant McKesson HBOC, Inc.
Michael D. Goldman, Esquire, and Stephen C. Norman, Esquire, Wilmington, David B. Hennes, Esquire, New York, NY, for Defendant Mark A. Pulido.
Alan J. Stone, Esquire, and Jessica Zeldin, Esquire, Wilmington, Karen S. Kennedy, Esquire, New York, NY, for Defendant Charles W. McCall.
Stuart M. Grant, Esquire, Wilmington, for Richard H. Hawkins.

### OPINION

CARPENTER, J.
*1 This is the Court's decision on Plaintiffs' motion for partial summary judgment, each of the Defendants' individual motions to dismiss, and Plaintiffs' motion to strike Exhibit A of Defendant McKesson HBOC, Inc.'s opening brief.

### FACTS

On December 17, 1998, Judy Kelly, Harriette Owens Waldron, Scott Symons and Michael Putnick (collectively the "Plaintiffs") sold their businesses, KWS & P, Inc. and KWS & P/SFA, Inc., to McKesson Corporation ("McKesson") [FN1] by entering into an Agreement and Plan of Merger ("Merger Agreement"). This was designed to be a stock-for-stock merger, and in exchange for their businesses, the Plaintiffs were to receive $103.5 million in publicly registered McKesson common stock. The exact number of shares, to which the Plaintiffs were entitled, was de-

termined by computing the average New York Stock Exchange ("NYSE") closing price of McKesson common stock for the ten (10) consecutive trading day period three days prior to closing.

> FN1. The Plaintiffs' businesses, which were sold to McKesson, focused on processing and marketing data for pharmaceutical manufacturers. The businesses assisted pharmaceutical manufacturers in selling their products to and through doctors and consumers by analyzing marketing data. Each Plaintiff owned 25% of KWS & P, Inc., while each Plaintiff owned 17.5 % of KWS & P/SFA, Inc. They collectively owned 70%. A fifth stockholder, not a party to this action, owned the remaining 30% interest in KWS & P/SFA, Inc.

On October 18, 1998, prior to the completion of the above merger, McKesson and HBO & Company ("HBOC") publicly announced that they had also agreed to a merger. On January 12, 1999, the McKesson/HBOC merger closed, and McKesson changed its name to McKesson HBOC, Inc. ("McKesson HBOC") [FN2] and HBOC became a wholly-owned subsidiary of the company.

> FN2. McKesson HBOC is a large pharmaceutical and medical-surgical supply management and health care information technology company.

On January 26, 1999, the Plaintiffs' businesses merged into wholly-owned subsidiaries of McKesson HBOC. Pursuant to the Merger Agreement, the Plaintiffs received a total of 998,336 McKesson HBOC shares plus 110,926 additional common stock shares, which were placed in escrow and reflected a stock value of $85.15 per share.

On April 28, 1999, three months after the Plaintiffs' merger closed, McKesson HBOC announced that there were irregularities in the accounting practices of HBOC, which were discovered after the McKesson HBOC merger. McKesson HBOC stated that it had improperly recognized revenue, and that it would have to restate its earnings. As a result of this disclosure, the McKesson HBOC stock plummeted to $32 per share.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

On July 14, 1999, McKesson HBOC announced that the write-offs would be larger than originally anticipated indicating they would total $327.4 million, consisting of $245.8 million for fiscal year ending March 31, 1999, and $48.4 million and $33.2 million, respectively, for fiscal years ending March 31, 1998 and March 31, 1997. The massive write-offs were attributed to revenue recognition of contingent sales, backdated contracts, unavailable products, non-Y2K compliant products, and subscription contracts and expense accruals.

The Plaintiffs brought suit against McKesson HBOC asserting that absent the accounting improprieties, the Plaintiffs would have received far more McKesson HBOC shares at closing in exchange for their businesses. The Plaintiffs also brought suit against several individuals: Defendant Mark A. Pulido ("Pulido"), who was President, CEO and director of McKesson and McKesson HBOC, Defendant Charles W. McCall ("McCall"), who was CEO of HBOC prior to the merger and Chairman of McKesson HBOC's Board when McKesson merged with HBOC, and Defendant Richard H. Hawkins ("Hawkins"), who was McKesson's Executive Vice President and CFO, (collectively, the "individual Defendants").[FN3]

> [FN3.] McCall was terminated in June 1999, and Pulido and Hawkins resigned in July 1999.

**\*2** In Count I, the Plaintiffs allege a breach of contract against McKesson HBOC based on representations, warranties, and obligations in the Merger Agreement. Specifically, the Plaintiffs allege that McKesson HBOC (1) misrepresented and failed to disclose material adverse facts concerning the financial results and accounting practices; (2) issued false and misleading financial and related statements in documents filed with the Securities and Exchange Commission ("SEC"); (3) failed to comply with federal securities laws and Generally Accepted Accounting Principles ("GAAP"); and (4) failed to advise the Plaintiffs, prior to the time their merger closed, of the material adverse changes in McKesson HBOC's finances. In Count II of the Complaint, the Plaintiffs allege that McKesson HBOC violated the implied covenant of good faith and fair dealing that accompanied the Merger Agreement. In Counts III and IV, the Plaintiffs assert that all the Defendants violated Section

11 and Section 12(a)(2) of the Securities Act of 1933 (the "Securities Act"). Lastly, in Count V, the Plaintiffs claim that the individual Defendants violated Section 15 of the Securities Act.

### DISCUSSION

*I. Plaintiffs' Motion for Partial Summary Judgment Defendant McKesson HBOC's Motion to Dismiss*

While the Plaintiffs and McKesson HBOC respectively move for partial summary judgment and to dismiss, the Court will address these motions together under this section. Summary judgment will be granted when, in viewing the record in the light most favorable to the non-moving party, the movant has shown that no genuine issues of material fact exist, and that the movant is entitled to judgment as a matter of law.[FN4] When a motion for summary judgment is supported by a showing that there are no material issues of fact, the burden shifts to a nonmoving party to demonstrate that there are material issues of fact.[FN5]

> [FN4.] Super. Ct. Civ. R. 56(c).

> [FN5.] *Moore v. Sizemore,* 405 A.2d 679 (1979).

For a motion to dismiss for failure to state a claim upon which relief can be granted, all allegations in the complaint must be accepted as true.[FN6] In addition, such a motion will not be granted if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.[FN7]

> [FN6.] *Spence v. Funk,* 396 A.2d 967 (1978).

> [FN7.] *Id.*

### A. Count I

In Count I, the Plaintiffs assert that McKesson HBOC breached express warranties and representations made in the Merger Agreement. Specifically, the Plaintiffs rely upon Paragraph 4.4 of the Merger Agreement, which stated:
*SEC Documents.* Buyer has filed all reports, proxy statements, forms and other documents required to be filed by it with the Securities and Exchange Commission (the "SEC")

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 8

since March 31, 1996 (the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements filed by Buyer since March 31, 1996 being hereinafter referred to as the "Buyer SEC Documents"). As of their respective dates, and giving effect to any amendments thereto, (a) the Buyer SEC Documents complied in all material respects with the applicable requirements of the federal securities Laws, including the applicable rules and regulations of the SEC promulgated thereunder, and (b) none of the Buyer SEC Documents when filed with the SEC contained any untrue statement of a material fact or omitted to state any material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.[FN8]

FN8. Merger Agreement at ¶ 4.4.

*3 The Plaintiffs argue that McKesson HBOC, who was McKesson's successor-in-interest, included false and misleading information in their SEC filings and failed to comply with the federal securities laws. The Plaintiffs also rely upon Paragraph 4.5 of the Merger Agreement which stated: *Financial Statements.* The financial statements of Buyer (including any notes and schedules thereto) included in the Buyer SEC Documents (the "Buyer Financial Statements") at the time filed or as subsequently amended by any Buyer SEC Document filed prior to the date hereof (a) complied as to form in all material respects with all applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, (b) were prepared in accordance with generally accepted accounting principles applied on a consistent basis (except in the case of unaudited statements, as permitted by Form 10-Q as filed with the SEC under the Exchange Act) during the periods involved (except as may be indicated in the related notes and schedules thereto) and (c) fairly present, in all material respects, the consolidated financial position of Buyer and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to annual year-end audit adjustments which are not, individually or in the aggregate, material).[FN9]

FN9. Merger Agreement at ¶ 4.5.

The Plaintiffs assert that McKesson HBOC breached these warranties because its financial statements were inaccurately made, according to the SEC rules and regulations, and to GAAP, and were admittedly false. As such, the Plaintiffs move for partial summary judgment with respect to this Count.

McKesson HBOC asserts that there were no breaches under Paragraphs 4.4 and 4.5 because those paragraphs only apply to SEC filings and financial statements made by McKesson, not HBOC or McKesson HBOC. As such, the initial question is whether there was a breach of Paragraphs 4.4 and/or 4.5 of the Merger Agreement.

In analyzing Count I's legal sufficiency, it is important first not to lose sight that, while the underlying claims regarding misrepresentations and false statements lie in the complexities of securities and corporate law, the dispute alleged in this Count is a contractual one. Unfortunately, there is a tendency to merge these legal concepts, which causes confusion, and which complicates them far beyond the parties' intent to this contract. In its simplest terms, the Plaintiffs bargained for a full and accurate financial disclosure by the Defendant so that they could fairly evaluate the appropriateness of the agreed upon sale of their business, and to obtain the appropriate number of shares of McKesson to fully compensate them at the agreed upon price. The Defendants were expected to be candid, and to provide a full accounting of the agreed upon documentation, which in turn would result in their acquisition of the Plaintiffs' businesses. Obviously these contractual terms have been significantly distorted by the false documents supplied by HBOC and subsequently used by McKesson to file financial statements. While the actions of HBOC are critical to understanding what has occurred, it is important to recognize that the contract in dispute in this litigation only involves McKesson or McKesson HBOC, and it is the conduct of those companies as it relates to the Plaintiffs that will determine whether a breach of contract has occurred. In this vein, the Court makes the following initial general findings.

*4 [1] First, the Court rejects McKesson HBOC's argument that since there is no assertion that McKesson alone filed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



false or materially misleading documents, and they are the named parties to the contract, that the contract dispute of Count I should be dismissed. The Court will simply not allow McKesson to avoid liability by hiding behind a change in their name. The Plaintiffs' bargain under the Merger Agreement was either with McKesson or McKesson HBOC, and the actions of either entity can form the basis of a breach of the contract.

[2] Secondly, the Court will also not allow McKesson to avoid liability simply because they assert in the filings complained of by the Plaintiffs that they were not warranting the financial information provided by HBOC. While such action can be considered by a jury in assessing the knowledge of McKesson and McKesson HBOC officials, it does not provide an automatic immunity from liability.

[3] Third, the Court also rejects the Plaintiffs suggestion that simply because the documentation provided by HBOC and utilized by McKesson was subsequently found to be false, that they have established their contractual claim found in Count I. As stated before, the contract dispute is between the Plaintiffs and McKesson or McKesson HBOC, and it is the actions and conduct of those entities that the Plaintiffs must establish violated the terms and conditions of the agreement. In other words, it is not at this junction an illogical assumption to surmise that McKesson may have been equally duped into believing the accuracy of the information provided by HBOC, and it will not be sufficient for the Plaintiffs to merely show that the documents were subsequently found to be false.

[4] With these underlying principles as its guide, the Court finds there remains a dispute, unresolvable by either parties' motion, as to what may have been reasonably known by McKesson, or McKesson HBOC, prior to the closure of Plaintiffs merger with McKesson, that would perhaps constitute a breach of the agreement. As such, the Court will provide the Plaintiffs an opportunity to fully explore these areas in discovery. It is clear that on November 27, 1998, a Joint Proxy Statement/Prospectus was issued by McKesson regarding its merger with HBOC. This Joint Proxy Statement/ Prospectus provided the summary financial data of McKesson and HBOC, separately, and the unaudited pro forma combined condensed consolidated financial data of

McKesson and HBOC, jointly, for the years ending March 31, 1998 and March 31, 1997, as well as for the six months ending September 30, 1998. This Joint Proxy Statement/ Prospectus was annexed to the Merger Agreement between McKesson and HBOC dated October 17, 1998, which included Section 3.1(f), entitled "Information Supplied," and stated in part:

The Form S-4 and the Joint Proxy Statement will comply as to form in all material respects with the requirements of the Exchange Act and the rules and regulations thereunder, except that no representation or warranty is made by McKesson with respect to statements made or incorporated by reference therein based on information supplied by HBO specifically for inclusion or incorporation by reference in the Form S-4 or the Joint Proxy Statement.

*5 In the Joint Proxy Statement/Prospectus, there were letters to the shareholders of both McKesson and HBOC. These letters encouraged the shareholders to read the Joint Proxy Statement/Prospectus and the McKesson/HBOC merger agreement.

On January 14, 1999, McKesson HBOC filed a Form 8-K with the SEC, which described the consideration McKesson paid for HBOC and indicated that HBOC had become a wholly-owned subsidiary of the company. It further stated that "[t]he financial statements required to be filed were previously reported in McKesson's Registration Statement on Form S-4 dated November 13, 1998, as amended by Amendment No. 1 thereto dated November 27, 1998 (No. 333-67299), which is incorporated herein by reference." FN10 Furthermore, "[t]he unaudited combined condensed pro forma financial statements of McKesson and HBOC were previously reported in McKesson's Registration Statement on Form S-4 dated November 13, 1998, as amended by Amendment No. 1 thereto dated November 27, 1998 (No. 333-67299), which is incorporated herein by reference." FN11

> FN10. McKesson HBOC's Form 8-K dated January 14, 1999 at Item 7(a).

> FN11. McKesson HBOC's Form 8-K dated January 14, 1999 at Item 7(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                    Page 10
Not Reported in A.2d, 2002 WL 88919 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

These actions occurred prior to the January 26, 1999 closing with the Plaintiff and reasonably call into question the knowledge of McKesson or McKesson HBOC officials as to the accuracy of the information provided by HBOC. If McKesson or McKesson HBOC knew, or had any reason to believe that the information that they or HBOC were disclosing regarding their merger was false, misleading or materially omitted critical information, they had an obligation under the contract with the Plaintiffs to make a disclosure prior to the January 26, 1999 closing. In essence, this is the crux of the dispute now between the parties, and it does not appear from the arguments made in the briefing of these motions to have been adequately explored by the parties at this juncture in the litigation. Since factual issues remain in dispute, it would be inappropriate to grant the Plaintiffs' motion for partial summary judgment at this time.

Having addressed the fundamental arguments of Count I, the Court will briefly discuss the miscellaneous legal arguments that remain as to this count. First, McKesson HBOC argues that the Joint Proxy Statement/Prospectus was not included as a "Buyer SEC Document" defined in Paragraph 4.4 of the Merger Agreement. Under Paragraph 4.4, "Buyer SEC Documents" were defined as "the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements filed by Buyer since March 31, 1996." While the Joint Proxy Statement/ Prospectus dated November 27, 1998 was jointly filed by McKesson and HBOC, the Court considers this document to be included in the Buyer SEC Documents mentioned in Paragraph 4.4 of the Merger Agreement. It fits the definition provided in Paragraph 4.4 and was filed by McKesson HBOC, the legally remaining entity of McKesson.

[5] In addition, McKesson HBOC argues that the January 14, 1999 Form 8-K was not a Buyer SEC Document under Paragraphs 4.4 or 4.5 because it was filed after the Merger Agreement of December 17, 1998. The Court finds that the language in Paragraph 4.4 does not limit the inclusion of the January 14, 1999 Form 8-K as a Buyer SEC Document. Article 4 of the Merger Agreement preludes with the following *6 [i]n order to induce the Companies and the Shareholders to enter into this Agreement, Buyer and the Merger Subsidiaries, jointly and severally, hereby represent and warrant to

the Companies and the Shareholders as of the date hereof and as of the Closing Date as follows.

Paragraph 4.4 then provides in part:*SEC Documents.* Buyer has filed all reports, proxy statements, forms and other documents required to be filed by it with the Securities and Exchange Commission (the "SEC") since March 31, 1996 (the Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and Proxy Statements filed by Buyer since March 31, 1996 being hereinafter referred to as the "Buyer SEC Documents"). As of their respective dates, and giving effect to any amendments thereto,...

The language "[a]s of their respective dates" in no way precludes a Form 8-K dated January 14, 1999 and there is no other limiting language that is date specific except March 31, 1996. In addition, the prelude to Paragraph 4.4 warrants the time frame from December 17, 1998, "as of the date hereof" through the Closing Date, which was January 26, 1999.[FN12] Unless there is a clear specific limiting language in the Agreement, the Court will not exclude from consideration documents filed by the Defendant and referenced in the Merger Agreement. To do otherwise would give the Defendant the freedom to file documents knowingly containing false information after signing the agreement but before closing without any consequences. That obviously is not the intent of the parties nor will it be condoned by the Court. As such, the Plaintiffs are not precluded from using the Form 8-K as a Buyer SEC Document under Paragraph 4.4.

> FN12. The Closing Date is defined in 1.6 of the Merger Agreement.

However, the Court finds that the language of Paragraph 4.5 warrants a different result. It provides in part:
*Financial Statements.* The financial statements of Buyer (including any notes and schedules thereto) included in the Buyer SEC Documents (the "Buyer Financial Statements") at the time filed or as subsequently amended by any Buyer SEC Document filed prior to the date hereof ...

The Court finds that based on Paragraph 4.5's language, the Plaintiffs would be precluded from arguing that the financial statements, contained in the January 14, 1999 Form 8-K, fit

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 11

within the warranties of this paragraph. The limiting language of "filed prior to the date hereof" leads the Court to conclude that for some unexplained reason or by mere oversight the parties agreed to a different time standard in Paragraph 4.5 than they did in Paragraph 4.4. The use of this language, which differs from the prelude to Article 4, indicates that the parties agreed upon a more restrictive date for the financial statements within the Buyer SEC Documents. As such, to the extent that the Plaintiffs argue that McKesson HBOC violated Paragraph 4.5 the documentation relied upon by the Plaintiffs to support this assertion would had to have been filed prior to December 17, 1998.

*7 [6] McKesson HBOC relying upon the "bespeaks caution doctrine" also argues that the Joint Proxy Statement/Prospectus provides no basis for the Plaintiffs' breach of contract claim because it provides material that was forward-looking and thus did not purport to relate misstatements of fact, which could give rise to a breach of Paragraphs 4.4 and 4.5 of the Merger Agreement. The Third Circuit examined this doctrine in *In re Donald J. Trump Casino Securities Litigation-Taj Mahal Litigation.*[FN13] It is premised upon the idea that if sufficient, cautionary statements are included in a prospectus, any alleged misrepresentations and omissions contained in the prospectus, may be nonactionable.[FN14] There, the Court explained:

> FN13. 7 F.3d 357 (3rd Cir.1993).

> FN14. *Id.* at 364(stating "[a]s we see it, "bespeaks caution" is essentially shorthand for the well-established principle that a statement or omission must be considered in context, so that accompanying statements may render it immaterial as a matter of law.").

[W]e can state as a general matter that, when an offering document's forecasts, opinions or projections are accompanied by meaningful cautionary statements, the forward-looking statements will not form the basis for a securities fraud claim if those statements did not affect the "total mix" of information the document provided investors. In other words, cautionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law. The bespeaks caution doctrine is, as an analytical matter,

equally applicable to allegations of both affirmative misrepresentations and omissions concerning soft information. Whether the plaintiffs allege a document contains an affirmative prediction/opinion which is misleading or fails to include a forecast or prediction which failure is misleading, the cautionary statements included in the document may render the challenged predictive statements or opinions immaterial as a matter of law. Of course, a vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge.[FN15]

> FN15. *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d at 371-72.

In finding that the Plaintiffs failed to state an actionable claim, the Third Circuit reasoned that the prospectus truly "bespeaks caution" because, not only did the prospectus generally convey the riskiness of the investment, but its warnings and cautionary language directly addressed the substance of the statement the Plaintiffs challenged.[FN16]

> FN16. *Id.* at 372.

While the Court believes that the "bespeaks caution" doctrine is not necessarily limited to the alleged violations of federal securities laws, but, instead, may be applied to a breach of contract claim where the underlying misrepresentations relate to securities, it also finds that the "bespeaks caution" doctrine does not immunize the Joint Proxy Statement/Prospectus filed in this litigation from the breach of contract claim. The Court is persuaded by the Plaintiffs' argument that the alleged false and misleading information were not projections of future results, as the information required the restatement of revenue, concerned of the financial statements for the fiscal years ending March 31, 1997 and March 31, 1998 and the six month period ending September 30, 1998. At the time of the November 27, 1998 Joint Proxy Statement/Prospectus, the statements regarding the finances for those times were not futuristic or forward-looking. Moreover, the Third Circuit in *In re Donald J. Trump*



*Casino Sec. Litig., supra,* reasoned that the warnings and cautionary language was abundant, meaningful and tailored to directly address the substance of the statement the Plaintiffs challenged.[FN17] This was not the case here.

> FN17. 7 F.3d at 369 (holding that the prospectus at issue in that case, contained "an abundance of warnings and cautionary language, which bore directly on the prospective financial success of the Taj Mahal and the Partnerships ability to repay the bonds.").

**\*8 [7]** McKesson HBOC also argues that the claim regarding Paragraph 4.4 fails under the pre-existing duty rule.[FN18] They argue that this provision required McKesson to comply with the federal securities laws, which was already a pre-existing legal duty. As such, McKesson HBOC relying upon *Seidel v. Lee*[FN19] asserts that this claim should be dismissed.

> FN18. The pre-existing duty rule is a well-settled principle of law that states a contract cannot be based upon a duty which one is already legally obligated to perform. *See Seidel v. Lee*, 954 F.Supp. 810, 817 (D.Del.1996)(citing Restatement (Second) of Contracts § § 73, 80(2)(1979); Calamari and Perillo, The Law of Contracts § 49(b)(West 1987)).

> FN19. 954 F.Supp. 810 (D.Del.1996).

While recognizing the validity of the pre-existing duty rule, this Court, like the Delaware Supreme Court in *Rossdeutscher v. Viacom, Inc.,*[FN20] cannot reasonably construe the requirements of Paragraph 4.4 of the merger agreement as an attempt to seek enforcement of an agreement to comply with federal security laws. Clearly Paragraph 4.4(b) does not, and Paragraph 4.4(a) is a certification of the buyer that he has complied with those laws. The certification by the buyer is what is critical to the agreement and what is important to the Plaintiff's decision making process, not the requirement that he do so. As such, this rule is not applicable to the facts of this litigation.

> FN20. 768 A.2d 8 (Del.2001).

In making the findings as to Count I, the Court believes it has addressed all the issues raised by the Defendant in its motion to dismiss. The Court has rejected these arguments, and the motion to dismiss at this junction in the litigation is hereby denied.

The remaining issues, as to Count I, arise from the Plaintiffs' motion for partial summary judgment. The motion itself is not very helpful in focusing the issues for the Court to consider, since it simply states in a conclusory form that there is no dispute of the existence of McKesson's representations and warranties and the breach by the company, so summary judgment is warranted. The Plaintiffs filed no opening brief in support of their motion, but simply allowed the Defendant in essence to create the legal issues relating to summary judgment in their brief, and then responded in a reply brief. The Court has previously ruled that the factual issues of the case are not as straightforward and uncontroverted as claimed by the Plaintiffs, and that summary judgment is not warranted. Having made this finding it is at least arguable at this point in time that the remaining issues raised by the Defendant in its briefs opposing summary judgment are mooted and should not be addressed. However, in spite of this, to avoid further delay, this Court will address those issues it believes are ripe for decision.

**[8]** According to sound Delaware law, a plaintiff must establish reliance as a prerequisite for a breach of warranty claim.[FN21] In *Bleacher v. Bristol-Myers Company,*[FN22] this Court held that "[t]he law is clear that in order for a defendant to be responsible for a breach of warranty, plaintiff must have known about the warranty and have relied upon it."[FN23] As further support for this holding, a federal district court in Illinois, interpreting Delaware law in a breach of corporate assets purchase contract, recently re-examined this issue, and held that the plaintiff in that action had to show reliance to prevail on its breach of warranty claim as a matter of Delaware law.[FN24] To support its ruling, the *Middleby* court examined Delaware precedent on the reliance in breach of warranty claims, and noted that

> FN21. *Bleacher v. Bristol-Myers Company,* 163 A.2d 526, 528 (1960); *Loper v. Lingo,* 97 A. 585 (Del.Super.1916); 1 Williston on Sales (Rev. Ed.), § 206.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                    Page 13
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

FN22. 163 A.2d 526 (Del.Super.1960).

FN23. *Bleacher* 163 A.2d at 528.

FN24. The *Middleby Corporation v. Hussmann Corporation,* No. 90C 2744, 1992 WL 220922, at *6 (N.D.Ill. Aug.27, 1992).

**\*9** [a]lthough Delaware case law is not replete with discussions of whether reliance is an essential element of a breach of warranty claim, several old-but apparently still viable-decisions answer the question in the affirmative. *See Harvard Industries, Inc. v. Wendel,* [Del. Ch.], 178 A.2d 486, 496 (1962) (requiring reliance but somewhat unclear whether referring to fraud or warranty claim); *Bleacher v. Bristol-Myers Co.,* [Del.Super.], 163 A.2d 526, 528 (1960)("The law is clear that in order for a defendant to be responsible for a breach of warranty, plaintiff must have known about the warranty and have relied upon it"); *Loper v. Lingo,* [Del.Super.], 97 A. 585, 586 (1916)(charging the jury that to find liability for breach of warranty in a horse sale, the jury must find "that at the time of the sale the horse was warranted by the defendant to be sound, and that the plaintiff relied upon such warranty").FN25

FN25. *Id.*

In the case at bar then, the Plaintiffs' reliance upon *Mowbray v. Waste Management Holdings, Inc.*FN26 is erroneous. While the *Mowbray* court found that reliance was not an essential element in a breach of warranty claim, that Massachusetts court was interpreting Illinois law, and examined the issue under Illinois law.FN27 As such, the *Mowbray* holding, in light of the clear Delaware case law, which requires reliance for a breach of warranty claim, is inapplicable.

FN26. 45 F.Supp.2d 132 (D.Mass.1999).

FN27. *Id.* at 135.

[9] McKesson HBOC asserts that the Plaintiffs and their expert advisors conducted their own independent investigation of McKesson HBOC's financial stability by retaining Bear Stearns & Company as their financial advisor. They further assert that included in the Plaintiff's Bear Stearns financial

team were senior members of that organization that had also worked with McKesson in connection with its merger with HBOC. While this Court believes that such advice and independent oversight was appropriate and important because of the financial stakes involved in the Plaintiffs' merger plans, it does raise factual issues as to what extent the Plaintiffs relied upon the documentation filed by McKesson HBOC, which formed the basis of the Plaintiffs' Complaint in this litigation. This will be an area that the parties will have to explore further in discovery as the litigation moves forward.

The final issue raised in Defendant's answering brief to Count I is the materiality of the breach. First, it appears to this Court that the parties agree that materiality is an issue of fact, not normally subject to a summary judgment proceeding. As such, it is unclear whether there remains a dispute as to this issue. Second, the Court does discuss materiality later in the opinion in the context of a security violation and finds the same reasoning and issues discussed there are applicable in a contractual context.FN28 However, in fairness to the parties, this Court does not believe that the record has been sufficiently developed on this issue for this Court to rule on its applicability. If at a later point in the litigation the parties want to pursue this issue, they are free to file an appropriate motion, and follow normal briefing patterns to insure that this Court fully appreciates the positions of each party. At the moment, materiality will remain a factual issue for the jury to decide.

FN28. See this Opinion at 35-36.

**\*10** In conclusion, as to the assertions made as to Count I, both the Defendant's motion to dismiss and the Plaintiffs' motion for partial summary judgment are hereby denied.

### B. Count II

McKesson HBOC asserts that Count II, which alleges a breach of an implied duty of good faith and fair dealing, fails to state a claim because claims for breach of this implied duty that mirror breach of contract claims are not permitted. As such, McKesson HBOC moves to dismiss this Count.

[10][11][12][13][14][15] Every contract in Delaware has an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

obligation of good faith and fair dealing, which is implied into the agreement by law.[FN29] As such, a party to a contract has made an implied covenant to act reasonably to fulfill the intent of the parties to the agreement.[FN30] This implied covenant was created to promote the spirit of the agreement and to protect against one side using underhanded tactics to deny the other side the fruits of the parties' bargain.[FN31] In such a claim, the Court must extrapolate the spirit of the agreement through the express terms and determine the terms that the parties would have bargained for to govern the dispute had they foreseen the circumstances under which their dispute arose.[FN32] But the Court will not readily imply a contractual obligation where the contract expressly addresses the subject of the alleged wrong, yet does not provide for the obligation that is claimed to arise by implication.[FN33] The implied covenant cannot contravene the parties' express agreement and cannot be used to forge a new agreement beyond the scope of the written contract.[FN34] To state a claim for breach of an implied covenant of good faith and fair dealing, the Plaintiffs must identify a specific implied contractual obligation.[FN35]

> FN29. *Chamison v. Healthtrust, Inc.,* 735 A.2d 912, 920 (Del.Ch.1999).
>
> FN30. *Id.*
>
> FN31. *Id.*
>
> FN32. *Id.* at 921.
>
> FN33. *Moore Business Forms, Inc. v. Cordant Holdings Corp.,* No. 13911, 1995 WL 662685, at *8 (Del.Ch. Nov.2, 1995)(quoting *Abex Inc. v. Koll Real Estate Group Inc.,* No. 13462, 1994 WL 728827, at *12 (Del.Ch. Dec.22, 1994).
>
> FN34. *Chamison,* 735 A.2d at 921.
>
> FN35. *Moore Business Forms* at *12. See also Painewebber R & D Partners, L.P. v. Centocor Inc.,* No. 96C-04-194, 1998 WL 109818 (Del.Super.Feb.13, 1998).

[16] Here the Plaintiffs argue that McKesson HBOC was obligated to accurately and timely disclose their financial

position, practices, and results so that the value of McKesson HBOC's shares, and, consequently, the full consideration to which the Plaintiffs were actually entitled, could be determined fairly and in good faith. The Plaintiffs argue that McKesson HBOC violated the implied covenant of good faith and fair dealing when it misrepresented, omitted and failed to disclose material facts concerning McKesson HBOC's financial condition and artificially inflated their stock price during the January 1999 valuation period. The Plaintiffs explain that since their consideration was dependent upon the integrity of the market price for McKesson common stock during the valuation period, the Defendant had an implied covenant not to distort the value of the stock by misleading or manipulating the market place.

The Court finds that the Complaint states a legally sufficient claim in Count II under the implied covenant of good faith and fair dealing theory. It appears that the Plaintiffs' implied covenant argument originates from Paragraphs 4.4 and 4.5 of the Merger Agreement, which sets forth the information that would be relied upon during the merger period to insure a fair and accurate valuation of the Defendant's stock as it related to the purchase price of the Plaintiffs' business. Implied in the contractual terms is the understanding that the Defendant would refrain from distorting its financial condition so as to not adversely affect the value of its stock which was to be used as the linchpin to the Plaintiffs' bargain. This implied covenant insured that there would be no attempt by the Defendant to adversely influence the market to artificially inflate the price of their stock thereby diminishing the number of shares the Plaintiffs were entitled to receive under the agreement. The absence of such an implied obligation would violate the spirit of the Merger Agreement and would result in the Plaintiff not receiving the full benefit of its bargain. As such, the Court finds this assertion has been adequately plead in the Complaint, and there is a legal basis for this claim to proceed forward. As a result, the Defendant's motion to dismiss Count II is denied.

C. Counts III and IV

*11 [17] McKesson HBOC argues that the Plaintiffs' claims against it under Counts III and IV concerning violations of Sections 11 and 12, respectively, of the Securities Act must fail because the issuance of stock to the Plaintiffs was not



Not Reported in A.2d                                           Page 15
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

made pursuant to a public offering. Conversely, the Plaintiffs argue that this was a public offering and that they are entitled to summary judgment. As such, the first question is whether Sections 11 and 12 of the Securities Act are applicable, and more specifically, whether this was a public or a private offering.

It is undisputed by the parties that Sections 11 <u>FN36</u> and 12 <u>FN37</u> of the Securities Act only apply to public offerings.<u>FN38</u> An offering is considered private only if limited to investors who have no need for the protection provided by registration.<u>FN39</u> The reason for the registration statement is to protect investors by promoting full disclosure of information thought necessary to make informed investment decisions.<u>FN40</u> It is clear that when there has been no registration of the stock and there is a dispute as to the private nature of the offering, the focus of the inquiry is on the need of the offerees for the protections afforded by registration and whether they would have access to the kind of information which registration would disclose. <u>FN41</u> In determining whether an offering was appropriately private, courts must make a fact-intensive inquiry into the following factors: (1) the number of offerees; (2) the sophistication of the offerees, including their access to the type of information that would be contained in a registration statement, and (3) the manner of the offering.<u>FN42</u> However, while this logical inquiry is appealing to the Court, its applicability to publicly registered stock is not as clear.<u>FN43</u>

> FN36. Section 11 of the Securities Act, <u>15 U.S.C. § 77k(a)(2)</u>, states in part:
> (a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue-

> (2) every person who was a director of (or person performing similar functions) or partner in, the issuer at the time of the filing of the part of the regis-

tration statement with respect to which his liability is asserted...

> FN37. Section 12 of the Securities Act, <u>15 U.S.C. § 77l(a)(2)</u>, states in part:
> (a) Any person who-
> (2) offers or sells a security...by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable...to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon...

> FN38. See Van de Walle v. Salomon Bros., Inc., No. 9894, 1997 LEXIS 140, at *9(Del. Ch. Sept. 30, 1997)(citing <u>Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 582, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995))</u>.

> FN39. <u>Securities and Exchange Comm'n v. Ralston Purina Co., 346 U.S. 119, 125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953)</u>.

> FN40. <u>Id.</u> at 124.

> FN41. <u>Id.</u> at 127.

> FN42. <u>United States v. Arutunoff, 1 F.3d 1112, 1118 (10th Cir.1993)</u>.

> FN43. See <u>Flake v. Hoskins, 55 F.Supp.2d 1196, 1229, n. 21 (D.Kan.1999)</u>.

McKesson HBOC argues that the Court should consider the McKesson stock issue pursuant to the Merger Agreement to



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
(Cite as: Not Reported in A.2d)

Page 16

be a private offering because it involved a small number of sophisticated offerees, five individuals. It argues that the sophistication is indicated by the Accredited Investor Certificates that were signed by the Plaintiffs. The "Accredited Investor Certificate" stated:

The undersigned represents and warrants that she has completely and accurately filled out the Accredited Investor Information questionnaire attached as Exhibit A. The undersigned further represents and warrants that she is an "accredited investor" within the meaning of Rule 501(a) as promulgated under the Securities Act of 1933, as amended.FN44

> FN44. The information in the questionnaire provided that each individual's net worth was in excess of $1,000,000, that each individual's income for each of the years 1997 and 1998 and anticipated 1999 was in excess of $200,000, and that each individual's joint income for the years 1997 and 1998 and anticipated 1999, was in excess of $300,000. Each of the Plaintiffs answered the questions in the affirmative, with the exception of Brian Dillon, who is not a Plaintiff.

Conversely, the Plaintiffs argue that this was not an unregistered private offering of stock, but rather, a publicly registered shelf offering and that because their stock was issued pursuant to a Registration Statement, Sections 11 and 12(a)(2) clearly apply to this case.

McKesson publicly registered all of the shares it issued to the Plaintiffs in its June 24, 1998 Amendment No. 1 to Form S-4 Registration Statement, which contained a Prospectus. The Prospectus related to 5,000,000 shares of common stock of McKesson in a "shelf offering" pursuant to Rule 415 of the Securities Act, 17 C.F.R. § 230.415.FN45 The Prospectus stated:

> FN45. 17 C.F.R. § 230.415, entitled "Delayed or continuous offering and sale of securities," provides in part:
> (a) Securities may be registered for an offering to be made on a continuous or delayed basis in the future, Provided, That-

(vii) Securities which are to be issued in connection with business combination transactions;

*12 This Prospectus relates to 5,000,000 shares [ ] of common stock, par value $0.01 per share [ ], of McKesson Corporation [ ] which may be offered and issued from time to time in connection with one or more business combinations with the Company or its subsidiaries. The Shares may be issued from time to time in connection with (I) mergers, consolidations, recapitalizations or similar plans of acquisition;...

The Company anticipates that the specific terms of each such business combination in which Shares will be issued will be the result of negotiations with the owners and controlling persons of the businesses, assets, securities or other interests involved in the business combination....

In a "shelf registration," the registrant can register a large number of securities and offer the securities to the public "on a continuous or delayed basis." FN46 In a shelf registration, the registration statement is filed but the securities are put on the shelf until the manner and date of the offerings are determined.FN47

> FN46. *Finkel v. Stratton Corp.*, 962 F.2d 169, 174 (2d. Cir.1992); 17 C.F.R. § 230.415.

> FN47. Thomas L. Hazen, *The Law of Securities Regulation* § 3.8, at 79 (1985).

In the Merger Agreement, 7.2(e) provides that [t]he shares of McKesson Common Stock to be issued to the Shareholders in the Mergers shall be covered by a Registration Statement, which Registration Statement shall be effective under the Securities Act and applicable state blue sky Laws.

In addition, 6.2(b) states thatBuyer shall use its best efforts to cause the shares of McKesson Common Stock issuable pursuant to the Mergers to be covered by Buyer's Registration Statement on Form S-4 (as amended) dated June 24, 1998 or another effective registration statement under the Securities Act and applicable blue sky laws ... and to be approved for listing on the NYSE and the PE, subject to official notice of issuance, prior to the Closing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 17

What makes this issue difficult is that the factors utilized to determine whether the private offering exemption to public registration is appropriate are uniquely applicable to the facts of this case. Here, there is a very small group of sophisticated investors who have access guaranteed by their Merger Agreement of significant financial information, and the stock offering is for the limited purpose of acquiring the Plaintiffs' businesses. If there was no registration of the stock, it appears the Defendant would be able to meet their burden of establishing a private transaction. However, neither party has been able to cite to the Court any authority where a stock offering was publicly registered, and then is subsequently determined by the Court to be a private offering. However, the lack of case law on this issue is not surprising because there is no logical reason once the registration has occurred, and the information publicly disclosed, to make such an argument unless one is attempting to avoid the liabilities imposed by Sections 11 and 12 once a transaction has become problematic. It was McKesson who made the decision to create a publicly registered shelf offering with the express purpose of acquiring other business ventures. Having made that decision, this Court will not allow them to legally reverse what at the time was a rational business decision simply because they now find themselves in a changed economic and legal position. The filing of the registration statement made this a public offering. As such, the Court finds that stock issued in the transaction between McKesson and McKesson HBOC and the Plaintiffs was a public offering and the claims under Sections 11 and 12 of the Securities Act remain viable.[FN48] Further, because of this ruling, the Court finds the arguments made by the Plaintiffs in their motion to strike exhibit A of McKesson HBOC's opening brief have become moot and that motion is thus denied.

> FN48. The Court finds support for its position from both the present and past Chancellors of the Delaware Chancery Court in decisions considering the required elements of a Section 11 claim. Chancellor Allen in the case of _Bernstein v. Vestron, Inc._, No.1986 WL 3138, at *4 (Del. Ch. Mar. 11, 1986) found that a Section 11 claim required the Plaintiff to acquire a "registered security" and Chancellor Chandler addressing a similar issue in

_Glaser v. Norris,_ found that the Plaintiff must have purchased under Section 11 "a security issued pursuant to a registration statement."

**\*13** [18] Although the Court finds that the Sections 11 and 12 claims are viable, McKesson HBOC further asserts that the misstatements in the pro forma financial information contained in the Joint Proxy Statement/Prospectus and the Form 8-K were not actionable because they were nonmaterial, forward-looking statements. Specifically, McKesson HBOC argues that the Joint Proxy Statement/Prospectus and the Form 8-K are immunized under SEC Rule 175, 17 C.F.R. § 230.175, the "safe harbor" rule. Rule 175 provides in part:

(a) A statement within the coverage of paragraph (b) of this section which is made by or on behalf of an issuer or by an outside reviewer retained by the issuer shall be deemed not to be a fraudulent statement (as defined in paragraph (d) of this section), unless it is shown that such statement was made or reaffirmed without a reasonable basis or was disclosed other than in good faith.

(c) For the purposes of this rule, the term "forward-looking statement" shall mean and shall be limited to:

(1) A statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items;

(2) A statement of management's plans and objectives for future operations;

(3) A statement of future economic performance contained in management's discussion and analysis of financial condition and results of operations included pursuant to Item 303 of Regulation S-K (§ 229.303 of this chapter) or Item 5 of Form 20-F; or

(4) Disclosed statements of the assumptions underlying or relating to any of the statements described in paragraphs (c)(1), (2) or (3) of this section.

(d) For the purposes of this rule the term "fraudulent statement" shall mean a statement which is an untrue statement of a material fact, a statement false or misleading with respect to any material fact, an omission to state a material fact necessary to make a statement not misleading, or which constitutes the employment of a manipulative, deceptive, or fraudulent device, contrivance, scheme, transaction, act,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                              Page 18
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

practice, course of business, or an artifice to defraud, as those terms are used in the Securities Act of 1933 or the rules or regulations promulgated thereunder.<sup>FN49</sup>

FN49. 17 C.F.R. § 230.175.

The purpose of the safe harbor protection is to encourage the disclosure of projections.<sup>FN50</sup> Rule 175 minimizes the disincentives on corporate disclosure created by the securities fraud laws so that investors may have information directly from the companies themselves about how they believe their economic performance will be.<sup>FN51</sup>

FN50. *Katz v. Household Int'l, Inc.*, 897 F.Supp. 1106 (D.Ill.1995).

FN51. *Id.* at 1112.

However, as ruled earlier in this opinion, the Court does not find that the documentation filed by McKesson with regard to the proposed merger with HBOC were forward-looking statements. They related to financial statements for a period of time prior to the date of the filing and were not projections or statements of future economic performance. While SEC Rule 175 has a specific definition for forward-looking statements, the documentation filed by McKesson also fails to meet the terms of that definition. As such, the safe harbor protection found in this Rule is not applicable to the facts of this case.

**\*14** [19] Because the Court found that the Section 11 claim is viable against McKesson HBOC, the Court must now determine whether the Plaintiffs are entitled to summary judgment under Count III of the Complaint. The Plaintiffs argue that under Section 11(a) of the Securities Act, the issuer is liable when a Registration Statement contains a material misstatement or omission. Under Count III, the Plaintiffs assert, *inter alia,* that because McKesson HBOC admitted that reported financial results were materially false and omitted material facts necessary to make the statements not misleading, McKesson HBOC was strictly liable for its misstatements and omissions under Section 11 of the Securities Act. They further argue that McKesson's Registration Statement incorporated McKesson's false SEC filings, including Amendment No.1 to the Company's Form S-4 Registration

Statement containing the Joint Proxy Statement/Prospectus for the HBOC transaction filed with the SEC November 27, 1998 and Form 8-K filed with the SEC January 14, 1999.

McKesson HBOC counters that summary judgment should be denied because the Plaintiffs cannot prove damages under Section 11(e) and that summary judgment is inappropriate at this juncture since, under Section 11(a), an alleged misstatement must be material, and materiality creates questions for the fact finder.

The elements of a Section 11 claim require the Plaintiffs to establish (1) that they acquired a registered security and (2) that any part of the registration statement relating to such security contained an untrue statement of a material fact or material omission.<sup>FN52</sup> While scienter is not required, the false statement or omission must be shown to have been or would have been material to a decision to purchase the security or not. The Court has previously ruled that the securities obtained by the Plaintiff were publicly filed and registered and thus it is clear that the initial requirement of a Section 11 claim has been established. It also cannot be reasonably disputed that the registration statement issued by McKesson/McKesson HBOC contained omissions which subsequently had to be corrected by the Defendant. Thus the resolution of this motion centers on whether there are undisputed facts to establish that the McKesson/McKesson HBOC statements were material to the Plaintiffs' decision to proceed with the merger and obtain the stock. There is a natural tendency to believe that the obvious answer to this question is "yes" because of the dramatic drop in the value of the stock once the discrepancies were disclosed. However, this tendency is flawed because it is based on the benefit of hindsight and knowledge of what effect the disclosure had on the value of the stock. The critical inquiry is not whether one would do the transaction now, but whether at the time of the merger the omitted information or false representations were material to the decision to acquire these securities and proceed with the merger. The Court believes the present record is insufficient to make such a finding. At a minimum, there remains a dispute between the parties as to the significance of this information to the merger decision that will need to be flushed out during discovery. While the Court acknowledges that under the appropri-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



ate circumstances the issue of materiality, as it relates to alleged misrepresentations or omissions from a registration statement, can become a question of law for the Court to decide, it is generally an issue of fact not suited for disposition by summary judgment.[FN53] As a result, the Plaintiffs' motion for partial summary judgment as to this Count is denied.

> FN52. *Glaser v. Norris*, No. 9538, 1989 WL 79875, at*3, (Del.Ch. July 13, 1989); *Bernstein v. Vestron, Inc.*, 1986 WL 3138, at *4 (Del.Ch. Mar.11, 1986).

> FN53. *Branson v. Exide Electronics Corporation*, 645 A.2d 568 (1994).

**\*15** The Court believes that the final argument made by the Defendant relating to damages has been mooted by the above decision denying the Plaintiffs' motion for partial summary judgment. However, the Court views the issue of damages to be separate and distinct from whether a prima facie case of a Section 11 violation has occurred. Once one establishes such a violation, the issue of whether the plaintiffs have suffered damages and are entitled to an award under Subsection (e) of Section 11 is an issue for the jury to decide with appropriate instructions from the Court as to the law in this area. The Court finds it is not an area appropriately considered in a summary judgment motion.

### III. Defendant Mark A. Pulido's Motion to Dismiss Defendant Charles W. McCall's Motion to Dismiss Defendant Richard H. Hawkins's Motion to Dismiss

#### A. Lack of Personal Jurisdiction

The Plaintiffs assert in Counts III, IV, and V, *inter alia*, that the individual Defendants Pulido, McCall, and Hawkins violated Sections 11, 12(a)(2), and 15 of the Securities Act. Defendants Pulido, McCall, and Hawkins individually have moved to dismiss these claims pursuant to Superior Court Civil Rule 12(b)(2) and 12(b)(6), in essence for lack of personal jurisdiction, and failure to state a claim upon which relief can be granted. Their motions vary based on their individual involvement and the Plaintiffs' personal jurisdiction theories, but Pulido, McCall, and Hawkins, all primarily as-

sert that the Court lacks personal jurisdiction under 10 *Del. C.* § 3114, 10 *Del. C.* § 3104, 15 U.S.C. § 77v, and under the "Consent to Jurisdiction" provision of the Merger Agreement. Before proceeding to the arguments, it is important to generally set forth the positions held by the individual Defendants as they relate to this litigation.

Pulido, a California resident, was Chief Executive Officer, and Director of McKesson and McKesson HBOC. Pulido signed the Registration Statement pursuant to which Plaintiffs' McKesson HBOC shares were issued. In addition, Pulido signed Amendment No. 1 to the November 27, 1998 Form S-4 Registration Statement, which contained the Joint Proxy Statement/Prospectus, the October 17, 1998 merger agreement between McKesson and HBOC, and other SEC filings and related documents, which included documents pertaining to the McKesson HBOC merger.

McCall, a Florida resident, was Chief Executive Officer of HBOC prior to the McKesson HBOC merger, and on January 12, 1999, became Chairman of McKesson HBOC's Board of Directors. On June 21, 1999, McCall was dismissed from his position as Chairman of the Board, but continues to be a director of McKesson HBOC.[FN54] Hawkins, a California resident, was Executive Vice President and Chief Financial Officer of McKesson and McKesson HBOC.

> FN54. McCall affidavit at 2.

On a motion to dismiss for lack of personal jurisdiction, pursuant to Rule 12(b)(2), the plaintiff is obligated to establish a prima facie case, that personal jurisdiction is sound.[FN55] This Court will first consider whether the Plaintiffs have established sufficient service under the provisions of Title 10 of the Delaware Code, and then will address the remaining jurisdictional claims.

> FN55. *In re USACafes*, 600 A.2d 43, 47 (Del.Ch.1991).

#### 1. 10 *Del. C.* § 3114

**\*16** [20] Pulido, a California resident, and McCall, a Florida resident,[FN56] were both served pursuant to 10 *Del. C.* § 3114, and assert that this Court does not have personal juris-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                 Page 20
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

diction over them, pursuant to this statute. <u>Section 3114(a)</u> provides in part:

> FN56. Hawkins was served under <u>10 *Del. C.* § 3104</u>.

Every nonresident of this State who ... accepts election or appointment as a director ... of a corporation organized under the laws of this State ... shall, by such acceptance or by such service, be deemed thereby to have consented to the appointment of the registered agent of such corporation ... as an agent upon whom service of process may be made in all civil actions or proceedings brought in this State, by or on behalf of, or against such corporation, in which such director ... is a necessary or proper party, or in any action or proceeding against such director ... for violation of a duty in such capacity, whether or not the person continues to serve as such director... at the time suit is commenced.<sup>FN57</sup>

> FN57. 10 *Del. C.* § 3114(a).

The Plaintiffs contend that the individual Defendants availed themselves of the privilege of being directors of a Delaware Corporation, received the protection of Delaware law, and therefore, it is reasonable for them to expect to be held accountable in a Delaware court. This Court however, is bound by the holdings of prior precedent, and in *Pestolite Inc. v. Cordura Corporation,* this Court thoroughly examined and discussed the legislative intent of <u>10 *Del. C.* § 3114</u>. The *Pestolite* court noted that <u>§ 3114</u> was the legislative response to *Schaffer v. Heitner,*<sup>FN58</sup> and was designed to protect Delaware's "substantial interest in defining, regulating, and enforcing the fiduciary obligations, which directors of Delaware corporations owe to such corporations and the shareholder who elected them." <sup>FN59</sup> That court also held that <u>§ 3114</u> only authorizes jurisdiction in actions which are "inextricably bound up in Delaware law and where Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary." <sup>FN60</sup> Thus, Delaware does not have a significant and substantial interest in overseeing each and every claim brought against a director of a Delaware corporation.<sup>FN61</sup>

> FN58. 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).

> FN59. *Pestolite Inc., v. Cordura Corp.,* 449 A.2d 263, 265 (Del.Super.1982).

> FN60. *Id.*

> FN61. *See id.*(holding that "[i]n the absence of such substantial interest or legitimate State purpose, the mere status as director of a Delaware corporation, standing alone, is not a significant basis for the individual Defendants to reasonably anticipate being haled into this Court."). *Pestolite* at 267.

It appears then, that <u>10 *Del. C.* § 3114</u> only applies to lawsuits brought against a nonresident director of a Delaware corporation for acts performed as a director, which involve fiduciary duty violations.<sup>FN62</sup> Section 3114 "does not confer personal jurisdiction over nonresident corporate directors simply on the basis of their status as directors of Delaware corporations." <sup>FN63</sup> Further, Delaware courts have consistently held that <u>10 *Del. C.* § 3114</u> does not confer personal jurisdiction over nonresident directors for alleged violations of the Securities Act.<sup>FN64</sup> The *In Re USACafes* court held

> FN62. *Mt. Hawley Ins. Co. v. Jenny Craig, Inc.,* 668 A.2d 763, 768 (Del.Super.1995); *Steinberg v. Prudential-Bache Securities, Inc.,* Del. Ch., No. 8173, Jacobs, V.C. (Apr. 30, 1996)(Mem.Op.).

> FN63. *Van de Walle v. Rothschild Holdings, Inc.,* No. 9894, 1994 WL 469150, at *6 (Del.Ch. Sept.30, 1997).

> FN64. *See In Re USACafes,* 600 A.2d 43, 47 (Del.Ch.1991).

Because the Securities Act claims do not arise under Delaware law or otherwise substantially implicate action in or affecting this state, the relationship among those claims, Delaware, and the defendants is not strong enough to permit the exercise of jurisdiction here based solely on the directors' status as directors .<sup>FN65</sup>

> FN65. *In re USACafes* 600 A.2d at 54.

*17 Based upon the above, this Court finds that <u>§ 3114</u> does not confer this Court with personal jurisdiction over Pulido

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

Page 21

or McCall. Here, the Plaintiffs have alleged that Pulido and McCall violated Sections 11 and 12 of the Securities Act, but have not asserted directly or by inference, that Pulido and McCall breached their fiduciary duties as directors. Therefore, Pulido and McCall have solely been sued based on their status as directors in a Delaware corporation, and similar to the situation in *In re USACafes,* the relationship here between the alleged Securities Act violations, the State of Delaware, and Pulido and McCall, is not strong enough to confer personal jurisdiction over them.

### 2. 10 *Del. C.* § 3104

[21] Next, the Plaintiffs assert that jurisdiction over the Defendant Hawkins is proper pursuant to Delaware's long arm statute, 10 *Del.C.* § 3104. Hawkins was the only individual Defendant served under 10 *Del. C.* § 3104, specifically 10 *Del. C.* § 3104(c)(1), because of his business transactions, which allegedly occurred in Delaware. The Plaintiffs thus premise jurisdiction based on Hawkins' involvement in buying the Plaintiffs' companies.

10 *Del. C.* § 3104(c)(1) gives this Court personal jurisdiction over any nonresident who "transacts any business or performs any character of work or service in the State." FN66 "In order for a court to exercise jurisdiction under subsection[ ] (c)(1) ... some act must actually occur in Delaware." FN67 FN68

> FN66. 10 *Del. C.* § 3104(c)(1).
>
> FN67. *Tristrata Technology, Inc. v. Neoteric Cosmetics, Inc.* 961 F.Supp. 686, 690 (D.Del.1997)(holding that absent actual conduct in Delaware, an employee's position as president, stockholder and researcher for a corporation is insufficient to establish jurisdiction.). The parties have not however, asserted this doctrine in their motions and briefs to this Court.
>
> FN68. *See id.*

As previously indicated, Hawkins, a California resident, was Executive Vice President and Chief Financial Officer of McKesson and McKesson HBOC. The Complaint alleges that through his attorney-in-fact, Hawkins signed (1) the Re-

gistration Statement pursuant to which the Plaintiffs' McKesson HBOC shares were issued, (2) the October 17, 1998 merger agreement between McKesson and HBOC, (3) McKesson HBOC's Form 10-Q filed with the SEC on February 13, 1999, and (4) other SEC filings and related documents, including those pertaining to the McKesson and HBOC merger. Hawkins contends that he had no contacts with Delaware, and never conducted business in Delaware. While he was an officer of McKesson and McKesson HBOC when the company changed its name on January 12, 1999, he asserts that the Registration Statement's signing in California, which was filed with the SEC in Washington, does not equate to "transacting business" under 10 *Del. C.* § 3104.

After a thorough review of the facts and pertinent law, this Court finds that the Plaintiffs did not present sufficient facts to establish that this Court has personal jurisdiction of Hawkins. The signing of the Registration Statement in California on behalf of a Delaware corporation does not meet the contacts necessary to establish personal jurisdiction under 10 *Del. C.* § 3104(c)(1). Absent actual conduct in Delaware, Hawkins' positions at McKesson, or McKesson HBOC, are insufficient to establish jurisdiction.FN69 Because Hawkins did not have any contacts in Delaware, this Court will not establish personal jurisdiction on the mere fact that he was employed by a Delaware corporation.FN70 In conclusion, the Court finds that the Plaintiffs have failed to establish sufficient facts to subject Hawkins to the personal jurisdiction of this Court pursuant to 10 *Del. C.* § 3104(c)(1).FN71

> FN69. *See Tristrata Tech.*961 F.Supp. at 690.
>
> FN70. It would also seem that the fiduciary shield doctrine would prevent personal jurisdiction over Hawkins. This doctrine is judicially created, and immunizes acts performed by an individual in the individual's capacity as a corporate employee from serving as the foundation for the exercise of personal jurisdiction over that individual. Since this issue was not raised by the parties, and is mooted by this Court's decision, it will not be addressed in detail.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



FN71. Because the Court concluded that the individual Defendants were not subject to jurisdiction under 10 *Del. C.* § 3114 and 10 *Del. C.* § 3104(c)(1), the Court will not undertake the due process inquiry of whether the individual Defendants had sufficient minimum contacts with Delaware to satisfy the "traditional notions of fair play and substantial justice." *See Tristrata Tech., 961 F.Supp. at 691* (*citing International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)*).

3. Nationwide Service of Process

*18 Next, the Plaintiffs alternatively argue that personal jurisdiction was established over Pulido, McCall, and Hawkins pursuant to the nationwide service of process provision of the Securities Act, 15 U.S.C. § 77v(a), which provides:
The district courts of the United States and United States courts of any Territory, shall have jurisdiction of offenses and violations under this subchapter and under the rules and regulations promulgated by the Commission in respect thereto, and, concurrent with State and Territorial courts, except as provided in section 77p of this title with respect to covered class actions, of all suits in equity and actions at law brought to enforce any liability or duty created by this subchapter. Any such suit or action may be brought in the district wherein the defendant is found or is an inhabitant or transacts business, or in the district where the offer or sale took place, if the defendant participated therein, and process in such cases may be served in any other district of which the defendant is an inhabitant or wherever the defendant may be found... Except as provided in section 77p(c) of this title, no case arising under this subchapter and brought in any State court of competent jurisdiction shall be removed to any court of the United States. No costs shall be assessed for or against the Commission in any proceeding under this subchapter brought by or against it in the Supreme Court or such other courts.FN72

FN72. 15 U.S.C. § 77v(a).

The Plaintiffs argue that the Securities Act grants concurrent jurisdiction to state and federal courts, and permits state

courts to use nationwide service of process. The Plaintiffs also assert that the Securities Act provisions permit this Court to employ the national contacts test in determining personal jurisdiction.

The Securities Act of 1933 confers subject matter jurisdiction over federal claims to state courts and allows them to hear what has traditionally been matters considered by the federal courts. The Plaintiffs raise the issue of whether two provisions of this statute, one which confers concurrent jurisdiction, and one that provides for nationwide service of process, should be read jointly or separately. If they are read as separate, independent provisions, then the statute confers nationwide service of process only upon federal courts, but would allow the subject matter jurisdiction of the federal claim to remain in state court if the prerequisites of that state's long-arm statutes have been met.FN73

FN73. *See* David Carlebach, Note, *Nationwide Service of Process in State Courts,* 13 Cardozo L.Rev. 223 (1991).

It appears that only two courts have reviewed this issue and have conflicting views on whether the explicit grant of concurrent jurisdiction in 15 U.S.C. § 77v extends to the nationwide service provision as well. In *Lakewood Bank & Trust Company v. Superior Court,*FN74 a California court stated in dicta that the nationwide service of process was available to the state court when enforcing the Securities Act.FN75 Contrary to that holding, a New York court in *Negin v. Cico Oil & Gas Company,*FN76 held that the Securities Act nationwide service provision did not apply to state courts.

FN74. 129 Cal.App.3d 463, 180 Cal.Rptr. 914 (1982).

FN75. *Id.* at 470, 180 Cal.Rptr. 914.

FN76. 46 Misc.2d 367, 259 N.Y.S.2d 434 (1965).

*19 [22] Unfortunately neither of these decisions are particularly helpful in analyzing this issue since it was not addressed in detail in those opinions. However, the Court is fortunate that the parties have done an excellent job in addressing this issue in their briefs. Having carefully considered those arguments, the Court finds that nationwide

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



service of process is not available to a plaintiff if they choose to pursue their securities act litigation in a state proceeding. First, the Court does recognize that there was no attempt in this litigation to pursue service under this statute when the Complaint was filed with the Court. It is only when questions concerning service and personal jurisdiction under Title 10 of the Delaware Code were raised by the Defendant that the issue of nationwide service has been pursued. However, the Court does not find this circumstance to be fatal to the plaintiff if nationwide service is appropriate and the plaintiffs have complied with the applicable statutes.

Second, the Court finds that the language of the statute reflecting service is clearly written in a federal context. The words "district", not state, are used and clearly these references are to the federal judicial districts into which the federal court system is divided. If Congress had intended to preempt the requirements of service under state law, they could have easily done so in a clear and precise manner. They did not, and the Court must conclude that the drafters of the statute recognized the unique meaning of the word district and the limitations they were placing on the statute.

Third, the Securities Act statute under which nationwide service was enacted was done so in 1933 at a time the *Pennoyer v. Neff*[FN77] decision on territorial sovereignty was still law, and before the Supreme Court had decided *International Shoe Company v. Washington.*[FN78] The Court agrees with the Defendants that given the jurisprudence setting in 1933 it would have been unthinkable for Congress to have passed legislation which would have radically interfered and trounced upon the independence of state rights without explicitly doing so.

FN77. 95 U.S. 714, 24 L.Ed. 565 (1877).

FN78. 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Fourth, the Plaintiffs have been unable to cite any federal court decision nor state court decision other than *Lakewood Bank & Trust Company* that have ruled that the nationwide service provision of the Securities Act applies in a state court action. To the contrary, similar violations involving the Securities Act have been litigated in Delaware and the

Chancery Court has resolved issues of personal jurisdiction by analyzing the requirements of Title 10 of the Delaware Code. If nationwide service was applicable to a state court proceeding, such an analysis would have been unnecessary by that Court.

Finally, the Court finds that separately considering these two provisions of the Securities Act does not cause the statute to become inconsistent or irreconcilably in conflict. It would have been appropriate for Congress to increase the number of forums available to individuals to redress conduct actionable under the Securities Act by allowing those actions to be filed in a local court where inconvenience and costs could be minimized. It does not, however, logically flow that with such action, Congress intended to impose upon those courts a service process foreign to it and inapplicable and unavailable to other litigants in that Court. If that was their intent, the Court believes it would have been incumbent upon them to explicitly indicate so in the statute. Since such clear and unequivocal language requiring states to enforce nationwide service inconsistent with the service of process provisions of that state's statutory laws are not present in the statute, the Court declines to create one.

**\*20** The Plaintiffs have chosen the state court forum to litigate this matter, and as such they will be required to comply with the State of Delaware service provisions regarding personal jurisdiction. As such, the Plaintiffs cannot rely upon the nationwide service provisions of the Securities Act to obtain jurisdiction over the individual Defendants.

### 4. The Merger Agreements "Consent to Jurisdiction" Provision

[23] Lastly, the Plaintiffs assert that Pulido and McCall are bound by the Merger Agreement's terms to the same extent as McKesson, despite the fact Pulido and McCall were not parties to the Merger Agreement. The Plaintiffs rely upon the Merger Agreement's Paragraph 9.12, which provides:
*Consent to Jurisdiction.* EACH OF THE PARTIES HERETO (I) CONSENTS TO SUBMIT TO THE PERSONAL JURISDICTION OF ANY FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR ANY DELAWARE STATE COURT IN THE EVENT ANY DISPUTE ARISES OUT OF THIS AGREEMENT OR ANY

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                  Page 24
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)
**(Cite as: Not Reported in A.2d)**

OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, (II) AGREES THAT SUCH PARTY SHALL NOT ATTEMPT TO DENY OR DEFEAT SUCH PERSONAL JURISDICTION BY MOTION OR OTHER REQUEST FOR LEAVE FROM ANY SUCH COURT, AND (III) AGREES THAT SUCH PARTY SHALL NOT BRING ANY ACTION RELATING TO THIS AGREE-MENT OR ANY OF THE TRANSACTIONS CONTEM-PLATED BY THIS AGREEMENT IN ANY COURT OTHER THAN A FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR A DELAWARE STATE COURT. THE FOREGOING SHALL NOT LIMIT THE ABILITY OF ANY PARTY TO ENFORCE ANY DE-CREE OF A FEDERAL COURT LOCATED IN THE STATE OF DELAWARE OR A DELAWARE STATE COURT IN ANY OTHER COURT OF COMPETENT JURISDICTION.

Pulido, McCall, and Hawkins assert that because they were not parties to the Merger Agreement, they are not bound by its terms. Indeed, none of the individual Defendants signed this Merger Agreement, as it was signed by McKesson's Vice President, William J. Dawson. In Delaware, as in other jurisdictions, it is well settled law that "a party may consent to the personal jurisdiction of a court." [FN79] Unlike subject matter jurisdiction, "personal jurisdiction is based on indi-vidual liberty interests protected by the due process clause," and it therefore "can be waived by a party's express or im-plied consent to jurisdiction." [FN80]

>      FN79. *Resource Ventures, Inc. v. Resources Man-agement Int'l., Inc., 42 F.Supp.2d 423, 431 (D.Del.1999)*(citing *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 703, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982); Chrysler Capital Corp. V. Wodhling, 663 F.Supp. 478, 481 (D.Del.1987)*).

>      FN80. *Resource Ventures, Inc.* 42 F.Supp. at 431.

Here, the parties to the Merger Agreement consented to sub-mit to the personal jurisdiction of any Delaware State Court in the event that a dispute arose from the Merger Agree-ment. The parties to the Merger Agreement consisted of KWS & P, Inc., KWS & P/SFA, Inc., Judy Kelly, Harriette

Owens Waldron, Michael Putnick, Scott Symons, Brian Dillon, McKesson, MKW, Inc., and MSF, Inc. Notably, Pulido and McCall were not included in the above men-tioned parties, and were not signatories of the Merger Agreement. Because Pulido, McCall, and Hawkins were not parties to the Merger Agreement, and were not signatories of the Merger Agreement, there is no basis to conclude that they have consented to personal jurisdiction by the Delaware court.

**\*21** For the reasons set forth in this section of the opinion, the motions to dismiss filed by Pulido, McCall, and Hawkins are granted due to a lack of personal jurisdiction.[FN81]

>      FN81. The individual Defendant's remaining asser-tions in their Motions to Dismiss will not be ad-dressed, as a result of the Court's finding that it lacks personal jurisdiction over them.

CONCLUSION

For the reasons set forth in this opinion, the Plaintiffs' mo-tion for partial summary judgment is denied; Defendant McKesson HBOC's motion to dismiss is denied, Plaintiffs' motion to strike exhibit A of Defendant McKesson HBOC's opening brief is denied, Defendants Mark A. Pulido, Charles W. McCall, and Richard H. Hawkins motions to dismiss are granted.

Del.Super.,2002.
Kelly v. McKesson HBOC, Inc.
Not Reported in A.2d, 2002 WL 88939 (Del.Super.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.